1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  Fredie Quair,                                No. 1:20-cv-01793-KJM-SKO

12                    Plaintiff,                 ORDER

13        v.

14  County of Kings et al.,

15                    Defendants.

16

17        Fredie Quair was shot multiple times in the course of being arrested.  He alleges Sergeant

18  Taylor Lopes of the Kings County Sheriff's Department (KCSD), and special agents Neil

19  Compston, John Silveira, and Edward Sinclair of the California Department of Justice (DOJ)

20  (collectively "State defendants") violated his Fourth Amendment rights by using excessive force

21  against him and by denying him adequate medical care.  Quair also alleges the County of Kings

22  ("the County") violated his constitutional rights under *Monell v. Department of Social Services of*

23  *the City of New York*, 436 U.S. 658 (1978), for failing to properly train its police officers on the

24  use of lethal force and for having an unofficial policy of sanctioning police shootings.

25        Three motions are before the court.  Lopes and the County (collectively, "County

26  defendants") and State defendants both move for summary judgment.  Quair requests judicial

27  notice of a previous case involving Lopes and the County.  As described more fully below, the

28  /////

1

1   court **grants** Quair's request for judicial notice and **grants** in part and **denies** in part both motions

2   for summary judgment.

3   **I.       PROCEDURAL BACKGROUND**

4         On December 21, 2020, Quair filed his complaint under 42 U.S.C. § 1983 alleging Lopes,

5   Compston, Sinclair and Silveira violated his Fourth Amendment rights by using excessive force

6   and by failing to provide him with adequate medical care during the course of his arrest.  *See*

7   Compl. ¶¶ 29–47, ECF No. 1.  Quair also alleges the County violated his constitutional rights

8   under *Monell*, 436 U.S. 658, for failing to train its officers and for having an unconstitutional

9   policy of "insulating its personnel from accountability for shootings."  *See* Opp'n at 29, ECF No.

10   44; Compl. ¶¶ 48–68.[1]  Quair seeks compensatory, special and punitive damages as well as

11   attorneys' fees.  *See id.* ("Prayer for Relief").  Both County and State defendants have moved for

12   summary judgment on all claims.  *See* Cnty. Defs.' Mot., ECF No. 36; State Defs.' Mot., ECF

13   No. 38.  County defendants have also moved for summary adjudication on Quair's request for

14   punitive damages.  *See* Cnty. Defs.' Mem. P. & A. Supp. Summ. J. (Cnty. Defs.' Mem.) at 28–29,

15   ECF No. 36-1.  Both motions are fully briefed.  *See* Opp'n, ECF No. 44; Cnty. Defs.' Reply, ECF

16   No. 49; State Defs.' Reply, ECF No. 50.  Quair also requests judicial notice of a related case

17   involving a police shooting where both Lopes and the County were defendants.  *See* Req. Jud.

18   Notice, ECF No. 45.

19         On October 21, 2024, the case was reassigned to the undersigned.  *See* Order (Oct. 21,

20   2024), ECF No. 55.  On April 17, 2025, the court heard oral argument on both motions.  *See*

21   Mins. Mot. Hr'g (Apr. 17, 2025), ECF No. 64.  Cooper Alison-Mayne and Darrell York appeared

22   on behalf of Quair.  *See id.*  Jim Arendt and David Klehm appeared on behalf of all defendants.

23   *See id.*

24   /////

25

---

[1] All page citations are to the top right by the CM/ECF system except citations to deposition testimony.  County defendants initially lodged the original deposition transcripts at ECF No. 36-5.  Prior to oral argument, the court received electronic courtesy copies of all the depositions from the parties.  Depositions are cited referencing the original page numbers of the deposition transcript.

## II.    CLARIFYING RECORD: JUDICIAL NOTICE, OBJECTIONS

Under Federal Rule of Civil Procedure 56, litigants who move for or oppose summary judgment must cite "particular parts of materials in the record" to show specific facts are disputed, undisputed or cannot be proved, as the case may be. *See* Fed. R. Civ. P. 56(c)(1). This district's local rules implement that rule by requiring a separate statement proposing undisputed facts. *See* E.D. Cal. L.R. 260(a). The separate statement must "cite the particular portions" of the record that establish each proposed fact as "undisputed." *Id.* The opposing party must then respond to each proposed fact on the list and either admit or deny that the fact is undisputed. *See* E.D. Cal. L.R. 260(b). If the opposing party contends the fact is disputed, it must cite "the specific particular portions" of the record showing the fact is disputed. *Id.*

Both State and County defendants have complied with Local Rule 260(a) and Quair has filed objections, his own statement of undisputed facts, and a request for judicial notice. *See* Cnty. Defs.' Stmt. Undisp. Facts, ECF No. 37; State Defs.' Stmt. Undisp. Facts, ECF No. 38-2; Pl.'s Resp. & Add'l Stmt Undisp. Facts, ECF Nos. 44-13–14; Req. Jud. Notice. In its reply, County defendants have raised objections to Quair's statement of facts and have filed an objection to the declaration of Curt Rothschiller, an expert in police practices. Cnty. Defs.' Reply to Pl.'s Resp. & Add'l Stmt. Undisp. Facts, ECF No. 49-1; Cnty. Defs.' Rothschiller Obj., ECF No. 49-2. The court addresses Quair's request for judicial notice first.

### A.    Judicial Notice

Quair's request for judicial notice involves three documents:

- The complaint in *Berbereia v. County of Kings, Taylor Lopes et al.*, 16-0363, filed in the Eastern District of California, alleging violations of the Fourth Amendment through Excessive Force and municipal liability under *Monell*, 436 U.S. 658. *See* Related Compl., ECF No. 45–1;

- A Notice of Settlement in *Berbereia*. *See* Notice of Settlement, ECF No. 45-2; and

- An action summary from the Board of Supervisors Chambers of the County of Kings on June 26, 2018, where the Board announced a settlement of $375,000

/////

3

1        with the plaintiffs in *Berbereia* with no admission of liability.  *See* The Cnty.

2        Board Mins., ECF No. 45-3.

3   *See generally* Req. Jud. Notice.  Defendants do not oppose the request although County

4   defendants argue none of these documents shows an admission of liability.  *See* Cnty. Defs.'

5   Reply at 8.

6        A judicially noticed fact is a "fact not subject to reasonable dispute." Fed. R. Evid. 201(b).

7   A fact is not subject to reasonable dispute if it is generally known or if it can be accurately and

8   readily determined from sources whose authority cannot reasonably be questioned.  *See id*.  The

9   court must take judicial notice "if a party requests it and the court is supplied with the necessary

10  information." *Id.* 201(c)(2).  Because the authority of public record usually cannot reasonably be

11  questioned, "[j]udicial notice is appropriate for records and 'reports of administrative bodies.'"

12  *Grant v. Aurora Loan Servs.*, 736 F. Supp. 2d 1257, 1263 (N.D. Cal. 2010) (quoting *United States*

13  *v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008)).  Courts

14  also may "take notice of proceedings in other courts, both within and without the federal judicial

15  system, if those proceedings have a direct relation to the matters at issue."  *United States ex rel.*

16  *Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).  However,

17  "[w]hile a court may take judicial notice of a judicial or administrative proceeding which has a

18  'direct relation to the matters at issue,' a court can only take judicial notice of the existence of those

19  matters . . . but not the veracity of the arguments and disputed facts therein."  *United States v. S.*

20  *Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (quoting *Robinson*, 971 F.2d at 248).

21        Here, the court takes judicial notice of the complaint in *Berbereia*, the notice of settlement

22  in *Berbereia*, and the County board minutes announcing the settlement in *Berbereia*.  The board

23  minutes are relevant to Quair's opposition as the settlement is of a case based on a police shooting

24  involving Lopes.  Further there is little reason to question the authenticity of the board minutes as

25  they are a public document.  The court also takes judicial notice of the judicial records—the

26  complaint and notice of settlement in *Berbereia*—as they also are related to Quair's *Monell* claim.

