ROB BONTA, State Bar No. 202668
Attorney General of California
NORMAN D. MORRISON, State Bar No. 212090
Supervising Deputy Attorney General
 2550 Mariposa Mall, Room 5090
 Fresno, CA  93721-2271
 Telephone:  (559) 705-2304
 Fax:  (559) 445-5106
 E-mail:  Norman.Morrison@doj.ca.gov
*Attorneys for Defendants Neil Compston,*
*John Silveira and Edward Sinclair*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **FREDDIE QUAIR,**<br><br>Plaintiff,<br><br>v.<br><br>**COUNTY OF KINGS; TAYLOR LOPES; NEIL COMPSTON; JOHN SILVERIA; EDWARD SINCLAIR; and DOES 1 THROUGH 10, inclusive,**<br><br>Defendants. | 1:20-CV-01793-KJM-SKO<br><br>**Declaration of Supervising Deputy Attorney General Norman D. Morrison IV In Support of Defendants Motion in Limine to Exclude and Prevent Testimony By Witnesses Who Invoked the Fifth Amendment Privilege During Discovery.**<br><br>**[STATE MIL NO. 1]**<br><br>Trial Date:    November 10, 2025<br>Action Filed:  December 21, 2020 |

I, NORMAN D. MORRISON IV, declare:

1.    I am a Supervising Deputy Attorney General with the Attorney General's Office, and counsel for Defendants Neil Compston, John Silveira and Edward Sinclair (Defendants) in this case. I make this declaration based upon my personal knowledge; and upon information and belief as to and upon the facts and evidence and review of the facts and evidence of this case and matters which are subject to judicial notice, and if called to testify, I could and would competently testify thereto. This declaration is made in support of Defendants' Motion in Limine to Prevent Plaintiff and other witnesses from testifying at trial regarding matters in which they

Decl. of Sup. Deputy Attorney General Norman D. Morrison IV In Support of Defendants Motion in Limine to
Exclude and Prevent Testimony By Witnesses Who Invoked the Fifth Amendment Privilege During Discovery
[STATE MIL #1] (1:20-CV-01793-KJM-SKO)

1

invoked their Fifth Amendment privilege and refused to testify or provide discovery responses, and for the trier of fact to be permitted to assume an adverse inference regarding the invocation of the Fifth Amendment privilege.

2.      Prior to the incident on June 18, 2019, forming the basis of Plaintiff's complaint, Plaintiff had been the subject of a multi-month surveillance and investigation conducted by a joint Federal, State and local task force known as "Operation Red Reaper." Plaintiff was the subject of a combination of video, audio, and electronic surveillance over a period of months performed by the Defendants. This included court-authorized wiretaps of phone numbers used by Plaintiff and his criminal associates, including Jose Quintero. The months long surveillance captured evidence of Plaintiff engaging in the trafficking of illegal firearms with other criminals, the sales of narcotics, and the discussion of various criminal activities relating to the Norteño's and Nuestra Familia.

3.      During the early morning hours of June 18, 2019, Plaintiff and two accomplices, Jose Quintero and David Hernandez, engaged in an armed home invasion robbery of a residence located in Corcoran, California. During the home invasion robbery, Plaintiff's accomplice, David Hernandez, was shot in the stomach. Plaintiff fled the scene on foot, and Hernandez was transported to the hospital by Quintero; the firearm used during the armed home invasion robbery was also in the vehicle used by Quintero.

4.      Plaintiff fled the scene on foot after the shooting, and eventually borrowed a cellular phone from a third-party to call Quintero. During this phone call, which was monitored by the Defendants as part of the court authorized wiretap, they heard Plaintiff and Quintero discussing the armed home invasion robbery, the shooting, the firearm used during the armed home invasion robbery, and Plaintiff's instructions to Quintero to come pick him up from the side of the highway. Plaintiff gave Quintero specific information about his address.

5.      Based upon the phone call, and their knowledge of the armed home invasion robbery that Plaintiff had just committed, and due to the existence of an arrest warrant issued for the Plaintiff by a court, the Defendants began surveillance of the Plaintiff using other vehicles as

2

well as a plane. Plaintiff was subsequently stopped by law enforcement officers in a field alongside the highway. In light of the facts known to them, including Plaintiff's involvement in an armed home invasion robbery where someone had just been shot, as well as Plaintiff's prior history involving firearms, the Defendants performed a "felony traffic stop."

6.      During discovery in this case, Plaintiff refused to provide responses to numerous questions relating to his actions preceding the traffic stop, including his involvement in the armed home invasion robbery, his involvement with criminal street gangs, his possession of firearms prior to the incident, and other matters that relate to the basis for the Defendants' actions during the felony stop. Plaintiff instead invoked his Fifth Amendment rights, and refused to provide any information.

7.      Attached hereto as Exhibit "A" are true and correct copies of Plaintiff's responses to Requests for Admission propounded by Defendants County of Kings and Sergeant Taylor Lopes, in which Plaintiff invoked his Fifth Amendment privilege and refused to provide responses. Attached hereto as Exhibit "B" are true and correct copies of Plaintiff's responses to Requests for Admission propounded by Defendant Neil Compston, in which Plaintiff similarly invoked his Fifth Amendment privilege and refused to provide responses.

8.      During deposition, Plaintiff advised he would not answer any questions relating to events that happened before the shooting itself, and that he would be invoking his Fifth Amendment right against self incrimination. Plaintiff subsequently invoked his Fifth Amendment rights and refused to testify as to numerous questions.

9.      Plaintiff refused to answer questions during his deposition relating to his involvement with criminal street gangs, including the Norteño's; although admitting to having a nickname he used he refused to identify it; questions relating to his possession and use of a firearm before the incident; questions relating to his involvement in the armed home invasion robbery that immediately preceded this incident; his interaction with others involved in the armed home invasion robbery; his direction and mode of travel immediately preceding the incident; his discussions with Jose Quinterio (the other occupant of the vehicle at the time of the incident);

3

whose cell phone he used prior to the incident; the identity of the voices on the phone call he had with Jose Quintero prior to the incident discussing the armed home invasion robbery and instructing Quintero to pick him up; whether he was under the influence of drugs or alcohol prior to the incident; whether he had previously engaged in the illegal sales of firearms; and what he had done with a handgun he was in the possession of prior to this incident and who he believed was in possession of it.

10.    Attached hereto as Exhibit "C" is a true and correct copy of portions of Plaintiff's deposition transcript taken in connection with this case where he invoked his Fifth Amendment right against self incrimination and refused to testify.

11.    During his deposition, Plaintiff advised he was refusing to testify regarding any events that occurred before the traffic stop on June 18, 2019. This included questions regarding his involvement in the armed home invasion robbery where someone had been shot which Plaintiff had participated in immediately before this traffic stop, and from which he had fled on foot, as well as other information relating to Plaintiff's involvement with criminal street gangs and related activities which formed the basis for Plaintiff being one of the specific individuals identified as a part of Operation Red Reaper, as well as an additional reason behind the traffic stop performed on June 18, 2019.

