1  James J. Arendt, Esq.  Bar No. 142937
   Matthew P. Bunting, Esq.  Bar No. 306034
2
          WEAKLEY & ARENDT
3          A Professional Corporation
          5200 N. Palm Avenue, Suite 211
4              Fresno, California 93704
          Telephone:  (559) 221-5256
5          Facsimile:  (559) 221-5262
              James@walaw-fresno.com
6             Matthew@walaw-fresno.com

7  Attorneys for Defendants County of Kings and Taylor Lopes

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  FREDDIE QUAIR,                    ) CASE NO.  1:20-CV-01793-KJM-SKO
                                      )
12              Plaintiff,            )
                                      )
13         vs.                        ) **COUNTY DEFENDANTS' TRIAL BRIEF**
                                      )
14  COUNTY OF KINGS; TAYLOR LOPES;    )
    NEIL COMPSTON; JOHN SILVERIA;     )
15  EDWARD SINCLAIR; and DOES 1       )
    THROUGH 10, inclusive,            )
16                                    )
                Defendants.           )
17

18        The parties, County of Kings and Taylor Lopes ("County Defendants") respectfully

19  submit the following trial brief:

20                        I.  **FACTUAL BACKGROUND**

21        This case arises from the non-fatal shooting of Plaintiff Fredie Quair ("Plaintiff" or

22  "Quair") by County Defendants and Neil Compston, John Silveira, and Edward Sinclair ("DOJ

23  Defendants").  On June 18, 2019, a multi-agency task force in the Hanford area was preparing

24  to serve a number of arrest and search warrants on Norteno street gang members and Nuestra

25  Familia prison gang members.  There were multiple local, state, and federal law enforcement

26  agencies involved, and hundreds of law enforcement officials participating.  Kings County

27  Sheriff's Sergeant Lopes was assigned to the task force and participated in the investigation

28

COUNTY DEFENDANTS' TRIAL BRIEF
                                    1

leading up to the issuance of the warrants.  During the investigation, Sergeant Lopes listened to numerous wire taps wherein Plaintiff Fredie Quair arranged drug and gun deals with other gang members.  He also saw footage in which Quair showed off owning automatic firearms.  He also conducted physical surveillance of Plaintiff.

At approximately 4:30 a.m., during the briefing for this operation, Sergeant Lopes was told that a home invasion robbery had just taken place in the City of Corcoran.  Through live wiretaps and other law enforcement sources it was learned that Plaintiff, Jose Quintero, and David Hernandez - all Norteno gang members - were involved in the home invasion and that Hernandez had been shot.

On the wiretap, Plaintiff and Quintero were heard talking about Hernandez getting shot and taken to the hospital by Quintero.  Plaintiff and Quintero had become separated in the aftermath of the home invasion with Quintero driving away, while Plaintiff was left on foot. Plaintiff and Quintero communicated via cell phone (also heard through the wiretap by Lopes) and Plaintiff told Quintero he would be walking north on Highway 43 from Corcoran towards Hanford, and asked him to pick him up.

Officers found Plaintiff sitting on the side of Highway 43 and watched as Quintero picked Plaintiff up in a maroon Nissan.  They began following and ultimately Sergeant Lopes took the lead as he was in a marked car.  After a short period, Sergeant Lopes activated his emergency lights.

Shortly after, Sergeant Lopes activated his car's emergency lights.  Quintero slowed down and turned onto the dirt driveway of a dairy.  Sergeant Lopes followed and stopped behind them.  Several State of California Department of Justice ("DOJ") special agents pulled up on both sides of Sergeant Lopes' car.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sergeant Lopes exited his car with an M4 rifle and began ordering Quintero to show him his hands.  Within 10 to 20 seconds of the Nissan stopping, the front passenger door unexpectedly and forcefully opened.  Plaintiff quickly stepped out, advanced and took a an isosceles shooting stance as if he were aiming a handgun in the direction of the officers.  He then mimicked the firing of a gun.  Sergeant Lopes, believing he and the DOJ agents were about to be shot, fired his rifle at Plaintiff.  Three of the DOJ agents also fired.  After Sergeant Lopes began firing, Plaintiff went out of Sergeant Lopes' view on the other side of the Nissan. Sergeant Lopes believed that Plaintiff was taking cover behind his vehicle.  When Sergeant Lopes lost sight of Plaintiff he moved to the back of his car and continued to fire as he still perceived Plaintiff as a threat in a position of cover.  When Sergeant Lopes got to the rear of his car he could see Plaintiff on the ground.  Sergeant Lopes did not fire any more rounds and immediately called for emergency medical services.  Plaintiff was yelling to "put me on Youtube" and "make me famous".  He also used gang terminology while moving on the ground.

