1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   NORMAN D. MORRISON, State Bar No. 212090
    Supervising Deputy Attorney General
3     2550 Mariposa Mall, Room 5090
      Fresno, CA 93721-2271
4     Telephone: (559) 705-2304
      Fax: (559) 445-5106
5     E-mail: Norman.Morrison@doj.ca.gov
    *Attorneys for Defendants Neil Compston,*
6   *John Silveira and Edward Sinclair*

7

8                  IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10                          CIVIL DIVISION

11

12

13  **FREDDIE QUAIR,**                    Case No. 1:20-CV-01793-KJM-SKO

                              Plaintiff,  **DEFENDANTS' MOTION IN LIMINE**
14                                        **TO EXCLUDE OPINIONS AND**
        v.                                **TESTIMONY OF PLAINTIFF'S**
15                                        **EXPERT, CURTIS ROTHSCHILLER**

16  **COUNTY OF KINGS; TAYLOR LOPES;**    **[STATE MIL NO. 2][1]**
    **NEIL COMPSTON; JOHN SILVERIA;**
17  **EDWARD SINCLAIR; and DOES 1**       Trial Date:   November 10, 2025
    **THROUGH 10, inclusive,**            Action Filed:  December 21, 2020
18
                              Defendants.
19

20

21

22

23

24

25

26

27  _____

       [1] For purposes of judicial convenience and reference, the State Defendants' Motions in
28  Limine are identified pursuant to the numbering and designation set forth in the Court's Final
    Pretrial Order (ECF 83), at 4-5.

---

1

**TABLE OF CONTENTS**

2

Page

3

Introduction ................................................................................................................ 3

Argument ..................................................................................................................... 5

Legal Standard ............................................................................................................ 5

    I.    The Improper Opinions of Plaintiff's Expert, Curtis Rothschiller, Should Be Excluded as It Lacks Foundation, Is Wholly Speculative, and Constitutes Improper Conclusions and Factual And Legal Opinions. ................... 5

        A.    Rothschiller's Opinions Regarding Any Alleged Negligent Tactics or Actions by Defendants Prior to the Use of Force Are Irrelevant and Inapplicable in a Fourth Amendment Use of Force Claim. ................. 7

        B.    The Court Should Issue an Order Preventing and Barring Rothschiller from Providing Testimony or Opinions that the Officers' Actions Constituted Excessive Force, Were Unlawful, Violated Policies and Procedures, or that Officers Were Not Entitled to Use Foce. ................................................................................ 10

        C.    The Court Should Enter an Order Barring Rothschiller from Testifying or Providing Any Opinions Regarding What Additional Resources Were Allegedly Available at the Time of the Use of Force ...................................................................................................... 15

        D.    Rothschiller Should Be Barred from Testifying Regarding Any Investigation Into the Underlying Incident, as Well As Offering Any Opinions Regarding Such Investigations, as He Lacks Specific Knowledge Regarding This Matter and His Opinions and Testimony Lack Foundation or Any Basis ................................ 17

        E.    The Court Should Enter an Order Barring Rothschiller from Offering Any Opinions Based Upon Information that Was Not Known to the Defendants at the Time of the Use of Force, Including that Plaintiff Was Unarmed. ...................................... 19

        F.    Rothschiller's Opinions and Testimony Regarding the State Defendants' Failure to Comply with Policies and Procedures Must Be Excluded as Rothschiller Had No Knowledge or Familiarity with the Department of Justice's Policies and Procedures, and Rothschiller Erroneously and Improperly Opined the State Defendants Were Obligated to Comply with the County of Kings' Policies and Procedures ........................................................... 20

Conclusion ................................................................................................................ 22

Declaration of Supervising Deputy Attorney General Norman D. Morrison IV in Support of Defendants' Motion in Limine to Exclude Opinions and Testimony Of Plaintiff's Expert, Curtis Rothschiller [State Mil No. 2] ................................. 24

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

Barnes v. Felix
605 U.S. 73 (2025) ................................................................................................ 9

Billington v. Smith
292 F.3d 1177 (9th Cir, 2002) ............................................................................. 8

Biscotti v. Yuba City
636 F. App'x 419 (9th Cir. 2016) ........................................................................ 8

Bogosian v. Mercedes-Benz of North America, Inc.
104 F.3d 472 (1st Cir. 1997) ............................................................................... 5

Brower v. County of Inyo
489 U.S. 593 (1989) ............................................................................................. 8

CFM Commc'ns, LLC v. Mitts Telecasting Co.
424 F. Supp. 2d 1229 (E.D. Cal. 2005) ............................................................ 14

County of Los Angeles v. Mendez
581 U.S. 420 (2017) ............................................................................................. 8

Daniels v. Williams
474 U.S. 327 (1986) ............................................................................................. 8

Elosu v. Middlefork Ranch Incorporated
26 F.4th 1017 (9th Cir. 2024) ........................................................................... 18

Engilis v. Monanto Company
151 F.4th 1040 (9th Cir. 2025) ....................................................................... 6, 7

Forman v. Pillsbury
753 F.Supp. 14 (D. D.C. 1990) ......................................................................... 18

General Elec. Co. v. Joiner
522 U.S. 136 (1997) ............................................................................................. 6

Graham v. Connor
490 U.S. 396 (1989) ..................................................................................... 10, 19

Guidroz-Brault v. Missouri Pacific R.R. Co.
254 F.3d 825 (9th Cir. 2001) .......................................................................... 6, 17

Hangarter v. Provident Life and Accident Insurance Co.
373 F.3d 1016 (9th Cir. 2004) ......................................................................... 14

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3
*Hathaway v. Bazany*
    507 F.3d 312 (5th Cir. 2007)..................................................... 6

4

*Johnson v. Manitowoc Boom Trucks, Inc.*
    484 F.3d 426 (6th Cir. 2007)..................................................... 6

5

6
*Johnson v. Myers*
    129 F.4th 1189 (9th Cir. 2025)............................................ 19, 20

7

8
*Jones v. City of North Las Vegas*
    150 F.4th 1030 (9th Cir. 2025)............................................ 19, 20

9

*Kilpatrick v. Breg, Inc.*
10    613 F.3d 1329 (11th Cir. 2010).................................................. 5

11
*Kingsley v. Hendrickson*
    576 U.S. 389 (2015) ................................................................ 10

12

13
*Kisela v. Hughes*
    584 U.S. 100 (2018) ........................................................... 19, 20

14

*Kumho Tire Co. v. Carmichael*
15    526 U.S. 17 (1999) ................................................................... 6

16
*Lowry v. City of San Diego*
    858 F.3d 1248 (9th Cir. 2017)............................................. 19, 20

17

18
*Luce v. United States*
    469 U.S. 38 (1984) ................................................................... 5

19

*Molina v. City of Visalia*
20    No. 1:13-cv-01991-DAD-SAB, 2016 WL 8730723 (E.D. Cal. Sep. 16, 2016) .................... 15

21
*Monroe v. Griffin*
    No. 14-CV-00795-WHO, 2015 WL 5258115 (N.D. Cal. Sept. 9, 2015) .............................. 15

22

23
*Monzon v. City of Murrieta*
    No. 2:17-CV-01371-RGK-SKX, 2019 WL 1061686 (C.D. Cal., Jan. 9, 2019) ...................... 8

24

*Nationwide Transp. Fin. v. Cass Info. Sys.*
25    523 F.3d 1051 (9th Cir. 2008)................................................... 14

26
*Rascon v. Brookins*
    No. CV-14-00749-PHX-JJT, 2018 WL 739696 (D. Ariz. Feb. 7, 2018)............................. 15

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Sanchez v. Jiles*
    No. 10-CV-9384, 2012 WL 13005996 (C.D. Cal. June 14, 2012) ........................................ 14

4

5

*Shirar v. Guerrero*
    No. 1-CV-3906, 2017 WL 6001270 (C.D. Cal. Aug. 2, 2017)................................................ 14

6

*Taylor v. Lemus*
    No. CV 11-9614 FMO, 2015 WL 12698306 (C.D. Cal. June 17, 2015).............................. 14

7

8

*U.S. v. R.J. Reynolds Tobacco Co.*
    416 F.Supp.316 (D. New Jersey 1976) ................................................................................ 17

9

10

*United States v. 87.98 Acres of Land*
    530 F.3d 899 (9th Cir. 2008).................................................................................................. 5

11

*United States v. Heller*
    551 F.3d 1108 (9th Cir. 2009)................................................................................................ 5

12

13

*Valtierra v. City of L.A.*
    99 F.Supp.3d 1198 (C.D. Cal. 2015)        ........................................................................ 15

14

CONSTITUTIONAL PROVISIONS

15

Fourth Amendment ........................................................................................ 7, 8, 19, 20

16

COURT RULES

17

Fed. R. Civ.
    P. 26 ...............................................................................................................*passim*

18

19

Fed. R. Evid.
    702.............................................................................................................. 6, 7, 17
    703............................................................................................................................ 17
    704............................................................................................................................ 14
    704(a) ........................................................................................................................ 14

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE THAT Defendants NEIL COMPSTON, JOHN SILVEIRA and EDWARD SINCLAIR (Defendants) hereby move the Court for an order in limine precluding Plaintiff and/or his counsel of record from introducing or eliciting at trial any testimony, evidence or opinions from Plaintiff's expert, Curtis Rothschiller, regarding (1) any alleged negligent tactics or decisions preceding the officer involved shooting identified in Plaintiff's Complaint; (2) any ultimate conclusions of law or fact by Rothschiller, as identified and set forth in his deposition testimony and/or Fed. R. Civ. P. 26 Report; (3) any opinions, testimony or evidence regarding what other resources or personnel were allegedly available to the Defendants at the time of the incident; (4) any evidence relating to the alleged failure to perform an investigation into the underlying Use of Force incident; and (5) any testimony, opinions, or evidence relating to any opinion by Rothschiller that the State Defendants violated or failed to follow any policy or procedure in connection with the underlying incident. As discussed herein, Rothschiller's opinions lack any factual support or basis, are contradicted by the facts and evidence in this case (which Rothschiller has admitted he is unfamiliar with and was not provided), constitute impermissible expert opinions and conclusions, and for which Rothschiller lacks the necessary knowledge, experience, and qualifications to provide opinions.

Defendants further move for an in limine order directing Plaintiff's counsel to instruct Rothschiller, Plaintiff, Plaintiff's other witnesses, and other persons under Plaintiff's control, that no mention, display or testimony be made in the presence of jurors or prospective jurors of the matter that is the subject of this motion, and that Plaintiff refrain from attempting to invoke or lay the foundation for such arguments during voir dire of the jury.

This motion is based upon this notice of motion, the attached memorandum of points and authorities, the attached declaration of Supervising Deputy Attorney General Norman D. Morrison IV, Plaintiff's expert designation and report served pursuant to Fed. R. Civ. P. 26, the deposition of Curtis Rothschiller, all pleadings and records on file in this action, and on such further authority, evidence, or argument as may be presented at or before the time of any hearing on this motion.

1

**Statement of Compliance:**

2
This Motion is made in response to this Court's July 24, 2025, ruling (ECF 83), as well as

3
the discussions on the record about the issue during the final pretrial conference held in this

4
matter.

5
Dated:  October 27, 2025                              Respectfully submitted,

6
ROB BONTA

7
Attorney General of California

8

9
NORMAN D. MORRISON

10
Supervising Deputy Attorney General
*Attorneys for Defendants Neil Compston,*

11
*John Silveira and Edward Sinclair*

12

13

14

15
FR2021301267

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Motion in Limine to Exclude Rothschiller Opinions and Testimony [STATE MIL #2] (1:20-CV-01793-KJM-SKO)

# INTRODUCTION

This lawsuit arises out of a shooting that occurred during the early morning hours on June 18, 2019, on a road next to State Route 43 near Hanford, California. Prior to this incident, Plaintiff Fredie Quair, Jr. had been under surveillance for multiple months as part of a joint Federal, State and local task force known as "Operation Red Reaper" that was investigating the Nuestra Familia criminal organization and the Norteño street gangs in the Kings and Tulare County region. As one of the targets of Operation Red Reaper, Plaintiff was the subject of a combination of video, audio, and electronic surveillance over a period of months performed by the Defendants. This included wiretaps of phone numbers used by Plaintiff and his criminal associates, including Jose Quintero. The months long surveillance captured evidence of Plaintiff engaging in the trafficking of illegal firearms with other criminals, the sales of narcotics, and the discussion of various criminal activities relating to the Norteño's and Nuestra Familia.

During the early morning hours of June 18, 2019, Plaintiff and two accomplices, Jose Quintero and David Hernandez, engaged in an armed home invasion robbery of a residence located in Corcoran, California. During the home invasion robbery, Plaintiff's accomplice, David Hernandez, was shot in the stomach. Plaintiff fled the scene on foot, and Hernandez was transported to the hospital by Quintero; the firearm used during the armed home invasion robbery was also in the vehicle used by Quintero.

Plaintiff fled the scene on foot after the shooting, and eventually borrowed a cellular phone from a third-party to call Quintero. During this phone call, which was monitored by the Defendants as part of the court authorized wiretap, they heard Plaintiff and Quintero discussing the armed home invasion robbery, the shooting, the firearm used during the armed home invasion robbery, and Plaintiff's instructions to Quintero to come pick him up from the side of the highway. Plaintiff gave Quintero specific information about his address.

Based upon the phone call, and their knowledge of the armed home invasion robbery that Plaintiff had just committed, and due to the existence of an arrest warrant issued for the Plaintiff by a court, the Defendants began surveillance of the Plaintiff using other vehicles as well as a

plane. Plaintiff was subsequently stopped by law enforcement officers in a field alongside the highway. In light of the facts known to them, including Plaintiff's involvement in an armed home invasion robbery where someone had just been shot, as well as Plaintiff's prior history involving firearms, the Defendants performed a "felony traffic stop."

After Plaintiff and his accomplice stopped their vehicle, they refused to follow instructions and directions made by Kings County Sheriff's Sergeant Taylor Lopes. Instead, Plaintiff flung open the front passenger side door of his vehicle and immediately assumed an isosceles shooting stance, holding both hands together and extended in front of him consistent with someone holding and intending to use a handgun, pointing towards the Defendants. Plaintiff then suddenly moved his hands upward in a motion consistent with experiencing the physical recoil of a firearm being shot. Knowing Plaintiff had a history of being armed with illegal firearms, having just been involved in an armed home invasion robbery where another individual was shot, seeing Plaintiff assume what was recognized as a shooting stance and displaying a physical reaction consistent with firing a handgun while simultaneously hearing gunfire, Defendants reasonably and logically believed the Plaintiff was shooting at them and discharged their firearms at the Plaintiff and the vehicle he had just exited in self-defense. After being shot, Plaintiff continued to resist arrest by refusing to comply with orders, before he was ultimately taken into custody and treated by emergency medical personnel.

Defendants now move for an order precluding Plaintiff and/or his counsel of record from introducing or eliciting at trial any testimony, evidence or opinions from Plaintiff's expert, Curtis Rothschiller, regarding (1) any alleged negligent tactics or decisions preceding the officer involved shooting identified in Plaintiff's Complaint; (2) any ultimate conclusions of law or fact by Rothschiller, as identified and set forth in his deposition testimony and/or Fed. R. Civ. P. 26 Report; (3) any opinions, testimony or evidence regarding what other resources or personnel were allegedly available to the Defendants at the time of the incident; (4) any evidence relating to the alleged failure to perform an investigation into the underlying Use of Force incident; and (5) any testimony, opinions, or evidence relating to any opinion by Rothschiller that the State Defendants violated or failed to follow any policy or procedure in connection with the underlying incident.

4

1   As discussed herein, Rothschiller's opinions lack any factual support or basis, are contradicted by

2   the facts and evidence in this case (which Rothschiller has admitted he is unfamiliar with and was

3   not provided), constitute impermissible expert opinions and conclusions, and for which

4   Rothschiller lacks the necessary knowledge, experience, and qualifications to provide opinions.

5       Defendants request that the in limine order direct Plaintiff's counsel to instruct

6   Rothschiller, Plaintiff, Plaintiff's other witnesses, and other persons under Plaintiff's control, that

7   no mention, display or testimony be made in the presence of jurors or prospective jurors of the

8   matter that is the subject of this motion, and that Plaintiff refrain from attempting to invoke or lay

9   the foundation for such arguments during voir dire of the jury.

10                                    **ARGUMENT**

11                                 **LEGAL STANDARD**

12      "A motion in limine is a procedural mechanism to limit in advance testimony or evidence

13  in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). "In the case of

14  a jury trial, a court's ruling 'at the outset' gives counsel advance notice of the scope of certain

15  evidence so that admissibility is settled before attempted use of the evidence before the jury." Id.

16  at 1111-12. Although the federal rules do not explicitly authorize motions in limine, the Supreme

17  Court has held that trial judges are authorized to rule on motions in limine under their authority to

18  manage trials. *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984).

19  I.   **THE IMPROPER OPINIONS OF PLAINTIFF'S EXPERT, CURTIS ROTHSCHILLER,**
20       **SHOULD BE EXCLUDED AS IT LACKS FOUNDATION, IS WHOLLY SPECULATIVE, AND**
         **CONSTITUTES IMPROPER CONCLUSIONS AND FACTUAL AND LEGAL OPINIONS.**

21
22      The proponent of an expert witness bears the burden of proving the admissibility of the

23  expert witness's testimony. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *United*

24  *States v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008). The court should exclude expert

25  testimony when the witness is not qualified to provide an opinion regarding the subject at issue.

26  *Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472, 476-477 (1st Cir. 1997) (trial

27  court properly found that a proffered expert lacked the requisite education and training to provide

28  an opinion related to the subject matter). The Ninth Circuit recently directed that it is the

                                          5

1    obligation and responsibility of a district court to perform a gatekeeping role "to ensure that the

2    [proffered] testimony is both relevant and reliable." *Engilis v. Monanto Company*, 151 F.4th

3    1040, 1047 (9th Cir. 2025). A district court discharges its "gatekeeping role" by ensuring that the

4    proposed expert's testimony is not only relevant, but also reliable. *Id.*

5        Case law is clear that an expert may not base his or her opinion on speculation or

6    conjecture. *Hathaway v. Bazany*, 507 F.3d 312, 317-319 (5th Cir. 2007) (proposed expert's

7    testimony was speculative and unreliable under *Daubert* and thus, it was properly excluded);

8    *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429-436 (6th Cir. 2007) (expert opinion

9    was properly excluded because the expert was not sufficiently qualified to provide an opinion on

10   the subject matter at issue and the opinion was based upon speculative and unreliable

11   methodology). "Expert opinion testimony is relevant if the knowledge underlying it has a valid

12   connection to the pertinent inquiry and reliable if the knowledge underlying it has a reliable basis

13   in the knowledge and experience of the relevant discipline." *Engilis*, 151 F.4th at 1047.

14       A court may conclude that there is simply too great an analytical gap between the data and

15   the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *Guidroz-Brault v.*

16   *Missouri Pacific R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (declaring that 'unsupported

17   speculation and subjective beliefs" cannot be a basis for expert testimony). The Supreme Court

18   has held that the reliability test required in a district court's gatekeeping role is also properly

19   applied to the expert's reasoning process, and that the "gatekeeper role" applies to *all* expert

20   testimony, not just scientific testimony. *General Electric v. Joiner*, 522 U.S. 136, 142 (1997);

21   *Kumho Tire Co. v. Carmichael*, 526 U.S. 17, 141 (1999).

22       Pursuant to the 2023 amendments to Fed. R. Evidence 702, it is incumbent upon the

23   proponent of expert testimony to demonstrate to the court that the required admissibility standards

24   are satisfied, and the expert's opinion must reflect a reliable application of the principles and

25   methods to the facts of the case. *Engilis*, 151 F.4th at 1049.

26       The *Engilis* Court additionally directed that "challenges to an expert's opinion go to the

27   weight of the evidence only if a court first finds it more likely than not that an expert has a

28   sufficient basis to support an opinion." *Engilis*, 151 F.4th at 1049. Accordingly, the *Engilis* Court

explained that "[j]udicial gatekeeping is essential to ensure that an expert's conclusions do not go beyond what the expert's basis and methodology may reliably support." *Id.* Following the 2023 amendments to Rule 702, there is no presumption in favor of the admissibility of expert opinion, and the proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence. *Id.* The *Engilis* Court further cautioned that a "district court cannot abdicate its role as gatekeeper, nor delegate[e] that role to the jury." *Id.* at 1050 (internal quotation omitted)(quoting *Hardeman v. Monsanto Company*, 997 F.3d 941, 960, n. 11 (9th Cir. 2021).

> **A.    Rothschiller's Opinions Regarding Any Alleged Negligent Tactics or Actions by Defendants Prior to the Use of Force Are Irrelevant and Inapplicable in a Fourth Amendment Use of Force Claim.**

Defendants move to exclude any references, opinions, or testimony by Rothschiller to any events, actions, or alleged negligent tactics or decisions that occurred prior to the actual use of force on June 18, 2019, as legally irrelevant and immaterial and an improper basis for expert opinion. Plaintiff's Complaint against the State Defendants alleges only a single cause of action for excessive force in violation of the Fourth Amendment. Plaintiff's Complaint does not allege *any* state-law causes of action, including negligence, negligent tactics, or similar claims. Further, Plaintiff's Complaint does not allege compliance with the Government Claims Act, which would be required to allege any causes of action based upon alleged violations of state law.

In his Rule 26 report, and his deposition testimony, Rothschiller identified multiple decisions and actions by the various Defendants that he identified as "negligent" and causing, or contributing to his opinion that excessive force was used. This includes his contention that the surveillance officers following Plaintiff and Quintero on the highway immediately before the felony stop "blew their cover" by their actions; that the Defendants failed to establish a perimeter and wait for additional backup officers; that the Defendants should have waited for S.W.A.T. or K9 officers before attempting to make the arrest; that the Defendants allegedly failed to identify a lead officer to supervise and oversee the felony stop; and that the Defendants positioning of their vehicles and actions in connection with setting up the felony stop were negligent.

Because Plaintiff's Complaint fails to allege a *state law* claim, such as negligent tactics or

negligence, Rothschiller's conclusions and opinions are irrelevant for purposes of the Fourth Amendment analysis. Unlike California negligence law, the court's Fourth Amendment "totality of circumstances" analysis focuses on whether deadly force used in the moment was reasonable. *Biscotti v. Yuba City*, 636 F. App'x 419, 421–22 (9th Cir. 2016). Conduct that amounts to nothing more than negligence does not constitute a Fourth Amendment violation. *Daniels v. Williams*, 474 U.S. 327 (1986); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir, 2002), abrogated on other grounds by *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017); *Brower v. County of lnyo*, 489 U.S. 593, 596-97 (1989).

The analysis required under the Fourth Amendment for use of force "tends to focus more narrowly on the moment when deadly force is used," whereas state law based claims are much broader and consider "the totality of the circumstances surrounding any use of deadly force." *Monzon v. City of Murrieta*, No. 2:17-CV-01371-RGK-SKX, 2019 WL 1061686, at *9, (C.D. Cal., Jan. 9, 2019), aff'd (9th Cir. 2020) 966 F.3d 946, and aff'd (9th Cir. 2020) 978 F.3d 1150. Rothschiller's opinions regarding the pre-use of force conduct constitute the exact type of "provocation rule" evidence and opinions that the Supreme Court unequivocally rejected in *County of Los Angeles v. Mendez*, 581 U.S. 420, 426-427 (2017). Pursuant to *Mendez*, any alleged improper actions by the officers prior to the use of force forming the basis of the excessive force claim (here, the officer involved shooting on June 18, 2019) cannot support or bootstrap a subsequent Fourth Amendment excessive force claim.

Defendants additionally note that several of the opinions expressed by Rothschiller in his report, and which Defendants anticipate Plaintiff will seek to rely upon, constitute the exact type of "provocation theory" arguments that the United State Supreme Court flatly rejected in *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017). For example, Rothschiller opines that "[Plaintiff] and Mr. Quintero did not pose an immediate threat to anyone that morning, therefore the use of deadly force by the investigators was inappropriate, excessive, and unreasonable, violated generally accepted policing training and standards, and violated KCSD policy. KCSD and DOJ personnel should have remained in a position of safety (cover / concealment), fully observe the totality of the event (time and space) and [Plaintiff's] actions to better determine their options

1  (Rothschiller Rep. ¶ 107); "[h]ad the officers followed P.O.S.T. training and industry standards,

2  under the circumstances as presented, they would never have endangered Mr. Quintero and

3  [Plaintiff's] lives or the lives of other potential occupants of the Nissan or caused them significant

4  bodily injury by firing their weapons. KCSD and DOJ personnel's decisions and actions were

5  dangerous and reckless, and a direct casual factor in the sequence of events leading up to the

6  unreasonable use of excessive lethal force on [Plaintiff]." (*Id.* at ¶ 108); "Sergeant Lopes' actions

7  in this case, with respect to the tactics Leading up to and during the stop, and amount the amount

8  of force used, reflected, at best, a reckless disregard to the life and safety of [Plaintiff], Mr.