27  The court does not take notice of the veracity of the contents of the complaint, but it does take

28  /////

1  notice of the complaint's existence and the fact the case settled. *See S. Cal. Edison Co.*, 300 F.

2  Supp. 2d at 974.

3      Quair's request for judicial notice is granted.

4  **B.    Objections**

5      Both the County defendants and Quair have listed numerous objections. Under Federal

6  Rule of Civil Procedure 56, litigants who move for or oppose summary judgment must cite

7  "particular parts of materials in the record" to show specific facts are disputed, undisputed or

8  cannot be proved, as the case may be. *See* Fed. R. Civ. P. 56(c)(1). This district's local rules

9  implement that rule by requiring a separate statement proposing undisputed facts. *See* E.D. Cal.

10  L.R. 260(a). The separate statement must "cite the particular portions" of the record that establish

11  each proposed fact as "undisputed." *Id.* The opposing party must then respond to each proposed

12  fact on the list and either admit or deny that the fact is undisputed. *See* E.D. Cal. L.R. 260(b). If

13  the opposing party contends the fact is disputed, it must cite "the specific particular portions" of

14  the record showing the fact is disputed. *Id.* As noted above, the County and State defendants and

15  Quair have filed separate statements of fact and both the County defendants and Quair have

16  disputed each other's statements of fact and have registered numerous evidentiary objections. *See*

17  *generally* Pl.'s Resp. & Add'l Stmt Undisp. Facts; Cnty. Defs.' Reply Pl.'s Resp. & Add'l Stmt.

18  Undisp. Facts; Cnty. Defs.' Rothschiller Obj.

19      None of the objections are well-taken. The most common objections both Quair and the

20  County defendants make are to relevance, speculation, and improper legal conclusions. Yet

21  "objections to evidence . . . that it is irrelevant, speculative, and/or argumentative, or that it

22  constitutes an improper legal conclusion are all duplicative of the summary judgment standard

23  itself." *Burch v. Regents of University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal.

24  2006). If a fact is not material, i.e., if it is irrelevant or it is a legal conclusion or it is speculative,

25  it is not germane to a Rule 56 analysis. *See, e.g.,* Pl.'s Resp. & Add'l Stmt Undisp. Facts No. 3

26  (objecting to County defendants' assertion that Lopes began participating in Operation Red

27  Reaper in 2017 as "irrelevant"). An objection is not needed. Many other objections relate to the

28  form in which Quair or County and State defendants provided the evidence. *See, e.g.*, Cnty.

1    Defs.' Reply Pl.'s Resp. Disp. Facts & Add'l Stmt. Undisp. Facts No. 159 (objecting to Quair's

2    assertion he was shot 17 times as being hearsay insofar as he was told this fact by his doctors).

3    But "to survive summary judgment, a party does not necessarily have to produce evidence in a

4    form that would be admissible at trial, so long as the party satisfies the requirements of Federal

5    Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

6    Litigants should not append long lists of formulaic objections to their summary judgment papers.

7    *See, e.g.*, *City of Lincoln v. County of Placer*, 668 F. Supp. 3d 1079, 1086 (E.D. Cal. 2023).

8    "This is especially true when many of the objections are boilerplate recitations of evidentiary

9    principles or blanket objections without analysis applied to specific items of evidence." *Doe v.*

10   *Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).

11          The parties' objections as to improper foundation also are unavailing.  While foundation

12   objections can be appropriate in connection with summary judgment motions, *see Beyenne v.*

13   *Coleman Sec. Servs., Inc.*, 854 F. 2d 1179, 1182 (9th Cir. 1988), frequent foundation objections,

14   with no supporting argument or rationale are on their face unconvincing.  For example, Quair

15   objects to County defendants' assertion Lopes had been assigned to observe Quair as part of

16   Operation Red Reaper and was aware he had possessed and trafficked in illegal firearms.  Pl.'s

17   Resp. & Add'l Stmt. Undisp. Facts No. 21.  The foundation for this fact is the arrest warrant and

18   Lopes' observations of Quair, as well as his monitoring of Quair's phone and social media

19   presence in the months leading up to his interaction with Quair on the day in question.  *See*

20   *generally* Cnty. Stmt. Undisp. Facts.  Quair may dispute this fact—he may say the allegations in

21   the warrant were untrue and the officers' investigation was flawed—but the County defendants'

22   assertion clearly has some foundation.

23          The County defendants have also filed a separate objection to Curt Rothschiller's

24   declaration in support of Quair's opposition to defendants' motions for summary judgment.  *See*

25   *generally* Cnty. Defs.' Rothschiller Obj.  The County defendants argue Rothschiller's declaration

26   is inadmissible because he fails to lay a foundation for any documents or sources upon which he

27   based his opinions.  *See id.* at 2.  Rothschiller has established he is basing his opinions on his

28   review of the aerial video of the incident as well as relevant documents related to this case.  *See*

6

1  Rothschiller Decl. ¶ 2.  As noted above, both defendants and Quair submitted the video of the

2  incident.  Rothschiller's opinions are limited to what is available on the video and in other

3  evidence of record, especially as it pertains to the training techniques the County uses for its

4  police officers.  The court will not exclude Rothschiller's declaration.

5       The court overrules both Quair's and the County defendants' objections, unless specified

6  otherwise below.

7  **II.    UNDISPUTED AND DISPUTED FACTS**

8       Unless specified below, the court construes the following facts as undisputed.  At 4:00

9  a.m. on June 18, 2019, Lopes gathered with 300 other law enforcement officers from various

10 California state agencies.[2]  Lopes Decl. ¶ 10, ECF No. 36-2.  These agents were part of

11 "Operation Red Reaper," a multi-year investigation into alleged members of the related

12 "Norteño" street gang and "Nuestra Familia" prison gang accused of committing various felonies,

13 including planning and participating in armed robberies.  Scomona Dep. at 14–15; Lopes Decl.

14 ¶¶ 3–4.  The officers came to work early that morning for a briefing before they were to serve

15 arrest warrants on many alleged members of the gang and to execute search warrants at their

16 homes.  *See id.* ¶ 10.

17      One of the suspected gang members was Quair, who was not in custody.  Members of

18 Operation Red Reaper had been following Quair for months and had surveilled Quair and his

19 home for hundreds of hours.  Scomona Dep. at 14; Lopes Decl. ¶¶ 5–9.  In March 2019, agents

20 had received court approval to wiretap Quair's phone and gain access to Quair's Facebook pages.

21 *See* Morrison Decl. Ex. F (Quair Arrest Warrant) at 4, ECF No. 39-6.  Among other discoveries,

22 the agents learned that Quair had posted photos of himself with a Glock handgun featuring an

23 extended magazine on one of his Facebook pages.  *See* Lopes Decl. ¶¶ 5, 9.  Agents also observed

24 Quair as he allegedly engaged in the sale of a gun.  *See id.*  The agents also had tapped the phone

25 of Quair's aunt's husband, Jose Quintero, another suspected Norteño gang member.  *See id.* ¶ 5.

---

[2] The court has compared the parties' respective statements of fact and the underlying record and reviewed the relevant deposition transcript and video footage.  Cnty. Defs.' Mot.; Cnty. Defs.' Stmt. Undisp. Facts; State Defs.' Mot.; Morrison Decl., ECF No. 39; State Defs.' Stmt. Undisp. Facts; Opp'n,; Pl.'s Resp. Disp. Facts & Add'l Stmt Undisp. Facts,; Cnty. Defs.' Reply Pl.'s Resp. Disp. Facts & Add'l Stmt. Undisp. Facts,.

1    Based on the details of the investigation provided in an officer's affidavit, the California Superior

2    Court for the County of Kings found probable cause to issue an arrest warrant for Quair.  *See*

3    Quair Arrest Warrant.  Specifically, the superior court found probable cause based on the

4    information provided that Quair had committed various crimes, including possession of a

5    controlled substance for sale, transportation of a controlled substance for sale, smuggling drugs

6    into a jail facility, possession of a firearm by a gang member and participation in a criminal street

7    gang.  *See id.* at 2.