12.    Following the close of discovery, and after the deadline for motions, Plaintiff entered into a plea agreement with the District Attorney's Office, wherein he plead guilty to numerous different charges, including weapons violations, assault with a deadly weapon (Penal Code § 245(b)) arising out of the armed home invasion robbery, and other charges. These other charges included weapons and narcotics related charges.

13.    Plaintiff's plea agreement, and subsequent conviction, occurred after the close of discovery, and after the deadline for filing any motions in this case.

14.    At no point in time, including after Plaintiff plead out to the multiple felonies in Kings County Superior Court, has Plaintiff confirmed whether he would continue to stand by his prior invocation of his Fifth Amendment rights and refusal to testify at trial in this case, nor has

4

he offered to provide further deposition testimony regarding these issues.

15.    At the time of the incident, Defendants were aware of Plaintiff's history involving firearms, including his prior arrests and convictions for unlawfully possessing loaded handguns, his illegal trafficking in firearms (including stolen firearms), as well as his involvement in numerous other criminal activities associated with violence.

16.    Defendants were also aware that Plaintiff had been involved in an armed home invasion robbery immediately before the incident forming the basis of this lawsuit; in fact, Defendants were actively monitoring and listening, in real time, to Plaintiff discuss his involvement in this violent crime pursuant to the court approved surveillance wiretaps authorized as a part of Operation Red Reaper.

17.    Defendants were not only aware of the fact that the suspects in the armed home invasion robbery, including Plaintiff, were armed with a firearm during the commission of the crime where someone was shot, but they had listened in real time as Plaintiff engaged in his phone conversation after the incident with Quintero wherein he discussed his involvement in this violent crime, discussed the firearm that had been used in the crime and the condition of his accomplice who had been shot, as well as other facts.

18.    They additionally listened in real time as Plaintiff instructed Quintero to come pick him up, which vehicle to use, and where he was located.

19.    Following the incident, Jose Quintero was interviewed and provided a statement regarding his discussions with Plaintiff preceding the shooting forming the basis of Plaintiff's complaint, as well as the fact that the Plaintiff had been in possession of a handgun prior to the armed home invasion robbery, a handgun that was subsequently recovered pursuant to a search warrant. Quintero also provided information about the conversations and other events preceding the incident that Plaintiff invoked his Fifth Amendment rights to.

20.    As a part of this lawsuit, the parties also took the deposition of David Hernandez, who was also involved in the armed home invasion robbery during the early morning hours on June 18, 2019. At the time of the deposition, Mr. Hernandez had been sentenced to a felony and

5

was incarcerated in the California Department of Corrections and Rehabilitation. During his deposition, Mr. Hernandez also invoked his Fifth Amendment privileges against self-incrimination and refused to testify or provide responses to any questions.

21.    Defendants have prepared for trial based upon Plaintiff's refusal to testify, and his invocation of the Fifth Amendment. Such preparation includes their deposition of Plaintiff's expert, as well as the information provided to Defendants own experts to prepare their opinions for trial. Additionally, Defendants have been unable to conduct additional potentially relevant discovery that would provide additional support to their defense due to Plaintiff's refusal to provide information and testimony.

22.    Defendants bring the current motion based upon their experience in another recent cases involving Plaintiff's counsel, wherein the Plaintiff similarly invoked his Fifth Amendment right against self incrimination during discovery and refused to testify. However, in that case Plaintiff's counsel notified the Defendants on the eve of the first day of trial, and well after the close of discovery and the deadline for filing any regular motions in the case, that the Plaintiff intended to abandon his prior invocation of the Fifth Amendment and that the Plaintiff now intended to testify at trial regarding the matters he had previously refused to testify about.


I hereby declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed this 7th day of August 2025 in Fresno County, California.

_____

Norman D. Morrison IV

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# A

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118
dalekgalipo@yahoo.com

LAW OFFICE OF DARRELL J. YORK
Darrell J. York (SBN 145601)
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Telephone: (661) 362-0828
Fax:   (877) 221-3306
Email:  djylaw@gmail.com

*Attorneys for Plaintiff, Freddie Quair*

## UNITED STATES DISTICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDIE QUAIR, | **Case No.  1:20-cv-01793-NONE (SKO)** |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF KINGS REQUEST FOR ADMISSIONS,  SET NO. 1** |
| COUNTY OF KINGS; TAYLOR LOPES; NEIL COMPSTON; JOHN SILVERIA; EDWARD SINCLAIR; and DOES 1 THROUGH 10, inclusive, | |
| Defendants | |

RESPONDING PARTY:        Plaintiff, Freddie Quair

PROUNDING PARTY:        Defendant, County of Kings

SET NO.:        One

**REQUEST FOR ADMISSION NO. 1:**

Admit that as of June 18, 2019, you were a member of the Norteno street gang.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit

or deny this request based on that privilege.  California Evidence Code §940 and the

1    5th Amendment.

2    **REQUEST FOR ADMISSION NO. 2:**

3    Admit that on April 14, 2019, you had a telephone conversation with Michael

4    Gonzalez wherein you discussed having Janell Lynn Miguel smuggle marijuana in to

5    the California State Prison in Salinas, where Michael Gonzalez was incarcerated.

6    **RESPONSE:**

7    Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit

8    or deny this request based on that privilege.  California Evidence Code §940 and the

9    5th Amendment

10   **REQUEST FOR ADMISSION NO. 3:**

11   Admit that on April 17, 2019, you had a telephone conversation with Selena
     Hamilton wherein you discussed selling cocaine to Ms. Hamilton.

12   **RESPONSE:**

13   Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit

14   or deny this request based on that privilege.  California Evidence Code §940 and the

15   5th Amendment

16   **REQUEST FOR ADMISSION NO. 4:**

17   Admit that on April 29, 2019, you had a telephone conversation with Jose Quintero

18   wherein the two of you discussed the purchase and sale of cocaine.

19   **RESPONSE:**

20   Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit

21   or deny this request based on that privilege.  California Evidence Code §940 and the

22   5th Amendment

23   **REQUEST FOR ADMISSION NO. 5:**

24   Admit that on May 2, 2019, you had a telephone conversation with Jose Quintero

25   wherein you discussed obtaining cocaine from Garcia.

26   **RESPONSE:**

27   Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit

28   or deny this request based on that privilege.  California Evidence Code §940 and the

5th Amendment

**REQUEST FOR ADMISSION  NO. 6:**

Admit that on May 17, 2019, you had a telephone conversation with Jose Quintero wherein you discussed the purchase/sale of a handgun.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

**REQUEST FOR ADMISSION  NO. 7:**

Admit that on May 17, 2019, you went with Jose Quintero to sell a handgun to a Norteno street gang member.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

**REQUEST FOR ADMISSION NO. 8:**

Admit that on June 18, 2019, you participated in a home invasion robbery at 1709 Hale Avenue, in the City of Corcoran.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

**REQUEST FOR ADMISSION NO. 9:**

Admit that you were in possession of a handgun during your participation in a home invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF KINGS REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION  NO. 10:**

Admit that while committing a home invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019, the firearm you were holding discharged and struck David Hernandez.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

**REQUEST FOR ADMISSION  NO. 11:**

Admit that after the Corcoran home invasion robbery on June 18, 2019,  you were walking northbound on Highway 43 outside the City of Corcoran.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.  However, Plaintiff does admit to walking northbound on Highway 43 outside the City of Corcoran.