Eventually when the officers were able to see Plaintiff's hands and get Quintero restrained they approached Plaintiff and determined he was unarmed.  This entire incident was video recorded by a California Highway Patrol fixed wing aircraft.  Sergeant Lopes had to make *split second* decisions in a four to five second window of time when he and the agents faced the threat of deadly force being used against them.  Sergeant Lopes' use of deadly force was objectively reasonable under the totality of circumstances.

## II.  ADMISSIONS & STIPULATIONS

The Parties have not entered into any stipulations or admissions other than what is listed in the Court's Pretrial Order (Doc. 83).

/ / /

/ / /

# III.  LEGAL ANALYSIS

## A.  Fourth Amendment- Excessive Force

Under the Fourth Amendment, a police officer may use such force that is objectively reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  An unreasonable seizure occurs when a law enforcement officer uses excessive force in making a lawful arrest.  Factors to consider in determining whether an officer used excessive force are the severity of the crime at issue, whether the plaintiff posed a reasonable threat to the safety of the officer or others, and whether the plaintiff was actively resisting detention or attempting to escape. *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).  An officer need not avail himself of the least intrusive means of responding to a situation; he need only act within a range of conduct that is reasonable.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

In analyzing a Fourth Amendment excessive force claim, the facts underlying an excessive force claim are considered from the perspective of a reasonable officer on the scene, without regard to the arresting officer's subjective motivation for using force.  *See Baker v. County of San Diego*, No. 09-CV-1194 BEN (WMc), 2012 WL 1903899, *2 (S.D. Cal. May 24, 2012); *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006). "The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011). The reasonableness of the use of force is not judged "from the perspective of the person seized or of a court reviewing the situation with 20/20 hindsight."  *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010).

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Furthermore, the Ninth Circuit has found that an officer can bring in outside evidence of a plaintiff's previous conduct to support what the officer perceived just prior to the use of force in dispute. *Boyd v. City and County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009). Plaintiff's prior criminal history, the fact that he was involved in an armed, home invasion robbery hours before where an individual was shot, and the evidence that Sergeant Lopes learned from wiretaps and surveillance regarding Quair's access to firearms and desperation to make money, make Plaintiff's assertions that he was trying to surrender less probable than, and tends to support, Sergeant Lopes' belief that Quair was armed with a firearm. This, combined with Quair coming flying out of the vehicle, wheeling around to face the officers, video showing Quair's hands together (not apart in surrender), and then taking a shooting stance in a matter of seconds justified Sergeant Lopes' actions. Further, Quair's later statements on the ground to "put me on Youtube" and "make me famous" show that he was trying to go out in a perceived blaze of glory.

Additionally, an officer need not avail himself of the least intrusive means of responding to a situation; he need only act within a range of conduct that is reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir.1994) (police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable); *see Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir.2010); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). In other words, Sergeant Lopes was not limited to less than lethal force (TASER, pepper spray, etc.) when he reasonably believed Plaintiff was pointing a firearm at him and about to shoot. "To be sure, the Fourth Amendment does not necessarily 'require[ ] officers to delay their fire until a suspect turns his weapon on them,' and '[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or

serious verbal threat might create an immediate threat.' " *Peck v. Montoya*, 51 F.4th 877, 888

(9th Cir. 2022), *citing George*, 736 F.3d at 838.

Furthermore, "[w]hile California state law does factor pre-shooting conduct into whether

an officer acts 'reasonably when using deadly force,' [cite] '[t]he Fourth Amendment is

narrower and places less emphasis on pre[-]shooting conduct."  *Hart v. City of Redwood City*,

99 F.4th 543, 554 (9th Cir. 2024). "[O]ne cannot 'establish a Fourth Amendment violation

based merely on bad tactics that result in a deadly confrontation that could have been avoided.'"