9  Quintero, himself, his fellow officers, and the public." (*Id.* at ¶ 121); "[t]he use of force in

10  connection with this incident was also excessive and unreasonable because there were far more

11  reasonable options available. Sergeant Lopes rushed to the front of the surveillance and tried to

12  initiate a high-risk stop without additional resources. There was no reason to draw attention to the

13  surveillance or an urgency to stop the Nissan." (*Id.* at ¶ 125).

14      Accordingly, the Court should bar and exclude Rothschiller's opinions and testimony

15  regarding any alleged negligent tactics, actions, or decisions by the Defendants prior to the actual

16  shooting incident as being irrelevant, because the sole analysis is whether the use of force was

17  reasonable under the totality of the circumstances, and the Supreme Court has specifically

18  declined to hold that the "totality of the circumstances" examination should include whether or

19  how an officer's own "creation of a dangerous situation" factors into the reasonableness analysis.

20  *Barnes v. Felix*, 605 U.S. 73, 83-84 (2025). Finally, any alleged negligent actions by the officers

21  prior to, or during, the traffic stop are irrelevant, as Plaintiff has testified he knew that the

22  Defendants were law enforcement officers when he was stopped, and he concedes he was stopped

23  by a marked police unit. Accordingly, when Plaintiff aggressively exited his vehicle, took up a

24  shooting position aiming towards the officers, and then simulated firing a handgun, he knew that

25  he was involved in a traffic stop by law enforcement officers, that the Defendants were law

26  enforcement officers, and that he was legally obligated to follow their directions. Thus, no alleged

27  "negligence" or "negligent tactics" had any role or effect in Plaintiff's decisions.

28

**B.    The Court Should Issue an Order Preventing and Barring Rothschiller from Providing Testimony or Opinions that the Officers' Actions Constituted Excessive Force, Were Unlawful, Violated Policies and Procedures, or that Officers Were Not Entitled to Use Force.**

In his Rule 26 Report, as well as in his deposition testimony, Rothschiller repeatedly makes ultimate conclusions of law and fact. He repeatedly opines and testifies that the Defendants' actions in this instance constitute impermissible excessive force, violate policies and procedure, violate State law, and that the Defendants were not entitled to use force. In doing so, he uses specific legal terminology and phrasing, improperly reaches ultimate conclusions of fact and law that are reserved to the trier of fact, and bases his opinions on speculation and conclusions – despite the fact he lacks the required knowledge and facts to support such conclusions.

Rothschiller additionally bases many of his opinions on information and facts that were not known to the Defendants at the time of the incident and only discovered *after* the use of force had ended. This specifically includes Rothschiller's opinions, where he states that the Defendants' use of force was excessive and improper 'because the Plaintiff was unarmed.' The determination of whether a law enforcement officer's use of force was reasonable is required to be judged "from the perspective of a reasonable officer on the scene, *rather than with the 202/vision of hindsight.*" *Graham*, 490 U.S. at 396; *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Neither Plaintiff nor Rothschiller can identify any facts showing that the Defendants actually knew that the Plaintiff was unarmed, and did not have a firearm, during the incident; and the evidence unequivocally establishes that their knowledge that Plaintiff was not armed with a firearm was only obtained minutes after the shooting, when they had taken Plaintiff into custody and were searching him incident to his arrest and providing medical treatment for his injuries. By relying upon information that was only discovered and thereby became known to the officers *after* the use of force had ended to reach his conclusions, Rothschiller upends the well-established rules regarding the analysis and ignores the well-established directions from the Supreme Court and the Ninth Circuit.

Such opinions and testimony by an expert are facially improper. Rothschillers' Rule 26

Report is replete with examples of such conclusory and improper opinions. These include the following opinions:

- That at the time of the incident Plaintiff was "unarmed and no threat to law enforcement or anyone else" (Rothschiller Rep., ¶ 46);

- "Disregard for multiple industry standards and accepted practices led to the unreasonable use of excessive lethal force against [Plaintiff]" (*Id.*, at ¶ 49);

- "The OIC would have directed the other officers towards a safe conclusion without the need to sue unreasonable excessive lethal force against [Plaintiff]" (*Id.* at ¶ 50);

- "Sergeant Lopes and other investigators violated established industry standard [sic] and acceptable tactics…" (*Id.* at ¶ 51);

- "This failure directly led to the unnecessary use of unreasonable use of excessive lethal force against [Plaintiff]" (*Id.* at ¶ 61);

- "[Plaintiff] and Mr. Quintero did not pose an immediate threat of death or serious bodily injury prior to the KCSD and DOJ personnel's use of deadly force, and there should have been less lethal options available." (*Id.* at ¶ 65);

- "Investigators Compston, Silveira, and Sinclair, in what can only be considered "contagious fire", fired their weapons after hearing shots being fired, even though there was no threat to their safety…" (*Id.* at ¶ 67);

- "Photographs of the Nissan after the unreasonable and excessive use of lethal force against [Plaintiff]…" (*Id.* at ¶ 74);

- "The delay of medical care caused [Plaintiff] extreme physical and emotional pain and suffering and was a contributing cause to [Plaintiff's] injuries."[2] (*Id.* at ¶ 81)

- "Based on their outdated actions during this incident, the County of Kings, KCSD and DOJ failed to continuously train their personnel in updated officer safety tactics, perishable skills, other methods of de-escalation and force options."[3] (*Id.*, at ¶ 92);

- "The County of Kings, KCSD and DOJ failed to train their personnel basic, current industry standard arrest, use of force, surveillance and investigation methods resulting in unreasonable and excessive use of lethal force against Mr. Quair causing him significant injuries." (*Id.* at ¶ 93)[4]

- "I was never presented with any evidence an after-action debriefing for KCSD and DOJ personnel occurred to determine what went right and what went terribly wrong and led to

---

[2] Rothschiller additionally lacks the necessary qualifications, training, and expertise to offer this opinion, as it constitutes a medical diagnosis or opinion that can only be made by a medical provider. Rothschiller does not identify that he has ever been licensed or qualified to act as any form of medical provider, nor does he state that he has ever qualified to testify regarding issues relating to medical injuries and/or the causes of injuries.

[3] At no point does Rothschiller ever state that he had reviewed any of the State Defendants' training or personnel records, or any other documents that would provide any support or basis for this statement.

[4] This opinion is also similarly improper, and lacks the necessary foundation, knowledge, or qualifications to be rendered for the reasons noted above.

11

the use of excessive lethal force on [Plaintiff]." (*Id.* at ¶ 95.)

- "Leading up to the unreasonable and excessive use of lethal force against Mr. Quair, personnel from multiple agencies were tasked with high-risk enforcement action without a plan or supervisor." (*Id.* at ¶ 97)[5]

- "Investigators were spread throughout the County and left to their own devices and unbridled rogue behavior."[6] (*Id.* at ¶ 97);

- "As illustrated in this case, the lack of supervision during any critical incident allows for rogue deputies to dispense excessive, unreasonable lethal force" (*Id.* at ¶ 98)[7];

- "Sergeant Lopes' use of excessive and unreasonable use of deadly force against Mr. Quair was his fifth (5th) such incident." (*Id.* at ¶ 100);

- "There was no evidence presented to me that indicated there was a thorough and unbiased investigation into this unreasonable and excessive use of lethal force against Mr. Quair." (*Id.* at ¶ 102);

- "This incident is a case of the use of excessive and unreasonable lethal force by Sergeant Lopes and DOJ personnel against Mr. Quair and the failure of KCSD and DOJ personnel to provide the required first aid and life-saving measures for the injuries he incurred as a result." (*Id.* at ¶ 103);

- "This incident is clearly a case of overzealous law enforcement personnel using excessive and objectively unreasonable deadly force against Mr, Quair which led to his extensive injuries and continuing medical issues." (*Id.* at ¶ 105);

- "Based on my analysis of the evidence and statements of events given by KCSD and DOJ personnel, their use of deadly force was excessive and unreasonable. Mr. Quair was unarmed, had his hands raised, was not advancing toward the investigators, and not a reasonably objective threat to the officers when the excessive lethal force was used." (*Id.* at ¶ 106);

- "[Plaintiff] and Mr. Quintero did not pose an immediate threat to anyone that morning, therefore the use of deadly force by the investigators was inappropriate, excessive, and unreasonable, violated generally accepted policing training and standards, and violated KCSD policy." (*Id.* at ¶ 107);

- "Had the officers followed P.O.S.T. training and industry standards, under the circumstances as presented, they would never have endangered Mr. Quintero and Mr. Quair's lives or the lives of other potential occupants of the Nissan or caused them significant bodily injury by firing their weapons. KCSD and DOJ personnel's decisions and actions were dangerous and reckless, and a direct casual factor in the sequence of events leading up to the unreasonable use of excessive lethal force on Mr. Quair." (*Id.* at ¶108);

- "The use of deadly force in connection with this incident was also unreasonable because

---

[5] During his deposition, Rothschiller repeatedly admitted he had never heard of "Operation Red Reaper," did not know what it was about, and had not reviewed any of the documents or materials relating to the Operation. Accordingly, Rothschiller lacks the ability or knowledge to offer any opinions regarding whether plans, supervisors, or the actions of any other individuals.
[6] *Id.*
[7] *Id.*

there were far more reasonable options available besides shooting at the Nissan and [Plaintiff]. There were fundamental errors and a gross lack of situational awareness in this incident." (*Id.* at ¶109);

- "KCSD and DOJ personnel, especially Sergeant Lopes, were un-rationally (subjectively) pre-disposed to resistance from the occupants of the Nissan. They failed to independently evaluate the threat or gauge compliance of Mr. Quair and Mr. Quintero, and instead without a threat, unleashed unreasonable and excessive force against them by firing a barrage of lethal rounds at them." (*Id.* at ¶ 111);

- "KCSD and DOJ personnel unleashed an objectively unreasonable and excessive use of lethal force on Mr. Quair and Mr. Quintero without threat to their safety or the safety of the public." (*Id.* at ¶ 116);

- "The use of deadly force against Mr. Quair and Mr. Quintero was excessive and objectively unreasonable under the circumstances, especially because Mr. Quair and Mr. Quintero were un-armed, and they did not pose an immediate threat of death or serious bodily injury to anyone." (*Id.* at ¶ 117);

- "Each investigator present during the objectively unreasonable excessive use of force that morning…"(*Id.* at ¶ 118);

- "Instead, they magnified the unreasonable excessive use of deadly force by allowing Sergeant Lopes and Investigator Sinclair to continue firing, and by firing their own additional rounds at Mr. Quair while he was on the ground, clearly unarmed…" (*Id.* at ¶ 119);

- "Sergeant Lopes' actions in this case, with respect to the tactics Leading up to and during the stop, and amount the amount of force used, reflected, at best, a reckless disregard to the life and safety of Mr. Quair, Mr. Quintero, himself, his fellow officers, and the public." (*Id.* at ¶ 121);

- "Sergeant Lopes' actions in this incident appear as deliberate (and not accidental), and as the cause of the cascading series of events that culminated in the use of deadly force against Mr, Quair." (*Id.* at ¶ 122);

- "…the use of deadly force against Mr. Quair demonstrates that Sergeant Lopes and the DOJ personnel were not properly trained on current officer safety techniques and force options or failed to follow that training and the California Peace Officer Standards and Training (P.O.S.T.) guidelines regarding the proper tactics and procedures, and /or chose to ignore that training."[8] (*Id.* at ¶ 123);

- "The use of force in connection with this incident was also excessive and unreasonable…" (*Id.* at ¶ 125);

- "…they would never have violated Mr. Quair's constitutional right to be free from an excessive and unreasonable use of force. KCSD and DOJ personnels decisions and actions were excessive and unreasonable, and a direct casual factor in the sequence of events leading up to [Plaintiff's] injuries." (*Id.* at ¶ 131);

"Though expert testimony is appropriate where 'scientific, technical, or other specialized

---

[8] As previously noted, Rothschiller does not identify any factual basis for his opinions regarding the State Defendants' training, as he did not review the State Defendants' training or personnel records. His opinions therefore are entirely speculative, conclusory, and lacking in any foundation or basis.

knowledge will assist the trier of fact,' expert testimony consisting of legal conclusions is generally inappropriate." *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005) (quoting *Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 447 (9th Cir.1992) (upholding district court's exclusion of expert legal opinion as "utterly unhelpful")). Under Fed. Rule Evid. 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." While expert witnesses can testify under Rule 704 to the ultimate issue to be decided by the jury, they may not testify to legal conclusions that are intertwined with the ultimate issue. See *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("Resolving doubtful questions of law is the distinct and exclusive province of the trial judge") (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir.1993)). Further, "an expert witness cannot give an opinion as to [his] *legal conclusion*, which is effectively an opinion on an ultimate issue of law." *Hangarter*, 373 F.3d at 1016(emphasis in original).

In situations involving a law enforcement officer's use of force, courts regularly exclude an expert's opinions where the expert seeks to provide ultimate opinions. "An expert witness therefore cannot offer testimony as to the reasonableness of an officer's actions and whether his use of force was appropriate under the facts of the case." *Sanchez v. Jiles*, No. 10-CV-9384, 2012 WL 13005996, at *31 (C.D. Cal. June 14, 2012) (citing *Tubar v. Clift*, No. 05-CV-1154, 2009 WL 1325952, *3 (W.D. Wash. May 12, 2009) (holding that a police practices expert was precluded from offering an opinion as to whether an officer had "probable cause" to believe he was in imminent danger, whether he acted "unconstitutionally," and whether his use of force was objectively unreasonable, as these were conclusions concerning ultimate issues of law)); see also *Shirar v. Guerrero*, No. 1-CV-3906, 2017 WL 6001270, at *5 (C.D. Cal. Aug. 2, 2017) (" Police practices experts may only testify as to whether an action conformed with a reasonable standard of practice, not whether the particular officer's action was reasonable under the specific circumstances he faced.") Similarly, an expert's "opinion as to what 'current law' 'mandates' or whether defendants were 'legally' 'justified' in using the force applied against [the plaintiff] usurps the jury's role." *Taylor v. Lemus*, No. CV 11-9614 FMO (SSx), 2015 WL 12698306, at *6

(C.D. Cal. June 17, 2015) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994)).

In law enforcement use of force cases, the courts additionally bar experts from employing judicially defined or legally specialized terms in expressing their opinions relating to the issue of excessive force. This includes prohibitions on the use of such phrases that defendants "acted unconstitutionally or used excessive force" (*Rascon v. Brookins*, No. CV-14-00749-PHX-JJT, 2018 WL 739696, at *4(D. Ariz. Feb. 7, 2018)); terms such as "grossly unlawful, unnecessary, and excessive violence" (*Monroe v. Griffin*, No. 14-CV-00795-WHO, 2015 WL 5258115, at *6–7 (N.D. Cal. Sept. 9, 2015)); offering opinions that the "use of force was excessive or unreasonable under the circumstances" (*Valtierra*, 99 F. Supp. 3d at 1198). Experts have also been barred from offering legal conclusions couched in the guise of law enforcement "training". *Molina v. City of Visalia*, No. 1:13-cv-01991-DAD-SAB, 2016 WL 8730723, at *6, n.1 (E.D. Cal. Sep. 16, 2016) (where plaintiff's police practices expert was precluded from testifying that the use of lethal force was unlawful under the circumstances, as taught by P.O.S.T.).

Accordingly, the Court should enter an order precluding Rothschiller from testimony regarding, and offering, the opinions identified in Rule 26 Report, as well as his deposition, that constitute improper and impermissible legal opinions as discussed above.

**C.    The Court Should Enter an Order Barring Rothschiller from Testifying or Providing Any Opinions Regarding What Additional Resources Were Allegedly Available at the Time of the Use of Force.**

A separate fatal flaw in Rothschiller's opinions consists of his self-admitted lack of familiarity with not only the specifics of Operation Red Reaper, but also regarding what additional resources were available to the Defendants at the time of the incident. During his deposition, Rothschiller repeatedly admitted he had never heard of Operation Red Reaper before that date, that he had not reviewed any records or documents relating to Operation Red Reaper, did not know how many people were involved in the Operation (either as subjects of the Operation or as law enforcement officers), did not know what the basis of Operation Red Reaper related to. (Rothschiller Tr., at 18:9-20; 95:21-96:7; 108:24-109:3; 120:1-3; 120:14-121:2.) Not only was Rothschiller unaware of the specifics of Operation Red Reaper, but he apparently made no request to Plaintiff's counsel for information relating to the underlying Operation that led to

15

the incident nor did he make any attempt to perform an independent investigation of what

Operation Red Reaper related to – including something so simple, cursory, and commonplace as a

"Google" search. (*Id.* at 18:9-22; 95:21-96:24; 96:5-98:5.)

Rothschiller further admitted that he had no knowledge regarding what resources,

including S.W.A.T. or K9 officers were available, much less how local law enforcement agencies

managed such resources. (Rothschiller Tr. at 120:14-121:12; 169:2-4; 169:17-170:24; 171:6-13;

167:12-20; 171:14-16.) Again, he apparently made no attempt to obtain information regarding

these resources and their availability at the time of the incident before making his opinions. (*Id.* at

18:9-22; 95:21-96:24; 96:5-98:5.) However, he makes sweeping opinions and conclusions

regarding these same categories that he lacks *any* knowledge for.

In his report, Rothschiller states that "[a]dditional resources, SWAT vehicles, K9 officers,

etc., were available to the surveilling investigators and Sergeant Lopes, which would have

minimized or prevented the use of unreasonable force against [Plaintiff]." (Rothschiller Rep. at ¶

126.) He likewise concludes "[t]he use of deadly force in connection with this incident was also

unreasonable because there were far more reasonable options available besides shooting at the

Nissan and Mr. Quair. There were fundamental errors and a gross lack of situational awareness in

this incident." (*Id.* at ¶ 109). Similarly, Rothschiller concludes "[r]ather than coordinate an arrest

plan, arrange for additional resources including less lethal options, a K9, SWAT vehicles, etc.,

that would have increased the odds of a safe, non-use-of-force resolution, Sergeant Lopes

initiated a traffic stop before his assisting units were prepared." (*Id.* at ¶ 56.) Rothschiller

identifies no facts whatsoever to support these statements and conclusory opinions, which form

the basis of his key conclusions regarding the use of force.

The Court should enter an order barring Plaintiff from eliciting any testimony from

Rothschiller regarding what other resources were allegedly available at the time of the incident.

Rothschiller's own deposition testimony clearly establishes he lacks any knowledge of whether

S.W.A.T., K9, or any other resources were available to the officers at the time of the incident.

Rothschiller identifies nothing to support or lend credence to his arguments and opinions.

Because of this, this is not a situation going to the weight of the opinion evidence, but instead

consists of an absolute lack of any factual basis for the opinion evidence to be offered at all, and therefore any testimony by Rothschiller is wholly speculatory and without basis and therefore cannot be helpful or informative to the jury, and will lead to a foundational misrepresentation of the facts and circumstances, result in juror confusion, and will constitute a knowing attempt to mislead the jury.

      **D.**    **Rothschiller Should Be Barred from Testifying Regarding Any Investigation Into the Underlying Incident, as Well As Offering Any Opinions Regarding Such Investigations, as He Lacks Specific Knowledge Regarding This Matter and His Opinions and Testimony Lack Foundation or Any Basis.**

In his Rule 26 Report, as well as in his deposition testimony, Rothschiller testified that he had concluded that the Defendants violated policies and procedures, and acted improperly, by failing to arrange for an investigation to be performed into the use of force.

Rothschiller's conclusions are contradicted by well-established facts in this case. First, the use of force was the subject of multiple investigations, including those conducted by the Kings County Sheriff's Department, an independent investigation performed by the Hanford Police Department, as well as a legal investigation and conclusion by the Kings County District Attorney's Office regarding the use of force involved here. These reports were well known to the Plaintiff prior to his retention of Rothschiller, as they were identified in both the State Defendants' and the County of Kings Defendants' Initial Rule 26 disclosures (as were the individuals involved in conducting these investigations.)

Rothschiller's opinions in this area accordingly lack foundation and constitute sheer speculation. "Opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion." *U.S. v. R.J. Reynolds Tobacco Co.*, 416 F.Supp.316, 325 (D. New Jersey 1976). The Ninth Circuit has held that an expert's opinion is properly excluded where it is not sufficiently founded on facts. *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 830-831 (9th Cir. 2001). Similarly, Fed. R. Evid. 703 provides that an expert "may base an opinion on facts or data in the case *that the expert has been made aware of or personally observed.*" Federal Rules of Evidence 702 similarly provides that expert

testimony must be "based on sufficient facts or data." Accordingly, the key inquiry regarding the expert's opinion is whether the expert had sufficient factual knowledge to reach the conclusion and opinion proferred. *Elosu v. Middlefork Ranch Incorporated*, 26 F.4th 1017, 1025-1026 (9th Cir. 2024). A district court is therefore required to "determine whether an expert had sufficient factual grounds on which to draw conclusions." *Id.*(quoting *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1475 (1st Cir. 1996). A court may "look behind" expert testimony and opinions to determine whether the testimony and opinions have an adequate factual or scientific foundation. *Forman v. Pillsbury*, 753 F.Supp. 14, 18 (D. D.C. 1990).

During his deposition, Rothschiller's testimony revealed that he had been provided a carefully selected and collated "world" of materials to review to perform his opinions, and anything that did not fit within the Plaintiff's desired outcome was excluded. Not only was Rothschiller not told by Plaintiff that independent investigations had been performed, but Plaintiff declined to produce these reports to Rothschiller. While Plaintiff did not produce the reports to Rothschiller, Plaintiff did, however, produce selected excerpts from the reports to Rothschiller without disclosing that they were from the investigations performed into the underlying incident (such as the recorded interviews of the Defendants).

Rothschiller testified at deposition that not only was he unaware of the existence of these prior reports, but he had made no attempt to independently investigate the incident and the surrounding facts himself, or determine whether any investigation had actually been performed – despite admitted he expected that the District Attorney's Office would have investigated the incident (which it did.) Rothschiller further admitted he did not make any attempt to follow up regarding this issue with Plaintiff.

This is not a situation where the issue goes to the weight of the expert's testimony, nor does it go to the expert credibility. Instead, the issue here is whether Rothschiller had the required facts and knowledge to reach the opinions and testimony offered. The evidence, including Rothschiller's own deposition testimony, unequivocally establishes that he did not because he was not provided with this information by Plaintiff. Therefore, Rothschiller's opinions must be excluded.

**E.    The Court Should Enter an Order Barring Rothschiller from Offering Any Opinions Based Upon Information that Was Not Known to the Defendants at the Time of the Use of Force, Including that Plaintiff Was Unarmed.**

In his written Rule 26 Report, as well as his deposition testimony, Rothschiller repeatedly opines that the Defendants used excessive force because it was subsequently found that Plaintiff was unarmed at the time force was used. Rothschiller Rep., at ¶¶ 48, 106 ("…their use of deadly force was excessive and unreasonable. [Plaintiff] was unarmed…"), 117 ("The use of deadly force against [Plaintiff] and Mr. Quintero was excessive and objectively unreasonable under the circumstances, especially because [Plaintiff] and Mr. Quintero were un-armed, and they did not pose an immediate threat of death or serious bodily injury to anyone."), 119 ("Investigators Compston and Silveira, who both had a clear view of Mr. Quair while he was on the ground, unarmed, and obviously injured… and by firing their own additional rounds at Mr. Quair while he was on the ground, clearly unarmed.").

In claims of excessive force under the Fourth Amendment, the reasonableness of a particular use of force is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones v. City of North Las Vegas*, 150 F.4th 1030, 1038 (9th Cir. 2025); *Johnson v. Myers*, 129 F.4th 1189, 1193-1194 (9th Cir. 2025); *Graham*, 490 U.S. at 396. As the Supreme Court has recognized, ""The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018). The Ninth Circuit has instructed that an "officer's use of force cannot be deemed excessive based on facts that he reasonably would not have known or anticipated." *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017).