8         At 4:30 a.m., the Operation Red Reaper briefing was interrupted when the Hanford Police

9    Department called Lopes and told him it was investigating the shooting of David Hernandez, who

10   had just been admitted to a hospital with a gunshot wound.  *See* Lopes Decl. ¶ 11.  Lopes had

11   been investigating Hernandez as an alleged Norteño gang member.  *See id.*  Then, Lopes received

12   another call, this time from the Corcoran Police Department, informing him it was investigating a

13   home invasion.  *See id.* ¶ 12.  Two suspects reportedly had broken into a bedroom window and a

14   shooting had occurred.  *See id.*; Morrison Decl. Ex. L (Corcoran Report), ECF No. 37-12.  There

15   was blood at the scene but none of the victims of the invasion had been injured.  Lopes Dep. at

16   51–53.  The Corcoran Police Department believed one of the suspects had been shot.  *See* Lopes

17   Decl. ¶ 12.

18        A little after 5:00 a.m., Lopes was informed by officers in the "wire room," who were

19   monitoring Quintero's tapped phone, that Quair and Quintero were on the phone discussing a

20   home invasion and someone having been shot.  *See* Lopes Dep. at 50–51.  The phone discussion

21   suggested Quintero had helped take Hernandez to the hospital in the aftermath.  *See* Lopes Decl. ¶

22   13.  Meanwhile, Quair had fled the scene of the home invasion on foot.  Morrison Decl. Ex. R

23   (Quintero Interview) at 3, ECF No. 39-18.  He had made his way to Highway 43 and was walking

24   along the highway from Corcoran to Hanford.  *See id.*  Quintero told Quair he would pick him up

25   on Highway 43, but he first had to switch cars as the one he had been driving had Hernandez's

26   blood stains in it. *See* Lopes Decl. ¶ 13.

27        At oral argument, the parties disputed whether the defendant officers had specific

28   information that Quair had shot Hernandez.  In the briefing, the parties do not dispute the

8

1    defendant officers suspected Quair had been involved in the home invasion and knew shots had

2    been fired during the invasion.  *See* Lopes Decl. ¶¶ 12–13.  Both Agent Compston and California

3    Highway Patrol (CHP) Officer John P. Scomona—a non-defendant who was at the incident but

4    did not fire his weapon—submit they believed Quair was dangerous at the time specifically

5    because of his connection to the home invasion.  *See* Scomona Dep. at 22–23; Compston Dep. at

6    12; Morrison Decl. Ex. H at 120 (Kings Cnty. Rep.), ECF No. 39-8.  But none of the officers

7    claimed they had specific knowledge Quair had fired a weapon during the home invasion.  *See*

8    Lopes Dep. at 50–54; Silveira Dep. at 15; Sinclair Dep. at 44–46; Scomona Dep. at 22–23;

9    Compston Dep. at 12.  According to Scomona, the precise information relayed to the officers that

10   morning about the home invasion was a "little bit sketchy."  Kings Cnty. Rep. at 168.

11        Officers from DOJ and CHP began searching for Quair along Highway 43.  Lopes Decl.

12   ¶ 14.  They located him sitting on the side of the highway but did not immediately arrest him.  *See*

13   *id.*  The agents then observed Quintero pick Quair up in a red Nissan Maxima; they began to

14   follow the car.  *See id.*  At around 5:30 a.m., Lopes driving alone in his marked car caught up

15   with the Nissan driving north on Highway 43, south of Jackson Avenue.  *See id.*  The CHP also

16   tracked the Nissan overhead from a fixed wing aircraft.  Morrison Decl. Ex. H at 48 (Kings Cnty.

17   Report), ECF No. 39-8.  The CHP aircraft videotaped the remainder of the incident from 5:29

18   a.m. until just before 5:53 a.m.[3]  *See id.*

19        Lopes was the only officer in the vicinity driving in a marked car—a black Dodge with

20   emergency lights, a siren and "Sheriff" written on the front and back—so he informed the DOJ

21   agents, presumably via radio, he would conduct the vehicle stop.  Lopes Decl. ¶ 14.  Lopes also

22   was wearing a tactical vest with the word "Sheriff" written on the front and back.  *See id.*  Lopes

23   activated his red and blue emergency lights.  *See id.*  In less than a minute, the Nissan slowed

24   down and turned left—westbound—across the highway onto a small dirt road and then stopped.

---

[3] The parties have lodged a copy of the video of the incident (hereafter "Video").  *See* Cnty. Defs.' Notice of Lodging, ECF No. 36-6; State Defs.' Notice of Lodging, ECF No. 40; Pl.'s Notice of Lodging, ECF No. 44-10.  The court has confirmed the copies contain the identical video.  For the purposes of this motion, the timestamps come from State defendants' submitted copy of the video.

1     *See* Video at 5:57 (5:35:25 a.m.).  Quintero and Quair have admitted they knew the police were

2     pulling them over.  *See* Quair Dep. at 60; Quintero Interview at 5.

3         Lopes followed and parked approximately 30 to 40 feet behind the Nissan, offset to the

4     left so Lopes could see the driver's side of the Nissan.  Lopes Decl. ¶ 15; Video at 6:10 (5:35:38

5     a.m.).  The DOJ agents then pulled up alongside Lopes.  Special Agent Compston, in a white

6     vehicle, pulled up and parked to the right of Lopes.  *See* Compston Dep. at 20–21; Video at 6:00–

7     10 (5:35:28–38 a.m.).  Both agents immediately opened their driver's side doors.  *See* Video at

8     6:10 (5:35:38 a.m.).  Lopes had an M4 rifle and stood behind his car door.  Lopes Decl. ¶ 16.

9     Compston, armed with a Glock, took a position between his driver's side door and the driver's

10    seat.  *See* Compston Dep. at 6–7.  About six seconds later, two more officers arrived.  Video at

11    6:16 (5:35:45 a.m.).  DOJ special agent Silveira, driving a black pickup truck, parked to the right

12    of Compston and immediately exited his vehicle and took a "position of cover" in the open crook

13    of his door.  *See* Silveira Dep. at 7–8.  Scomona parked his silver Dodge Ram to the left of Lopes.

14    *See* Scomona Dep. at 31.  A couple of seconds later, immediately before the incident underlying

15    this case unfolded, two more vehicles arrived.  Video at 6:18 (5:35:50 a.m.).  Special Agent

16    Edward Sinclair arrived in a black SUV and parked to the left of Scomona.  *See* Sinclair Dep. at

17    14.  Sinclair quickly got out of his vehicle and—as the incident was unfolding—put himself in a

18    position of cover between his driver's side door and the driver's seat, armed with an AR M-

19    Platform rifle.  *See id.* at 7–8.  Another police car, operated by DOJ special agent Chase

20    Dobbins—a non-defendant who did not fire his gun—parked immediately behind Lopes's

21    vehicle.  Video at 6:18 (5:35:50 a.m.); Kings Cnty. Rep. at 64.

22        The incident then took less than six seconds.  *See* Video at 6:26–6:32 (5:35:55–5:36:00

23    a.m.).  The following facts regarding the incident are undisputed.  Lopes yelled out a command to

24    Quintero and Quair while the two were sitting in the red Nissan Maxima.  *Compare* Lopes Decl.

25    ¶ 16 *with* Quair Dep. at 67.  Quair got out of the Maxima and at some point, his hands came up.

26    Lopes Decl. ¶ 17; Quair Dep. at 70; Silveira Dep. at 26, 38.  Neither Lopes nor any other officer

27    gave Quair any commands after he left the Nissan.  *See* Lopes Dep. at 63.  Within one second of

28    Quair's getting out of the Nissan, Lopes, followed by Compston, Sinclair and Silveira, shot in the

1    direction of Quair multiple times and Quair ended up on the ground.  *See* Video at 6:26–6:32

2    (5:35:55–5:36:00 a.m.).[4]  Lopes does not dispute he shot first.  *See* Lopes Dep. at 25.  In total, the

3    officers who fired shots unloaded at least 33 rounds at Quair.  Lopes fired "around 22 times," *see*

4    Lopes Decl. ¶ 22, Sinclair fired three times, *see* Sinclair Dep. at 7, Silveira fired three times, *see*

5    Silveira Dep. at 26, and Compston fired five times, *see* Compston Dep. at 6.  In the process of

6    shooting, Lopes moved to the back of his car and eventually around to the passenger side.  *See*

7    Lopes Decl. ¶ 20; Video at 6:26–6:32 (5:35:55–5:36:00 AM).  It is undisputed that none of the

8    police officers saw Quair wielding a gun or moving his hand towards his waistband or pocket.