**REQUEST FOR ADMISSION  NO. 12:**

Admit that on June 18, 2019, Jose Quintero picked you up in a red Nissan while you were on foot in the area of Highway 43 and Nevada Avenue.

**RESPONSE**:

Admit.

**REQUEST FOR ADMISSION  NO. 13**:

Admit that after being picked up by Jose Quintero, while traveling northbound on Highway 43 you became aware at some point you were being followed by at least one law enforcement vehicle.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION  NO. 14**:

Admit that while traveling northbound on Highway 43 with Jose Quintero on June

**REQUEST FOR ADMISSION NO. 28:**

Admit that when you took the shooting stance described in Request for Admission No. 23, you were fired upon by multiple officers and were struck more than once.

**RESPONSE:**

Objection, this request assumes Plaintiff admitted to taking a shooting stance. *Diedrich v. Department of Army* (SD NY 1990) 132 FRD 614, 619.   See Response to Request No. 24.  Plaintiff does admit that he was shot more than once.

**REQUEST FOR ADMISSION NO. 29:**

Admit that you took the shooting stance described in Request for Admission No. 23, with the intent on getting one or more officers to shoot at you.

**RESPONSE:**

Objection, this request assumes Plaintiff admitted to taking a shooting stance. *Diedrich v. Department of Army* (SD NY 1990) 132 FRD 614, 619.  See Response to Request No. 24.

**REQUEST FOR ADMISSION NO. 30:**

Admit that you were under the influence of cocaine at the time of the events discussed above in Requests for Admission Nos. 7 to 28.

**RESPONSE:**

Plaintiff respectfully asserts the privilege of self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION NO. 31:**

Admit that video footage recorded from a CHP aircraft over the scene of the events described in the complaint shows you exited the passenger side of the red Nissan, with your arms raised shoulder height and your hands together in a shooting stance pointing in the general direction of the individuals stopped behind you.

**RESPONSE:**

1  timely and adequate medical care.

2

3  Dated:  September 15, 2021                          By: _____

4                                                          Darrell J. York
                                                           Attorney for Plaintiff
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF KINGS REQUEST FOR ADMISSIONS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# B

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel:    (818) 347-3333
Fax:   (818) 347-4118
dalekgalipo@yahoo.com

LAW OFFICE OF DARRELL J. YORK
Darrell J. York (SBN 145601)
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Telephone: (661) 362-0828
Fax:    (877) 221-3306
Email: djylaw@gmail.com

*Attorneys for Plaintiff, Freddie Quair*

**UNITED STATES DISTICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FREDDIE QUAIR,<br><br>                Plaintiff,<br><br>    vs.<br><br>COUNTY OF KINGS; TAYLOR LOPES; NEIL COMPSTON; JOHN SILVERIA; EDWARD SINCLAIR; and DOES 1 THROUGH 10, inclusive,<br><br><br><br>              Defendants | Case No.  1:20-cv-01793-NONE (SKO)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT COMPSTON'S REQUEST FOR ADMISSIONS,  SET NO. 1** |

RESPONDING PARTY:        Plaintiff, Freddie Quair

PROUNDING PARTY:        Defendant, Compston

SET NO.:        One

**PRELIMINARY STATEMENT**

    This responding party has not fully completed an investigation of the facts relating to this case, has not fully completed discovery in this action and has not completed trial preparation. All of the answers contained herein are based only upon such information and documents, which are presently available and

2.  Plaintiff objects to the Requests for Admission to the extent that they seek irrelevant information and information that is not reasonably calculated to lead to the discovery of admissible evidence.

3.  Plaintiff objects to the Requests for Admission to the extent that they are over-broad and unduly burdensome.

4.  Plaintiff objects to the Requests for Admission to the extent that they are vague and ambiguous and phrased so as to require Plaintiff to speculate concerning the meaning intended by Defendant.

5.  Plaintiff objects to the Requests for Admission to the extent that they call for information protected from discovery by the attorney-client privilege, the attorney work-product doctrine and/or other applicable privileges and protections. 6.

6.  Inadvertent disclosure of confidential, private or privileged information shall not constitute a waiver of any privilege or ground for objecting to disclosing such information and shall not waive Plaintiff's right to object to the use of such information.

7.  Plaintiff objects to the Requests for Admission to the extent that they seek information that infringes upon the privacy rights of third parties.

8.  Plaintiff objects to the Requests for Admission to the extent that they seek information protected by her right to privacy.

9.  Plaintiff objects to the Requests for Admission to the extent that they seek information already in Defendant's possession.

**REQUEST FOR ADMISSION NO. 1:**

Admit that as of June 18, 2019, you were a member of the Norteno street gang.

**RESPONSE:**

Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION NO. 2:**

Admit that on May 17, 2019, you had a telephone conversation with Jose Quintero

1  wherein you discussed the purchase/sale of a handgun.

2  **RESPONSE:**

3  Plaintiff respectfully asserts the privilege against self-incrimination and can neither

4  admit or deny this request based on that privilege.  California Evidence Code §940

5  and the 5th Amendment

6  **REQUEST FOR ADMISSION NO. 3:**

7  Admit that on May 17, 2019, you went with Jose Quintero to sell a handgun to a

8  Norteno street gang member.

9  **RESPONSE:**

10  Plaintiff respectfully asserts the privilege against self-incrimination and can neither

11  admit or deny this request based on that privilege.  California Evidence Code §940

    and the 5th Amendment

12  **REQUEST FOR ADMISSION NO. 4:**

13  Admit that on June 18, 2019, you participated in a home invasion robbery at 1709

14  Hale Avenue, in the City of Corcoran prior to the events identified in your complaint.

15  **RESPONSE:**

16  Plaintiff respectfully asserts the privilege against self-incrimination and can neither

17  admit or deny this request based on that privilege.  California Evidence Code §940

18  and the 5th Amendment

19  **REQUEST FOR ADMISSION NO. 5:**

20  Admit that you were in possession of a handgun during your participation in a home

21  invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019.

22  **RESPONSE:**

23  Plaintiff respectfully asserts the privilege against self-incrimination and can neither

24  admit or deny this request based on that privilege.  California Evidence Code §940

25  and the 5th Amendment

26  **REQUEST FOR ADMISSION  NO. 6:**

27  Admit that the home invasion robbery you participated in on June 18, 2019, at 1709

28  Hale Avenue, in the City of Corcoran, was done for the benefit of a criminal street

1  gang.

2  **RESPONSE:**

3  Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege

4  against self-incrimination and can neither admit or deny this request based on that

5  privilege. California Evidence Code §940 and the 5th Amendment

6  **REQUEST FOR ADMISSION  NO. 7:**

7  Admit that the home invasion robbery you participated in on June 18, 2019, at 1709

8  Hale Avenue, in the City of Corcoran, was done pursuant to orders you understood

9  were issued by the leaders of a criminal street gang.