*Id*.

B. **Monell Claim**

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in

other words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

theory." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 445 (9th Cir. 2010) (quoting *Monell*, 436

U.S. at 691, 98 S.Ct. 2018); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117

S.Ct. 1382, 137 L.Ed.2d 626 (1997).  To prevail on his *Monell* claim against the city, plaintiff

"must demonstrate that an 'official policy, custom, or pattern' on the part of [the city] was 'the

actionable cause of the claimed injury.' " *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th

Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)); *see*

*also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (stating that to establish

municipal liability under § 1983, a plaintiff must show a direct causal link between the

municipal policy or custom and the alleged constitutional violation).

A municipality may be liable under § 1983 if "the individual who committed the

constitutional tort was an official with final policy-making authority or such an official ratified a

subordinate's unconstitutional decision or action and the basis for it." *Rodriguez v. Cnty. of Los*

*Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018) (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d

1086, 1097 (9th Cir. 2013)).  "To show ratification, a plaintiff must prove that the 'authorized

policymakers approve a subordinate's decision and the basis for it.' " *Id.* at 1239 (quoting *City

of St. Louis v. Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915). "The mere failure to discipline

[employees] does not amount to ratification of their allegedly unconstitutional actions."

*Sheehan v. City of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other

grounds*, 575 U.S. 600, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015); *see also Dodge v. Evergreen

School Dist. #114*, 56 F.4th 767, 788 (9th Cir. 2022); *Oakry v. City of Tempe*, No. 20-cv-01167-

PHX-JAT, 2021 WL 8155158, at *6 (D. Ariz. May 18, 2021) ("[I]t is well-settled in this circuit

that without 'something more,' a City's failure to discipline an officer, or its finding that an

officer's conduct did not violate policy, does not amount to ratification."); *Mueller v. Cruz*, No.

13-cv-01274-CJC-JCG, 2015 WL 9455565, at *3 ("[C]ourts in this circuit have stopped short of

holding that a plaintiff can prove *Monell* liability simply on the basis of a defendant

department's post-incident ratification through failure to discipline or take other action

concerning the officer directly involved.").

　　　　In this case, Plaintiff's theory of *Monell* liability is that Sergeant Lopes has had multiple

officer involved shootings in the past and has never been disciplined.  As a result, the County is

ratifying Lopes' actions.  It does not credibly put forward any evidence that these shootings

were not justified under the law.  Rather, they cite to allegations in previous complaints and

point to some settlements.  They also cite lack of training as regards to Sergeant Lopes as a

source of *Monell* liabilty.

## C. __Qualified Immunity__

　　　　Qualified immunity protects Section 1983 defendants "from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). The threshold questions which any court must consider in ruling upon the defense of qualified immunity are: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? *Pearson v. Callahan*, 555 U.S. 223, 241 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The first question of whether there were violations of constitutional rights is discussed above. Only if the court finds distinct constitutional rights were violated does the court then have to determine whether those rights were clearly established at the time of the defendant's alleged misconduct. "In determining whether a right was 'clearly established,' the court considers whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011). The Court must answer this question in light of the clearly established law and the information possessed by the officer.  *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442-43 (9th Cir. 1991); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity gives [police officers] breathing room to make reasonable but mistaken judgements," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Qualified immunity may apply regardless of whether the officer makes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id*. Existing precedent is determined by

looking to the state of the law at the time of the subject incident to determine whether the officer had fair notice that his/her conduct was unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The "general excessive force standard cannot always, alone, provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc). Here, the clearly established right is a citizen's right "to be free from excessive use of force under the facts and circumstances presented in this case." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

The Court must answer this question in light of the clearly established law and the information possessed by each separate law enforcement officer. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442-43 (9th Cir. 1991); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The existing precedent must have placed the constitutional question beyond debate. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). "[I]f officers of reasonable competence could disagree on the issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Deference should be given to the judgment of reasonable officers on the scene, not "the person seized or . . . a court reviewing the situation with 20/20 hindsight." *Vilar v. County of Yolo*, No. 2:12-CV-01472-KJN, 2013 WL 6422936, at *8 (E.D. Cal. Dec. 9, 2013). In other words, "[q]ualified immunity gives [police officers] breathing room to make reasonable but mistaken judgements," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft*, 131 S.Ct. at 2085.