Rothschiller's conclusions that the use of force was excessive and unreasonable, both inappropriate and impermissible legal conclusions for an expert to attempt to offer at trial, are improper because they are founded not upon information known at the time of the incident, but instead upon information that was discovered *after* the use of force had been concluded and Plaintiff taken into custody. There is no evidence showing, or even inferring, that the Defendants

1   had knowledge prior to the conclusion of the incident (when Plaintiff was taken into custody and

2   finally searched) that he was unarmed. Rothschiller's opinions in this regard are exactly the type

3   of hindsight based opinions and conclusions that the Supreme Court and the Ninth Circuit have

4   repeatedly held to be improper in a Fourth Amendment use of force analysis. *Kisela*, 584 U.S.

5   103; *Lowry*, 858 F.3d at 1257; *Jones*, 150 F.4th at 1038; *Johnson*, 129 F.4th at 1193-1194.

6   Accordingly, Rothschiller's opinions, as they are based upon knowledge only acquired

7   after the incident, are wholly improper and must be excluded. The Court should accordingly enter

8   an order barring Rothschiller from testifying as to these opinions.

9   **F.     Rothschiller's Opinions and Testimony Regarding the State Defendants'
         Failure to Comply with Policies and Procedures Must Be Excluded as
10        Rothschiller Had No Knowledge or Familiarity with the Department of
         Justice's Policies and Procedures, and Rothschiller Erroneously and
11        Improperly Opined the State Defendants Were Obligated to Comply with
         the County of Kings' Policies and Procedures**

12   This Court must also enter an order excluding any testimony, opinions, or references by

13   Rothschiller regarding the alleged failure of the State Defendants to follow applicable policies

14   and procedures.

15   In Rothschiller's Rule 26 Report, Rothschiller repeatedly opines that the State Defendants

16   were negligent and failed to comply with the standards applicable to law enforcement offices

17   because they did not comply with the *County of Kings'* policies and procedures. In his Rule 26

18   Report, Rothschiller repeatedly references specific provisions from the County of Kings Sheriff's

19   Department's Policies and Procedures Manual, including provisions relating to the use of force

20   and deadly force in reaching his opinions and conclusions regarding the actions of all of the law

21   enforcement officers present at the scene (including officers who are not named as parties, as well

22   as officers from law enforcement agencies *other than* the California Department of Justice and

23   the County of Kings.) Rothschiller Rep. at ¶¶ 33, 34, 79, 86, 87, 89, 107 ("…therefore the use of

24   deadly force by the investigators was inappropriate, excessive, and unreasonable, violated

25   generally accepted policing training and standards, *and violated KCSD policy.*"), 118 ("Each

26   investigator present during the objectively unreasonable excessive use of force that morning had

27   the ethical and moral duty, *and as outlined in KCSD Policy 300.2.1…*"). In another section,

28

Rothschiller opines that all of the law enforcement officers present – including not only the State Defendants but those belonging to other independent, separate law enforcement agencies – "did not provide any first aid or lifesaving measures for [Plaintiff] in clear violation of KCSD policy." (*Id.* at ¶ 82.)

Nowhere in Rothschiller's Report does he identify or claim that he ever reviewed, much less was familiar with, the policies and procedures of the California Department of Justice. In fact, the *only* policies and procedures he identifies in his list of materials reviewed as part of the preparation of his opinions is the "KCSD [Kings County Sheriff's Department] policy manual", a "Lexipol / Policy Manual", the "KCSD's Use of Force and Deadly Force Policies", and allegedly an unknown number of unidentified policies of other agencies, which Rothschiller vaguely describes in his required report as "Surrounding Counties [sic] policy and police [sic] manuals, and Lexipol Manuals re: use of force applications." Rothschiller Report, at 2, ¶¶ 7, 8, 13, 14. Rothschiller additionally references reviewing the "Ventura County Criminal Justice Training Center Field Training manual." Rothschiller Rep., at 2, ¶ 15.

During his deposition, Rothschiller testified that he had not been provided with the policies and procedures for the California Department of Justice, and that he had not reviewed the Department of Justice's policies and procedures. (Rothschiller Tr. at 98:6-99:8.) Rothschiller conceded that the State Defendants were not subject to, and not within the coverage of, the County of Kings' policies and procedures (despite his opinions to the contrary), and that they were subject to their own department's policies. (Rothschiller Tr. at 99:14-100:10.) Rothschiller further admitted that P.O.S.T. guidelines do not constitute departmental policies and procedures. (*Id.* at 101:20-23, 125:5-117:17.)

Rothschiller further admitted that he had not been provided with any Department of Justice policies and procedures by Plaintiff as part of his retention. (Rothschiller Tr. at 97:10-99:8; 100:4-101:2/) Significantly, although Rothschiller was aware that he had not been provided with policies and procedures that applied to the State Defendants, he admitted he made absolutely no attempt to obtain a copy of these policies and procedures so that he could review them and prepare his opinions. (*Id.*)  He did not follow up with Plaintiff's counsel to request copies of the

21

Department of Justice policies and procedures, nor did he make any attempt to independently obtain a copy of the policies and procedures he was well aware applied to the State Defendants. (*Id.*)

There is absolutely no factual basis for *any* opinions by Rothschiller regarding whether the actions of the State Defendants did not comply with *any* applicable policies and procedures. Rothschiller not lacked knowledge of the State's policies and procedures, but he intentionally made no attempts to obtain the policies and procedures and instead deliberately proceeded to form opinions without this information. Rothschiller's lack of knowledge regarding the existence and contents of the Department of Justice's policies and procedures. As an expert witness testifying to law enforcement agencies policies and procedures, Rothschiller is expected to be aware of the fact that all California law enforcement agencies have been required, pursuant to California law, to publish their policies and procedures on their departmental websites since January 2020 – nearly three years before Rothschiller's deposition. Accordingly, this material was available to Rothschiller at all times, and his failure to do even a minimal amount of inquiry and research serves to render his opinions wholly speculative and without any factual support or basis.

Accordingly, Rothschiller's opinions must be excluded, and he must be barred from offering any opinions regarding whether the State Defendants' actions complied with applicable policies and procedures. Rothschiller's opinions are wholly speculative, lack any factual basis or foundation, and are therefore not only entirely unhelpful to the trier of fact, but are fundamentally and legally misleading and improper.

## CONCLUSION

Accordingly, the State Defendants request that the Court grant the motion in limine barring Plaintiff and/or his counsel from introducing or attempting to elicit any testimony or opinions at trial from Rothschiller, or anyone else, regarding Rothschiller's opinions identified herein.

1    Dated: October 27, 2025                    Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California

3

4

5                                                NORMAN D. MORRISON
                                                 Supervising Deputy Attorney General
6                                                *Attorneys for Defendants Neil Compston,
                                                 John Silveira and Edward Sinclair*

7    FR2021301267

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF SUPERVISING DEPUTY ATTORNEY GENERAL NORMAN D. MORRISON IV IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT, CURTIS ROTHSCHILLER [STATE MIL NO. 2]**

I, Norman D. Morrison IV, do hereby declare as follow:

1.      I am employed by the State of California Department of Justice, Office of the Attorney General, as a Supervising Deputy Attorney General. I am counsel of record for Defendants Neil Compston, John Silveira and Edward Sinclair in this case. I am aware of the facts identified herein, and if called to testify I could and would testify accurate to them. This Declaration is made in support of the Defendants' Motion in Limine to exclude portions of the opinions and testimony of Plaintiff's designated expert, Curtis Rothschiller.

2.      This lawsuit arises out of a shooting that occurred during the early morning hours on June 18, 2019, on a road next to State Route 43 near Hanford, California. Prior to this incident, Plaintiff Freddie Quair, Jr. had been under surveillance for multiple months as part of a joint Federal, State and local task force known as "Operation Red Reaper" that was investigating the Nuestra Familia criminal organization and the Norteño street gangs in the Kings and Tulare County region. As one of the targets of Operation Red Reaper, Plaintiff was the subject of a combination of video, audio, and electronic surveillance over a period of months performed by the Defendants. This included wiretaps of phone numbers used by Plaintiff and his criminal associates, including Jose Quintero. The months-long surveillance captured evidence of Plaintiff engaging in the trafficking of illegal firearms with other criminals, the sales of narcotics, and the discussion of various criminal activities relating to the Norteños and Nuestra Familia.

3.      Both the State Defendants and the County of Kings served initial disclosures in this case pursuant to Fed. R. Civ. P. 26. These disclosures identified witnesses and documents known to the Defendants, and the disclosures specifically identified the separate investigations into the underlying incident performed by the Hanford Police Department, the County of Kings Sheriffs Department, as well as the Kings County District Attorneys office. Attached as Exhibit "A" is a true and correct copy of the State Defendants' initial disclosures identifying these reports and witnesses. Attached as Exhibit "B" is a true and correct copy of the County of Kings' initial

24

1    disclosures that also identify these reports and witnesses.

2        4.      In 2022, Plaintiff served a copy of their expert designation, identifying Curtis

3    Rothschiller as their police practices expert. A copy of Mr. Rothschiller's expert report, served

4    pursuant to Fed. R. Civ. P. 26, is attached hereto as Exhibit "C". Since their service of Mr.

5    Rothschiller's report in 2022, Plaintiff has not served any supplemental expert report or advised

6    that Mr. Rothschiller had any additional or different opinions beyond those expressed in his report

7    and at his deposition, or that he had reviewed any additional documents.

8        5.      On October 10, 2022, the deposition of Curtis Rothschiller was taken. During this

9    deposition Mr. Rothschiller admitted, among other things, that he had not been provided with

10   multiple relevant documents by Plaintiff's that directly related to his opinions, including the

11   multiple reports into the underlying incident performed by the Hanford Police Department, the

12   County of Kings Sheriff's Department, and the Kings County District Attorney's Office; the

13   policies and procedures of the California Department of Justice; and the statements and

14   deposition testimony of witnesses. Attached hereto as Exhibit "D" is a true and correct copy of

15   relevant portions of Mr. Rothschiller's deposition testimony.

16       I hereby declare under penalty of perjury that the foregoing is true and correct. Executed

17   this 27th day of October, 2025, in Fresno, California.

18

19   _____

20                   Norman D. Morrison IV

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# A

1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  PAMELA J. HOLMES, State Bar No. 147360
   Supervising Deputy Attorney General
3  NORMAN D. MORRISON, State Bar No. 212090
   Deputy Attorney General
4    2550 Mariposa Mall, Room 5090
     Fresno, CA  93721
5    Telephone:  (559) 705-2304
     Fax:  (559) 445-5106
6    E-mail:  Norman.Morrison@doj.ca.gov
   *Attorneys for Defendants Neil Compston, John*
7  *Silveira, Edward Sinclair*

8

                IN THE UNITED STATES DISTRICT COURT
9
            FOR THE EASTERN DISTRICT OF CALIFORNIA
10
                        CIVIL DIVISION
11

12

13  **FREDDIE QUAIR,**                      1:20-cv-01793

14                          Plaintiff,      **DEFENDANTS' INITIAL
                                            DISCLOSURES PURSUANT TO FED. R.**
15          v.                              **CIV. P. 26**

16
    **COUNTY OF KINGS; TAYLOR LOPES;**
17  **NEIL COMPSTON; JOHN SILVERIA;**
    **EDWARD SINCLAIR; AND DOES 1**         Trial Date:     TBD
18  **THROUGH 10, inclusive,**              Action Filed:   December 21, 2020

19                          Defendants.

20

21          To All Parties, and their Counsel of Record:

22          Defendants Neil Compston, John Silveria, and Edward Sinclair submit the following

23  disclosures in accordance with Fed. R. Civ. P. 26.

24  ///

25  ///

26  ///

27  ///

28  ///

                                    1

I.   **WITNESSES**

**Fed. R. Civ. P. 26(a)(1)(A)(i) – The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support his or her claims or defenses, unless the use would be solely for impeachment.**

1.   Plaintiff Freddie Quair, Jr.
     C/O Plaintiff's counsel of record
     Plaintiff, occupant of vehicle, suspect in armed home invasion.

2.   Jose Juan Quintero
     1155 Summer Field Court
     Hanford, CA 93230
     Quintero was the driver of the vehicle stopped during the incident, and was also a party to the armed home invasion that preceded the vehicle stop.

3.   David Perez Hernandez III
     809 Van Zante Street,
     Hanford, CA 93230
     Hernandez is a party to the armed home invasion that preceded the vehicle stop.

4.   Special Agent Neil Compston
     C/O Deputy Attorney General Norman D. Morrison IV
     California Attorney General's Office
     2550 Mariposa Mall, Room 5090
     Fresno, CA 93721
     (559) 705-2304
     Special Agent Compston was involved in the incident alleged in Plaintiff's complaint, and is a witness to the events. Special Agent Compston was also involved in the surveillance conducted on Plaintiff as a part of Operation Red Reaper, including surveillance of Plaintiff engaged in various illegal activities including the sale and distribution of narcotics and illegal firearms.

5.   Special Agent John Silveira
     C/O Deputy Attorney General Norman D. Morrison IV
     California Attorney General's Office
     2550 Mariposa Mall, Room 5090
     Fresno, CA 93721
     (559) 705-2304
     Special Agent Silveira Agent Compston was involved in the incident alleged in Plaintiff's complaint, and is a witness to the events. Special Agent Compston was also involved in the surveillance conducted on Plaintiff as a part of Operation Red Reaper, including surveillance of Plaintiff engaged in various illegal activities including the sale and distribution of narcotics and illegal firearms.

2

6. Special Agent Edward Sinclair
   C/O Deputy Attorney General Norman D. Morrison IV
   California Attorney General's Office
   2550 Mariposa Mall, Room 5090
   Fresno, CA 93721
   (559) 705-2304
   Special Agent Sinclair was involved in the incident alleged in Plaintiff's complaint, and
   is a witness to the events. Special Agent Sinclair was also involved in the surveillance
   conducted on Plaintiff as a part of Operation Red Reaper, including surveillance of
   Plaintiff engaged in various illegal activities including the sale and distribution of
   narcotics and illegal firearms.

7. Kings County Sheriff's Sergeant Taylor Lopes
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Sergeant Lopes was involved in the incident alleged in Plaintiff's complaint, and is a
   witness to the events.

8. Special Agent Chase Dobbins
   C/O Deputy Attorney General Norman D. Morrison IV
   California Attorney General's Office
   2550 Mariposa Mall, Room 5090
   Fresno, CA 93721
   (559) 705-2304
   Special Agent Dobbins was involved in the incident alleged in Plaintiff's complaint,
   and is a witness to the events. Special Agent Dobbins was also involved in the
   surveillance conducted on Plaintiff as a part of Operation Red Reaper, including
   surveillance of Plaintiff engaged in various illegal activities including the sale and
   distribution of narcotics and illegal firearms.

9. Special Agent Dean Johnston
   C/O Deputy Attorney General Norman D. Morrison IV
   California Attorney General's Office
   2550 Mariposa Mall, Room 5090
   Fresno, CA 93721
   (559) 705-2304
   Special Agent Johnston is a supervisor of Special Agents Compston, Silveira, Sinclair,
   and Dobbins who was monitoring the wiretap of Plaintiff's telephone, and was involved
   in the decision to perform a vehicle stop to apprehend Quair and monitored the
   proceedings by radio. Johnston was present at the scene after the incident during the
   investigation and assisted in the investigation of the incident. Special Agent Johnston
   was also involved in the surveillance conducted on Plaintiff as a part of Operation Red
   Reaper, including surveillance of Plaintiff engaged in various illegal activities including
   the sale and distribution of narcotics and illegal firearms.

3

10. California Highway Patrol Officer John Scomona
    C/O Deputy Attorney General Norman D. Morrison IV
    California Attorney General's Office
    2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
    (559) 705-2304
    Officer Scomona was involved in the incident alleged in Plaintiff's complaint, and is a witness to the events.

11. California Highway Patrol Officer Nick Fishbough
    C/O Deputy Attorney General Norman D. Morrison IV
    California Attorney General's Office
    2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
    (559) 705-2304
    Officer Fishbough was the pilot of AIR 43, the California Highway Patrol observation plane that conducted video surveillance of the incident.

12. California Highway Patrol Officer Dusty Manning
    C/O Deputy Attorney General Norman D. Morrison IV
    California Attorney General's Office
    2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
    (559) 705-2304
    Officer Mancebo was the observer in AIR 43, the California Highway Patrol observation plane that conducted video surveillance of the incident.

13. Special Agent Nathan Mancebo
    C/O Deputy Attorney General Norman D. Morrison IV
    California Attorney General's Office
    2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
    (559) 705-2304
    Special Agent Mancebo has knowledge of the incident and events by participating in the investigation of the events forming the basis of Plaintiff's complaint.

14. California Highway Patrol Officer M. Szatmari
    C/O Deputy Attorney General Norman D. Morrison IV
    California Attorney General's Office
    2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
    (559) 705-2304
    Officer Szatmari has knowledge of the incident and events by participating in the investigation of the events alleged in Plaintiff's complaint.

4

15. California Highway Patrol Sergeant Rico Vasquez
C/O Deputy Attorney General Norman D. Morrison IV
California Attorney General's Office
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 705-2304
Sergeant Vasquez has knowledge of the incident and events by participating in the interviews of the California Highway Patrol officers during the course of the investigation of the events alleged in Plaintiff's complaint.

16. California Highway Patrol Officer Dan Sanchez
C/O Deputy Attorney General Norman D. Morrison IV
California Attorney General's Office
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 705-2304
Officer Sanchez has knowledge of the incident and events by participating in the investigation of the events alleged in Plaintiff's complaint.

17. Gabriel Lee Andrada
C/O Deputy Attorney General Norman D. Morrison IV
California Attorney General's Office
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 705-2304
Gabriel Andrada is a witness to the events alleged in Plaintiff's Complaint, and has stated he saw Plaintiff shooting in his direction, and feared for his life.

18. Hanford Police Department Corporal Christifer Barker
425 North Irwin Street
Hanford, CA 93230
Corporal Barker has knowledge of Plaintiff's involvement in the armed home invasion that occurred shortly before the vehicle stop, and was involved in the investigation of the armed home invasion.

19. Corcoran Police Department Officer Carlos Andrade
911 Hanna Avenue
Corcoran, CA 93212
Officer Andrade has knowledge of Plaintiff's involvement in the armed home invasion that occurred shortly before the vehicle stop, and was involved in the investigation of the armed home invasion.

20. Dr. Lindita Coku
400 West Mineral King Avenue
Visalia, CA 93291
Dr. Coku treated Plaintiff for gunshot wounds following the vehicle stop, and retrieved evidence that was turned over to law enforcement.

5

21. Alexander Mark Perez
    8471 Hanford Armona Road
    Hanford, CA 93230
    Mr. Perez is the registered owner of vehicle occupied and used by Quintero and
    Plaintiff at the time of the events alleged in Plaintiff's complaint.

22. Kings County Sergeant Bettencourt
    C/O James Arendt, Esq.
    Weakley & Arendt
    5200 N. Palm Avenue, Suite 211
    Fresno California 93704
    Tel. (559) 221-5256
    Sergeant Bettencourt has knowledge of the events because he was involved in the
    investigation, and assisted in the preparation of reports and search warrants.

23. Jessica Machado
    C/O James Arendt, Esq.
    Weakley & Arendt
    5200 N. Palm Avenue, Suite 211
    Fresno California 93704
    Tel. (559) 221-5256
    Ms. Machado is understood to be an employee of the Kings County Sheriff's
    Department, and has knowledge of the events because of her participation and
    assistance in the investigation.

24. Kings County Sheriff's Department Detective Andrew Mazza
    C/O James Arendt, Esq.
    Weakley & Arendt
    5200 N. Palm Avenue, Suite 211
    Fresno California 93704
    Tel. (559) 221-5256
    Detective Mazza has knowledge of the events because he was involved in the
    investigation and interviews of witnesses and participants.

25. Kings County Sheriff's Department Detective Eric Essman
    C/O James Arendt, Esq.
    Weakley & Arendt
    5200 N. Palm Avenue, Suite 211
    Fresno California 93704
    Tel. (559) 221-5256
    Involved in investigation of the incident.
    Detective Essman has knowledge of the events because he was involved in the
    investigation and interviews of witnesses and participants.

6

26. Kings County Sheriff's Department Deputy J. Brewster
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Deputy Brewster has knowledge of the events because he was involved in the investigation.

27. Kings County Sheriff's Department Detective Rios
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Deputy Rios has knowledge of the events because he was involved in the investigation.

28. Kings County Sheriff's Department Detective Elizabeth Cisneros
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Detective Cisneros has knowledge of the events because she was involved in the investigation.

29. Kings County Sheriff's Department Deputy C. Santos
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Deputy Santos has knowledge of the events because he was involved in the investigation.

30. Kings County Sheriff's Department Deputy B. Moore
   C/O James Arendt, Esq.
   Weakley & Arendt
   5200 N. Palm Avenue, Suite 211
   Fresno California 93704
   Tel. (559) 221-5256
   Deputy Moore has knowledge of the events because he was involved in the investigation.

7

31. Hanford Police Detective Raymond Dias
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Detective Dias has knowledge of the events because he was involved in the
   investigation.

32. Hanford Police Department Detective Ryan Tomey
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Detective Tomey has knowledge of the events because he was involved in the
   investigation.

33. Hanford Police Department Detective Alsie Ortega
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Detective Brewster has knowledge of the events because he was involved in the
   investigation.
   .

34. Hanford Police Department Sergeant Justin Vallin
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Sergeant Vallin has knowledge of the events because he was involved in the
   investigation.

35. Hanford Police Department Detective Jarred Cotta
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Detective Cotta has knowledge of the events because he was involved in the
   investigation.

36. Hanford Police Department Communications Dispatch Supervisor Toni Barns
   425 North Irwin Street
   Hanford, CA 93230
   (559) 585-2540
   Supervisor Barns has knowledge of the events because she was responsible for
   reviewing, identifying, and obtaining the relevant radio communications traffic as part
   of the investigation.

37. Kings County Fire Department Captain Gong
    208 Campus Drive
    Hanford, CA 93230
    (559) 852-2881
    Captain Gong has knowledge of the events involving Plaintiffs post-shooting medical treatment and care, as well as the decision to stage emergency medical services until the scene was safe because he was involved in the response to the incident.

38. Kings County Fire Department Firefighter D. Bravo
    208 Campus Drive
    Hanford, CA 93230
    (559) 852-2881
    Firefighter Bravo has knowledge of the events involving Plaintiffs post-shooting medical treatment and care, as well as the decision to stage emergency medical services until the scene was safe, as he was involved in the response to the incident.

39. Daniel Fulks
    American Ambulance
    910 Garner Avenue
    Hanford, CA 93230
    (559) 585-6803
    Mr. Fulks has knowledge of the events involving Plaintiffs post-shooting medical treatment and care, as well as the decision to stage emergency medical services until the scene was safe because he was involved in the response to the incident.

40. Laura Diez
    American Ambulance
    910 Garner Avenue
    Hanford, CA 93230
    (559) 585-6803
    Ms. Diez has knowledge of the events involving Plaintiffs post-shooting medical treatment and care, as well as the decision to stage emergency medical services until the scene was safe because she was involved in the response to the incident.

41. Scott Davis
    American Ambulance
    910 Garner Avenue
    Hanford, CA 93230
    (559) 585-6803
    Mr. Davis has knowledge of the events involving Plaintiffs post-shooting medical treatment and care, as well as the decision to stage emergency medical services until the scene was safe because he was involved in the response to the incident.

9

42. Lemoore Police Department Officer Kevin Kurtz
657 Fox Drive
Lemoore, CA 93245
Officer Kurtz has knowledge of the events because he was involved in the investigation.

43. Ana Laura Navarro
1709 Hale Avenue
Corcoran, CA 93212
Ms. Navarro was the victim of, and a witness to, the armed home invasion conducted by Plaintiff and Quintero shortly before the Victim/Witness of home invasion by Plaintiff and Quintero

**Fed. R. Civ. P. 26(a)(1)(A)(ii) – A copy, or a description by category, and location of all documents, electronically stored information, and tangible things that the disclosing party has in his or her possession, custody, or control and may use to support his or her claims or defenses, unless the use would be solely for impeachment.**

1.      Arrest Warrant for Freddie Quair, Jr., a copy of which is in the possession of Defendants' counsel of record.

2.      Arrest Warrant for Jose Quintero, Jr., a copy of which is in the possession of Defendants' counsel of record.

3.      Search Warrant for 2015 Nissan Altima SL, Cal. #7MTM281, a copy of which is in the possession of Defendants' counsel of record.