9    *See* Lopes Dep. at 36; Silveira Dep. at 13; Sinclair Dep. at 23; Compston Dep. at 11; Video at

10   6:26–6:32 (5:35:55–5:36:00 a.m.).

11          The parties do dispute what happened within the first second of the incident.  Quair

12   submits he heard a command to "come out with [your] hands up" and, in an attempt to obey,

13   opened the passenger side door of the Nissan and put his hands up in the air, to signify he was

14   surrendering to the police.  *See* Quair Dep. 70.  He was then shot and fell to the ground and was

15   shot again and again while on the ground, writhing in pain.  McFarlane Dep. at 26.  According to

16   Quair, officers shot at least 19 rounds while he was on the ground, and shot at him multiple times

17   after he had assumed a "semi-fetal" position on the ground.  *See id.* at 33–34.  After being shot,

18   Quair submits he has no memory of what happened next until four days later when he woke up in

19   the hospital.  Quair Dep. at 82–83.  Quair claims he was hit a total of 17 times.  Rothschiller Decl.

20   ¶ 33, ECF No. 44-12.

21          The State and County defendants tell a different story.  Defendants assert Quair opened

22   his door aggressively—so aggressively the door "bounced back"—and then moved forward

23   toward Lopes and immediately assumed a "triangle shooting stance" with his arms extending

24   outward from his body and his hands clasped together as though he was holding a handgun.  *See*

25   Lopes Decl. ¶ 17; Silveira Dep. at 25–26; Sinclair Dep. at 16–17; Compston Dep. at 24–25.

26   Quair then jerked his hands upwards as though they were recoiling after firing a shot at the

---

[4] The court notes the limitations of the video evidence as the video was taken by aircraft a mile above ground.

officers.  Lopes Decl. ¶ 17; Silveira Dep. at 26.  Given the nature of Quair's stance and hand

motions, defendants believed Quair possessed a gun.  *See id.*  Defendants rely on the deposition

testimony of the individual defendants, and Scomona, as well as the video evidence, which the

State and County defendants believe shows Quair's actions as they describe them.  Defendants

also rely on the testimony of an eyewitness, Gabriel Andrada, who was driving along Highway 43

on his way to work when he says he saw the incident unfold.  *See* Morrison Decl. Ex. N (Andrada

Dep.), ECF No. 39-14.  Andrada avers he saw Quair step out of the car and "saw his hands go up

like he was pointing a weapon at the truck." *Id.* at 12.  Quintero, the driver of the Nissan Quair

was in, also made statements that appear to confirm at least a part of defendants' story.  Quintero

says he heard the police command Quintero and Quair to "put their hands in the air."  Quintero

Interview at 5.  Quintero also says Quair told him right before opening the door that he was

planning to flee.  *See id.*

> After Quair exited the Nissan and once Lopes started firing, Silveira, Compston and
Sinclair submit they heard gunshots and thought Quair was firing at them; they then began to
shoot in Quair's direction.  *See* Compston Dep. at 9; Sinclair Dep. at 24; Silveira Dep. at 26.
Defendants dispute that Quair was hit 17 times, although they admit he was shot multiple times.
*See* State Defs.' Stmt. Undisp. Facts No. 25 (citing Video at 6:26–6:32 (5:35:55–5:36:00 a.m.)).
Lopes states that Quair's movements were so sudden, and events unfolded so quickly, that he had
no time to deploy non-lethal alternatives for taking Quair into custody.  *See* Lopes Decl. ¶ 19.

> After the officers stopped shooting, Lopes requested medical help via radio immediately.
*See* Lopes Decl. ¶ 20.  Quair meanwhile lay on the ground near the Nissan for approximately
fifteen minutes before emergency medical services arrived and began treating him.  *See* Video at
6:32–21:32 (5:36:00–5:51:00 a.m.).

> The parties dispute whether, and if not why, police did nothing to help Quair in those
fifteen minutes.  Lopes claims Quair was "yelling things" at him while on the ground, like
"you're just going to make me famous" and "put me on Youtube," laughing hysterically all the
while.  *See* Lopes Dep. at 69; Morrison Decl. Ex. J (Hanford Police Report) at 9, ECF No. 39-10.
Lopes also believed Quair was still trying to obtain his gun because, according to Lopes, Quair

1   was "rolled over [and] really quickly move[d] his hands underneath him back and forth"—one

2   that Quair did not in fact have.  *See* Lopes Dep. at 69.  The State defendants assert an officer

3   checked on Quair and the video does appear to show one officer and then several officers

4   hovering over Quair's body roughly ten minutes after the shooting came to an end and when

5   medical personnel arrived starting at 5:51 a.m.  *See* Video at 17:32–21:32 (5:47:01–5:51:00 a.m.).

6   The State defendants assert medical services personnel initially staged at another area nearby until

7   Quair had been taken into custody.  *See* Morrison Decl. Ex. Q (KCSD Dispatch Log) at 4, ECF

8   No. 39-17.  From Quair's perspective, he posed no threat to the officers once their shots ended.

9   *See* Rothschiller Decl. ¶ 33.  The officers provided no medical treatment or lifesaving measures,

10  such as putting pressure on his bullet wounds, in the time between the calling and arrival of

11  medical personnel.  *See id.* ¶ 32.  He also asserts County and State defendants unreasonably

12  delayed medical personnel's attending to him, as police searched the car after the shooting ended

13  before taking him into custody.  *See id.* ¶ 33.  Neither party addresses what, if any, additional

14  injury Quair may have suffered as a result of lying on the ground for fifteen minutes after being

15  shot and before he was treated by medical personnel.

16        Quair asserts his shooting was a product of systematic failures by the County, which he

17  says failed to properly train its officers and who had an unofficial policy of sanctioning police

18  shootings.  He submits Lopes had been involved in four other police shootings prior to the

19  incident with Quair and the County had not disciplined or retrained Lopes after any of those

20  shootings.  *See* Lopes Dep. at 21–22.  On the day of the incident, Quair submits Lopes failed to

21  use alternative non-lethal methods of force, to wait and allow his fellow officers to take up proper

22  tactical positions, and to reassess the situation after Quair had fallen to the ground.  *See*

23  Rothschiller Decl. ¶¶ 19–20.  Further, Quair submits the County had not found a single police-

24  involved shooting to be out of policy in the five years preceding this incident—including the

25  shooting of Quair—and did not discipline or require retraining of officers, including Lopes, who

26  had participated in police shootings.  Galipo Decl. Ex. H (County's Response to Interrogatories)

27  at 9, ECF No. 44-9.  Quair concedes Lopes was trained according to State of California standards,

28  that Lopes had extensive active shooter and firearms training, and the County has an extensive

1    review process for all police shootings.  *See* Pl.'s Resp. & Add'l Stmt Undisp. Facts at 35 (not

2    disputing County defendants' Statement of Undisputed Facts Nos. 119–122); Lopes Decl. ¶¶ 23–

3    25; Thayer Decl. ¶¶ 2–5, ECF No. 36-3.  Lopes also avers he was a "department range master and

4    provided training on firearms and use of force."  Lopes Decl. ¶ 24.

5    **IV.    SUMMARY JUDGMENT ANALYSIS**

6          Summary judgment is appropriate if "there is no genuine dispute as to any material fact

7    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

8    "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

9    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

10   of the suit under the governing law."  *Id.*  The court views the record in the light most favorable

11   to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

12   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398

13   U.S. 144, 157 (1970).  Summary adjudication is evaluated under the same standard, "giving the

14   nonmoving party in each instance the benefit of all reasonable inferences."  *Am. Civil Liberties*

15   *Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

16   **A.    Excessive Force (Claim One)**

17         Quair alleges Lopes, Silveira, Sinclair, and Compston violated his Fourth Amendment

18   rights (1) when they shot at him after he stepped out of the Nissan and (2) when they continued to

19   shoot at him after he had fallen to the ground.  *See* Opp'n at 15–21.  Defendants allege their

20   actions were justified as they reasonably believed Quair to be armed and dangerous.  Cnty. Defs.'