10  **RESPONSE:**

11  Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege

12  against self-incrimination and can neither admit or deny this request based on that

   privilege. California Evidence Code §940 and the 5th Amendment

13  **REQUEST FOR ADMISSION NO. 8:**

14  Objection, assumes facts not in evidence. Admit that while committing a home

15  invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019, you

16  were holding a firearm, pointed the firearm, discharged the firearm, and struck David

17  Hernandez.

18  **RESPONSE:**

19  Plaintiff respectfully asserts the privilege against self-incrimination and can neither

20  admit or deny this request based on that privilege. California Evidence Code §940

21  and the 5th Amendment

22  **REQUEST FOR ADMISSION NO. 9:**

23  Admit that after committing a home invasion robbery at 1709 Hale Avenue, in the

24  City of Corcoran on June 18, 2019, you fled the scene on foot.

25  **RESPONSE:**

26  Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege

27  against self-incrimination and can neither admit or deny this request based on that

   privilege. California Evidence Code §940 and the 5th Amendment.

28

PLAINTIFF'S RESPONSE TO DEFENDANT COMPSTON'S REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION  NO. 10:**

Admit that after committing a home invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019, Jose Quintero transported David Hernandez to the hospital.

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment

**REQUEST FOR ADMISSION  NO. 11:**

Admit that after committing a home invasion robbery at 1709 Hale Avenue, in the City of Corcoran on June 18, 2019, you telephoned Jose Quintero and discussed David Hernandez's having been shot.

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION  NO. 12:**

Admit that during the telephone call identified in Request for Admission No. 11, you and Jose Quintero discussed concealing of the evidence associated with the home invasion you committed at 1709 Hale Avenue, in the City of Corcoran, on June 18, 2019.

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION  NO. 13:**

Admit that during the telephone call identified in Request for Admission No. 11, you and Jose Quintero discussed destroying the evidence associated with the home invasion you committed at 1709 Hale Avenue, in the City of Corcoran, on June 18,

2019.

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION  NO. 14**:

Admit that during the telephone call identified in Request for Admission No. 11, you and Jose Quintero discussed disposing of the firearm used during the home invasion you committed at 1709 Hale Avenue, in the City of Corcoran, on June 18, 2019

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION  NO. 15**:

Admit that during the telephone call identified in Request for Admission No. 11, you asked Jose Quintero to come and pick you up.

**RESPONSE**:

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION  NO. 16:**

Admit that after the Corcoran home invasion robbery on June 18, 2019, you were walking northbound on Highway 43 outside the City of Corcoran.

**RESPONSE:**

Objection, assumes facts not in evidence. Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege.  California Evidence Code §940 and the 5th Amendment.

///

///

PLAINTIFF'S RESPONSE TO DEFENDANT COMPSTON'S REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 44:**

Admit that after you were taken into custody and handcuffed, you received prompt medical attention.

**RESPONSE:**

Deny.

**REQUEST FOR ADMISSION NO. 45:**

Admit that after being shot, you were provided timely medical care.

**RESPONSE:**

Deny.

**REQUEST FOR ADMISSION NO. 46:**

Admit that you were under the influence of cocaine at the time of the events that occurred on the dirt road located to the west of Highway 43 on June 18, 2019.

**RESPONSE:**

Plaintiff respectfully asserts the privilege against self-incrimination and can neither admit or deny this request based on that privilege. California Evidence Code §940 and the 5th Amendment.

**REQUEST FOR ADMISSION NO. 47:**

Admit that the video footage recorded from a California Highway Patrol aircraft over the scene of the incident truly and accurately reflects the events alleged in your complaint.

**RESPONSE:**

Plaintiff admits that the video shows some of the events that transpired but denies that the video captured all of the events alleged in the complaint.

**REQUEST FOR ADMISSION NO. 48:**

Admit that video footage recorded from a CHP aircraft over the scene of the events described in the complaint shows you exited the passenger side of the red Nissan, with your arms raised shoulder height, and your hands together in a shooting stance pointing in the general direction of the individuals stopped behind you.

///

**REQUEST FOR ADMISSION NO. 53:**

Admit it was objectively reasonable under the totality of circumstances for the Defendants to use deadly force against you.

**RESPONSE:**

Deny.

**REQUEST FOR ADMISSION NO. 54:**

Admit that you do not have any recollection of the events beyond those identified in your responses to the interrogatories propounded by Defendants.

**RESPONSE:**

Deny.


Dated:  March 15, 2022                          By: _____

                                                Darrell J. York
                                                Attorney for Plaintiff

PLAINTIFF'S RESPONSE TO DEFENDANT COMPSTON'S REQUEST FOR ADMISSIONS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# C

Exhibit C

Transcript of the Testimony of:

## FREDIE QUAIR

QUAIR

vs.

COUNTY OF KINGS, et al.

April 5, 2022

Volume 1



IMAGINE

REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


FREDDIE QUAIR,

      Plaintiff,

   vs.

COUNTY OF KINGS; TAYLOR LOPES;
NEIL COMPSTON; JOHN SILVERIA;
EDWARD SINCLAIR; and DOES 1
THROUGH 10, inclusive,

      Defendants.
_____

CASE NO:
1:20-CV-01793-JLT-
SKO


DEPOSITION OF
FREDIE QUAIR
Appearing Remotely From
Hanford, California
Tuesday, April 5, 2022


Stenographically reported by:
Diane C. Waldron, CSR No. 7363
Job No:  66143

```
 1        REPORTED REMOTELY FROM RIVERSIDE COUNTY, CALIFORNIA

 2              Tuesday, April 5, 2022, 10:24 a.m.

 3

 4        THE REPORTER:  The attorneys participating in

 5   this deposition acknowledge that I am not physically

 6   present in the deposition room and that I will be

 7   reporting this deposition remotely.  They further

 8   acknowledge that, in lieu of an oath administered in

 9   person, I will administer the oath remotely.  The

10   parties and their counsel consent to this arrangement

11   and waive any objections to this manner of reporting.

12   Please indicate your agreement by stating your name and

13   your agreement on the record.

14        MR. ARENDT:  This is Jim Arendt, and I'm

15   representing the County of Kings and Taylor Lopes.  And

16   I agree.

17        MR. MORRISON:  Good morning.  Norman Morrison

18   representing the state defendants.  I agree.

19        MR. YORK:  Darrell York on behalf of the

20   plaintiff.  I agree.

21        MS. BAGDASSARIAN:  Eugenia Bagdassarian on

22   behalf of the plaintiff, and I agree.

23        THE REPORTER:  Okay.  If plaintiff counsel

24   would verify the identification of the witness, please?

25        MR. YORK:  It is Fredie Quair.
```

1          THE REPORTER:  Thank you.

2

3                      FREDIE QUAIR,

4      having been first duly sworn, was examined and

5                    testified as follows:

6

7                      EXAMINATION

8

9   BY MR. ARENDT:

10      Q.   Good morning, Mr. Quair, and for the record,

11   your first name is spelled F-r-e-d-i-e, correct?