If the Court determines that the law was clearly established, it must then determine whether, based on the circumstances of the case, any law enforcement officer made a reasonable mistake regarding what the law required given the circumstance he confronted. *Saucier*, 121 S.Ct. at 205; *Brosseau*, 543 U.S. at 198; *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007). "Therefore, regardless of whether the constitutional violation occurred, [the deputies] should prevail if . . . [they] could have reasonably believed that [their] particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). "[T]he test is not whether [the deputies] attempted all other available methods of responding to a situation, but whether [they] reasonably could believe [their] conduct was lawful under the circumstances confronting [them]." *Neal-Lomax v. Las Vegas Metropolitan Police Dept.*, 574 F.Supp.2d 1170, 1188 (D. Nev. 2008).  If a law enforcement officer could reasonably have believed that his actions were legal in light of clearly established law and the information he possessed at the time, then his conduct falls within the protective sanctuary of qualified immunity.  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The case that closest resembles this case is *Cruz v. City of Anaheim*, where a confidential informant told the police that Cruz was a gang member who sold methamphetamine, carried a gun, had a past felony conviction, and said that "he was not going back to prison." 765 F.3d 1076, 1077–78 (9th Cir. 2014). Multiple police officers pulled Cruz over for a broken taillight. *Id.* at 1078. The officers surrounded him, and Cruz tried to escape by backing his SUV into a marked patrol car. *Id*. The officers exited their vehicles with their guns lowered and ordered Cruz to get on the ground. *Id.* According to the officers, Cruz exited his car, ignored their commands, and reached for the waistband of his pants, prompting all five officers to open fire. *Id*. But some facts in the record undermined that account. A bystander on the other side of Cruz's vehicle witnessed the shooting but was unable to see if Cruz in fact

reached toward his waistband because Cruz's car blocked his view. *Id*. The officers fired twenty shots in about two to three seconds, killing Cruz. *Id*. His body was found "tangled in his seat belt and hanging from it." *Id*. The officers did not find a weapon on him but recovered a loaded gun from the passenger seat. *Id*.

The court in *Cruz* found that "It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire. Conversely, if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door. At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified." *Cruz*, 765 F.3d at 1078-79.

Considering the information available to Sergeant Lopes at the time, that Quair had been part of an armed robbery in which someone was shot hours before, Quair took video of himself holding firearms, Quair exiting the video quickly, wheeling around, and taking a shooting stance at Lopes, this makes it reasonable for Sergeant Lopes to respond in self-defense. It was definitely reasonable that in those couple of seconds that Sergeant Lopes had to determine whether Quair had a weapon in his hand as Quair was in a shooting stance, that he might make a mistake as to the fact of whether or not Quair had a gun in his hand.

D. **Damages**

Plaintiff identified only approximately $42,000 in medical specials from Kaweah Hospital in his responses to discovery requests related to special damages. He has not asserted loss of wages (past or future) nor has he provided any documentation of other medical damages through discovery.

COUNTY DEFENDANTS' TRIAL BRIEF

1

E.  **Punitive Damages**

2

Punitive damages are recoverable in section 1983 cases "when defendant's conduct is

3

shown to be motivated by evil motive or intent, or when it involves reckless or callous

4

indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

5

Punitive damages also may be awarded to address "malicious, wanton, or oppressive acts or

6

omissions."  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

7

8

A municipality is immune from punitive damages under 42 U.S.C. § 1983.  *City of*

9

*Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981).

10

11

DATED:  October 27, 2025                 WEAKLEY & ARENDT
                                          A Professional Corporation

12

13

                                          By:    /s/   *James J. Arendt*

14

                                                 James J. Arendt

15

                                                 Matthew P. Bunting
                                                 Attorneys for Defendants

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTY DEFENDANTS' TRIAL BRIEF