4.      California Highway Patrol Vehicle Report, CHP 180, a copy of which is in the possession of Defendants' counsel of record.

5.      Hanford Police Department Critical Incident Investigation Report, a copy of which is in the possession of Defendants' counsel of record.

6.      Kings County Sheriff's Office Incident Report for Incident 19K019976, a copy of which is in the possession of Defendants' counsel of record.

7.      Plaintiff's medical records from Kaweah Delta Medical Center for treatment on June 18, 2019, a copy of which is in the possession of Defendants' counsel of record.

8.      Corcoran Police Department Criminal Report for Case C1901057, a copy of which is in the possession of Defendants' counsel of record.

9.      County of Los Angeles Department of Medical Examiner Coroner Gunshot Residue Test Results, copies of which are in the possession of Defendants' counsel of record.

10.     Aerial video of incident taken by California Highway Patrol AIR 43, a copy of which is in the possession of Defendants' counsel of record.

11.     FARO Scan of scene, a copy of which is in the possession of Defendants' counsel of record.

12.     Approximately 833 images of the scene, Plaintiff, and other evidence, copies of which are in the possession of Defendants' counsel of record.

13.     Recordings of interviews of Sergeant Lopes, Special Agent Dobbins, Special Agent Sinclair, Special Agent Silveira, Special Agent Neil Compston, California Highway Patrol Officer John Scomona, California Highway Patrol Officer Fishbough, California Highway Patrol Manning, Gabriel Andrade, and Jose Quintero.

14.     Recording of radio communications traffic during incident, a copy of which is in the possession of Defendants' counsel of record.

10

1    15.    Surveillance recordings of Plaintiff discussing and engaging in the illegal sale,
2    transportation, and distribution of firearms.

3    **Fed. R. Civ. P. 26(a)(1)(A)(iii) – A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material (unless privileged or protected from disclosure) on which each computation is based, including materials bearing on the nature and extent of injuries suffered:**

6        Not applicable.

7    **Fed. R. Civ. P. 26(a)(1)(A)(iv) – For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

10       Not applicable.

11   Dated:  June 30, 2021                    Respectfully submitted,

12                                            ROB BONTA
                                             Attorney General of California
13                                           PAMELA J. HOLMES
                                             Supervising Deputy Attorney General
14
15                                           /s/ Norman D. Morrison
16                                           NORMAN D. MORRISON
                                             Deputy Attorney General
17                                           *Attorneys for Defendants Neil Compston, John Silveira, Edward Sinclair*
18
19   FR2021301267
     95392483.docx
20
21
22
23
24
25
26
27
28

11

Defendants' Initial Disclosures Pursuant to Fed. R. Civ. P. 26  (1:20-cv-01793)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    ***Quair v. County of Kings, et al.***
No.:          **1:20-cv-01793**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On June 30, 2021, I served the attached **DEFENDANTS' INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26** by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 2550 Mariposa Mall, Room 5090, Fresno, CA 93721, addressed as follows:

Dale K. Galipo, Esq.
Renee V. Masongsong, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367-6479
*Attorney for Plaintiff*

James J. Arendt, Esq.
Attorney at Law
Weakley, Ratliff, Arendt & McGuire, LLP
5200 N. Palm Avenue, Suite 211
Fresno, CA 93704
*Attorney for County of Kings & Lopes*

Darrell J. York
Attorney at Law
Law Office of Darrell J. York
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
*Attorney for Plaintiff*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 30, 2021, at Fresno, California.

| Lisa Gaad | /s/ Lisa Gaad |
|---|---|
| Declarant | Signature |

FR2021301267
95393793.docx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# B

1    James J. Arendt, Esq.    Bar No. 142937
     Ashley N. Reyes, Esq.    Bar No. 312120
2
            WEAKLEY & ARENDT
3           A Professional Corporation
          5200 N. Palm Avenue, Suite 211
4            Fresno, California 93704
           Telephone: (559) 221-5256
5          Facsimile:  (559) 221-5262
            James@walaw-fresno.com
6           Ashley@walaw-fresno.com

7    Attorneys for Defendants County of Kings and Taylor Lopes

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   FREDDIE QUAIR,                    ) CASE NO.  1:20-CV-01793-NONE-SKO
                                       )
12              Plaintiff,             )
                                       )
13        vs.                          ) **DEFENDANT COUNTY OF KINGS AND**
                                       ) **TAYLOR LOPES' F.R.C.P RULE 26**
14                                     ) **INITIAL DISCLOSURES**
     COUNTY OF KINGS; TAYLOR LOPES;    )
15   NEIL COMPSTON; JOHN SILVERIA;     )
     EDWARD SINCLAIR; and DOES 1       )
16   THROUGH 10, inclusive,            )
                                       )
17              Defendants.            )
                                       )
18

19        Defendants County of Kings, a public entity, and Sergeant Taylor Lopes, an employee of the

20   County of Kings (collectively "County Defendants"), hereby jointly submit the following Initial

21   Disclosures, pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 26(a)(1):

22   A.    **WITNESSES**

23   1.    Investigator Aguirre
           State of California Department of Justice
24
           **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.
25
26   2.    Officer Carlos Andrade, #177
           Corcoran Police Department
27
           **Subject of Information:** Investigation of Corcoran home invasion robbery.
28   / / /

_____

3.      Gabriel Andrade
        444 Avalon Drive
        Lemoore, CA 93245

        **Subject of Information:** The incident that is the subject of this lawsuit.

4.      Corporal C. Barker
        Hanford Police Department

        **Subject of Information:** The incident that is the subject of this lawsuit.

5.      Communications Dispatch Supervisor Toni Barns
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

6.      Sergeant Bettencourt
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

7.      Commander Mark Bevens
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit and administrative review.

8.      Commander Bradford
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

9.      Deputy J. Brewster, #440
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

10.     Surenia Burriga
        1155 Summerfield
        Hanford, CA 93230

        **Subject of Information:** Corcoran home invasion robbery.

11.     Corcoran Police Officer Frank Carrasco
        Corcoran Police Department

        **Subject of Information:** Investigation of the hone invasion robbery.

12.     Sergeant Pedro Castro, #7
        Corcoran Police Department

        **Subject of Information:** Investigation of Corcoran home invasion robbery.

/ / /

_____

1    13.    Corcoran Police Officer Steven Chee, #23
                 Corcoran Police Department

2

3                 **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

4    14.    Investigator Cisneros
                 State of California Department of Justice

5                 **Subject of Information:** Investigation of gang activities resulting in issuance of search and
arrest warrants to be served on day of subject incident.

6

7    15.    Deputy J. Coghlan, #470
                 Kings County Sheriff's Office

8                 **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

9    16.    Special Agent Neil Compston
                 State of California Department of Justice Bureau of Investigations

10               **Subject of Information:** The incident that is the subject of this lawsuit.

11

12    17.    Officer Jarred Cotta, #1472
                 Hanford Police Department

13                 **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

14    18.    Corcoran Deputy Chief of Police Gary Cramer
                 Corcoran Police Department

15

16               **Subject of Information:** Provided information to Sergeant Lopes regarding Corcoran home
invasion robbery.

17    19.    Detective Raymond Diaz, #1473
                 Hanford Police Department

18

19               **Subject of Information:** Investigation of the incident that is the subject of this lawsuit; and
Corcoran home invasion robbery.

20    20.    Corcoran Police Officer Dieterle
                 Corcoran Police Department

21

22               **Subject of Information:** Provided information to Sergeant Lopes regarding Corcoran home
invasion robbery.

23    21.    Special Agent Chase Dobbins
                 State of California Department of Justice Bureau of Investigations

24

25               **Subject of Information:** The incident that is the subject of this lawsuit.

26    22.    Hanford Police Officer Estrada
                 Hanford Police Department

27               **Subject of Information:** Provided information to Sergeant Lopes re: Corcoran home invasion
robbery.

28    / / /

23.   Detective Eric Essman, #I445
      Kings County Sheriff's Office

      **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

24.   Hanford Police Officer Farr
      Hanford Police Department

      **Subject of Information:** Investigation of Corcoran home invasion robbery.

25.   Officer Nick Fishbough
      California Highway Patrol

      **Subject of Information:** Investigation of the incident that is the subject of this lawsuit; took video of subject incident from CHP aircraft.

26.   Alondra Garcia
      1715 Hale Avenue
      Corcoran, CA 93212

      **Subject of Information:** Corcoran home invasion robbery.

27.   J. G. (Minor)

      **Subject of Information:** Corcoran home invasion robbery.

28.   Jason Leon Griggs
      1708 Hale Avenue
      Corcoran, CA 93212

      **Subject of Information:** Corcoran home invasion robbery.

29.   A. H. (Minor)

      **Subject of Information:** Corcoran home invasion robbery.

30.   Corcoran Police Officer John Harris, #43
      Corcoran Police Department

      **Subject of Information:** Investigation of Corcoran home invasion robbery; and the incident that is the subject of this lawsuit.

31.   David Hernandez
      809 Van Zante Street
      Hanford, CA 93230

      **Subject of Information:** Participation if home invasion robbery prior to subject incident.

32.   Brent Iden
      946 E. Cambridge
      Visalia, CA

      **Subject of Information:** Investigation of Corcoran home invasion robbery.

/ / /

---
County Defendants' Initial Disclosures

4

33.     Mariah Jacquez
        1155 Summerfield
        Hanford, CA 93220

        **Subject of Information:** Corcoran home invasion robbery.

34.     Special Agent Johnson
        State of California Department of Justice

        **Subject of Information:** Investigation of gang activities resulting in issuance of search and arrest warrants to be served on day of subject incident.

35.     Special Agent Dean Johnston
        State of California Department of Justice

        **Subject of Information:** Investigation of gang activities resulting in issuance of search and arrest warrants to be served on day of subject incident.

36.     Sergeant Taylor Lopes
        Kings County Sheriff's Office

        **Subject of Information:** The incident that is the subject of this lawsuit.

37.     Detective Jessica Machado, #389
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

38.     Special Agent Nathan Mancebo
        State of California Department of Justice - Bureau of Investigations

        **Subject of Information:** Investigation of gang activities resulting in issuance of search and arrest warrants to be served on day of subject incident; investigation of Corcoran home invasion robbery.

39.     Officer Dusty Manning
        California Highway Patrol

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit; took video of subject incident from CHP aircraft.

40.     Detective Andrew Mazza
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

41.     Corcoran Police Officer McAlister
        Corcoran Police Department

        **Subject of Information:** Incident that is the subject of this lawsuit.

42.     Deputy B. Moore
        Kings County Sheriff's Office

        **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

43.    Anna Laura Navarro
       1709 Hale Avenue
       Corcoran, CA 93212

       **Subject of Information:** Corcoran home invasion robbery.

44.    A. N. (Minor)

       **Subject of Information:** Corcoran home invasion robbery.

45.    D. N. (Minor)

       **Subject of Information:** Corcoran home invasion robbery.

46.    Detective Ortega
       Hanford Police Department

       **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

47.    Corcoran Police Officer Gabriel Padama, #103
       Corcoran Police Department

       **Subject of Information:** Investigation of Corcoran home invasion robbery.

48.    Sergeant Puga
       Kings County Sheriff's Office

       **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

49.    Plaintiff Freddie Quair
       214 South Street
       Hanford, CA 93230

       **Subject of Information:** Corcoran home invasion robbery, and the incident that is the subject of this lawsuit.

50.    Angel Gabriel Quintero
       1709 Hale Avenue
       Corcoran, CA 93212

       **Subject of Information:** Corcoran home invasion robbery.

51.    Jose Quintero
       1863 W. Springcrest Street
       Hanford, CA 93230

       **Subject of Information:** Corcoran home invasion robbery, and the incident that is the subject of this lawsuit.

52.    N. Q. (Minor)

       **Subject of Information:** Corcoran home invasion robbery.

/ / /

_____
County Defendants' Initial Disclosures                    6

53.    Detective G. Rios
       Kings County Sheriff's Office

       **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

54.    Investigator Rivera
       Corcoran Police Department

       **Subject of Information:** Investigation of the Corcoran home invasion robbery.

55.    Corcoran Police Officer Jimmy Roark, #117
       Corcoran Police Department

       **Subject of Information:** Investigation of Corcoran home invasion robbery.

56.    Corcoran Police Officer Garrett Robertshaw, #172
       Corcoran Police Department

       **Subject of Information:** Investigation of Corcoran home invasion robbery.

57.    Investigator Rodriguez
       State of California Department of Justice

       **Subject of Information:** Investigation of gang activities resulting in issuance of search and arrest warrants to be served on day of subject incident.

58.    Officer Max Rapozo, #157
       Corcoran Police Department

       **Subject of Information:** Investigation of Corcoran home invasion robbery.

59.    Laura Rojas
       2101 Kern River Avenue
       Corcoran, CA 93212

       **Subject of Information:** Corcoran home invasion robbery.

60.    Deputy C. Santos, #419
       Kings County Sheriff's Office

       **Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

61.    Officer John Scomona
       California Highway Patrol

       **Subject of Information:** The incident that is the subject of this lawsuit.

62.    Special Agent John Silveira
       State of California Department of Justice Bureau of Investigations

       **Subject of Information:** The incident that is the subject of this lawsuit.

/ / /

/ / /

---

63. Special Agent Edward Sinclair
State of California Department of Justice Bureau of Investigations

**Subject of Information:** The incident that is the subject of this lawsuit.

64. California Highway Patrol Officer Michael Szatmari
California Highway Patrol

**Subject of Information:** Investigation of Corcoran home invasion robbery; and the incident that is the subject of this lawsuit.

65. A. T. (Minor)

**Subject of Information:** Corcoran home invasion robbery.

66. Es. T. (Minor)

**Subject of Information:** Corcoran home invasion robbery.

67. Ezekiel Osha Taylor
1806 Orange Avenue
Corcoran, CA 93212

**Subject of Information:** Corcoran home invasion robbery.

68. Detective Tomey
Hanford Police Department

**Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

69. Sergeant Justin Vallin, #1414
Hanford Police Department

**Subject of Information:** Investigation of the incident that is the subject of this lawsuit.

70. J. V. (Minor)

**Subject of Information:** Corcoran home invasion robbery.

71. Roger Wilson

**Subject of Information:** Interview of Sergeant Lopes after subject incident.

**B.     DOCUMENTS REGARDING LIABILITY**

1. Hanford Police Department Report No. H1903235

2. Kings County Sheriff's Office Report No. 19K019976

3. Corcoran Police Department Report No. C1901057

4. State of California Department of Justice Bureau of Investigations Report # 120, Investigation #BI-FR2018-00028

1    5.      Interview audio recordings

2    6.      Scene and evidence photos

3    7.      FARO Laser Scan

4    8.      Dispatch audio recording

5    9.      CHP aerial video

6    10.     Kaweah Delta Medical Center medical records

7    11.     June 17, 2020, Letter from Kings County Assistant District Attorney Phil Esbenshade to

8            Sheriff David Robinson re: District Attorney's Office investigation of subject incident

9    12.     Kings County Sheriff's Office Administrative Investigation, IA #2020-010 (will be produced

10           subject to a stipulated protective order)

11

12   DATE: June 30, 2021

                                            WEAKLEY & ARENDT, PC
13

14                                  By:     /s/ James J. Arendt
                                            James J. Arendt
15                                          Ashley N. Reyes
                                            Attorneys for Defendants County of Kings and Taylor
16                                          Lopes

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

I, the undersigned, hereby certify that I am employed in the County of Fresno, State of California, over the age of eighteen years and not a party to the within action; my business address is 5200 North Palm Avenue, Suite 211, Fresno, California 93704.

3

4

On the date set forth below, I placed in a sealed envelope and served a true copy of the within

5

**DEFENDANT COUNTY OF KINGS AND TAYLOR LOPES' F.R.C.P RULE 26 INITIAL DISCLOSURES**

6

addressed as follows:

7

8

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq.
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA   91367
Tel: (818) 347-3333
Fax: (818) 347-4118
E-mail: dalekgalipo@yahoo.com

9

10

11

12

LAW OFFICE OF DARRELL J. YORK
Darrell J. York
27240 Turnberry Lane, Suite 200
Valencia, CA   91355
Tel: (661) 362-0828
Fax: (877) 221-3306
E-Mail: djylaw@gmail.com

13

14

15

16

Attorneys for Plaintiff, Freddie Quair

17

☐    BY OVERNIGHT COURIER    I caused such envelope(s) to be delivered via overnight courier service to the addressee(s) designated.

18

19

☒    BY ELECTRONIC DELIVERY    I caused said document to be delivered electronic email to the offices of the above addressees.

20

☒    BY MAIL    I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited in the ordinary course of business.

21

22

I caused each envelope, with postage fully prepaid, to be placed in the United States mail, at Fresno, California.

23

24

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury that the foregoing is true and correct, and that this proof of service was executed at Fresno, California, on June 30, 2021.

25

26

/s/ Carol Mathis
Carol Mathis

27

28

---
County Defendants' Initial Disclosures

10

James J. Arendt, Esq.        Bar No. 142937
Matthew P. Bunting, Esq.    Bar No. 306034

WEAKLEY & ARENDT
A Professional Corporation
5200 N. Palm Avenue, Suite 211
Fresno, California 93704
Telephone: (559) 221-5256
Facsimile:  (559) 221-5262
James@walaw-fresno.com
Matthew@walaw-fresno.com

Attorneys for Defendants County of Kings and Taylor Lopes

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDIE QUAIR,<br><br>    Plaintiff,<br><br>    vs.<br><br>COUNTY OF KINGS; TAYLOR LOPES;<br>NEIL COMPSTON; JOHN SILVERIA;<br>EDWARD SINCLAIR; and DOES 1<br>THROUGH 10, inclusive,<br><br>    Defendants. | CASE NO.  1:20-CV-01793-JLT-SKO<br><br>**DEFENDANT COUNTY OF KINGS AND TAYLOR LOPES' SUPPLEMENTAL F.R.C.P RULE 26 INITIAL DISCLOSURES** |

Defendants County of Kings and Sergeant Taylor Lopes ("County Defendants"), submit the following Supplemental Initial Disclosures, pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 26(a)(1):

A.    **WITNESSES**

1.    Custodians of record for any documents or things whose authenticity is not stipulated to.

**Subject of Information:** Liability and damages.

2.    Witnesses identified in medical records not yet produced.

**Subject of Information:** Liability and damages.

3.    RA (unknown first or last name - this disclosure will be supplemented)
Kings County Sheriff's Office

_____
County Defendants' Supplemental Initial Disclosures

4.      Blake Bursiaga
        Kings County Sheriff's Office

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

5.      JC (unknown first or last name - this disclosure will be supplemented)
        Hanford Police Department

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

6.      Marc Carrillo
        Hanford Police Department

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

7.      Elizabeth Cisneros
        Kings County Sheriff's Office

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

8.      CD (unknown first or last name - this disclosure will be supplemented)
        Kings County Sheriff's Office

9.      Raymond Diaz
        Hanford Police Department

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

10.     KH (unknown first or last name - this disclosure will be supplemented)
        Kings County Sheriff's Office

11.     RL (unknown first or last name - this disclosure will be supplemented)
        California Highway Patrol

12.     Michael Kennedy
        California Department of Justice

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

13.     Alsie Ortega
        Hanford Police Department

        **Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

---

14.    Hipolito Pelayo
California Highway Patrol

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

15.    Alfred Rivera
Hanford Police Department

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

16.    Daisy Rodriguez
Kings County Sheriff's Office

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

17.    JS (unknown first or last name - this disclosure will be supplemented)
Hanford Police Department

18.    Ryan Tomey
Hanford Police Department

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

19.    Justin Vallin
Hanford Police Department

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

20.    Michael West
California Department of Corrections and Rehabilitation

**Subject of Information:** Operation Red Reaper investigation including but not limited to  review of telephonic wire taps.

B.    **DOCUMENTS REGARDING LIABILITY**

1.    Wellpath Health Care records regarding Plaintiff (the County Defendants are not yet in possession of any such records).

2.    Community Regional Medical Center records regarding Plaintiff (the County Defendants are not yet in possession of any such records).

3.    Operation Red Reaper criminal discovery records including but not limited to, audio

1    recordings, video recordings, photos and screenshots, search warrants and supporting

2    affidavits, arrest warrants (materials will be produced to the parties via Dropbox).

3

4

5    DATE: May 25, 2022

                                        WEAKLEY & ARENDT, PC
6

7                                   By:    /s/ James J. Arendt
                                           James J. Arendt
8                                          Matthew P. Bunting
                                           Attorneys for Defendants County of Kings and Taylor
9                                          Lopes

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# Exhibit

# C

26
27
28

Exhibit C

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
*dalekgalipo@yahoo.com*
Eugenia Bagdassarian, Esq. (SBN 334898)
*ebagassarian@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel:  (818) 347-3333;  Fax: (818) 347-4118

**LAW OFFICE OF DARRELL J. YORK**
Darrell J. York (SBN 145601)
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Telephone: (661) 362-0828; Fax: (877) 221-3306
Email:  djylaw@gmail.com

*Attorneys for Plaintiff Fredie Quair*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDIE QUAIR,<br><br>            Plaintiff,<br><br>      v.<br><br>COUNTY OF KINGS; TAYLOR<br>LOPES; NEIL COMPSTON; JOHN<br>SILVERIA; EDWARD SINCLAIR;<br>and DOES 1 THROUGH 10, inclusive,<br><br>            Defendants. | **CASE No.: 1:20-CV-01793-JLT-SKO**<br><br>**PLAINTIFF'S RULE 26 INITIAL EXPERT DESIGNATION** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure, Plaintiff Fredie Quair hereby designates the following retained expert witness who may be called upon to give expert testimony at trial. Plaintiff reserves the right to supplement and/or amend this disclosure.

/ / /

/ / /

1 **RETAINED EXPERTS:**

2    **1. Curt Rothschiller**

3      KJB Consulting, Inc.

4      5021 Verdugo Way #187

5      Camarillo, CA

6      (805) 947-8323

7      Mr. Rothschiller is a police practices expert. Mr. Rothschiller's Rule 26 report,

8 C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto

9 as **Exhibit "A."**

10 **NON-RETAINED EXPERTS:**

11    1. **Dr. Ammon Rasmussen** (surgeon who performed surgery on Mr. Quair)

12      Kaweah Delta Health Care District

13      400 W. Mineral King Ave.

14      Visalia, CA 93291

15    2. **Dr. Joseph Ford** (surgeon who performed surgery on Mr. Quair)

16      Kaweah Delta Health Care District

17      400 W. Mineral King Ave.

18      Visalia, CA 93291

19    3. **Dr. Matthew Campbell** (surgeon who performed surgery on Mr. Quair)

20      Kaweah Delta Health Care District

21      400 W. Mineral King Ave.

22      Visalia, CA 93291

23    4. **Dr. Nichole Atherton** (surgeon who performed surgery on Mr. Quair)

24      Kaweah Delta Health Care District

25      400 W. Mineral King Ave.

26      Visalia, CA 93291

5. **Dr. Lindita Coku** (surgeon who performed surgery on Mr. Quair)

Kaweah Delta Health Care District

400 W. Mineral King Ave.

Visalia, CA 93291

6. **Dr. Naeem Siddiqi** (Mr. Quair's primary care physician)

Visalia Health Care Center

2611 N. Dinuba Blvd.

Visalia, CA 93291

7. **Dr. Robynn Weston** (Mr. Quair's nurse practitioner)

Wellpath

329 West 8th Street

Hanford, CA 93230

DATED: July 25, 2022

LAW OFFICES OF DALE K. GALIPO
LAW OFFICES OF DARRELL J. YORK

Dale K. Galipo
Darrell J. York
Eugenia Bagdassarian
*Attorneys for Plaintiff Fredie Quair*

1

## PROOF OF SERVICE

2

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

4

5

On July 25, 2022, I served the foregoing document described as: **PLAINTIFF'S RULE 26 INITIAL EXPERT DESIGNATION**, on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

6

7

8

### METHOD OF SERVICE

9

☒ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

10

11

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

12

13

☒ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

14

15

16

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

17

18

19

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

20

21

22

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

23

Executed on July 25, 2022, at Woodland Hills, California.