21   Mem. at 18–23; State Defs.' Mem. at 12–18, ECF No. 38-1.  Because all the individual

22   defendants admit to shooting at Quair and none deny hitting him, *see* Lopes Decl. ¶ 22; Sinclair

23   Dep. at 7; Silveira Dep. at 26; Compston Dep. at 6, the court analyzes Quair's excessive force

24   claim against these four defendants collectively as they all individually allegedly harmed Quair in

25   the same way.  *Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002) (requiring § 1983 claims to show

26   individual participation in an alleged violation).

27         The "settled and exclusive" test for ultimately deciding whether an officer's force was

28   excessive, and thus unlawful under the Fourth Amendment, is the "objective" standard described

1   in *Graham v. Connor*, 490 U.S. 386, 396 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

2   *See, e.g.*, *County of Los Angeles v. Mendez*, 581 U.S. 420, 420 (2017); *Tolan v. Cotton*, 572 U.S.

3   650, 656 (2014) (per curiam); *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).   There are

4   three steps to the analysis.   First, the court must consider the "type and amount of force inflicted."

5   *Thompson*, 885 F.3d at 586 (quoting *Espinosa v. City & County of San Francisco*, 598 F.3d 528,

6   537 (9th Cir. 2010)).   Second, the court must assess the "government's interests."  *Id.* (quoting

7   *Espinosa*, 598 F.3d at 537).   And third, the court must decide whether the government's interests

8   justified the force used.  *See id.*  This is an objective test that assesses the officers' conduct "from

9   the perspective of a reasonable officer on the scene."  *Graham*, 490 U.S. at 396.

10        "Because [the excessive force inquiry] nearly always requires a jury to sift through

11   disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on

12   many occasions that summary judgment or judgment as a matter of law in excessive force cases

13   should be granted sparingly."  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en

14   banc); *see Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022) (same); *Green v. City & County

15   of San Francisco*, 751 F.3d 1039, 1046 (9th Cir. 2014) ("[T]he reasonableness of officer conduct

16   should be decided by a jury where the inquiry turns on disputed issues of material fact.").

17   Finally, while video footage is available here, "[t]he mere existence of video footage of the

18   incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be

19   drawn from that footage."  *Vos v. City of Newport Beach*, 892 F.3d 1024,1028 (citing *Scott v.

20   Harris*, 550 U.S. 372, 380 (2007)).

21        As the County defendants admit, the use of force in this incident was lethal, legally, even

22   though Quair survived.  *See* Cnty. Defs.' Mem at 20; *Bryan v. MacPherson*, 630 F.3d 805, 825

23   n.6 (9th Cir. 2010) ("Lethal force is force that creates a substantial risk of death or serious bodily

24   injury.").   "The use of deadly force implicates the highest level of Fourth Amendment interests

25   both because the suspect has a 'fundamental interest in his own life' and because such force

26   'frustrates the interest of the individual, and of society, in judicial determination of guilt and

27   punishment.'"  *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*,

28   /////

471 U.S. at 9).  Defendants thus have a heavy burden to show the government interest at stake justified the lethal force used.

Under the government interest analysis, the court examines three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Bryan*, 630 F.3d at 826 (quoting *Graham*, 490 U.S. at 396)).  By far the most important factor in this analysis is whether the suspect "posed an immediate threat to anyone's safety." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011)).

The court finds it cannot resolve Quair's excessive force claims short of trial as there is a dispute of material fact regarding the extent of the governmental interest.  A jury also is required, once it resolves the disputes of material facts, to balance the governmental interest against the lethal force used against Quair.  It is undisputed that Quair was wanted for serious crimes at the time of his arrest.  *See generally* Quair Arrest Warrant.  He was the subject of a warrant—based on months of surveillance—that accused Quair of felony offenses like drug dealing, illegally possessing a weapon and being a member of a criminal street gang.  *See id.*  He also was implicated in a home invasion that resulted in a shooting only hours before his apprehension.  *See* Lopes Decl. ¶¶ 12–13.  The government had an interest in his apprehension.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985) (holding government has strong interest in bringing offenders to justice especially when they are accused of felonies).  It also is undisputed that police officers had an objective reason to be on guard around Quair.  *See Mattos*, 661 F.3d at 442 ("[T]here must be objective factors to justify a [fear for safety].")  They had observed Facebook photos of Quair holding guns, there was probable cause he owned or possessed a gun and Quair allegedly had been involved in a crime where a gun was discharged only hours earlier.  *See* Lopes Decl. ¶¶ 5, 9.

But even accepting these aspects of the circumstances as undisputed, there is a dispute as to how dangerous Quair actually was at the time the police officers sought to apprehend him.  As Quair notes, taking the facts in the most favorable light to him as the court must do at this stage, Quair had been compliant after the police turned on their flashing red lights on Highway 43.

1   Opp'n at 17.  Quintero pulled over almost immediately when Lopes turned his emergency lights

2   on.  *See* Video at 5:57 (5:35:26 a.m.).  Quair testified at deposition he believed he was following

3   the police instructions when he got out of the car and put his hands up.  *See* Quair Dep. at 70.  His

4   credibility is for the jury to assess.  Quair was unarmed when he was shot.  None of the police

5   officers, further, had received specific information to suggest Quair had actually fired a weapon

6   during the alleged home invasion.  *See* Lopes Dep. at 50–54; Silveira Dep. at 15; Sinclair Dep. at

7   44–46; Scomona Dep. at 22–23; Compston Dep. at 12.  The defendants also never saw Quair

8   actually possessing a gun on the day of the incident, from the moment they observed Quair sitting

9   by the side of Highway 43 until he was shot.  *See* Lopes Dep. at 36; Silveira Dep. at 13; Sinclair

10  Dep. 23; Compston Dep. at 11; Video at 6:26–6:32 (5:35:55–5:36:00 a.m.).  Defendants also did

11  not see Quair reach toward his pocket or his waistband after he exited the Nissan—two of the

12  classic "threatening gestures" or "furtive movements" that might show the use of lethal force to

13  be reasonable even when a suspect is not actually armed.  *See Cruz v. City of Anaheim*, 765 F.3d

14  1076, 1078 (9th Cir. 2014) (noting police likely would be justified in shooting suspect if he had

15  reached for his waistband as though grabbing a gun or making a similar threatening gesture).

16      The government relies on the video and its eyewitness, Andrada, to argue Quair

17  undisputedly posed a threat to the safety of the officers by adopting a shooter's stance.  But

18  defendants' version of events—while it may ultimately prove convincing to a jury—is not

19  undisputed.  For example, defendants' eyewitness Andrada was driving along the highway, it is

20  unclear whether his view of Quair was limited by the speed at which he was traveling or restricted

21  by the presence of police vehicles, during the mere seconds in which the incident played out.  *See*

22  Andrada Dep. at 18–22; Video at 6:26–27 (5:35:55–5:35:56 a.m.).  A reasonable jury could find

23  Andrada's impressions were mistaken or unreliable, and Andrada himself has admitted his

24  "memory is not the best."  *See* Andrada Dep. at 19.  The aerial video, while it does not negate the

25  government's version of events, also does not prove that version as a matter of law.  *See Vos*, 892

26  F.3d at 1028 ("the mere existence of video footage of the incident does not foreclose a genuine

27  factual dispute as to the reasonable inferences that can be drawn from that footage.").  It is not

28  indisputable, for example, that Quair moved forward towards Lopes.  *See* Video at 6:26–27

(5:35:55–5:35:56 a.m.).  Nor is it clear from the video that Quair's passenger door violently opened in the manner defendants suggest.  *See id.*  While Quintero told police Quair planned to flee, there is no evidence suggesting Quair attempted to flee after he got out of the car, *see* Quintero Interview at 5, and the defendant's position that he assumed a shooter's stance is inconsistent with flight.  Given the complexity of the relevant factual scenario, a jury is required to evaluate the merits of the parties' conflicting versions of events.