12      A.   That's correct, sir.

13      Q.   One D?

14      A.   One D.

15      Q.   Okay.  My name is Jim Arendt, and I'm

16   representing Kings County and Taylor Lopes in this

17   lawsuit that's been filed by Mr. York and Mr. Galipo and

18   some others on your behalf regarding an event back in

19   June 18, 2019, and we're here today to take your

20   deposition with regards to that lawsuit.

21          And you probably had a chance to speak with

22   Mr. York about the deposition process, but let me cover

23   just a couple of the ground rules with you to make sure

24   we're on the same page.

25          And maybe to speed things up, have you ever had

1    investigation?

2          A.    No, I was not aware, sir.

3          Q.    Okay.  Were you aware that there was a search

4    warrant for your residence at the time of the incident?

5          A.    No, sir, I was not aware.

6          Q.    Okay.  With respect to the allegations

7    concerning the home invasion, are there gang

8    enhancements included in those charges?

9          A.    Yes, with the allegations, there are.

10          Q.    Okay.  At the time of the incident were you a

11    member of any criminal street gangs?

12          A.    I assert the privilege against

13    self-incrimination, and I plead the Fifth based on that

14    privilege.

15              MR. ARENDT:    You know, Darrell, this is

16    probably going to be a good time to discuss this issue

17    since that's going to kind of be the start of a number

18    of questions where, I suspect, that will be the

19    response.

20              I don't know that we need to discuss this on

21    the record.  I think we can summarize it after we have a

22    discussion.

23              With your permission and Mr. Morrison's

24    permission, I'd like to go off the record so we can

25    discuss this issue concerning the Fifth Amendment.

Fredie Quair                                                    April 5, 2022

```
 1        A.   Yes, I've heard of it.
 2        Q.   Have you communicated with any Nuestra Familia
 3   gang members in the last five years?
 4        A.   I respectfully assert the Fifth Amendment.
 5        Q.   In the last five years, have you taken any
 6   direction from any Nuestra Familia gang members to
 7   commit any crimes?
 8        A.   I respectfully assert the Fifth Amendment.
 9        Q.   Okay.  Who is Jose Quintero?
10        A.   He is my uncle by marriage.
11        Q.   His wife is your aunt?
12        A.   That is correct.
13        Q.   And what's her name?
14        A.   Maria Quintero.
15        Q.   And what's the -- is she your mother's sister
16   or your father's sister?  What's the aunt relationship?
17        A.   That's my father's sister.
18        Q.   Okay.  And just in addition to you being
19   Mr. Quintero's nephew, are you friends with him?
20        A.   Why, yes, because he's a part of the family.
21        Q.   Sure.
22             Would you describe it as a close family
23   relationship?
24        A.   Yes.
25        Q.   How long have you known him?
```

1   On a scale of one to ten, one being you're acquaintances

2   and ten being you're best friends, where on that scale

3   would you place your friendship with Mr. Hernandez?

4       A.   If I put it on a scale, approximately four to

5   five.

6       Q.   Are you aware of Mr. Hernandez being a member

7   of any criminal street gangs?

8       A.   No, I am not aware.

9       Q.   Are you aware of him being affiliated with the

10  Norteño street gang?

11      A.   No, I am not aware.

12      Q.   Are you aware of whether he's been determined

13  to be a validated street gang member to any law

14  enforcement agencies?

15      A.   To my knowledge, I'm not aware.

16      Q.   Are you aware of whether he has any affiliation

17  with the Nuestra Familia prison gang?

18      A.   No, I'm not aware to my knowledge.

19      Q.   Were you in contact with Mr. Hernandez during

20  the evening hours of June 17, 2019, up to midnight?

21      A.   To my knowledge, I believe so.  I believe.

22  It's been so long I don't remember.

23      Q.   Do you recall any circumstances of any contact

24  with Mr. Hernandez on June 17th?

25      A.   What do you mean?

Fredie Quair                                                                April 5, 2022

1      Q.   You believe you had contact with him, and I
2   agree it is almost three years ago now.
3          Do you recall the circumstances of any contact
4   you might have had with Mr. Hernandez on June 17th
5   before midnight?
6      A.   No, not that I remember.  Like I said, it's
7   been three years.  It's been a while.
8      Q.   Have you had -- or did you have contact with
9   him on June 18th, 2019, at any time after midnight?
10     A.   I respectfully assert the Fifth Amendment.
11     Q.   So I want to go into the activities, your
12   activities after midnight on June 18, 2019.  And part of
13   our discussion was, it's my understanding that you are
14   going to answer questions after a point when you and --
15   when Mr. Quintero picked you up on Highway 43.
16          I want to ask you what your activities were
17   between midnight on June 18, 2019, and the time of
18   Mr. Quintero picking you up on June 18, 2019?
19     A.   I respectfully assert the Fifth Amendment.
20     Q.   About what time was it when Mr. Quintero picked
21   you up?
22     A.   I would say approximately between 2:00 and
23   3:00, maybe 4:00.  I'm not sure.
24     Q.   Now I want to nail it down, though.  You are
25   invoking your Fifth Amendment rights as to any questions

Fredie Quair                                                    April 5, 2022

```
 1        A.   We were at my grandmother's which was my aunt's
 2   mom, mom's house.
 3        Q.   And is that where you were living at the time?
 4        A.   No.  I would --
 5        Q.   Okay.
 6        A.   I would be there, but I was not living there.
 7        Q.   Okay.  I had in my notes you were living with
 8   your grandmother, Helen Castillo.  Is this a different
 9   grandmother?
10        A.   Yes.
11        Q.   Who is this grandmother?
12        A.   This is my dad's mom.
13        Q.   What's her name?
14        A.   Kathy Hawkis, but she passed away prior.
15        Q.   Anybody else there during this contact with
16   Mr. Quintero and your aunt and your child and wife -- or
17   not your -- significant other?
18        A.   No.  As I said, it's been so long I can't
19   recall.
20        Q.   And generally what were you doing?
21        A.   Just spending time with the family.
22        Q.   Same time frame, 6:00 p.m. June 17th to the
23   time Mr. Quintero picked you up June 18th, did you have
24   any contact with David Hernandez?
25        A.   I respectfully assert the Fifth Amendment.
```

1      Q.    Does David Hernandez own a black Impala?

2      A.    I'm not sure what kind of car it is.

3      Q.    And I'm talking about around that time period.

4   You're not sure?

5      A.    No, I'm not sure.

6      Q.    Do you know anyone who owns a black Impala

7   around that time period?

8      A.    No.

9      Q.    So where were you when Mr. Quintero picked you

10  up?

11     A.    I believe it was Highway 43.

12     Q.    And what would be the nearest cross street?

13     A.    I'm not sure.

14     Q.    Okay.  Does Jackson sound familiar?

15     A.    I know the street Jackson, but I'm not sure if

16  that's the cross street.  I don't know.