24

25

26

Karen Slyapich

27

28

4

1                                 <u>SERVICE LIST</u>

2 James J. Arendt, Esq.
   WEAKLEY & ARENDT
3 5200 N. Palm Avenue, Suite 211
   Fresno, CA 93704
4 Tel:  (559) 221-5256
   Fax:  (559) 221-5262
5 Email: james@walaw-fresno.com

6 *Attorney for Defendants County of Kings and Taylor Lopes*

7 Rob Bonta
   Attorney General
8 Pamela J. Holmes, State Bar No. 147360
   Supervising Deputy Attorney General
9 Norman D. Morrison, State Bar No. 212090
   Deputy Attorney General
10 2550 Mariposa Mall, Room 5090
    Fresno, CA 93721
11 Telephone: (559) 705-2304
    Fax: (559) 445-5106
12 E-mail: Norman.Morrison@doj.ca.gov

13 *Attorney for Defendants Neil Compston, John Silveira, and Edward Sinclair*

14 Darrell J. York, Esq. (SBN 145601)
    LAW OFFICE OF DARRELL J. YORK
15 1935 East Vine Street, Suite 140
    Salt Lake City, Utah 84121
16 Telephone: (661) 478-9640
    Email: djylaw@gmail.com
17
    *Attorney for Plaintiff, Freddie Quair*
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# *KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA

## Curt Rothschiller

805.947.8323

**PLEASE NOTE THAT PORTIONS OF THIS REPORT ADDRESS CONFIDENTIAL MATERIAL COVERED BY THE PROTECTIVE ORDER AND SHOULD ANY SUCH PORTION REQUIRE SUBSEQUENT FILING WITH THE COURT IN A PUBLIC DOCUMENT, OPPOSING PARTY SHOULD CONTACT PLAINTIFFS' COUNSEL FOR REDACTION.**

July 22, 2022

Darrell J. York, Esq.
The Law Office of Darrell J. York
1935 East Vine Street, Suite 140
Salt Lake City, UT 84121

Dale K. Galipo, Esq.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Re: Quair v. County of Kings, et.al.

Dear Counsel:

You have asked me to analyze material and render opinions regarding the officer involved shooting of Freddie Quair by the Kings County Sheriff's Department (KCSD) and California Department of Justice Special Agents on June 18, 2019, in Kings County, California, as well as the applicable police policies and procedures of the Kings County Sheriff's Department (KCSD) related to Mr. Quair's arrest.

Pursuant to the requirements of Rule 26, I have studied the records, reports, depositions, recordings, including video files and other documented materials (as listed in this report under Materials Reviewed Thus Far) provided to me regarding this case. I also reserve the right to supplement my opinion should additional information be provided by the defendants or throughout the expert deposition process.

As an expert, I do not express opinions regarding who are the more believable witnesses. The resolution of any such conflicts is for a jury to decide. Taking any such differences (such as they are) into account, my opinions to date follow.

1

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
Curt Rothschiller                                                    805.947.8323

**Materials Reviewed Thus Far:**

1. Photographs of Mr. Quair's injuries
2. Photographs of the shooting and arrest scene
3. Photographs of the red Nissan
4. Arial video surveillance recording of the incident
5. A copy of the Complaint for Damages in this action
6. Notice of Deposition of Freddie Quair with request for production of documents
7. KCSD policy manual
8. Lexipol / Policy Manual
9. Training records for Taylor Lopes
10. Audio recording of a telephone conversation between Mr. Quair and Mr. Quintero
11. California POST Basic Learning Domains:
    a. #1: "Leadership, Professionalism & Ethics."
    b. #2: "Criminal Justice System."
    c. #3: "Policing in the Community."
    d. #5: "Introduction to Criminal Law."
    e. #15: "Laws of Arrest."
    f. #16: "Search and Seizure."
    g. #17: "Courtroom Testimony."
    h. #18: "Investigative Report Writing."
    i. #20: "Use of Force."
    j. #21: "Patrol Techniques."
    k. #23: "Crimes in Progress."
    l. #33: "Arrest Methods/Defensive Tactics."
12. Standards for Law Enforcement Agencies, 5th Ed., CALEA (2009)
13. Surrounding Counties policy and police manuals, and Lexipol Manuals re: use of force applications.
14. KCSD's Use of Force and Deadly Force Policies
15. Ventura County Criminal Justice Training Center Field Training manual.
16. Deposition of Freddie Quair
17. Deposition of Edward Sinclair
18. Deposition of John Silveira
19. Deposition of Neil Compston
20. Deposition of Taylor Lopes
21. Certified transcripts of the initial statements of Compston, Lopes, Scomona, Dobbins, Silveira, and Sinclair

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

<u>**General Law Enforcement Overview and Basis for Opinions to Follow:**</u>

1.     The mission of the California Commission on Peace Officer Standards and Training (P.O.S.T.) is to continually enhance the professionalism of California law enforcement in serving its communities.

2.     Recognizing that effective law enforcement is the cornerstone of a free and safe society, P.O.S.T. is committed to a vision of the future that ensures quality, integrity, accountability, and cooperation; encourages new ideas; explores and uses appropriate technologies; and delivers relevant, client-based programs and services.

3.     P.O.S.T continuously researches, trains, and certifies law enforcement personnel and updates agencies on current techniques, force options, and officer safety trends and options. It is incumbent upon professional law enforcement agencies and their personnel to seek out available training to maintain knowledge, proficiency in their craft and sharpen their perishable skills. There are established protocols taught at basic police training academies and In-Service training, including the P.O.S.T approved Basic Training Academies, to all certified officers.

4.     A great deal of emphasis is placed on tried and proven tactics during the P.O.S.T. Basic Academy and In-Service training with the strong message that incompetent tactics and weakened perishable skills will invariably lead to unnecessary tragedies, including injury and/or death. Officer safety is an underlying emphasis in most training.  Officers are drilled not to place themselves in immediate peril.

5.     Additionally, officers are taught at the P.O.S.T. Basic Academy that there are fundamental tactics that are required as a professional. They are also taught that when they depart from the required tactics it creates an unacceptable and unnecessary risk to themselves, their fellow officers, the suspects that they encounter, and the public.  A primary emphasis is it is essential that all officers maintain officer safety protocol, including cover, throughout an incident.

6.     Officers are trained at the certified P.O.S.T. Basic Academy that the use of force must meet an "Objectively Reasonable" standard. Further, P.O.S.T. teaches early in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by P.O.S.T. certified police officers.

7.     The P.O.S.T. standard of "Reasonable Fear" is defined as: A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual, perceived circumstances. P.O.S.T. defines "Excessive and unreasonable Fear" as: Generated in the

3

officer's mind with no direct correlation to facts and situations. (Learning Domain # 20, Chapter 5.)

8.  Officers are trained that all force used must be "objectively reasonable", and force used in an arrest or in self-defense must be proportional to the threat, and that force used to control a person must be objectively reasonable under the circumstances. Police officers are also trained that by taking an oath and accepting their badges and guns they must always act in consideration of the extreme reverence our society places on all human life, even when that means facing certain risks themselves.

9.  P.O.S.T. training domains have identified an officer's mentality in decision making to depart from basic tactics as: "Tombstone Courage." That is: "Overly anxious to show one's courage; [and] attempting to handle dangerous situations beyond one's ability." (P.O.S.T. Learning Domain # 21, pages 1-21.) P.O.S.T. has also given a specific name to tactical mistakes that are likely to lead to injury or death as: "*Fatal Error.*"

10. Additionally, P.O.S.T. specifies that there are key factors that can affect which force option is approved and appropriate under the concept of the "Totality of Circumstances." (Learning Domain # 20 "Use of Force," Chapter 2.)

11. P.O.S.T. training specifies that the use of force under the "Totality of Circumstances" is only justified on the basis of an "objectively reasonable" standard. In other words, per the P.O.S.T. requirements, officers are not justified in any use of force based on "subjective fear." The requirements are taught in detail through the P.O.S.T. Basic Curriculum (as required by law).

12. P.O.S.T. trains that an officer's overreaction to the resistance (Subjective Fear) presented by a subject is synonymous with excessive force and an officer's subjective fear does not reach the threshold of 'reasonably objective' justification for the use of force. Officers must also adhere to the 5C's and not place themselves in a position of danger to justify the use of force.

13. Offices are trained that good police tactics are not only important for the safety of the officers; they are also essential for the safety of the public at large. Far too often innocent persons are injured or killed by incompetent and unnecessary police acts – particularly during apprehensions of criminal suspects.

14. For decades, law enforcement agencies across the country have recognized the need and trained their officers in multiple ways to apprehend recalcitrant / non-responsive suspects without resorting to unnecessary excessive force. These methods are continuously updated,

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                                    805.947.8323

well known, and have proven to be effective for the safety and welfare of officers, subjects, and the public. Often referred to as "perishable skills", it is critical for everyone's safety that officers receive regular training and maintain proficiency. A critical emphasis in the training is that each and every use of deadly force must be justified and must be in immediate defense of life.

15.   All law enforcement agencies must provide updated and accurate P.O.S.T. certified training for their personnel. P.O.S.T mandates regular training for the "perishable skills" required of officers to safely provide law enforcement services. Equally as important is that agencies monitor their personnel for compliance and adherence to that training.

16.   Training, including the P.O.S.T. Basic Academy and any other P.O.S.T. certified courses, is only valuable if the course attendees absorb and embrace the presented material. Certified officers must then apply that knowledge and implement the tactics in their daily activities. Failure or refusal to maintain proficiency in critical aspects of their duties often leads to violations of policy and tragic outcomes.

17.   Mandatory P.O.S.T. training, by itself, is often not sufficient for active law enforcement officers to maintain proficiency in their profession. As officers advance through their careers, it is incumbent that they seek additional training, practice, and maintain their perishable skills, and stay current on policy, case law, and tactics.

18.   The criminal justice system gives law enforcement two extraordinary powers:
      a) The power of arrest; and
      b) The power to use force, including deadly force.
      Incumbent upon them with this power is to know what constitutes probable cause.

19.   The authority to do so does not come from the rules of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint. It is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve. (Learning Domain # 2: "Criminal Justice System," pages 1-4.)

20.   Officers are trained that the use of deadly force constitutes a lawful and justifiable act of self-defense only when the officer using deadly force actually and objectively reasonably believes one or more of the following facts exist:
      a)      That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.

5

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                     805.947.8323

    b)     That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.

    c)     That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime or other obvious factors. In such cases, deadly force is not allowed to prevent the escape of misdemeanants and most felony suspects.

21.    It is incumbent upon all Peace Officers to develop the ability to identify threats intelligently and objectively to their safety and the safety of others. Factors that officers must consider when assessing a potential threat include:
a) Nature of the threat that must be overcome.
b) Presence of a firearm and the type of firearm.
c) Seriousness of the offense.
d) Person's age, history, and capabilities.
e) Officer's capability to overcome the resistance.
f) Availability of assistance from other officers.
g) Location and surroundings.
h) Level of danger to bystanders.
i) Time of day. (P.O.S.T. Learning Domain # 35 "Firearms/Chemicals Agents," (p. 5-32.)

22.    The safe resolution of incidents without the use of force calls for ingrained critical incident knowledge and experience. All officers must receive sufficient certified training which gives them the skills needed to consider their options and to act with reason.

23.    Law enforcement officers must continuously train in updated officer safety tactics, maintain proficiency in perishable skills and other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution. Officers proficient in the officer safety use of cover, concealment, time and space reduce their personal risk as well as the need to use unnecessary excessive force.

24.    Firing a weapon at a human being is unlike all other police uses of force. There are, indeed, other police tactics that may qualify as "deadly force," but none carry the same high probability of death as an officer's weapon. Police officers are trained that they can use firearms in the immediate defense of life or to prevent serious bodily injury to themselves or others. The reasonable need to resort to deadly force is extremely rare, especially if officers follow their training and adhere to the rules of officer safety.

25.    The vast majority of police officers in the United States never use their firearms as deadly

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

force during their entire careers. They continuously train in updated officer safety tactics, maintain proficiency in perishable skills and other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution.

26.    P.O.S.T. certified law enforcement officers are also trained that if a decision is made to use lethal force by firing their weapon, each and every time they pull the trigger is a separate use of lethal force and must be justified and necessary to prevent serious injury or loss of life. Maintaining proficiency in their perishable skills provides officers with the ability to quickly assess whether continued use of lethal force is objectively reasonable, and officers have a duty to reassess to determine whether deadly force is still necessary and appropriate.

27.    Command, Coordination, Communication, Containment and Control are commonly referred to as the 5 Cs of tactics in the law enforcement world and emphasized as key elements during any critical incident. In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from P.O.S.T. certified officers.

    a)    Command:
        There must be an officer-in-charge who takes control of the incident and directs all others toward a safe conclusion. Initially, this is the first officer on-scene. As other officers arrive, a plan should be discussed as to a safe resolution, roles of the officers, and which officer would take the lead. In most circumstances, the lead officer tends to be a senior officer, a Field Training Officer (FTO) or supervisor who takes on the role of overseeing the incident and coordinating resources.

    b)    Coordination
        Assets on-scene and responding units must be properly utilized. The officer-in-charge must communicate to all officers on the scene and give frequent updates as the situation unfolds. Probable cause must be determined before an arrest is initiated. As personnel arrive on-scene, roles should be assigned, i.e., lead officer, lead communicator, arrest team. less lethal, lethal, etc. It is critical the officers approach the incident as a coordinated team and follow the agreed upon plan. Independent action in a team environment often leads to tragedy.

    c)    Containment
        It is imperative that those on scene who are suspects, for their safety as well as the safety of the officers, be monitored, and contained if necessary but this does not always include, and should not always include, physical take down methods. If the circumstances dictate, an inner and outer perimeter must be established to prevent escape, apprehend, and preserve evidence.

7

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**    805.947.8323

      d)  Communication

          Tactical communication is often the key element in the successful outcome of an incident. Failure to communicate with the suspect, officers on scene, and / or responding personnel often compromises evidence and officer safety.

      e)  Control

          Control of the scene is mandatory. A plan to efficiently bring an incident to a safe conclusion both for the suspect and the officers must be discussed, understood, and adhered to. Control of a subject by restricting his movements and preventing any opportunity to flee is critical to the safety of all during a detention or arrest. The dynamics are exacerbated when a vehicle is part of the equation and multiplied if the vehicle is still moving.

28.     Across the state, P.O.S.T training teaches law enforcement personnel de-escalation tactics when encountering members of the public, including wanted individuals. The training also stresses that "time and space", and "empathy and compassion" are critical tools in de-escalating crisis situations for the safety of the individual as well as the officer. It also emphasizes the utilization of the 5C's to bring potentially life-threatening incidents to a safe resolution.

29.     P.O.S.T. Basic and approved In-Service training, along with industry standard has the first officer on-scene assume command of an incident. As additional officers arrive, a plan for a safe outcome should be discussed, roles of each officer defined, and which officer would take the lead. In most circumstances, the lead officer tends to be a senior officer, a Field Training Officer (FTO) or supervisor who takes on the role of overseeing the incident and coordinating resources. Formulating a plan prior to contacting a wanted individual, when threat is not imminent and when time allows, grants the officers the ability to work together as a team geared toward safety and de-escalation.

30.     Individuals in stressful contact with law enforcement often fail to recognize their behavior as threatening and often act out without thinking. KCSD personnel should have recognized the possibility of irrational behavior by Mr. Quair and Mr. Quintero due to their circumstances and reverted to P.O.S.T. training of adding "time and space" when contacting them. More "time and space" creates a larger window for the crisis cycle to run its course. This would also have allowed KCSD personnel to implement a plan (had one been formulated) to avoid the unreasonable excessive force.

31.     Any use of unjustified force by deputies constitutes excessive and unreasonable force under the circumstances (as taught by P.O.S.T., and as exists in the KCSD policy manual).

8

# KJB CONSULTING, INC.  5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
805.947.8323

32. P.O.S.T. Learning Domain #18 (LD#18) – Investigative Report Writing - trains officers during the basic law enforcement academies about the importance of clearly documenting the facts and activities of an investigation and the documentation's reflection on the officer's own professionalism. LD#18 also emphasizes the consequences of an ineffective / inaccurate report to the officer, the officer's agency, policing profession, and the community.

## Facts not in dispute:

There are several significant facts, which do not seem to be in dispute, including:

33. The Kings County Sheriff's Department's Use of Force and Deadly Force Policies commencing with Section 300.1 and following dictate that deputies shall use only that force which reasonably appears necessary, given the facts and circumstances perceived by the deputy (300.3). When determining whether to apply force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit (Government Code § 7286(b)). These factors include but are not limited to: (a) The apparent immediacy and severity of the threat to deputies or others (Penal Code§ 835a), (b) The conduct of the individual being confronted, as reasonably perceived by the deputy at the time (Penal Code § 835a), (c) Deputy/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of deputies available vs. subjects), (d) The conduct of the involved deputy leading up to the use of force (Penal Code § 835a), (e) The effects of suspected drugs or alcohol, (f) The individual's apparent mental state or capacity (Penal Code § 835a), (g) The individual's apparent ability to understand and comply with deputy commands (Penal Code § 835a), (h) Proximity of weapons or dangerous improvised devices. (i) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained. (j) The availability of other reasonable and feasible options and their possible effectiveness (Penal Code § 835a), (k) Seriousness of the suspected offense or reason for contact with the individual prior to and at the time force is used, (l) Training and experience of the deputy, (m) Potential for injury to deputies, suspects, bystanders, and others, (n) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the deputy, (o) The risk and reasonably foreseeable consequences of escape, (p) The apparent need for immediate control of the subject or a prompt resolution of the situation, (q) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the deputy or others, (r) Prior contacts with the subject or awareness of any propensity for violence.(s) Any other exigent circumstances.

9

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA

**Curt Rothschiller**                                          805.947.8323

34.    300.2.1 of the KCSD Policy manual – Duty to Intercede – Clearly states that any deputy present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable deputy under the circumstances, shall, when in a position to do so, intercede to prevent the use of unreasonable force. When observing force used by a law enforcement officer, each deputy should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject. (Government Code § 7286(b))

35.    On June 18, 2019, in the early morning hours, Kern County Sheriff's Department (KCSD), California Department of Justice investigators, and investigators from numerous Kings Count law enforcement agencies were preparing to terminate, by arrests and search warrants, a months-long wiretap investigation in which they had identified individuals allegedly involved in criminal activity, including Mr. Quair and Mr. Quintero.

36.    Investigators received information that Mr. Quintero was in a red vehicle on his way to pick up Mr. Quair on Highway 43. Investigators in unmarked police vehicles observed a red Nissan stop on the side of Highway 43 and a subject get into the passenger side of the Nissan.

37.    Multiple unmarked police vehicles and Sergeant Lopes attempted to conduct a high risk-traffic stop on the Nissan. The Nissan turned off Highway 43 into a clearing near a vacant field. The unmarked police vehicles and Sergeant Lopes pulled in behind the Nissan. The Nissan's windows had dark tint preventing the investigators from seeing the interior to determine the number of occupants or movement.

38.    Sergeant Lopes began yelling orders to the occupants of the Nissan before the other investigators were prepared or in tactical positions. Sergeant Lopes was focused on the driver and the driver's side of the Nissan.

39.    Mr. Quair exited the right front passenger door of the Nissan and raised his empty hands. (Video 05:35:55) (Quair depo 69/25)

40.    Sergeant Lopes immediately began rapid-firing multiple rounds from his assault rifle at Mr. Quair, striking Mr. Quair numerous times, even though Sergeant Lopes never saw Mr. Quair with a weapon. Mr. Quair fell to the ground immediately after Sergeant Lopes fired his first round. (Video 05:35:55)

41.    Sergeant Lopes continued to rapid-fire multiple rounds from his assault weapon at Mr. Quair and the Nissan while Mr. Quair was immobile and unarmed on the ground, even

# KJB CONSULTING, INC.
## Curt Rothschiller

5021 Verdugo Way #187, Camarillo, CA

805.947.8323

though he could not see Mr. Quair or any other threat. (Video 05:35:55 – 05:36:06) (Interview 35/1)

42. Sergeant Lopes fired multiple rounds from his assault rifle through the rear window into the passenger compartment of the Nissan, even though he could not see if anyone was in the car. (Interview 34/12)

43. DOJ investigator Compston fired multiple rounds from his handgun at Mr. Quair while Mr. Quair was unarmed and on the ground. Investigator Compston never saw Mr. Quair with a weapon or anything in his hands. (Interview 11/18)

44. DOJ investigator Silveira fired multiple rounds from his handgun at Mr. Quair, even though Mr. Quair was unarmed and on the ground. Investigator Silveira never saw Mr. Quair with a weapon or anything in his hands. (Interview 10/8)

45. DOJ investigator Sinclair fired multiple rounds from his assault rifle at Mr. Quair while Mr. Quair was unarmed and on the ground. Investigator Sinclair never saw Mr. Quair with a weapon or anything in his hands. (Interview 9/8) He also testified in his deposition that he indiscriminately fired into the Nissan without knowing if there were additional occupants. (23-24)

46. The video clearly shows dirt flying up as rounds strike the ground near Mr. Quair while he is laying on his back on the ground, unarmed and no threat to law enforcement or anyone else.

47. CHP officer Scomona did not perceive Mr. Quair or Mr. Quintero as a threat and therefor, did not fire his weapon. (Interview 14 - 15)

48. No weapons were found on or near Mr. Quair, on or near Mr. Quintero, or in the Nissan.

## Departures from Proper Procedures Resulting in the Unreasonable Use of Excessive Force Against Mr. Quair:

49. Investigators from the KCSD and DOJ attempted to address a dynamic, high-risk event with no tactical plan and no concern for the 5C's, which is contrary to all current P.O.S.T. training and industry standards. Disregard for multiple industry standards and accepted practices led to the unreasonable use of excessive lethal force against Mr. Quair.

50. KCSD and DOJ personnel failed to establish command of the enforcement action by designating an officer-in-charge (OIC). The OIC would have directed the other officers

11

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                                805.947.8323

toward a safe conclusion without the need to use unreasonable excessive lethal force against Mr. Quair.

51.   Because of the lack of leadership and command, Sergeant Lopes and other investigators violated established industry standard and acceptable tactics that put Mr. Quair and Mr. Quintero on notice of an impending law enforcement action.

52.   P.O.S.T. teachings in the Basic Academies and In-Service trainings are very clear when addressing high risk enforcement actions.   Coordination of assisting units and communication of the impending plan is critical to the safe resolution, not only of the officers involved, but the individuals subjected to the law enforcement action.   This incident was compromised by the lack of a common radio frequency which would have allowed the multiple agencies involved to coordinate their law enforcement actions to a safe resolution.

53.   In his initial statement to investigators, Investigator Compston related the following:
   a)   He was driving an unmarked Chevrolet Traverse with a hidden siren, and enforcement light, which had to be manually placed in on the dash. (C 3/23)
   b)   He admitted he made a U-turn, activated his vehicles hazard lights, and parked on the side of Highway 43, all within view of Mr. Quair. (C 8/19) Investigator Compston further stated he let one un-involved vehicle pass him before he pulled his vehicle out in front of other traffic so he could catch the Nissan that picked up Mr. Quair. (C 9/12) Investigator Compston then passed the un-involved vehicle, leaving no vehicles between him and the Nissan for "cover." (C 9/14)
      1)   Both movements are contrary to industry standards and P.O.S.T Surveillance course teaching because they tend to draw attention to the surveilling units and law enforcement presence.
   c)   Sergeant Lopes activated his enforcement lights shortly after he maneuvered his vehicle passed Investigator Compston and was directly behind the Nissan. (C 10/20)
   d)   The Nissan turned off Highway 43 into a dirt area. (C 10/21)
   e)   Investigator Compston parked his vehicle to the right of Sergeant Lopes' vehicle. (C 10/24)
   f)   Sergeant Lopes was already out of his vehicle and yelling commands at the occupants of the Nissan before Investigator Compston could get out of his own vehicle. (C 11/4)
   g)   The back window of the Nissan was heavily tinted. (C 11)
   h)   As soon as Mr. Quair got out of the passenger side of the Nissan Investigator Compston heard gunshots being fired, so he began firing. (C 11/19)

54.   In his initial statement to investigators Sergeant Lopes related the following:
   a)   He was driving a black Major Crimes Task Force Dodge, "which are well known in

12

# KJB CONSULTING, INC.  5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
805.947.8323

the community with our gangsters." (L 7/23)

b) The back windows and rear side widows of the Nissan were heavily tinted preventing him from seeing inside the vehicle. (L 21/10)

c) DOJ investigators pulled alongside Sergeant Lopes in the unmarked vehicles and multiple commands were given to the occupants of the Nissan. (L 21/22)

d) He was focused on the driver of the Nissan. (L 23/4)

e) The passenger door opened and Mr. Quair "jumps out of the vehicle – like, just fucking jumps. Like, I don't know how else to describe it, like jumps, and he runs up, and all you see is him run up." (L 23/19)

f) In a "split second" he began firing at Mr. Quair, center mass.

g) He continued to fire his assault rifle at Mr. Quair after Mr. Quair fell out of his view. (L 24/14)

h) He did not find a weapon on Mr. Quair or in the Nissan. (L 28/8)

55.    Sergeant Lopes rushed past the surveillance units (Silveira statement/8), drawing attention to himself and the undercover surveillance units following the red Nissan. His actions led to unnecessarily warning the subjects in the Nissan of an impending traffic stop, which directly led to the unreasonable use of excessive lethal force against Mr. Quair. (L 20)

56.    There was no urgency to draw attention to the surveillance or initiate a stop of the Nissan without a coordinated plan once it was under the surveillance of the undercover investigators and the CHP air unit. Rather than coordinate an arrest plan, arrange for additional resources including less lethal options, a K9, SWAT vehicles, etc., that would have increased the odds of a safe, non-use-of-force resolution, Sergeant Lopes initiated a traffic stop before his assisting units were prepared.