The same is true for other key questions regarding the incident.  For example, it is best left to a jury to decide whether or not in the span of a second Quair assumed a "shooting stance" and whether, based on that stance, it was reasonable for defendants to begin firing at Quair even though they could not identify a gun on his person.  *See Longoria v. Pinal County*, 873 F.3d 699, 706–07 (9th Cir. 2017) (finding dispute of material fact over whether suspect took "shooter's stance"); *Nehad*, 929 F.3d at 1131 (finding dispute of material fact over whether officer's fatal shooting of unarmed suspect within five seconds of leaving squad car was reasonable); *see also Cruz*, 765 F.3d at 1078–1079 (finding dispute of material fact over whether suspect made "threatening gesture" that would have made his fatal shooting objectively reasonable).  Similarly, it is for a jury to assess whether the defendants were too time-pressed to consider options other than deadly force to subdue Quair.  *See Bryan*, 630 F.3d at 826 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.").  The material factual disputes are heightened by defendants' continued firing of their weapons toward Quair after he had fallen to the ground.  Even the video expert hired by the defendants noted Quair was in a "semi fetal" position when defendants fired at him multiple times.  *See* McFarlane Dep. at 33–34.  In *Tan Lam v. City of Los Banos*, the Ninth Circuit upheld a jury verdict that found an officer's second shooting of a suspect—one who, unlike Quair, had actually attacked the officer—unreasonable because the suspect no longer posed a threat to the officer and was not fully upright when shot.  *See* 976 F.3d 986*,* 999 (9th Cir. 2020).  Without prejudging the outcome, it is not inconceivable a reasonable jury could reach a conclusion similar to the verdict rendered by the jury in *Tan Lam*. /////

1    On the merits of Quair's excessive force claim, the court denies summary judgment to the

2    defendants.

3                        **1.    Qualified Immunity**

4    Still, if a reasonable officer would not have been on notice that the force used here was

5    excessive, then the defendant officers are immune to civil suit under the doctrine of qualified

6    immunity.  "Qualified immunity is a judge-made doctrine designed to 'balance[] two important

7    interests—the need to hold public officials accountable when they exercise power irresponsibly

8    and the need to shield officials from harassment, distraction, and liability when they perform their

9    duties reasonably.'" *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pearson v.

10   Callahan*, 555 U.S. 223, 231 (2009)).  The two-pronged test currently used for assessing whether

11   qualified immunity applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001).  *Pearson*,

12   555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).  Under that test, the court first "decide[d]

13   whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional

14   right." *Id.* (citing Fed. R. Civ. P. 12, 50, 56; *Saucier*, 533 U.S. at 201).  Then, "if the plaintiff [ ]

15   satisfied this first step, the court [ ] decide[d] whether the right at issue was 'clearly established'

16   at the time of defendant's alleged misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201).  "[U]nder

17   either prong, courts may not resolve genuine disputes of fact in favor of the party seeking

18   summary judgment." *Tolan*, 572 U.S. at 656 (citations omitted) (per curiam).

19   Here, the court has exercised its discretion and analyzed the first prong above as to the

20   excessive force claim, finding material disputes of fact preclude summary judgment as to each

21   defendant officer.  *See Pearson*, 555 U.S. at 236.  Turning to the second prong, the court notes

22   that the clearly established law must be defined with a "high 'degree of specificity.'" *District of

23   Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309,

24   (2015) (per curiam)); *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  This

25   standard is "demanding." *Wesby*, 138 S. Ct. at 589.  The "legal principle [at issue] must have a

26   sufficiently clear foundation in then-existing precedent." *Id.*  However, "[p]recedent involving

27   similar facts can help move a case beyond the otherwise 'hazy border between excessive and

28   acceptable force' and thereby provide an officer notice that a specific use of force is unlawful,"

1    *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 18),

2    and "a general constitutional rule already identified in the decisional law may apply with obvious

3    clarity to the specific conduct in question, even though 'the very action in question has [not]

4    previously been held unlawful,'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018)

5    (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

6         Here, the law had been clearly established at the time of the incident, that shooting at an

7    unarmed nondangerous suspect is unlawful.  In the 1985 case, *Tennessee v. Garner*, the Court

8    held "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."

9    *Garner*, 471 U.S. at 11.  Since at least 2017, the Ninth Circuit has made clear that "few things in

10   our case law are as clearly established as the principle that an officer may not 'seize an unarmed,

11   nondangerous suspect by shooting him dead."  *Longoria*, 873 F.3d at 709–10.  While defendants

12   argue Quair was in fact dangerous, even if unarmed, that is a dispute of material fact "best

13   resolved by a jury."  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).  State

14   defendants argue there is no clearly established law because there is no case where a plaintiff

15   successfully pled a Fourth Amendment violation after, among other things, "refus[ing] to follow

16   lawful instructions from peace officers, and . . . intentionally and purposefully engag[ing] in an

17   [sic] physical activity designed and intended to simulate shooting at law enforcement officers."

18   State Defs.' Reply at 11.  But here as well, the State defendants are relying on a version of the

19   facts that is reasonably disputed to make this argument; those facts ultimately need to be resolved

20   by a jury as a threshold matter.  *See Torres*, 648 F.3d at 1123.  Even so, there have been many

21   cases in the Ninth Circuit where police have encountered and shot suspects behaving in

22   questionable, erratic and arguably disobedient ways that have survived summary judgment.  *See*

23   *also Longoria*, 873 F.3d at 706–07 (finding dispute of material fact over whether police shooting

24   of someone moving erratically and perhaps taking shooter's stance was objectively reasonable);

25   *Nehad*, 929 F.3d at 1131 (finding dispute of material fact over whether fatal shooting of unarmed

1  person walking erratically who had previously made threats to hurt people was objectively

2  reasonable); *Cruz*, 765 F.3d at 1078–1079 (finding dispute of material fact as to whether fatal

3  shooting of man arguably behaving in dangerous and erratic fashion was objectively reasonable).

4         As the Ninth Circuit has just determined, it has been clearly established since before

5  2019—when this incident took place—"that an officer cannot reasonably continue shooting a

6  criminal suspect who is on the ground, appears wounded, and shows no signs of getting up unless

7  the officer first reassesses the situation . . . because the suspect may no longer pose a threat."

8  *Estate of Daniel Hernandez v. City of Los Angeles*, No. 21-55994, 2025 WL 1553910, at *9 (9th

9  Cir. June 2, 2025) (en banc) (citations and internal marks omitted).  Similarly, the Ninth Circuit in

10 *Tan Lam* previously found *Hopkins v. Andaya* clearly established an officer violated the Fourth

11 Amendment in continuing to fire a weapon after the suspect was no longer a threat.  976 F.3d at

12 998–999 (citing *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) (per curiam), *overruled on*

13 *other grounds* by *Saucier v. Katz*, 533 U.S. 194 (2001)).  In *Hopkins*, a suspect attacked a police

14 officer with a baton.  958 F.2d at 885–86.  The officer shot the assailant and then shot again when

15 the person, "wounded and . . . unarmed," approached the officer again.  *See id.* at 883–87; *see*

16 *also J.L.D. v. City of Los Angeles*, 555 F. App'x 670, 671 (9th Cir. 2014) (finding officer's first

17 shot to repel an attacker was justified but there was a dispute of material fact over whether second

18 shot, fired at the attacker when he was arguably on the ground, was justified).  Additionally, in

19 *Zion v. County of Orange,* the Circuit has held that "[w]hen police confront a suspect who poses

20 an immediate threat, they may use deadly force against him.  But they must stop using deadly

21 force when the suspect no longer poses a threat."  874 F.3d 1072, 1075 (2017).  In *Zion*, the

22 police shot nine times at a suspect who had bit one of the officers.  *See id.*  After the suspect had

23 fallen to the ground, one of the officers fired multiple volleys at the suspect and stomped him in

24 the head three times with his knee.  *See id.*  The Circuit held that if a jury were to find the suspect

25 was no longer a threat when the second volley of shots was fired, the officers would have violated

26 a clearly established constitutional right. *See id.* at 1075–76.  And as noted above, the Circuit

27 recently applied this same principle in *Estate of Hernandez*, where it found that even though a

28 police officer's first and second volley of shots fired at a suspect was objectively reasonable,

1  there was a dispute of material fact as to whether the third volley—fired at the suspect who was

2  now on the ground writhing in pain—was objectively reasonable. *Estate of Hernandez*, 2025 WL

3  1553910, at *7–8. As in *Hopkins*, in *Zion* and in *Estate of Hernandez*, a reasonable jury in this

4  case could find the first shots the officers fired at Quair were reasonable, but then find the officers

5  violated clearly established law of which they were on notice when they fired at Quair as he lay

6  on the ground.