17     Q.    All right.  What was nearby you when he picked

18  you up?  And by that I mean, were there homes nearby,

19  business or were you just -- is it out country, ag area?

20  What's the general setting?

21     A.    I would have to say it was like country, ag

22  area.

23     Q.    Were there any buildings, any structures,

24  around you?

25     A.    Not that I could see.

1  Q.  What were you doing there?

2  A.  I was walking.

3  Q.  Where were you walking from?

4  A.  I respectfully assert the Fifth Amendment.

5  Q.  Where were you walking to?

6  A.  Hanford.

7  Q.  Why were you walking?

8  A.  I didn't -- I didn't have a ride.

9  Q.  Was anybody with you?

10  A.  No.

11  Q.  Now you made a cell phone call to Mr. Quintero,

12  correct?

13  A.  I respectfully assert the Fifth Amendment.

14  Q.  Okay.  How did it come about that Mr. Quintero

15  knew where you were to pick you up to your knowledge?

16  A.  I respectfully assert the Fifth Amendment.

17       MR. ARENDT:  I want to -- David, I want to play

18  the audio clip of a recorded phone call, and, Diane, I

19  don't think you need to -- this is up to Mr. York and

20  Mr. Morrison, also -- I don't think you need to try to

21  transcribe this audio clip.

22       And we will attach the audio clip as Exhibit 2

23  to the deposition, and we'll either, I guess, we'll send

24  it electronically, maybe a flash drive, something like

25  that.  I believe everyone has got this anyway.

```
 1              David, go ahead and play that audio clip.
 2    David?
 3              MR. GONZALEZ:  I'm just setting it up.
 4              MR. ARENDT:  Okay.  Thank you.
 5              MR. GONZALEZ:  Okay.  It's ready.  Should I go
 6    ahead and play?
 7              MR. ARENDT:  Yes, play it please.  Thank you.
 8              (Exhibit 2, remotely introduced and
 9              provided electronically to the reporter)
10              MR. ARENDT:  Nothing is coming across.  Okay.
11    Let's put that on hold for now, and we'll see if we can
12    get that worked out.  Let's move on from that.  We'll go
13    back to it.
14    BY MR. ARENDT:
15       Q.   Okay.  I think you answered at the beginning of
16    the deposition that you had heard the audio recording of
17    a phone call between you and Mr. Quair -- I mean
18    Mr. Quintero.
19       A.   I have heard.  I've heard different ones.  I'm
20    not sure if that's the one you're going to play.
21       Q.   Okay.  Fair enough.  We'll get to it when we
22    can.
23              But while you were waiting for Mr. Quintero to
24    pick you up, were you -- did you think that law
25    enforcement was looking for you at that time?
```

Fredie Quair                                                            April 5, 2022

```
 1        A.    No.
 2        Q.    Did you have any thoughts at all that law
 3   enforcement may be looking for you?
 4        A.    No.
 5        Q.    I apologize if I asked you this already, but I
 6   asked you if you were -- if you talked to Mr. Quintero
 7   on a cell phone --
 8        A.    I respectfully asserted the Fifth Amendment.
 9        Q.    -- before he picked you up?
10              Assuming you did speak to Mr. Quintero on his
11   cell phone, whose cell phone was that?
12        A.    I respectfully assert the Fifth Amendment.
13        Q.    If I ask you to describe any phone
14   conversation -- well, let me just ask it.
15              Will you describe any phone conversations you
16   had with Mr. Quintero before he picked you up within a
17   half hour or so of him picking you up?
18        A.    I would -- I would assert the Fifth Amendment
19   respectfully.
20        Q.    So now let's go to the point where Mr. Quintero
21   picks you up.
22              You were on Highway 43, and you do not recall
23   the cross street; is that correct?
24        A.    Yeah, I do not recall the cross street.
25        Q.    And it was generally an Ag area?
```

Fredie Quair                                                    April 5, 2022

```
 1        A.   Yes, that is correct.
 2        Q.   Had you made any cell phone calls to anybody
 3   else besides Mr. Quintero, let's say, within an hour
 4   prior to him picking you up?
 5        A.   I respectfully assert the Fifth Amendment.
 6        Q.   Which side of 43 were you on, the west side of
 7   43 or the east side of 43?
 8        A.   I cannot recall.  I don't know.
 9        Q.   And were you walking towards Hanford?
10        A.   I was walking towards Hanford; that is correct.
11        Q.   Okay.  So Mr. Quintero stops.  He picks you up.
12   Did you have any conversation, any discussion, with
13   Mr. Quintero?
14             MR. YORK:  Object to vague as to time.
15   Assuming when he's in the car.
16             MR. ARENDT:  Yes, correct.
17             MR. YORK:  Okay.
18             THE WITNESS:  While in the car, I do not
19   remember.
20   BY MR. ARENDT:
21        Q.   Do you recall did you have any discussion with
22   Mr. Quintero -- and I'm going all the way up to the
23   point in time where you are shot -- did you and
24   Mr. Quintero discuss anything, anything said back and
25   forth between you and Mr. Quintero in that time frame?
```

Fredie Quair                                                                    April 5, 2022

1    A.    Yes.

2    Q.    Who?

3    A.    My family.  My family would.

4    Q.    And what kind of support?

5    A.    Housing.  If I needed any gas money, anything

6    like that, they would -- they would help out.

7    Q.    Food?

8    A.    Correct.

9    Q.    Clothing?

10   A.    Correct.

11   Q.    Miscellaneous expenses?

12   A.    Yes.

13   Q.    Did you have any bills during that year period?

14   A.    Not many.

15   Q.    What did you have?

16   A.    Phone bill, insurance, and that's all I can

17   think of as of right now.

18   Q.    Again, averages, what average per month for the

19   year prior to this incident, what would you estimate the

20   value of the support you received from family members?

21   A.    It varies.  Whatever is needed.

22   Q.    Well, what would an average be, if you can

23   estimate?

24   A.    Maybe 3-, 300 a month, 400 a month.

25   Q.    Did you own any firearms in the year prior to

Fredie Quair                                                    April 5, 2022

1    June 18, 2019?

2        A.    No, I did not own any firearms.

3        Q.    Did you possess any firearms in the year prior

4    to June 18, 2019?

5        A.    I respectfully assert the Fifth Amendment.

6        Q.    As of June 18, 2019, were there any legal

7    reasons that made it unlawful for you to possess

8    firearms?

9        A.    Yes, there was.

10       Q.    And what was that?

11       A.    I was on informal probation.

12       Q.    With Kings County?

13       A.    That is correct, yes.

14       Q.    And how long had you been on informal

15   probation?

16       A.    I would have to approximately say three to

17   four years.

18       Q.    And one of the terms of that probation was you

19   were not to possess any firearms?

20       A.    That is correct.

21       Q.    Okay.  What were the underlying charges why you

22   were on probation?

23       A.    What do you mean by "underlying charges"?

24       Q.    Yeah.  What are charges -- I don't know if you

25   were convicted, you pled, whatever there was, what were

1  the charges that you were on probation for?