57.    Once the Nissan turned off Highway 43, Sergeant Lopes failed to coordinate the stop and impending forced apprehension of the individuals in the Nissan.

58.    Even in high-risk vehicle stops, the tenants of "time and space" as taught by P.O.S.T are critical to the safety of all involved. "Time and space" allow for the human crisis cycle to begin to run its course toward more rational decision making.

59.    Sergeant Lopes was the ranking law enforcement individual on scene and failed to control and coordinate the arrest of the individuals in the Nissan. Instead, Sergeant Lopes jumped out of his vehicle with his assault rifle and started yelling commands to the driver of the Nissan, without waiting for other surveillance units and investigators to be properly equipped and in tactical positions.

60.    KCSD and Cal DOJ personnel failed to designate one individual (OIC) to take command

13

and control of the incident, and because of the lack of command and control, multiple investigators shouted commands at the individuals in the Nissan. (Lopes statement 21/22)

61.    Without an OIC, there was no investigator to coordinate the enforcement action and prevent the independent actions of other officers in a critical, team environment. This failure directly led to the unnecessary use of unreasonable use of excessive lethal force against Mr. Quair.

62.    Sergeant Lopes positioned his police unit behind the Nissan but failed to take advantage of the "cover" his engine block would provide if he positioned his vehicle semi-perpendicular to the Nissan. This technique has been taught by P.O.S.T. and has been an officer safety staple for many years.

63.    Sergeant Lopes began randomly, rapid firing his assault rifle at the Nissan and Mr. Quair, even though he had no time to assess the threat of Mr. Quair exiting the Nissan because his focus was on the driver's side of the Nissan and Mr. Quintero.

64.    Sergeant Lopes, Investigator Compston, Investigator Silveira, and Investigator Sinclair all testified they fired their weapons without seeing a weapon in Mr. Quair's hands, without an armed threat, without acquiring target acquisition, and while Mr. Quair was both going to and on the ground.

65.    Mr. Quair and Mr. Quintero did not pose an immediate threat of death or serious bodily injury prior to the KCSD and DOJ personnel's use of deadly force, and there should have been less lethal options available. Further, there was no warning that deadly force was imminent.

66.    Mr. Quair testified in his deposition that he followed the directions given to him by law enforcement to get out of the Nissan with his hand up. He got out of the Nissan with his hands up and his palms showing. (69-70)

67.    Investigators Compston, Silveira, and Sinclair, in what can only be considered "contagious fire", fired their weapons after hearing shots being fired, even though there was no threat to their safety, and they never saw Mr. Quair or Mr. Quintero with a weapon.

68.    Sergeant Lopes testified in his deposition to the following:
    a) The use of lethal force against Mr. Quair was the fifth use of deadly force incident in which he was a shooter. (12)
        1)    He fired 18-20 rounds from a rifle in his first use of deadly force. (14/12)
        2)    He fired 3-4 rounds from a handgun in his second use of deadly force.

14

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
**805.947.8323**

        (16/17)

    3)    He fired 8-9 in his third use of deadly force. (17/22)

    4)    He fired one round from a rifle in his fourth use of deadly force. (20/1)

b) He never saw Mr. Quair reach for his waistband or pocket. (48/25)

c) He had received training that you cannot use deadly force if you do not see a weapon. (48/12)

d) He had received training on the appropriateness of shooting an individual taking a stance with no weapon. (47/25)

e) He did not see Mr. Quair in possession of a weapon prior to his use of deadly force. (35/24) (36/15)

f) He did not see Mr. Quair in possession of a weapon while he was using deadly force against Mr. Quair. 36/25)

g) He was able to see weapons from a greater distance in his prior shootings. (34/1)

h) He claimed Mr. Quair advanced toward the rear of the Nissan after getting out of the passenger side of the Nissan.

i) He did not hear shots being fired before he fired at Mr. Quair. (25/19)

j) He did not see muzzle flash coming from the direction of Mr. Quair or the Nissan. (42/22)

k) He did not hear any threats from Mr. Quair or Mr. Quintero. (42/22)

l) He fired 22 rounds at Mr. Quair from an assault rifle. (23/23)

m) In semi-automatic mode, Sergeant Lopes intentionally pulled the trigger on his assault rifle each, and every time he fired a round. (29/5).

n) No weapons were found on or near Mr. Quair, or in the Nissan. (54)

o) He had his rifle in the semi-automatic setting (24/16), but it was also equipped to fire in full-automatic mode. (24/13)

p) He fired the 22 rounds in three-to five seconds. (25/13)

q) He had the impression his first round hit Mr. Quair. (38/19)

r) He used deadly force against Mr. Quair while Mr. Quair was on the ground. (37/6)

s) He continued to use deadly force against Mr. Quair even though he had no target acquisition on Mr. Quair. (39/1)

t) He was aware it was inappropriate to use deadly force against Mr. Quair while Mr. Quair was on the ground. (76/6)

u) He estimated there was 1-2 seconds between the time Mr. Quair began getting out of the Nissan and the time he began using deadly force against Mr. Quair. (30/25)

v) He used deadly force against Mr. Quair, with "less than half" of the rounds he fired when he had no target acquisition on Mr. Quair. (40/13) (70/8)

w) He used deadly force by firing rounds through the rear window of the Nissan, even though he could not see Mr. Quair or into the passenger compartment of the Nissan. (40/23) (71/3)

15

x) The encounter "scared the hell out of me." (26/17)

y) He backed away from the protection of the engine block of his vehicle and continued to use deadly force against Mr. Quair even though he could not see Mr. Quair or determine if he was a threat.

69. P.O.S.T. certified peace officers are trained to maintain cover and/ or concealment and to avoid placing themselves in any position of danger. P.O.S.T. training in this regard is precise. Officers are taught that leaving the safety of cover and standing in the open area is a forbidden tactic. It is defined by P.O.S.T. as a "Fatal Error" and indicates a "Tombstone Mentality" that will likely cause unnecessary injury and/or death to citizens and officers (Learning Domain # 22 – "Vehicle Pullovers").

70. Contrary to all training, from P.O.S.T Basic Academy through mandatory in-service training, Sergeant Lopes left a position of cover behind his vehicle's engine block, and back-peddled away from his vehicle into an open space while continuing to randomly and indiscriminately rapid fire his assault weapon in the direction of the Nissan and where he believed Mr. Quair was on the ground. A trained law enforcement professional, especially a sergeant with multiple years of experience and professed SWAT training, is expected to utilize their extensive Officer Safety training and knowledge during all critical incidents.

71. In his deposition, Investigator Compston testified to the following:
a) He positioned his vehicle behind and slightly to the right of the Nissan giving him a clear view of the passenger side.
b) He did not give any commands to the occupants of the Nissan (8/7), and he did not hear any of the investigators announce that they had seen a gun (8/8) before he fired at Mr. Quair.
c) He was unsure as to the number of rounds he fired - "about five (5)" "could have been more"- from his .40 cal. Glock handgun, (6/8) even though he had been trained that he was accountable for every round he fired. (15/19)
d) He heard one shot (9/5) but never saw Mr. Quair with a weapon (11/15) or saw muzzle flash coming from the area of the Nissan before he began firing at Mr. Quair. (12/25)
e) One of the reasons he shot was the sound of gunfire. (25/3)
f) He never had any information that Mr. Quair ever point a gun at anyone, shot at anyone, injured anyone, or threaten to harm officers in the past. (12)
g) He did not perceive Mr. Quair as a threat while Mr. Quair was on the ground. (16/1)
h) He believed he could shoot Mr. Quair if Mr. Quair attempted to flee "based on the information we have about them being involved in a home invasion." (23-24)
i) He would not shoot simply because someone came out in a stance with his hands together but no identifiable gun. (25-26)

16

*KJB CONSULTING, INC.*   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**
805.947.8323

      j) He never saw a gun in Mr. Quair's possession and did not see muzzle flash coming from Mr. Quair. (26/12)

      k) Mr. Quair was not firing at him or anyone else while Mr. Quair was going to the ground, and Mr. Quair was not pointing anything at the KCSD and DOJ personnel while he was on the ground. (27)

72.    In his deposition, Investigator Silveira testified to the following:

      a) He positioned his unmarked vehicle to the right of Investigator Compston's vehicle giving him a clear view of the passenger side of the Nissan.

      b) He did not put up his red and blue handheld light "because there was no time." (5/13)

      c) He never saw Mr. Quair or Mr. Quintero in possession of a weapon. (13)

      d) He could see Mr. Quair's hands when Mr. Quair got out of the Nissan, but he did not see anything in Mr. Quair's hands. (25/22)

      e) He has been trained that deadly force cannot be used if the suspect simply puts his hands together, but a weapon is not seen. (33/24)

      f) He has been trained that deadly force cannot be used if there is no immediate threat. (34/1)

      g) Based on his training, he knew he could not shoot someone already down. (39/12)

      h) He had no information that Mr. Quair was in possession of a weapon. (15) (25/1)

      i) He did not see muzzle flash coming from Mr. Quair's position. (26/7)

      j) No weapon was found on Mr. Quair or on the ground. ((30)

      k) He fired three rounds within two seconds (26/3) from his Glock handgun (6/17) five-to-ten seconds after Mr. Quair got out of the Nissan (14/9), and after hearing shots being fired. (7/1)

73.    Investigator Sinclair testified in his deposition to the following:

      a) He positioned his vehicle to the left of Sergeant Lopes' vehicle, to the rear of the Nissan. (7/ 17)

      b) He fired three rounds, with an intentional trigger pull for each round, from his AR M-Platform rifle at the Nissan even though he could not see Mr. Quair (12/3) or any other threat.

      c) He fired his weapon only after hearing "a lot" of shots being fired (8/25) and never saw Mr. Quair's hands. (17/1)

      d) He claimed Mr. Quair was advancing rapidly toward the rear of Nissan after he got out of the Nissan. (21/1)

      e) He never saw a weapon in Mr. Quair's possession. (23/19)

      f) He did not have information that Mr. Quair pointed a weapon or shot at anyone. (38/17)

      g) He fired into the passenger area of the Nissan even though he did not see a threat. (24/5)

      h) He fired because other law enforcement officers were firing at the Nissan and Mr.

# *KJB CONSULTING, INC.*  5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                  805.947.8323

Quair. (25/3)
i) He never heard any law enforcement official tell anyone to drop a gun. (31/1)
j) He has never had training on contagious or sympathetic fire. (39/1)
k) He had no target acquisition before firing at the Nissan. (43/22)

74.    Photographs of the Nissan after the unreasonable and excessive use of lethal force against Mr. Quair showed KCSD and DOJ personnel fired numerous rounds into the Nissan even though they testified they could not see a threat to their safety due to the tinted windows.

75.    KCSD and DOJ personnel never warned the occupants of the Nissan, including Mr. Quair, that lethal force was imminent

76.    P.O.S.T. certified officers are continuously trained and reminded that deadly force is justified only:
a) as a last resort
b) under the direst of circumstances
c) in the immediate defense of life
d) when no other options are available
e) when all other options are exhausted
f) after a deadly force warning has been given, if feasible
g) if every shot can be justified

## Failure of King's County, DOJ and KCSD Personnel to Provide the Necessary and Required Medical Attention per Training.

77.    The American Red Cross First Aid / CPR / and AED course emphasizes several critical points when assisting a severely injured individual, including once you recognize that an emergency has occurred, you must decide how to help and what to do.

78.    All certified law enforcement officers are taught that the failure to provide timely medical treatment to an injured person could result in further and significant injury and the unnecessary infliction of additional pain.

79,    Policy 424 of the KCSD's policy manual (Emergency Medical Care) establishes policies and procedures for first aid services which will conform with current medical practices. The Kings County Sheriff's Office sworn personnel are responsible for providing emergency medical care for victims that are encountered during law enforcement activities, in the absence of any other emergency medical care.

18

# KJB CONSULTING, INC.
**Curt Rothschiller**

5021 Verdugo Way #187, Camarillo, CA

805.947.8323

80.   At approximately 05:35:55, the air surveillance video provided clearly shows Mr. Quair getting out of the front passenger side of the Nissan and immediately falling to the ground after Sergeant Lopes fires his initial round. Numerous rounds can be seen kicking up dirt around Mr. Quair while he lays immobile on his back on the ground.

81.   After being shot approximately seventeen (17) times from multiple lethal firearms, Mr. Quair was immobile, bleeding profusely, and in obvious and critical need of emergency medical care and treatment. KCSD and DOJ personnel did not timely summon medical care or permit medical personnel to treat Mr. Quair. The delay of medical care caused Mr. Quair extreme physical and emotional pain and suffering and was a contributing cause to Mr. Quair's injuries.

82.   Mr. Quair was left on the ground with no medical aid until 05:51:48 when medical professionals began attending to Mr. Quair, even though there were numerous law enforcement officers present and the scene was safe. The officers did not provide any first aid or lifesaving measures for Mr. Quair in clear violation of KCSD policy. In fact, many can be seen milling around with apparent indifference to Mr. Quair's well-being. There was no effort by any of the officers to apply pressure to Mr. Quair's wounds, attempt stop the bleeding, or even retrieve issued First Aid kits. The officers do take the time to retrieve protective gloves for themselves prior to searching Mr. Quair, but then just stand around him without rendering any aid.

## Failure of the County of Kings, the King's County Sheriff's Department and the State of California to Conduct an Appropriate Criminal Investigation, Administrative Review, or Internal Affairs Investigation.

83.   I was not presented with evidence a thorough, impartial, independent Internal Affairs or criminal investigation was completed regarding this use of unreasonable excessive lethal force. The lack of an industry standard impartial investigation by the KCSD and DOJ or other independent entity compounded the issues with this incident. P.O.S.T requires that agencies maintain adequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct. Failure to provide such documentation is indicative of entities not complying with P.O.S.T. requirements.

# *KJB CONSULTING, INC.*  5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
### 805.947.8323

84.    It is imperative that all incidents and officers' actions are openly and honestly reviewed through Critical Incident Debriefings, After Action Reports, and Internal Affairs investigations. Failure to conduct critical incident reviews leads to agencies and officers continuously making critical errors. Complete and factual information must be provided for the reviews to determine if tactics and training must be adjusted. I have seen no evidence of critical incident reviews being conducted surrounding the use of unreasonable excessive lethal force against Mr. Quair.

85.    The approval and ratification of the KCSD and DOJ personnel's actions in this incident are also concerning and may be indicative that their personnel are not held to the standards and policies of modern law enforcement. I have seen no evidence that any of the investigators or Sergeant Lopes were either disciplined or re-trained in arrest methods, tactical deployments, basic investigative techniques, first aid, or use of force.

86.    302.1 of the KCSD Policy manual specifically establishes a process for the Kings County Sheriff's Office to review the use of force by its employees. It states that this review process shall be in addition to any other review or investigation that may be conducted by any outside or multi-agency entity having authority over the investigation or evaluation of the use of deadly force. 302.2 of the manual states the Kings County Sheriff's Office will objectively evaluate the use of force by its members to ensure that their authority is used lawfully, appropriately and is consistent with training and policy. 302.3 calls for the removal from duty assignment whenever an employee's actions or use of force in an official capacity, or while using department equipment, results in death or very serious injury to another, and that employee will be placed in a temporary administrative assignment pending an administrative review. No evidence or documentation was presented to me that the KCSD complied with 302.1 – 302.3 in this case.

87.    Although 306.1 of the KCSD Policy manual establishes policy and procedures for the investigation of an incident in which a person is injured or dies as the result of an officer-involved shooting or dies as a result of other action of a deputy and specifically outlines steps and responsibilities, including criminal investigations, administrative investigations, and civil investigations to determine liability, there was no evidence presented to me or indication that any of the investigation or policy had been followed.

88.    In my opinion, actions by law enforcement personnel that defy current training and industry standard tend to indicate disregard for that training, or improper training and lack of experience. A systemic issue is apparent when failure to follow policy, procedure, and industry standards are later ratified by other members in the organizations. Misperceptions that the actions were proper set a dangerous precedent, reinforce negative behavior and are

20

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
805.947.8323

counter to industry standards and training.

89.    The lack of an industry standard, impartial investigation by Internal Affairs or other independent entities compounds the issues with this unreasonable and excessive use of force by KCSD and DOJ personnel and signals to KCSD and DOJ personnel that excessive and unreasonable lethal force is acceptable.

## Failure to Train and Failure to Supervise KCSD and DOJ Personnel by the County of Kings, the King's County Sheriff's Department and the State of California

90.    For decades, law enforcement agencies across the country have recognized the need and trained their officers in multiple ways to apprehend non-compliant suspects without resorting to unreasonable excessive force. These methods are continuously updated, well known, and have proven to be effective for the safety and welfare of officers, subjects, and the public. Often referred to as "perishable skills", it is critical for everyone's safety that officers receive regular training and maintain proficiency. A critical emphasis in the training is that every use of force must be accounted for and justified.

91.    The safe resolution of incidents without the use of force calls for ingrained critical incident knowledge and experience. All officers must receive sufficient certified training which gives them the skills needed to consider their options and to act with reason.

92.    Based on their outdated actions during this incident, the County of Kings, KCSD and DOJ failed to continuously train their personnel in updated officer safety tactics, perishable skills, other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution. Officers proficient in the officer safety use of cover, concealment, time, and space reduce their personal risk as well as the need to use unreasonable excessive force.

93.    The County of Kings, KCSD and DOJ failed to train their personnel basic, current industry standard arrest, use of force, surveillance and investigation methods resulting in unreasonable and excessive use of lethal force against Mr. Quair causing him significant injuries.

94.    I was presented with no evidence that KCSD and DOJ personnel had documented, or had others accurately document, their actions. The only account of the incident provided was their transcribed interview statements, which went unchallenged by the interviewers. In my experience, training, and how I train report writing, "If it wasn't in your report, it didn't happen."

21

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                                    805.947.8323

95.    I was never presented with any evidence an after-action debriefing for KCSD and DOJ personnel occurred to determine what went right and what went terribly wrong and led to the use of excessive lethal force on Mr. Quair. Without debriefing critical incidents and determining corrective action, the personnel are destined to continue to violate the rights of the citizens they serve.

96.    It is incumbent on all law enforcement professional that they stay proficient at their perishable skills, whether-or-not their agency trains them.

97.    Leading up to the unreasonable and excessive use of lethal force against Mr. Quair, personnel from multiple agencies were tasked with high-risk enforcement action without a plan or supervisor. Investigators were spread throughout the County and left to their own devices and unbridled rogue behavior. Sergeant Lopes eliminated himself from the role of supervisor when he inserted himself as the primary unit on a high-risk arrest where there was no urgency to take immediate enforcement action.

98.    As illustrated in this case, the lack of supervision during any critical incident allows for rogue deputies to dispense excessive, unreasonable lethal force. Had industry standards and P.O.S.T. training been followed, a supervisor could have taken command, formulated a professional tactical plan, directed their personnel's actions, coordinated resources, and controlled the incident to a safe conclusion. Sergeant Lopes was so consumed with being in the middle of the action that he abandoned his primary role as a supervisor, and no other law enforcement personnel assumed the role.

99.    Sergeant Lopes admitted, without remorse, having been in four (4) use of deadly force shootings of human beings prior to his shooting of Mr. Quair.
    a) In Berbereia v. County of Kings, et al., case number 1:16-cv-00363; the Kings County and Sergeant Lopes settled with the family of Albert Hanson, Jr., a 76-year-old man who was fatally shot by sheriff deputies including Sergeant Lopes. Kings County sheriff's deputies used an excessive and unreasonable amount of force when they fired more than 45 rounds through the rear of Mr. Hanson's vehicle at a time when Mr. Hanson did not pose a threat to the deputies' or any other person's safety. Sergeant Lopes at the time of Berbereia, had previously been involved in two (2) prior shooting incidents, both without adverse consequences.
    b) In Estate of Stephen E. Crawley, et al.v. Kings County, et al., case number 1:13-cv-02042; Kings County settled with the family of Stephen Crawley, after sheriff's deputies used excessive and unreasonable force to break through the door of Mr. Crawley's residence and fired an unknown number of rounds, fatally striking Mr.

22

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

Crawley three times.

100. Sergeant Lopes' use of excessive and unreasonable use of deadly force against Mr. Quair was his fifth (5th) such incident. It is clear the Kings County and the KCSD do not feel the need to hold their employees accountable when they clearly fail to follow industry standards and P.O.S.T training. Kings County and KCSD knew or should have known Sergeant Lopes had the propensities and character traits to repeatedly use unreasonable and excessive lethal force. I was not presented with any evidence Sergeant Lopes, or the DOJ investigators, were disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Mr. Quair's injuries.

101. King's County and the KCSD failed to supervise and properly address the known issues concerning Sergeant Lopes, i.e., his repeated use of excessive force, including deadly force. As mentioned above, the vast majority of law enforcement offices never resort to the use of deadly force, even in lengthy careers in high-risk assignments.

102. Without established and enforced oversight of use of force incidents by KCSD and DOJ personnel, unreasonable and excessive use of force incidents will continue to violate the safety of citizens. There was no evidence presented to me that indicated there was a thorough and unbiased investigation into this unreasonable and excessive use of lethal force against Mr. Quair.

103. Lack of and poor supervision are synonymous with the failure to discipline, reprimand, retrain, or suspend.

**Summary of Opinions:**

104. This incident is a case of the use of excessive and unreasonable lethal force by Sergeant Lopes and DOJ personnel against Mr. Quair and the failure of KCSD and DOJ personnel to provide the required first aid and life-saving measures for the injuries he incurred as a result.

105. Every day, law enforcement must weigh their response to the circumstances presented to them objectively reasonable, without prejudice. This incident is clearly a case of over-zealous law enforcement personnel using excessive and objectively unreasonable deadly force against Mr. Quair which led to his extensive injuries and continuing medical issues. The firing of a gun by a police officer at a person constitutes the use of deadly force and can only be justified in immediate defense of life.

106. Based on my analysis of the evidence and statements of events given by KCSD and DOJ

personnel, their use of deadly force was excessive and unreasonable. Mr. Quair was unarmed, had his hands raised, was not advancing toward the investigators, and not a reasonably objective threat to the officers when the excessive lethal force was used. The investigators had access to positions of safety (cover and concealment), time, and space to tactically and fully evaluate Mr. Quair's actions. The use of deadly force against Mr. Quair was not objectively reasonable under the circumstances as presented.

107.   Mr. Quair and Mr. Quintero did not pose an immediate threat to anyone that morning, therefore the use of deadly force by the investigators was inappropriate, excessive, and unreasonable, violated generally accepted policing training and standards, and violated KCSD policy. KCSD and DOJ personnel should have remained in a position of safety (cover / concealment), fully observe the totality of the event (time and space) and Mr. Quair's actions to better determine their options.

108.   Officers are trained that as they assess the possibility of using lethal force they must consider whether innocent individuals or unintended targets are in peril. Had the officers followed P.O.S.T. training and industry standards, under the circumstances as presented, they would never have endangered Mr. Quintero and Mr. Quair's lives or the lives of other potential occupants of the Nissan or caused them significant bodily injury by firing their weapons. KCSD and DOJ personnel's decisions and actions were dangerous and reckless, and a direct casual factor in the sequence of events leading up to the unreasonable use of excessive lethal force on Mr. Quair.

109.   The use of deadly force in connection with this incident was also unreasonable because there were far more reasonable options available besides shooting at the Nissan and Mr. Quair. There were fundamental errors and a gross lack of situational awareness in this incident.