7      The court denies defendants' motion based on their qualified immunity defense at this

8  time. Defendants may renew their qualified immunity defense at trial.

9      The court denies in full defendants' motion for summary judgment of Quair's excessive

10  force claim.

11      **B.    Inadequate Medical Care (Claim Two)**

12      The Constitution provides a right to adequate medical treatment for those the government

13  confines and detains, but the contours of that right can vary depending upon the nature of the

14  detention. *See D'Braunstein v. California Highway Patrol*, 131 F.4th 764, 768–69 (9th Cir.

15  2025). Those incarcerated in prison after being convicted of an offense can find their right to

16  adequate medical treatment in the Eighth Amendment. *See id.* at 769. Those in pretrial detention

17  can rely on the Due Process Clause under the Fourteenth Amendment. *See id.* And those like

18  Quair, who are injured as they are being arrested or detained, can rely on their right to adequate

19  medical treatment under the Fourth Amendment. *See id.* (citing *Tatum v. City & County of San*

20  *Francisco*, 441 F.3d 1090, 1098–99 (9th Cir. 2006)). Under the Fourth Amendment, courts use an

21  "objective reasonableness" analysis to determine whether officers have sought "the necessary

22  medical attention for a detainee when he or she has been injured while being apprehended by

23  either promptly summoning the necessary medical help or by taking the injured detainee to the

24  hospital." *Id.* (quoting *Tatum*, 441 F.3d at 1099).

25      Before the court can engage in an "objective reasonableness analysis," it must first

26  determine whether the record supports the conclusion an injury was caused by the alleged

27  inadequate care—an injury in addition to the injury suffered in the first instance and that required

28  the medical care in the first place. Two cases make this point clear. In *D'Braunstein v.*

1   *California Highway Patrol*, a case recently decided by the Ninth Circuit, plaintiff D'Braunstein

2   had a stroke and crashed his car into a concrete wall near a freeway onramp.  *See id.* at 765–67.

3   The officer investigating the accident believed D'Braunstein to be on drugs and therefore did not

4   take him to the hospital.  *See id.*  As a consequence, doctors arguably could not provide

5   D'Braunstein tissue plasminogen activator (TPA) treatment, "which would have mitigated the

6   stroke's effects, because this treatment must be administered within a certain number of hours

7   after the onset of stroke symptoms."  *See id.* at 767.  The delay, in other words, caused an

8   additional injury in D'Braunstein being unable to receive TPA treatment.  In *Ostling v. City of*

9   *Bainbridge Island*, the plaintiff showed there was a dispute of material fact regarding whether the

10  decedent experienced an injury caused by the failure of medical care.  *See* 872 F. Supp. 2d 1117,

11  1130–31 (W.D. Wash. 2012).  In *Ostling*, police shot a man who was suffering from a mental

12  health episode.  *See id.* at 1123.  They called an ambulance but then delayed allowing medical

13  personnel to see the man for over an hour.  *See id.*  In that time, the man died.  *See id.*  In a

14  wrongful death suit, the man's father tendered an expert who claimed the man would have

15  survived had medical personnel been able to see him within twenty-five minutes of arriving at the

16  scene.  *See id.* at 1123. The decedent thus arguably suffered an injury in addition to the gunshot

17  wound, namely, death, as a consequence of law enforcement's failure to provide care.  *See id.*

18          Here, Quair alleges officers should have provided him medical care and they should not

19  have delayed medical personnel's treatment of him.  *See* Opp'n at 25–27.  But Quair does not

20  provide any material facts to show he suffered an injury apart from his bullet wounds as a

21  consequence of these alleged failures.  In his complaint, Quair alleges generally that the delay

22  was a contributing cause to his injuries, but he provides no facts with evidentiary support to

23  support a reasonable factfinder's conclusion that the delay in fact exacerbated his injuries.  *See*

24  Compl. ¶ 42.  Absent some factual support for Quair's claimed injury caused by defendants'

25  inadequate medical care, the court cannot find a jury is required to determine whether a

26  constitutional violation occurred.  The court therefore need not reach the question whether

23

1    defendants are entitled to qualified immunity on Quair's inadequate medical care claim.

2            The court grants defendants' motion for summary judgment on this claim.

3            **C.      Monell Liability (Claims Three and Four)**

4            Section 1983 provides that "[e]very person who, under color of [law] . . . subjects, or

5    causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or

6    immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42

7    U.S.C. § 1983.  This section has been applied to include municipalities and other local

8    governments as "persons" who are subject to liability.  *Monell*, 436 U.S. at 690.  However,

9    municipalities "are responsible only for their own illegal acts."  *Connick v. Thompson*, 563 U.S.

10   51, 60 (2011) (citations omitted).  Municipalities "cannot be held liable [for the actions of their

11   employees] under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  Instead, the

12   constitutional injury must occur during the execution of an official "policy or custom."  *Id.* at 694.

13           Ultimately, to establish municipal liability under *Monell*, a plaintiff must prove: "'(1) that

14   [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the

15   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

16   constitutional right; and, (4) that the policy is the moving force behind the constitutional

17   violation.'"  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v.*

18   *Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  "Official municipal policy

19   includes the decisions of a government's lawmakers, the acts of its policymaking officials, and

20   practices so persistent and widespread as to practically have the force of law."  *Connick*, 536 U.S.

21   at 61 (citations omitted).  The Ninth Circuit recognizes four theories that establish municipal

22   liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to

23   train, supervise, or discipline; or (4) a decision or act by a final policymaker."  *Horton by Horton*

24   *v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

25           Where there are factual disputes surrounding an alleged constitutional violation, as there

26   are here, a district court may still evaluate whether there is a  basis for *Monell* liability.  *See, e.g.*,

27   *McFarland v. City of Clovis*, No. 1:15-CV-1530 AWI SMS, 2017 WL 1348934, at *16 (E.D. Cal.

28   Apr. 10, 2017).  Quair alleges *Monell* liability in connection with his excessive force claim,

1   alleging the County kept an unofficial and unlawful policy of sanctioning police shootings and for

2   failing to properly train its officers.  *See* Compl. ¶¶ 48–68; Opp'n at 28–31.  The court addresses

3   each aspect of his claim each in turn.

4                    1.      **Failure to Train (Claim Three)**

5          Municipalities are liable for failing to train their employees when that failure amounts to

6   deliberate indifference "to the rights of those who deal with municipal employees."  *Benavidez v.*

7   *County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021).  To prove a failure to train claim,

8   Quair must "include sufficient facts to support a reasonable inference (1) of a constitutional

9   violation; (2) of a municipal training policy that amounts to deliberate indifference to

10  constitutional rights; and (3) that the constitutional injury would not have resulted if the

11  municipality properly trained their employees."  *Id.* at 1153–54 (citing *Blankenhorn v. City of*

12  *Orange*, 485 F.3d 463, 484 (9th Cir. 2007)).  In general, a single instance of unlawful conduct "is

13  insufficient to state a claim for municipal liability under section 1983."  *Id.* at 1154 (citing *Fed'n*

14  *of Afr. Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1216 (9th Cir. 1996)).  However, there

15  is an exception for instances of lethal force, where "for example, a 'city has armed its officers

16  with firearms[,] . . . the need to train officers in the constitutional limitations on the use of deadly

17  force can be said to be "so obvious," that failure to do so could properly be characterized as

18  deliberate indifference to constitutional rights.'"  *Id.* (quoting *City of Canton v. Harris*, 489 U.S.