2      A.    The charges I was on probation for was

3  possession of a firearm as well as delinquence (sic) to

4  a minor.

5      Q.    That was all in Kings County?

6      A.    That is correct.

7      Q.    And who was the investigating law enforcement

8  agency on those charges?

9      A.    I am not sure.

10     Q.    Where were you living at -- where did the

11 events happen that led to those charges?

12     A.    What do you mean?

13     Q.    That you were charged with unlawful possession

14 of a firearm and, I believe, contributing to the

15 delinquency of a minor?

16     A.    That is correct.  I believe so.

17     Q.    Where did those events take place that you were

18 charged with?

19     A.    You mean --

20     Q.    In Lemoore?

21     A.    Can you repeat that?  I didn't catch the end.

22     Q.    Sure.  Sure.

23           Those are based on some events that happened

24 that led to those criminal charges.  Where were those

25 events?  What area of Kings County were those events?

```
 1              MR. ARENDT:  All right.

 2              MR. YORK:  Let's take a 15-minute break.

 3              MR. ARENDT:  Okay.  Sounds good.

 4          (A short recess was taken)

 5   BY MR. ARENDT:

 6       Q.   Mr. Quair, you understand you are still under

 7   oath?

 8       A.   Yes, I understand that, sir.

 9       Q.   And I think, hopefully, we've got a work around

10   on the audio that David was going to play a little while

11   ago, and, David, can you go ahead and play that audio

12   now?

13              MR. GONZALEZ:  Yes, let me see if this works.

14   Are you able to hear me?

15              MR. ARENDT:  I can hear you.  I don't hear any

16   audio yet.

17              MR. GONZALEZ:  Okay.

18          (At this time audio plays)

19              MR. ARENDT:  It's not clear as a bell, but I

20   think we can hear it.  It's only a minute or two.

21              So is anybody -- maybe you can turn the volume

22   up a little bit if you can.

23              MR. GONZALEZ:  All right.  Let me know if this

24   is good enough.

25          (At this time audio plays)
```

Fredie Quair                                                     April 5, 2022

```
 1   BY MR. ARENDT:
 2       Q.   Okay.  Mr. Quair, do you recognize either of
 3   those two voices?
 4       A.   I believe so, yes.
 5       Q.   And who are the two voices?
 6       A.   At this time I wish to assert the Fifth
 7   Amendment.
 8       Q.   Okay.  That's one of the issues we'll put on
 9   the Fifth Amendment list.  But let me be clear -- it
10   almost threw me off the way you answered that.
11           You recognized the voices, and you're invoking
12   your Fifth Amendment rights as to identifying who those
13   two voices belong to, correct?
14       A.   That's correct.
15       Q.   Okay.
16           MR. YORK:  Just add it to the list.  It's
17   getting long.
18           MR. ARENDT:  I think we're at a point where
19   we're through them, but we'll see.
20           MR. YORK:  Okay.
21   BY MR. ARENDT:
22       Q.   We're at the point where you and Mr. Quintero
23   were driving towards Hanford, and at some point did you
24   become aware of the fact that a law enforcement vehicle
25   was following you?
```

1    Q.    Were you under the influence of drugs, any

2  drugs, at the time?

3    A.    I assert the Fifth Amendment.

4    Q.    Had you ingested any drugs between midnight and

5  the time of the shooting?

6    A.    I assert the Fifth Amendment.

7    Q.    Were you under the influence of alcohol at the

8  time?

9    A.    I assert the Fifth Amendment.

10    Q.    Had you ingested any alcohol between midnight

11  and the time of the incident?

12    A.    I assert the Fifth Amendment as well.

13    Q.    After you stepped out of the car, did you ever

14  bring your hands together where they were in contact

15  with each other?

16    A.    No, sir.

17    Q.    Did you ever move them close to each other

18  toward the center line of your body?

19    A.    No, sir.

20    Q.    Did you ever extend your hands out forward so

21  that your hands and arms were reached out as far as they

22  could reach out?

23    A.    Not that I can recall, no, sir.

24    Q.    Did you ever extend your hands out in the

25  center line of your body with your hands close together

1    A.   I don't remember anything after being shot on

2  the ground.

3    Q.   Now sometimes during depositions when we work

4  our way through things, it starts bringing up memories

5  of these events, and sometimes you -- different things

6  come to mind that maybe I asked you about earlier that

7  popped in your head.  And I'll try to break this down

8  for you in chunks to make it a little more manageable.

9         But is there anything -- and I want to be

10  clear.  Any of your activities before Mr. Quintero

11  picked you up, you're refusing to testify by invoking

12  your Fifth Amendment rights, correct?

13    A.   Can you break that down a little bit more?  I'm

14  sorry.

15    Q.   Sure.

16         I just want to make this crystal clear.  The

17  point where Mr. Quintero picks you up -- anything of the

18  events of June 17 and June 18 up to the point

19  Mr. Quintero picked you up, you're invoking your Fifth

20  Amendment rights to testify as to any of those events

21  other than the family time you spent?

22    A.   Yes, I'm invoking the Fifth Amendment to

23  anything prior.

24    Q.   So is there anything else you remember now as

25  we have gone through this that you did not tell me about

Fredie Quair                                                    April 5, 2022

1      A.    No, I can't remember.

2      Q.    Okay.  The red Altima that Mr. Quintero was

3   driving when he picked you up, do you know who owns that

4   vehicle?

5      A.    I believed it was Jose, but now that you

6   mention the name, it might have been his father.

7      Q.    Who is Jose's father?

8      A.    I don't know if they call him Alex.  Or that

9   might be his grandfather.  I'm not sure.  I'm not 100

10  percent sure.

11     Q.    Now you think that Alexander Mark Perez might

12  be his father or grandfather?

13     A.    With new information and the name, I think it

14  may be.  I'm not 100 percent sure.

15     Q.    And who is Jesse Juarez?  Do you know that

16  name?

17     A.    Jesse Juarez?

18     Q.    Yes.

19     A.    I think I've seen it before.

20     Q.    Where do you think you've seen that name

21  before?

22     A.    I believe it's in my discovery.

23     Q.    Okay.  Do you remember what the context is in

24  your discovery?

25     A.    I would like to assert the Fifth Amendment.

Fredie Quair                                                      April 5, 2022

1       Q.    Okay.   Do you know if Mr. Juarez is a member of
2   a criminal street gang?
3       A.    I would like to assert the Fifth Amendment.
4       Q.    Have you ever engaged in any transactions
5   involving the sale of controlled substances with
6   Mr. Juarez?
7       A.    I would like to respectfully assert the Fifth
8   Amendment.
9       Q.    Have you ever engaged in the transaction of
10  firearms with Mr. Juarez?
11      A.    I would like to respectfully assert the Fifth
12  Amendment.
13      Q.    Who is Eric Sanchez?
14      A.    I believe he was an inmate here.
15      Q.    He's also, I believe, was known as Eric
16  Nichols?
17      A.    I am not aware of that.
18      Q.    So you think he was an inmate there.   That's
19  the only time that you've ever met him?
20      A.    No.   I went to school with him as well.
21      Q.    Do you -- do you know if he's a member of a
22  criminal street gang?
23      A.    No, I do not.
24      Q.    Did you sell Mr. Schultz or Mr. Sanchez some
25  firearms in 2018?