110.   Law enforcement officers across the country face perilous circumstances every day. They are trained that their duty is to respond to each incident objectively and within reason. They must evaluate the behavior and actions of the individuals they contact with an unbiased, open mind. An individual's prior history and associations may be considered but cannot be used to formulate a decision to use lethal force. "Subjective fear" (the fear associated with non-factual information) must be eliminated from the factors when law enforcement chooses to use deadly force.

111.   KCSD and DOJ personnel, especially Sergeant Lopes, were un-rationally (subjectively) pre-disposed to resistance from the occupants of the Nissan. They failed to independently evaluate the threat or gauge compliance of Mr. Quair and Mr. Quintero, and instead without a threat, unleashed unreasonable and excessive force against them by firing a barrage of

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                805.947.8323

lethal rounds at them.

112.   Sergeant Lopes and the DOJ investigators claimed they were in fear of Mr. Quair and Mr. Quintero prior to the tactically botched enforcement stop because of their alleged association with other individuals.

113.   While KCSD and DOJ personnel may have had third hand information (wiretap) Mr. Quair or Mr. Quintero were associated with illegal activity, they had no information either had a violent criminal history, a propensity toward violence, were in possession of a weapon, or a threat to law enforcement or the public.

114.   Other than the statements of KCSD and DOJ personnel, there was no evidence presented to me that Mr. Quair or Mr. Quintero had criminal associates, were a threat to the public, had threatened violence, had threatened law enforcement personnel, or law enforcement knew they were involved in violent criminal activity at the time of the unreasonable use of excessive force.

115.   Sergeant Lopes and DOJ personnel created their own fear by subjectively interpreting the information they received from other officials, the alleged information gathered in the wiretap investigation, and the actions of Mr. Quair and Mr. Quintero the morning of June 18. Sergeant Lopes' statement that the occupants of the Nissan left the windows partially rolled up as some sort of sign the were plotting something "because everyone in traffic stops seem to roll down their windows" and the "angle of car–red flag" (L 22/15) is one small example of his subjective mindset that morning. His subjective fear is also evident by his statement that Mr. Quair "jumps" out of the Nissan and "runs up" prior to the use of unreasonable excessive force when it is clearly contradicted by video evidence.

116.   KCSD and DOJ personnel unleashed an objectively unreasonable and excessive use of lethal force on Mr. Quair and Mr. Quintero without threat to their safety or the safety of the public.

117.   The use of deadly force against Mr. Quair and Mr. Quintero was excessive and objectively unreasonable under the circumstances, especially because Mr. Quair and Mr. Quintero were un-armed, and they did not pose an immediate threat of death or serious bodily injury to anyone.

118.   Each investigator present during the objectively unreasonable excessive use of force that morning had the ethical and moral duty, and as outlined in KCSD Policy 300.2.1, to intervene and de-escalate the continuous, contagious rapid-fire shooting of Mr. Quair. P.O.S.T. Basic and In-Service training stresses that officers maintain self-control, effective

25

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**    805.947.8323

communication, scene assessment and management, and weigh force options in high-risk incidents where use of force is considered. (LD#20) Avoidance of contagious fire is stressed in firearms training throughout an officer's career. They are taught to make their own assessment of the threat prior to firing their weapon. They are also taught to communicate with other officers present if they determine there is no longer a threat.

119. Investigators Compston and Silveira, who both had a clear view of Mr. Quair while he was on the ground, unarmed, and obviously injured, should have called for Sergeant Lopes and Investigator Sinclair to cease their indiscriminate rapid-fire use of unreasonable excessive lethal force on Mr. Quair. Instead, they magnified the unreasonable excessive use of deadly force by allowing Sergeant Lopes and Investigator Sinclair to continue firing, and by firing their own additional rounds at Mr. Quair while he was on the ground, clearly unarmed.

120. Certified law enforcement personnel are trained that they are not justified in a use of deadly force when their deliberate decisions and actions are contrary to reasonable and required tactics.

121. Sergeant Lopes' actions in this case, with respect to the tactics leading up to and during the stop, and amount the amount of force used, reflected, at best, a reckless disregard to the life and safety of Mr. Quair, Mr. Quintero, himself, his fellow officers, and the public.

122. Sergeant Lopes' actions in this incident appear as deliberate (and not accidental), and as the cause of the cascading series of events that culminated in the use of deadly force against Mr. Quair.

123. In this regard, the use of deadly force against Mr. Quair demonstrates that Sergeant Lopes and the DOJ personnel were not properly trained on current officer safety techniques and force options or failed to follow that training and the California Peace Officer Standards and Training (P.O.S.T.) guidelines regarding the proper tactics and procedures, and /or chose to ignore that training.

124. KCSD and DOJ personnel failed to understand that an officer's overreaction to a subject's failure to follow verbal commands, verbal resistance, or passive resistance is synonymous with excessive force and an officers' subjective fear does not reach the threshold of 'reasonably objective' justification for the use of excessive force.

125. The use of force in connection with this incident was also excessive and unreasonable because there were far more reasonable options available. Sergeant Lopes rushed to the front of the surveillance and tried to initiate a high-risk stop without additional resources. There was no reason to draw attention to the surveillance or an urgency to stop the Nissan.

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                          805.947.8323

126. Additional resources, SWAT vehicles, K9 officers, etc., were available to the surveilling investigators and Sergeant Lopes, which would have minimized or prevented the use of unreasonable force against Mr. Quair.

127. "Time and space" have proven to be allies when investigators attempt to take enforcement action. Law enforcement must always evaluate the true threat and decide which options are appropriate considering that threat.

128. A significant number of civilian injuries and deaths caused by police officers result from a series of cascading departures from expected and required tactics. This statistic is consistent with the downward spiral of events resulting in the use of excessive and unreasonable force by the KCSD and DOJ personnel.

129. KCSD and DOJ personnel failed to understand that they are not justified in a use of force when their deliberate decisions and actions are contrary to reasonable and required tactics. Deputies' actions in this tragic incident, with respect to the tactics and amount of force used, reflected—at best—a reckless disregard to the liberty and safety of Mr. Quair and Mr. Quintero and contradictory to police practices and procedure.

130. There was no objectively reasonable basis, given my skillset, training and experience, to believe that Mr. Quair was an armed threat to KCSD and DOJ personnel prior to the investigators firing their weapons at him.

131. Had KCSD and DOJ personnel been sufficiently trained and followed their P.O.S.T certified training and industry standard under the circumstances as presented, they would never have violated Mr. Quair's constitutional right to be free from an excessive and unreasonable use of force. KCSD and DOJ personnel's decisions and actions were excessive and unreasonable, and a direct casual factor in the sequence of events leading up to Mr. Quair's injuries.

132. The lack of transparency in this case, regarding the production of official reports and documentation is extremely concerning. Failure to produce official documentation, i.e., Use of Force, investigative, crime scene, and Internal Affairs reports from KCSD and DOJ leads me to believe there was a concerted effort by law enforcement to prevent the facts of this incident to become known.

## Qualifications for Reviewing this Case:

133. My opinions are based in part on my training, professional experience, and education, as

27

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                          805.947.8323

well as review of policies and procedures from multiple agencies, and the items of evidence provided to me.

134. I have over thirty-six years of service with the Ventura County Sheriff's Office retiring as a Sheriff's Captain. I was hired on October 1, 1979, and I retired from active service on March 3, 2016. I am a graduate of the P.O.S.T. Basic Academy Class 79-4 and hold P.O.S.T. Basic, Intermediate and Advanced certificates. I completed numerous P.O.S.T. approved Management, Supervision, Officer Safety, and Critical Incident Tactics courses. I obtained a Bachelor's degree in Psychology while employed by the Sheriff's office and I am in the process of completing the thesis portion of a Master's degree in Psychology.

135. During my service with the department, I had a wide range of duties where I gained the experience on which to base my opinions. As a deputy those duties included custody, uniformed patrol, a Special Enforcement unit, and general assignment investigations. As a senior deputy, I was briefly assigned to custody before working narcotics for approximately nine (9) years where I served as a training officer for over eight years. As a sergeant I supervised patrol, administration, and community services units, and narcotics for approximately seven (7) years. After being promoted to captain, I managed highly skilled and trained units of narcotics, intelligence, and special crimes task forces. I gained extensive operational, investigative, tactical, covert surveillance, and Anti –Terrorist experience while assigned to, supervising, and managing multi-agency personnel, operations and units. I have testified as an expert for the prosecution in State and Federal court and I am a recognized expert and certified instructor of multiple law enforcement disciplines.

136. Between 2001 and 2016, I was a member and an instructor for the Ventura County Law Enforcement Crisis Intervention Team (CIT), a multi-jurisdictional task force approach based on the Memphis Model of law enforcement treatment of those with a mentally illness. Initially, I secured $800,000 of federal funding and served as the agency wide VCSO CIT Coordinator. From 2009 -2016, I was the county-wide, multi-agency CIT Coordinator and manager. I taught at and hosted over thirty (30) forty-hour (40 hr.) CIT academies which trained hundreds of officers from throughout California. I am also a former Ventura County Behavioral Health Advisory Board appointee and Ventura County National Alliance on Mental Illness Board (NAMI) member.

137. I have trained new and seasoned officers in P.O.S.T. and agency approved patrol procedures, critical incidents, field investigations, officer safety, apprehension techniques, crisis intervention, high-risk arrests, and emergency procedures.

138. I have reviewed, and continue to review, critical incidents and offered opinions at the

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

request of law enforcement agencies and private attorneys.

139.    I commanded multi-agency task forces made up of local, state, and federal investigators and supervisors. While doing so, I reviewed policy and procedures from multiple agencies and created an operational manual addressing tactical deployment of personnel during critical incidents, which was approved by Letter of Agreement from numerous agencies.

140.    My units conducted investigations including undercover surveillance, high risk apprehensions, buys, buy busts, and reverse stings. The narcotics cases usually involved multiple kilogram quantities of drugs and up to millions of dollars, which raised the stakes and violence by the offenders. The investigations spanned all corners of the country and includes foreign nations. We also conducted numerous investigations involving Organized Crime and street gang activity. Additionally, we deployed at the request of other investigative units (Robbery, Homicide, Burglary, etc.) due to our experience, tactical expertise, and training. Many of the suspects I was involved in apprehending were armed and considered extremely dangerous. Most were apprehended during their crimes, armed and extremely prone to use firearms to escape apprehension.

141.    Over my career, I have been involved with numerous arrests, pursuits, and high-risk operations where deadly force was often a possibility. Even though in many instances it may have been technically "justified", I have never used deadly force. In those instances, I chose other options available to me. Additionally, no officer under my direction or supervision has ever needed to resort to the use of deadly force. The lack of use of deadly force by myself and co-workers speaks for itself and was accomplished through proper tactics, training, and pointed reviews of incidents, and revision of tactics, if necessary.

142.    I commanded and supervised personnel with a focus on training in updated and current, safe tactical apprehension methods, officer safety, and adherence to the moral and ethical standards endorsed by California P.O.S.T., the agencies committed to the task forces, and state and federal law. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice. I advocated and demanded critical reviews of all incidents to identify mistakes, adjust training and prevent the same mistakes from occurring in the future.

143.    Attached as Exhibit A is a statement, curriculum vitae, listing my law enforcement qualifications and experience.

144.    I have testified as a compensated expert in Court. I have also testified as an expert for the prosecution when I was employed by a government agency, for which I did not receive

29

# *KJB CONSULTING, INC.*  5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**  805.947.8323

expert compensation.

145.  I am currently sole proprietor of KJB Consulting, Inc. which specializes in law enforcement tactical training and trial preparation.

These opinions are based upon my education, training, experience, and skillset and are based upon information known to me at this time. Should new information become available, I reserve the right to consider same.

Submitted this 22nd day of July 2022

Curt Rothschiller

30

# KJB CONSULTING, INC.  5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
### 805.947.8323

## Curriculum Vitae

**Curt Rothschiller**                        curt.kjbconsulting@yahoo.com
                                             Home: (805) 947-8323

## PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 03/16 – present | **Director of Security and Safety, Golden State Medical Supply, Inc.** |
| 03/16 – present | **KJB Consulting, Inc. Sole Proprietor** |

- Law Enforcement Policies and Procedures
- Use of Force
- Tactics Assessment
- Investigation Analysis
- Case Review
- Trial Preparation
- Crisis Intervention (CIT)
- Peer Support
- Security

Over 36 years with the Ventura County Sheriff's Office includes:

**04/12 - 03/16     Captain, Special Services, Special Investigation Unit**

- Manage the Sheriff's Narcotics and Intelligence / Special Crimes Division.
- Managed Regional Ventura County Combined Agency Team (VCAT), a multi-local and federal agency task force assigned to interdict major Drug Trafficking Organizations (DTO) internationally.
- Implemented regional Pharmaceutical Diversion Task Force and Open Source (Social Medial) unit.
- County-wide manager of the Ventura County Law Enforcement Crisis Intervention Team (CIT) program.

**04/08 – 04/12     Sergeant, Community Resource Unit—Central County Patrol**

- Implemented and managed the C.O.P.P.S. philosophy of policing.
- Management of School Resource Officers, the Juvenile Detective, Citizen Patrol, Explorers, and Crime Prevention Officers.
- County-wide coordinator of the Ventura County Law Enforcement Crisis Intervention Team (CIT) program.

**03/07—04/08     Sergeant, Administration—Central County Patrol Services**

31

*KJB CONSULTING, INC.*  5021 Verdugo Way #187, Camarillo, CA

Curt Rothschiller                                              805.947.8323

|  | |
|---|---|
| | • Administrative duties and staff work of all patrol services within the Central County Patrol Services station including: COMPSTAT, scheduling, training, records, and budget. |
| | • CIT coordinator |
| 03/05—03/07 | **Sergeant, Field Supervisor—Central County Patrol Services** |
| | • Supervise patrol field operations within the city of Camarillo and the surrounding county. |
| | • Coordinate briefings and conduct training sessions for patrol services. |
| | • CIT coordinator. |
| 08/04—03/05 | **Sergeant, Field Supervisor—East County Patrol Services** |
| | • Supervise patrol field operations within the city of Thousand Oaks and the surrounding county. |
| | • Coordinate briefings and conduct training sessions for patrol services. |
| | • CIT coordinator. |
| 09/01—08/04 | **Sergeant, Administration—East County Patrol Services** |
| | • Administrative, budget, and staff work duties of all patrol services within the East County Patrol Services Division. |
| | • CIT coordinator. |
| 07/94—09/01 | **Sergeant, Narcotics—Special Services Division** |
| | • Supervision and management of Narcotics Units conducting undercover operations throughout the western United States. |
| 02/94—07/94 | **Sergeant, Watch Commander - Detention Services** |
| 06/84—02/94 | **Senior Deputy, Narcotics Investigator—Special Services Division** |
| | • Managed multi-state narcotics investigations. |
| | • California Narcotics Officers Association Investigator of the Year 1993 and 1994 |
| 01/84—06/84 | **Senior Deputy, Pre-Trial Detention Facility—Detention Services** |
| 10/79—01/84 | **Deputy—Detention Services / East County Patrol Services** |

## SPECIAL QUALIFICATIONS / ACHIEVEMENTS:

- Extensive investigative, covert surveillance, and Anti –Terrorist experience

- Extensive operational and tactical supervision of multi-agency covert operations

- Developed and managed Intelligence Led Policing Special Crimes / Intelligence unit

- Master Interview and Interrogation Expert

32

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                        805.947.8323

- Development Team for the statewide Drug Abuse Recognition program

- Drug Recognition and Influence Expert

- State and Federally Recognized Expert and certified Instructor (multi-discipline)

- Research and development of policies and operational procedures

- Labor Relations Liaison and Human Resource experience

- Leadership, Management, and Supervision Courses

- Quality staff reports and responses to city councils and managers

- Grant Writing and Administration

- Public Information Officer (PIO) with extensive media relations

- Development Team and manager for the countywide Crisis Intervention Team (CIT) program

- Advanced California Peace Officer Standards and Training Certificate

**AFFILIATIONS:**

- Law Enforcement representative for the Ventura County Behavioral Health Advisory Board

- California Narcotics Officers Association – Lifetime Member

- National High School Football Coaches Association – 1989-present

**EDUCATION:**

- California Coast University, B.S., Psychology
- California Coast University, M.S., Psychology (Thesis IP)

33

*KJB CONSULTING, INC.*   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

## CASES TESTIFIED BY TRIAL / DEPOSITION

- Bordegaray v. County of Santa Barbara Case No. 2:14-cv-08610-CAS (JPRx) October 2016
- Bedetti v. City of Long Beach, et. al    Case No. 2:14-cv-09102-DMG March 2017
- Hornshaw v. City of Long Beach, et al Case No. 2:18-cv-06555-MVF (PLAx)
- Williams v. County of San Bernardino, et al Case No. 5:19-cv-00470-SVW-SHK
- Briceno v. County of Los Angeles, et al. Case No. 2:21-CV-01388-SB (Ex)

Curt Rothschiller
KJB Consulting Inc.
5021 Verdugo Way 187, Camarillo, CA 93012

Fee Schedule

Detailed below is my current fee schedule.

1. 1. A retainer fee of $2,000.00 is required prior to the commencement of professional services on any case and will be credited against the first invoice. Billing for services performed or expenses incurred will be charged against the retainer until it is exhausted. Any unused portion of the retainer fee will be refunded to the client. Fees are billed to the client in fifteen-minute increments with a minimum charge of fifteen minutes.

2. Consulting time, including but not limited to, case reviews, report reviews, deposition reviews, analysis of criminal investigations, research, interviews, consultation time, meetings, site inspections, deposition preparation, deposition support, interpretation of police documents, interpretation of investigative files, report preparation, preparation for negotiation or any miscellaneous tasks as assigned by the client attorney or opposing attorney (client approved) shall be billed at $300.00 per hour. Billing will be in fifteen-minute increments plus expenses.

3. Consulting time for professional services is $400.00 per hour. This includes deposition testimony, trial testimony and any other legal testimony.

4. Travel and actual expenses reasonably and necessarily include (meals, lodging, ground transportation, rental car, etc.) will be billed to the client at cost and copies of expenses will be provided when available.

Schedule of Fees (2022):

Retainer: $2,000.00 at commencement of retention, to be applied toward case review.

Hourly fee for case file review, investigation, research, analysis and preparation:                    $300.00 per hour

Deposition/Trial testimony:                    $400.00 per hour

All travel time outside of Ventura County will be billed at $125.00 per hour and travel costs are due and payable when invoiced.

FRESNO OFFICE
DEPARTMENT OF JUSTICE

2022 JUL 28 AM 10:53

ATTORNEY GENERAL
RECEIVED

RECEIVED
ATTORNEY GENERAL

2022 JUL 28  AM 10: 53

DEPARTMENT OF JUSTICE
FRESNO OFFICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Exhibit**

**D**

23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FREDDIE QUAIR,                              No. 1:20-CV-01793-JLT-SKO

                    Plaintiff,

vs.

COUNTY OF KINGS; TAYLOR LOPES;
NEIL COMPSTON; JOHN SILVERIA;
et al.,

                    Defendants.
_____

REMOTE DEPOSITION VIA ZOOM VIDEOCONFERENCE OF
CURT ROTHSCHILLER

Monday, October 10, 2022, at 9:00 A.M.

Reported by:

Shelly A. Davis, CSR #8947, RPR

Curt Rothschiller                                          October 10, 2022

```
 1                 UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3    FREDDIE QUAIR,                    No. 1:20-CV-01793-JLT-SKO

 4                       Plaintiff,

 5    vs.

 6    COUNTY OF KINGS; TAYLOR LOPES;
      NEIL COMPSTON; JOHN SILVERIA;
 7    et al.,

 8                       Defendants.
      _____
 9

10

11            BE IT REMEMBERED, that pursuant to Notice, and

12    on the 10th day of October, 2022, commencing at the hour

13    of 9:00 a.m., remotely via Zoom Videoconferencing,

14    pursuant to CCP 2025.310, before me, SHELLY A. DAVIS,

15    Certified Shorthand Reporter No. 8947, RPR, the

16    following proceedings took place:

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL (all appearing via Zoom):

 2

 3        For the Plaintiff:

 4            Law Office of Darrell J. York
              BY:  DARRELL J. YORK, ESQ.
 5            27240 Turberry Lane, Suite 200
              Valencia, CA  91355
 6            661.362.0828
              djylaw@gmail.com
 7
              Law Offices of Dale K. Galipo
 8            BY:  EUGENIA BAGDASSARIAN, ESQ.
              21800 Burbank Boulevard, Suite 310
 9            Woodland Hills, CA  91367
              818.347.3333
10            eugeniabagdassarian@galipolaw.com

11

12        For the Defendants COUNTY OF KINGS AND TAYLOR LOPES:

13            Weakley & Arendt
              BY:  MATTHEW P. BUNTING, ESQ.
14            5200 North Palm Avenue, Suite 211
              Fresno, CA  93704
15            559.221.5256
              matthew@walaw-fresno.com
16

17
          For the Defendants NEIL COMPSTON, JOHN SILVERIA,
18        EDWARD SINCLAIR:

19            Department of Justice
              Attorney General of California
20            BY:  NORMAN D. MORRISON, ESQ.
                  Deputy Attorney General
21            2550 Mariposa Mall, Room 5090
              Fresno, CA  93721
22            559.705.2304
              norman.morrison@doj.ca.gov
23

24

25
```

Curt Rothschiller                                          October 10, 2022

```
 1                          INDEX

 2                                                  PAGE

 3    EXAMINATION BY MR. BUNTING                      5

 4    EXAMINATION BY MR. MORRISON                     82

 5    EXAMINATION BY MR. BUNTING                     145

 6    EXAMINATION BY MR. MORRISON                    161

 7    EXAMINATION BY MR. BUNTING                     172

 8    EXAMINATION BY MR. MORRISON                    178

 9

10

11

12                       EXHIBIT INDEX

13    NUMBER      DESCRIPTION                    IDENTIFIED

14    Exhibit 1  Notice of Deposition               181

15    Exhibit 2  POST Learning Domain 35            181
                 Firearm/Chemical Agents
16
      Exhibit 3  POST Learning Domain 20            181
17               Use of Force

18    Exhibit 4  Kings County Sheriff's Office       181
                 Incident Report for 19K019976
19
      Exhibit 5  Office of the District Attorney     181
20               Report dated June 17, 2020

21    Exhibit 6  DOJ Investigation Report            181

22

23

24

25
```

1        MONDAY, OCTOBER 10, 2022; 9:00 A.M. - 1:52 P.M.

2

3                          CURT ROTHSCHILLER,

4            having been first duly remotely sworn,

5                       testified as follows:

6        THE WITNESS:  I do.

7

8                          EXAMINATION

9   BY MR. BUNTING:

10       Q.   Can you please state your name and spell it,

11  sir.

12       A.   Curt, C-u-r-t.  Rothschiller,

13  R-o-t-h-s-c-h-i-l-l-e-r.

14       Q.   And you're a hired expert, so I can dispense

15  with the admonitions, sir?

16       A.   Yes.

17       Q.   Do you know when you were retained, sir?

18       A.   No.

19       Q.   Okay.

20       A.   I don't.  Maybe three or four months ago.

21       Q.   Okay.  The first letter I see from you to

22  plaintiff's counsel is July 22nd, 2022.  Does that sound

23  roughly correct?

24       A.   No.  I -- I really don't remember when we

25  first started talking.

1  no, it should have been someone from their task force.

2      Q.   Okay.  So if somebody from the DOJ outranked

3  Taylor Lopes, it should have been whoever it was for the

4  DOJ that outranked Mr. Lopes -- or Deputy Lopes --

5  Sergeant Lopes?

6      A.   Again, depending on who was running the case,

7  which agency was the lead in the cases, it should have

8  been their supervisor.

9      Q.   In the materials you reviewed to prepare for

10  your testimony in this case, sir, did you familiarize

11  yourself with the Operation Red Reaper documents that

12  were provided?

13      A.   No.

14      Q.   So as you sit here today, and I say "Operation

15  Red Reaper" to you, does that mean anything?

16      A.   I'm going to guess that was the name of their

17  wire-tap case.

18      Q.   Do you know the objectives of Operation Red

19  Reaper?

20      A.   I never reviewed anything about Red Reaper.

21      Q.   Okay.  Then I'll represent to you, sir, this

22  case, you know, is part of Operation Red Reaper.

23          Now, sir, how -- I see here in your testimony,

24  how did the failure to have an officer in charge lead to

25  the unjustified use of force in your terms?

1       A.    No.

2       Q.    What do those e-mails discuss?

3       A.    Those e-mails would be the e-mails that I

4  received containing the information that I reviewed.

5       Q.    Any reason you didn't produce those documents

6  in preparation for today's deposition?