19  378, 390 n.10 (1989)).

20         On the record before it, the court finds there is a dispute of material fact over whether the

21  County improperly trained its employees on lethal force.  Quair's expert witness, Rothschiller,

22  submits Lopes made several significant mistakes during the incident here, including failing to

23  wait for other officers to establish tactical positions, failing to coordinate the stop properly, failing

24  to arrange for additional resources including less lethal options for resolution, and failing to

25  reassess the situation after initial shots were fired.  *See* Rothschiller Decl. ¶¶ 19–20.  Quair also

26  submits the County had an unofficial policy of sanctioning police shootings and had not retrained

27  or disciplined officers after any police shooting in the five years preceding the incident.  *See* The

28  County's Response to Interrogatories at 9. ("Defendant County believes that in the five year

                                                        25

1  period prior to the subject incident, on no occasion was a Kings County Deputy Sheriff's use of

2  deadly force determined to be out of policy.").  Quair says this failure to retrain officers includes

3  Lopes himself, who had been involved in other police shootings, including in *Berbereia*.  *See*

4  Lopes Dep. at 18–19; Req. Jud. Notice.  It is not out of the question that a reasonable jury could

5  find the County's failure to train officers like Lopes on the proper way to use and avoid using

6  lethal force was a result of a policy of the County and that this policy of indifference resulted in

7  the injuries Quair experienced as a result of Lopes' involvement of his shooting on June 18, 2019.

8          County defendants argue Lopes and the County's officers were properly trained.  Cnty.

9  Defs.' Mem. at 27.  Lopes did receive California-mandated training on the use of force for police

10  officers and also had SWAT team training and firearms training.  Lopes Decl. ¶¶ 23–25; Thayer

11  Decl. ¶¶ 2–5.  And Lopes served as "department range master and provided training on firearms

12  and use of force."  Lopes Decl. ¶ 24.  Quair does not dispute any of Lopes' training.  But he does

13  dispute whether Lopes was trained effectively.  If the County had an unofficial policy of

14  indifference towards police shootings, then Lopes was effectively trained not to use alternative

15  non-lethal methods when arresting a suspect, not to effectively establish a command to exhaust

16  efforts to avoid the use of lethal force, not to issue instructions to the suspect so lethal force

17  would not be necessary, and not to reassess an unfolding situation to cease lethal force as soon as

18  it became unnecessary.  *See* Opp'n at 28–31.  Although the evidence Rothschiller submits relates

19  only to one officer and mostly one incident, because the incident here involves lethal force, that

20  evidence could sustain a failure to train theory under *Monell*.  *See Benavidez*, 993 F.3d at 1154.

21          Moreover, Lopes's serving as a trainer on the use of deadly force cuts both ways: while it

22  may support a conclusion he was an expert in the subject matter, a jury might also find, especially

23  if it finds Lopes used excessive force in this matter, that Lopes was providing inadequate or even

24  unlawful training on the use of excessive force to the County's police officers.

25          The court denies the County's motion for summary judgment on Quair's failure to train

26  claim.

27  /////

1              **2.**       **Unlawful Policy (Claim Four)**

2        "A policy is [a] 'deliberate choice to follow a course of action . . . made from among

3 various alternatives by the official or officials responsible for establishing final policy with

4 respect to the subject matter in question.'" *Long v. County of Los Angeles*, 442 F.3d 1178, 1185

5 (9th Cir. 2006) (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002)). As Quair alleges

6 here, *see* Opp'n at 29, a "policy of inaction" may give rise to liability if the inaction "amounts to a

7 failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

8        The court finds there is a dispute of material fact as to whether the County maintained an

9 unlawful policy of sanctioning police shootings. Quair has adequately alleged a constitutional

10 violation. It is undisputed the County determined Quair's shooting fell within its policy and the

11 County has not sanctioned a police officer in the five years preceding this incident for being

12 involved in a police shooting. *See* County's Response to Interrogatories at 9. Quair also points to

13 the fact that Lopes had been involved in multiple other police shootings, including in *Berbereia*, a

14 case that resulted in a settlement, and had not been disciplined or retrained as a consequence. *See*

15 Lopes Dep. at 18–19; Req. Jud. Notice. On these facts, a reasonable jury could find the County

16 had an unofficial policy of sanctioning unlawful police shootings, and that policy informed how

17 Lopes conducted himself towards Quair on the day Quair was shot. County defendants argue the

18 previous cases involving Lopes would be inadmissible and the *Berbereia* settlement does not

19 admit liability, but the court cannot conclude on this record that the evidence cited in Quair's

20 opposition cannot be reduced to an admissible form at trial. *See, e.g.*, *Fraser*, 342 F.3d at 1036–

21 37 (considering inadmissible evidence at summary judgment because it "could be presented in an

22 admissible form at trial"). Nor can the court conclude as a matter of law the evidence would fall

23 short of showing the County had an informal policy of allowing, or at the very least doing nothing

24 to prevent, excessive force violations by its police during searches and seizures.

25        The court denies the County defendants' motion for summary judgment on Quair's

26 unlawful policy theory of *Monell* liability.

27 /////

1    **D.    Punitive Damages**

2        To recover punitive damages for his § 1983 claims Quair must show the individual

3    defendants' conduct was "motivated by evil motive or intent" or "involves reckless or callous

4    indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

5    In the Ninth Circuit, "[t]he standard for punitive damages under § 1983 mirrors the standard for

6    punitive damages under common law tort cases," which extends to "malicious, wanton, or

7    oppressive acts or omissions." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir.2005) (citing *Wade*,

8    461 U.S. at 49). "[E]ven in the absence of a compensable injury," punitive damages may be

9    available, and "[i]n such situations 'punitive damages may be the only significant remedy

10   available.'" *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1122 (9th Cir. 2008) (quoting

11   *Wade*, 461 U.S. at 55 n.21). "It is well-established that a jury may award punitive damages under

12   section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it

13   involved a reckless or callous indifference to the constitutional rights of others." *Dang*, 422 F.3d

14   at 807 (internal quotation marks, alterations, and citations omitted).

15       Here, a reasonable jury could decide, whether it does or not, the individual officers'

16   conduct when violating Quair's Fourth Amendment rights involved a reckless indifference to his

17   federally protected rights. A jury could find, for example, that the sheer number of shots fired,

18   particularly after Quair had fallen to the ground, suggests an indifference to Quair's life.

19       The court denies County defendants' motion for summary adjudication on Quair's request

20   for punitive damages.

21   **IV.    CONCLUSION**

22       As described above, the court:

23       • **Grants** Quair's request for judicial notice (ECF No. 45).

24       • **Overrules** Quair's and County defendants' evidentiary objections (ECF Nos. 44,

25           49).

26       • **Denies** County and State defendants' motion for summary judgment on Quair's

27           excessive force claim (Claim One).

28   /////

- **Grants** County and State defendants' motion for summary judgment on Quair's inadequate medical treatment claim (Claim Two).
- **Denies** County defendants' motion for summary judgment on Quair's *Monell* claims (Claims Three and Four).
- **Denies** County defendants' motion for summary adjudication on Quair's request for punitive damages.
- A final pretrial conference is set for **July 10, 2025, at 10:00 a.m**.  The parties shall meet and confer and file a joint status report 7 days prior to the final pretrial conference addressing matters the court should consider in setting a trial date, including whether they request referral to a magistrate judge to conduct a further court-convened settlement before the final pretrial conference.  *See*  E.D. Cal. L.R. 282; Fed R. Civ. P. 16.

This order resolves ECF Nos. 36, 38, and 45.

IT IS SO ORDERED.

DATED:  June 4, 2025.

SENIOR UNITED STATES DISTRICT JUDGE