1      A.    I would like to respectfully assert the Fifth

2  Amendment.

3      Q.    What occurred during that transaction?

4          MR. YORK:    Objection.    Assumes facts not in

5  evidence.

6          You can answer it.

7          THE WITNESS:    I would like to assert the Fifth

8  Amendment.

9  BY MR. MORRISON:

10     Q.    Okay.  When did you -- you testified earlier

11  that you were on informal probation from Kings County.

12          When did that probation end?

13     A.    I don't believe it ever ended.

14     Q.    So are you still on that probation or was it

15  ever revoked?

16     A.    I'm not sure.  I don't know how it works.

17     Q.    Do you still meet with a probation officer?

18     A.    I have -- I've never had a probation officer.

19     Q.    Do you still file any reports with the

20  probation department?

21     A.    I've never had to.

22     Q.    Okay.  I believe you testified that on the

23  evening before the incident you were with family

24  members; is that correct?

25     A.    That is correct.

Fredie Quair                                                            April 5, 2022

1       Q.   Were you in possession of a Beretta handgun

2   during that gathering?

3       A.   I would like to assert the Fifth Amendment.

4       Q.   What did you do with that Beretta handgun?

5            MR. YORK:  Objection.  Assumes facts not in

6   evidence.

7            You can answer.

8            THE WITNESS:  I would like to respectfully

9   assert the Fifth Amendment.

10  BY MR. MORRISON:

11      Q.   Who do you believe is currently in possession

12  of that Beretta handgun?

13      A.   I am not sure.  I --

14      Q.   When did you dispose of that Beretta handgun?

15           MR. YORK:  Objection.  Assumes facts not in

16  evidence.

17           THE WITNESS:  I respectfully assert the Fifth

18  Amendment.

19  BY MR. MORRISON:

20      Q.   Did you provide the Beretta handgun to

21  Mr. Quintero?

22           MR. YORK:  Objection.  Assumes facts not in

23  evidence.

24           THE WITNESS:  I respectfully assert the Fifth

25  Amendment.

Fredie Quair                                                     April 5, 2022

```
1  BY MR. MORRISON:
2       Q.   Do you have a nickname that people use for you?
3       A.   Yes.
4       Q.   What is your nickname?
5       A.   I assert the Fifth Amendment.
6       Q.   Do you have a Facebook page?
7       A.   Yes.
8       Q.   What is your name on the Facebook page?
9       A.   I have two Facebooks.
10      Q.   Okay.
11      A.   One is Fredie Quair, and the other one is Yo
12  Boy Monsta.
13      Q.   So is "Monsta" your nickname?
14      A.   I would like to assert the Fifth Amendment.
15      Q.   Just to be clear, do you feel that you are
16  going to be -- you are at a risk of criminal prosecution
17  over your nickname; is that correct?
18           MR. YORK:  Say that again?  I'm sorry.  I
19  didn't hear you, Norman.
20           MR. MORRISON:  I just want to be clear that he
21  feels he's at risk of criminal prosecution over his
22  nickname that he uses.
23           THE WITNESS:  Yes.
24  BY MR. MORRISON:
25      Q.   Okay.  When you got out of the vehicle, you
```

1  said you put your hands in front of you like that

2  (indicating), you testified; is that correct?  Were they

3  directly in front of you, palms fairly close together,

4  palms outward towards the vehicle; is that correct?

5      A.   I've described by my attorney they were in

6  front of me, my chest.  He gave the estimates of where

7  they were.

8      Q.   Why didn't you raise your hands above your

9  head?

10     A.   Those were the direct -- why -- can you repeat

11 that question?

12     Q.   Sure.

13          Why didn't you raise your hands above your

14 head?

15     A.   Those were not the directions given.

16     Q.   Have you ever been stopped by law enforcement

17 before?

18     A.   Yes.

19     Q.   Okay.  Has law enforcement ever ordered you out

20 of the vehicle before?

21     A.   No, sir.

22     Q.   Okay.  Whose phone did you use to call

23 Mr. Quintero to come pick you up?

24     A.   I would like to assert the Fifth Amendment.

25     Q.   Okay.  And just to be clear, if I ask you

Fredie Quair                                                April 5, 2022

```
1        Q.    Do you have a general recollection?

2        A.    No, I do not.

3        Q.    Do you recall reading any statements made by

4   Mr. Quintero concerning the shooting incident?  The

5   shooting out on Highway 43 not at the home invasion.

6        A.    I do not recall.  I do not remember.

7        Q.    Do you know who shot David Hernandez?

8        A.    I plead the Fifth.

9              MR. ARENDT:  I don't think I have any other

10  questions, so.

11             MR. MORRISON:  The only other thing I would

12  ask, Jim and Darrell, on this, the plaintiff testified

13  that he's on various medications.  What I'd like to do

14  is to just have the court reporter insert a few blank

15  lines in the deposition transcript and have the

16  plaintiff, if he doesn't know what medications he's

17  taking now, have him fill those out when he reviews his

18  transcript.

19             MR. YORK:  Okay.  He'll probably have to ask

20  the staff who is administering it, because I don't think

21  they give them prescription bottles.

22             MR. MORRISON:  Yes, I'm anticipating he'll

23  probably have to meet with the nurse.  He can tell them

24  it's in response to the depo, and that's why I'm

25  including the lines.  He can even show them the booklet
```

Fredie Quair                                                    April 5, 2022

```
 1   and say, "See, this is where I've got to put it."
 2           MR. YORK:  Got it.
 3           MR. MORRISON:  I imagine they just -- they
 4   probably give you your meds in like a Dixie cup?
 5           THE WITNESS:  They bring them in an envelope.
 6           MR. MORRISON:  Okay.  Used to be little Dixie
 7   cups.  So now I guess they've moved up to envelopes.
 8           But, yeah, they can tell -- that way you can
 9   find out what the name is, and you'll be getting a
10   booklet to review.  And just, there will be some lines
11   at the end and fill in your medications and the dosage
12   and how often you take it.
13           THE WITNESS:  Sounds good.  Thank you.
14           (Information requested:_____
15   _____
16   _____)
17           MR. ARENDT:  Okay.  I think we're done.
18           MR. YORK:  Real quick.  I guess, logistically,
19   I'm probably going to have to get a hard copy over to
20   him because he has no access.
21           MR. ARENDT:  Right.
22           MR. YORK:  So, yeah, just have her send me the
23   depo to my office.
24           Actually, Madam Court Reporter, when do you
25   think the transcript will be done?
```

```
 1          THE REPORTER:  Usually it's about a two-week
 2    turnaround.
 3          MR. YORK:  Okay.  We can go off the record for
 4    this.
 5          (Off the record discussion)
 6          MR. MORRISON:  I'll take a copy.
 7          MR. ARENDT:  Same.
 8          (Deposition concluded at 1:50 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```