7       A.    Well, I assume that plaintiff's counsel

8  provided that to you guys.

9       Q.    You are aware that Mr. Quair was the subject

10  of a multi-agency state and federal task force known as

11  Operation Red Reaper, correct?

12      A.    I knew there was a wire tap, but I didn't know

13  who all was involved.

14      Q.    Do you know whether Mr. Quintero was, in fact,

15  the subject of Operation Red Reaper as well?

16      A.    I knew that he was involved in the wire tap.

17      Q.    And what is your understanding of

18  Mr. Quintero's involvement in the wire tap?

19      A.    I don't believe I had an understanding of

20  their role -- either one of their roles in the wire tap.

21      Q.    Okay.  Did you request to review any of the

22  documents relating to Operation Red Reaper?

23      A.    Again, I had no clue what Red Reaper -- I've

24  never heard of that term before today.

25      Q.    You didn't see any discussion of the term

1    "Operation Red Reaper" in any of the deposition

2    transcripts you reviewed?

3         A.    I do not believe I did.

4         Q.    You didn't see it in any of the reports that

5    you reviewed?

6         A.    I believe today is the first day I heard that

7    term.

8         Q.    Did you do any online, like, a Google search

9    or anything for Freddie Quair?

10        A.    No.

11        Q.    Any reason you didn't?

12        A.    No.

13        Q.    Okay.  Is it normal that when you're doing a

14   report, you attempt to find out all information that you

15   can about what you're offering testimony about?

16        A.    That -- yes.  And that information is provided

17   by the plaintiff's counsel.

18        Q.    So we've established that you -- you just

19   established that you do want to review as much as

20   possible and as provided by plaintiff's counsel, so when

21   you feel that you're not getting all the information

22   that you would expect to see from plaintiff's counsel,

23   do you attempt to locate that information on your own?

24        A.    No.

25        Q.    So, basically, would it be accurate, then, to

1  say, sir, that you believe your position is simply to

2  form an opinion only upon that information which

3  plaintiff's counsel gives you even though you know it

4  may not be incomplete -- complete information?

5       MR. BUNTING:  I'm going to object at this point.

6  It misstates the testimony, and it mischaracterizes it.

7            You can answer.

8       THE WITNESS:  I'm sorry.  Can you repeat that?

9  BY MR. MORRISON:

10      Q.   Sure.  Let me rephrase it for you, then.

11           Would it be accurate to state, sir, that you

12  believe that your role as an expert is to only offer

13  opinions based upon the information provided to you by

14  your hiring person, here the plaintiffs, and that your

15  job is to simply offer an opinion based upon the

16  information that they gave you even though you would

17  expect to see additional information that you aren't

18  seeing in what they've provided?

19      MS. BAGDASSARIAN:  Same objection.

20      THE WITNESS:  I -- I believe my position is to

21  review the information given to me and offer an opinion.

22  BY MR. MORRISON:

23      Q.   But -- so, then, sir, do you believe that you

24  don't have any obligation where you believe that there

25  might not be the complete information provided to you,

1    that you have an obligation to go out and try to find

2    the additional information?

3         A.    I do not believe it's my responsibility to go

4    out and find that information independent of what the

5    plaintiff's counsel gives to me.

6         Q.    Okay.  Did you review the Department of

7    Justice's policies and procedures?

8         A.    No.

9         Q.    Did you request them?

10        A.    I don't recall if I did.

11        Q.    Any reason you wouldn't have requested to

12   review the Department of Justice's policies and

13   procedures when you're offering opinions regarding

14   Department of Justice personnel?

15        A.    I requested all information that the

16   plaintiff's counsel had.

17        Q.    That's fine, sir.  You said that before.  I'm

18   asking a different question, though.  Is there a reason

19   that you would not have requested to review the DOJ,

20   Department of Justice, policies and procedures when you

21   are offering expert opinions regarding Department of

22   Justice special agents?

23        A.    Was there any reason I didn't?

24        Q.    Is there any reason you didn't request it?

25        A.    I requested all information from the

1  plaintiff's counsel.

2      Q.   Okay.   Then the next question:   When you

3  didn't receive copies of Department of Justice policies

4  and procedures, and knowing that you were being asked to

5  provide opinions about Department of Justice personnel,

6  why didn't you follow up regarding those documents?

7      A.   I believe if they had them, they would have

8  provided them to me.

9      Q.   And you felt comfortable offering opinions

10 regarding the alleged failure to comply with policies

11 and procedures that you've never reviewed?

12     A.   I offered an opinion on what happened that

13 day.

14     Q.   I believe, sir, that a lot of your testimony

15 is that they didn't -- the people present didn't comply

16 with -- with the Kings County Sheriff's Department

17 policies.  You would agree, sir, that the Department of

18 Justice is not a subsidiary of the Kings County

19 Sheriff's Department, correct?

20     A.   Correct.

21     Q.   It's an entity of the State of California,

22 correct?

23     A.   Correct.

24     Q.   It's subject to its own policies and

25 procedures, correct?

1      A.    I would assume so.

2      Q.    You don't know?

3      A.    I'm sure it is.

4      Q.    So, again, sir, with that in mind, knowing

5  that you've been hired to offer opinions about

6  Department of Justice personnel, and you opine that the

7  people present did not follow policies and procedures,

8  why didn't you request the DOJ policies?

9      A.    I requested all information that they had and

10 believed that they would provide what they had to me.

11     Q.    And when you didn't receive any DOJ policies,

12 did you do any further questioning of plaintiff's

13 counsel regarding why they had not given you DOJ

14 policies?

15     MS. BAGDASSARIAN:   Objection.  Asked and answered

16 multiple times.

17 BY MR. MORRISON:

18     Q.    You can answer.

19     A.    Why didn't I ask them for them?

20     Q.    When you saw that you had not received any

21 copies of DOJ policies, why didn't you follow up with

22 plaintiff's counsel to obtain copies of those policies

23 before you prepared your opinions?

24     A.    Again, I asked for them and didn't receive

25 them, which indicated to me they did not have them.

1       Q.    The --

2       A.    Why they didn't have them, I don't know.

3       Q.    But you felt comfortable offering opinions

4    regarding the failure to comply with policies that you

5    didn't have a copy of; is that correct?

6       A.    Yes, I did, based on the fact that that --

7    POST trains all law enforcement in the state, and I

8    believe that is what DOJ followed.

9       Q.    Let's move to POST for a few moments.  What is

10   POST, to your understanding?

11      A.    Well, Police Officers Standards in Training.

12      Q.    Has any court that you're aware of held that

13   POST training guidelines constitute policies and

14   procedures?

15      A.    I have no idea.

16      Q.    Isn't it true, sir, that POST learning

17   domains, including those that you've referenced, are

18   used to train civilians?

19      A.    Yes.

20      Q.    And then, in fact, are you aware of any agency

21   that has said the POST learning domains are their

22   policy?

23      A.    No.

24      Q.    Are you aware of any agency that will

25   discipline an officer for not following a POST learning

1    simply because they committed a crime.

2         MR. BUNTING:  Move to strike as nonresponsive.

3    BY MR. MORRISON:

4         Q.   Sir, I am asking you a specific question about

5    components of the Garner decision that's an LD20, which

6    you identified in your report as forming the basis of

7    your opinions.  In fact, under the first component -- my

8    question is simple.  Under the first component, doesn't

9    the fact that someone was involved in an armed

10   home-invasion robbery where another person was shot with

11   a firearm during the commission of that armed

12   home-invasion robbery constitute a crime involving

13   infliction or threatened infliction of serious physical

14   injury or death?

15        A.   It does include that.

16        Q.   And that is a factor that officers are

17   entitled to rely upon, correct?

18        A.   Correct.

19        Q.   Do you recall as we sit here today the other

20   elements of the Garner decision?

21        A.   No.

22        Q.   Is there any reason your -- both your

23   declaration and your report omits any reference

24   whatsoever to the Garner decision.

25        A.   No.

Curt Rothschiller                                        October 10, 2022

1      Q.   Did you feel that it wasn't important to
2  include the Supreme Court's analysis that the courts
3  rely upon in your opinion?
4      A.   No.
5      Q.   Was it just an oversight to not include it?
6      A.   No.
7      Q.   So with that in mind, then, sir, why didn't
8  you include an analysis of Tennessee vs. Garner in your
9  report or your declaration?
10     MS. BAGDASSARIAN:   Objection.   Asked and answered.
11 BY MR. MORRISON:
12     Q.   You can answer.
13     A.   I didn't think it was important to put it on
14 this case.
15     Q.   Okay.   And to be clear, you are aware that
16 shots had, in fact, been fired during the armed
17 home-invasion robbery that took place prior to the
18 vehicle stop, correct?
19     A.   I have no personal knowledge of it.   All I
20 know is that it was alleged in officers' statements.
21     Q.   Okay.   So you didn't receive a copy of the
22 City of Corcoran Police Department report regarding the
23 armed home-invasion robbery?
24     A.   That's correct.
25     Q.   Did you request a copy of it?

Curt Rothschiller                                    October 10, 2022

1       A.   I requested copies of everything that
2   plaintiff's counsel had.  Specifically that report, no.
3       Q.   Is there a reason when you saw that -- the
4   fact that Mr. Quair had been reported to be involved in
5   an armed home-invasion robbery in which someone was
6   shot, did it surprise you that you didn't receive a copy
7   of the police report for that?
8       MS. BAGDASSARIAN:  Objection.  Assumes facts not in
9   evidence.
10          You can answer.
11      THE WITNESS:  It didn't surprise me.
12  BY MR. MORRISON:
13      Q.   And why didn't it surprise you that you didn't
14  get a copy of the police report of the armed
15  home-invasion robbery which was discussed in the report
16  you did review?
17      A.   Because my experience is that often agencies
18  don't want to provide information to the plaintiff's
19  attorney.
20      Q.   Do you recall making any specific request for
21  that report, though?  I know you've talked before about
22  you requested all documents, but I'm asking now do you
23  recall making a specific request for the police report?
24      A.   No.
25      Q.   Earlier you talked about the air units and the

1    air surveillance.  Have you ever worked as an air

2    spotter?

3         A.   Yes.

4         Q.   For who?

5         A.   Federal agencies, and LAPD, and Ventura

6    Sheriffs.

7         Q.   Okay.  And my recollection is Ventura sheriffs

8    used to have a Huey, LAPD has had a number of different

9    birds over the years.  Have you ever worked in a

10   fixed-wing aircraft as a spotter?

11        A.   Yes.

12        Q.   When was that?

13        A.   That would have been between 1985 and 1984 --

14   I'm sorry, 1994.

15        Q.   Okay.  Do those aircrafts have FLIR?

16        A.   Not at that time.

17        Q.   Did they have gimbal-mounted cameras?

18        A.   Not at that time.

19        Q.   Have you been near any aircraft that's used by

20   the California Highway Patrol for aerial surveillance in

21   the last ten years?

22        A.   Not by the highway patrol.

23        Q.   You testified earlier that it would be

24   difficult, I believe, and I'm paraphrasing a little bit,

25   that it would be difficult for the officer to maintain

1   surveillance because he would have to change his seat

2   and reposition himself; is that correct?

3       A.   In the fixed-wing, yes.

4       Q.   Are you aware of how this fixed-wing aircraft

5   was positioned?

6       A.   No.

7       Q.   Are you aware of the equipment that the

8   officer was using to surveil?

9       A.   Well, it obviously had a video camera on it.

10      Q.   Would it surprise you if I told you he didn't

11  have to reposition himself at all?

12      A.   No.

13      Q.   So you were making a generalization, is that

14  correct, when you testified that officers have to move

15  their bodies to maintain a visual?

16      A.   Depending on the aircraft, yes.

17      Q.   And, again, you know nothing about this

18  particular aircraft, correct?

19      A.   Correct.

20      Q.   Let's go back to the resources.  You talked

21  about a takedown.  You talked about SWAT being

22  available.  What's your basis for SWAT being available?

23      A.   I believe in testimony from Sergeant Lopes, he

24  indicated that because of their takedown operation of

25  their wire, they had SWAT vehicles available.

Curt Rothschiller                                    October 10, 2022

1    Q.   Are you aware of how many people were the

2  subject of Operation Red Reaper?

3    A.   No.   I never heard of Red Reaper.

4    Q.   Would it surprise you if I told you that on

5  the date in question, shortly after the stop was made,

6  every -- the Operation Red Reaper, they were scheduled

7  to do the enforcement, and do the search warrants and

8  arrest warrants, to execute them simultaneous?

9    A.   Would it surprise me?  No.

10   Q.   Would it surprise you to know that Operation

11 Red Reaper ended up in the arrest of approximately a

12 hundred people?

13   A.   No.

14   Q.   So you testified that there was a lot -- that

15 they had these resources available, but you don't

16 actually know what resources were available; is that

17 correct?

18   A.   I only know what Sergeant Lopes testified to,

19 and that the takedowns had not occurred, so they had

20 resources available.

21   Q.   Do you know where the SWAT vehicles were?

22   A.   No.

23   Q.   Do you know where they were stationed at?

24   A.   No.

25   Q.   Do you know anything about the Kings County

1    SWAT team?

2          A.    No.

3          Q.    Do you know if they -- well, strike that.

4                For Ventura County, did they have a full-time

5    SWAT team?

6          A.    No.

7          Q.    So in Ventura County, if you were going to

8    call SWAT out, what would happen?

9          A.    The individual members who were co-lateral

10   SWAT officers would get a call, and they would leave

11   whatever they were doing and respond to a command POST.

12         Q.    So that would take time, correct?

13         A.    It would take time in an unplanned operation,

14   but it wouldn't in a planned operation.

15         Q.    Okay.  So you're viewing this as being a

16   planned operation?

17         A.    I'm -- I'm viewing the search warrants and

18   arrests, based on their wire tap, should have been a

19   planned operation.

20         Q.    Okay.  But let's keep in mind that Mr. Quair

21   was not home at the time, even though he was a subject,

22   he was walking on a highway, he had just made a phone

23   call requesting to be picked up that they heard, so

24   therefore would that be considered a planned operation

25   to take him into custody?

1      A.    They should have had a plan to take him in

2   custody.

3      Q.    Would that be -- for purposes of calling out

4   SWAT, would that be what you'd consider to be a planned

5   operation?

6      A.    A planned operation would have you use all

7   resources available.

8      Q.    And I believe in Mr. -- Sergeant Lopes's

9   testimony, he talked about calling out a BearCat.  Do

10  you recall that?

11     A.    Not specifically a BearCat.

12     Q.    Okay.  Do you know what a BearCat is?

13     A.    Yes.

14     Q.    And what's a BearCat?

15     A.    It's a smaller armed vehicle.

16     Q.    Okay.  And what is it used for?

17     A.    SWAT-type tactical arrests and -- and search

18  warrants.

19     Q.    So you don't recall any testimony about

20  Sergeant Lopes requesting a BearCat or considering a

21  BearCat?

22     A.    Specifically a BearCat, no.

23     Q.    Do you recall any testimony about Sergeant

24  Lopes where he discussed calling out an armored vehicle?

25     A.    Not that I recall.

Curt Rothschiller                                      October 10, 2022

1          Q.   Okay.

2          MS. BAGDASSARIAN:  Norman, sorry to interrupt.  Can

3    we take a break sometime soon?

4          MR. MORRISON:  Sure.  How long do you want to take?

5          MS. BAGDASSARIAN:  Maybe -- how long is everyone

6    else good with?  Five to ten minutes is fine with me.

7    Whatever you guys want.

8          MR. BUNTING:  Whatever is fine with everyone.  I'm

9    fine with everyone.

10         MS. BAGDASSARIAN:  Okay.  Let's do ten, if that's

11   okay.

12         MR. MORRISON:  Okay.

13         MS. BAGDASSARIAN:  Okay.  Thank you.

14             (Break taken.)

15             (Record read.)

16   BY MR. MORRISON:

17         Q.   And, Mr. Rothschiller, in connection with your

18   service as a law enforcement officer in Ventura County,

19   you've worked with emergency medical service agents in

20   the past, including fire and ambulance, correct?

21         A.   Correct.

22         Q.   As a deputy?

23         A.   Correct.

24         Q.   What is their -- the policy of those agencies

25   regarding responding to an active crime scene such as a

1    shooting?

2         A.    My experience is they will stage in the area

3    and wait until it's safe.

4         Q.    Are you aware of whether, in fact, they staged

5    in this area?

6         A.    I don't know.

7         Q.    Did you review any copy of the dispatch log?

8         A.    The Kings County dispatch log or their log?

9         Q.    The Kings County dispatch log.

10        A.    I don't believe so.

11        Q.    Do you know if you were provided with a copy

12   of it?

13        A.    I don't believe so.

14        Q.    But you don't know what time medical was even

15   requested, do you?

16        A.    No.

17        Q.    So you don't know if medical was timely

18   requested and staged waiting to be told the scene was

19   safe and secured, do you?

20        A.    No.

21        Q.    Will medical personnel respond to the scene

22   until they've been told that the scene is secure, in

23   your experience?

24        A.    No.

25        Q.    Are you aware of the decisions of the courts

1  regarding officers' obligations to request medical care

2  for detainees and arrestees?

3       A.   The court cases themselves, no, but there's --

4  go ahead.

5       Q.   Okay.  Earlier we were talking about the

6  learning domains.  I'm going to come back to the

7  learning domains.  You talked about Learning Domain 20,

8  correct?

9       A.   Yes.

10      Q.   What does Learning Domain 20 say about agency

11 policy?

12      A.   Which part of agency policy?

13      Q.   Well, let me rephrase it, then, sir.  Isn't it

14 true that Learning Domain 20, Chapter 4, page 4-9,

15 states that "officers must conform to agency policy and

16 federal and state law"?

17      A.   Yes.

18      Q.   There's no reference in there to officers

19 complying with POST learning domains, is there?

20      A.   No.

21      Q.   In fact, doesn't the same section of Learning

22 Domain 20 also state, "All of the law and courts have

23 established a baseline for the use of the deadly force,

24 the conditions under which deadly force may be used are

25 strictly controlled by agency policy"?

1         A.    I believe so.

2         Q.    So you would agree that it's agency policy

3    that's -- that's required to be followed, not a learning

4    domain?

5         A.    Oh, I agree.

6         Q.    And that the same section of Learning Domain

7    20, Chapter 4, page 4-9, provides, "Some issues

8    regarding the use of deadly force addressed by agency

9    policies include, but are not limited to:  Defense of

10   self and others against serious bodily harm or death;

11   use of warning shots; and shooting at or from a moving

12   vehicle."

13        A.    Yes.

14        Q.    So, again, those are all issues that are

15   controlled by agency policy, not POST learning domains,

16   correct?

17        A.    Correct.

18        Q.    In fact, have you ever had any of your

19   opinions -- has any party ever moved to exclude your

20   opinions at trial or otherwise based upon improper

21   foundation?

22        A.    Not that I'm aware.

23        Q.    I'm going to come back to Learning Domain 35,

24   Chapter 5, this is on package 5-10.  Earlier I asked you

25   about the ability to shoot while in the prone position.

1    Do you recall that?

2        A.   I recall you asking.

3        Q.   Do you recall that POST identifies several

4    advantages to an officer being able to shoot while

5    prone?

6        A.   Yes.

7        Q.   What are those advantages?

8        A.   It lowers your target level.

9        Q.   Okay.  So it makes it harder for someone to

10   hit you while you're trying to shoot at someone else,

11   correct?

12       A.   Yes.

13       Q.   And do you recall what POST defines as being

14   the characteristics of a proper firearm shooting stance?

15       A.   No.

16       Q.   Okay.  But you would admit that those are

17   covered in the learning domain, correct?

18       A.   Yes.  And each individual officer determines

19   what he's most comfortable with.

20       MR. MORRISON:  Okay.  Move to strike everything

21   beyond the "yes" as nonresponsive.

22   BY MR. MORRISON:

23       Q.   If -- hypothetically, if Mr. Quair's position

24   met definitions of each of the firearm stances, would

25   you agree that that's a factor to be considered by the

1     Q.   Do you know how close they were to an occupied

2  area?

3     A.   How close they were?  They were in an

4  unoccupied area there, but he didn't have his resources

5  area.

6     Q.   No.  I asked, do you know how close they were

7  to an occupied area?

8     A.   I have no idea.

9     Q.   Do you know how long it would take for him to

10 get to an occupied area?

11    A.   No.

12    Q.   You talked about a K9 unit.  Are you aware of

13 a K9 unit even being available?

14    A.   I do not know.

15    Q.   But you say that that's something they should

16 have done, and that therefore they were below the

17 standard because they didn't request a K9 unit, so you

18 thought the K9 unit was available, correct?

19    A.   They should have requested all additional

20 resources and not rushed their stop.

21    Q.   Okay.  During your 36 years of law

22 enforcement, how often did you allow a suspect that you

23 knew was wanted in connection with an armed

24 home-invasion robbery where someone had been shot and

25 had to be hospitalized, and that you're aware of the

1      A.   I don't know.

2      Q.   Were they even in the same direction that

3  Mr. Quair was traveling?

4      A.   I don't know.

5      Q.   How many SWAT members were available?

6      MS. BAGDASSARIAN:  Objection.  Calls for

7  speculation.  Lacks foundation.

8      MR. MORRISON:  Counsel, he's saying they were

9  available, so I'm trying to find out what his basis for

10  his opinion is, so ...

11      THE WITNESS:  The basis of my opinion was

12  information I was provided that they were going to do

13  multiple search warrants, and SWAT was part of that

14  investigation.  And for all I know, they could have been

15  heading towards where SWAT was.

16  BY MR. MORRISON:

17      Q.   So in short, you have no knowledge whatsoever

18  regarding the actual state of SWAT being available for

19  this?  You have no facts to support that?

20      A.   Other than what I was presented.

21      Q.   And, again, you don't know how many takedowns

22  were being done simultaneously, do you?

23      A.   No.

24      Q.   You don't know where these takedowns were

25  being done, do you?

Curt Rothschiller                                    October 10, 2022

```
 1        A.   No.
 2        Q.   You have no idea if any of the members of SWAT
 3   team were assigned to conduct these takedowns, do you?
 4        A.   I read that SWAT was part of the operation.
 5        Q.   Correct.  Which operation, sir?  The
 6   takedown -- the overall take down of Red Reaper or the
 7   vehicle stop?
 8        A.   Oh, by the way, on Red Reaper, I do recall
 9   seeing them refer to their -- their operation as Red
10   Reaper.
11        Q.   Okay.
12        A.   And your question?
13        Q.   Yeah.
14        MR. MORRISON:  I'll have my question read back by
15   the court reporter.
16             (Record read.)
17        THE WITNESS:  I believe SWAT was part of the
18   operation for the Red Reaper takedown.
19   BY MR. MORRISON:
20        Q.   But you have no knowledge about whether these
21   agents were assigned to conduct other takedowns
22   simultaneously; isn't that correct?
23        A.   No specific information.  But my experience is
24   you try to do this simultaneously.
25        Q.   Isn't it a fact also that in your experience
```

1   on large multi-agency task force where you're going to

2   do a takedown of something like Nuestra Familia, the

3   Nortenos for violent crimes, that you try to do it

4   simultaneously?  You try to do it simultaneously?

5        A.    I believe I just said that.

6        Q.    You wouldn't pull a group off of a house to

7   allow that house to get knowledge so that they could go

8   over somewhere else; is that correct?

9        A.    I don't know how many SWAT personnel were

10   available.

11        Q.    Do you have any knowledge of the Kings County

12   SWAT team at all?

13        A.    No.

14        Q.    And you have no knowledge regarding whether a

15   K9 unit was available; is that correct?

16        A.    Correct.

17        Q.    You have no knowledge regarding what other

18   less lethal devices were available in the vehicles;

19   isn't that correct?

20        A.    I can only assume.

21        Q.    Okay.  Do you believe a taser should have been

22   used?

23        A.    Based on where their cars were, I don't think

24   it would have reached, so no.

25        Q.    Okay.  Do you know whether every department

# CERTIFICATE OF SERVICE

Case Name:   **Quair v. County of Kings, et al.**   No.   **1:20-CV-01793-KJM-SKO**

I hereby certify that on <u>October 27, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT, CURTIS ROTHSCHILLER [STATE MIL NO. 2]**

2. **[PROPOSED] ORDER REGARDING DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT, CURTIS ROTHSCHILLER [STATE MIL NO. 2]**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 27, 2025</u>, at Los Angeles, California.

| J. Sissov | /s/ J. Sissov |
|:---:|:---:|
| Declarant | Signature |

FR2021301267