Rob Bonta, State Bar No. 202668
Attorney General of California
Norman D. Morrison, State Bar No. 212090
Supervising Deputy Attorney General
 2550 Mariposa Mall, Room 5090
 Fresno, CA 93721-2271
 Telephone: (559) 705-2304
 Fax: (559) 445-5106
 E-mail: Norman.Morrison@doj.ca.gov
*Attorneys for Defendants Neil Compston,*
*John Silveira and Edward Sinclair*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **FREDDIE QUAIR,**<br><br>Plaintiff,<br><br>v.<br><br>**COUNTY OF KINGS; TAYLOR LOPES; NEIL COMPSTON; JOHN SILVERIA; EDWARD SINCLAIR; and DOES 1 THROUGH 10, inclusive,**<br><br>Defendants. | Case No. 1:20-CV-01793-KJM-SKO<br><br>**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CLAIMS OR THEORIES RELATING TO POLICE TACTICS NOT INCLUDED IN PLAINTIFF'S COMPLAINT OR A GOVERNMENT CLAIMS ACT NOTICE**<br><br>**[STATE MIL NO. 9]**[1]<br><br>Trial Date:    November 10, 2025<br>Action Filed:  December 21, 2020 |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE THAT Defendants NEIL COMPSTON, JOHN SILVEIRA and

EDWARD SINCLAIR (Defendants) hereby move the Court for an order in limine precluding

Plaintiff and/or his counsel of record from introducing or eliciting at trial any testimony, evidence

or opinions from Plaintiff's expert, Curtis Rothschiller, or any other witnesses regarding any

claims, legal theories, or arguments relating to police tactics, negligence, and any other state-law

based claims based upon Plaintiff's failure to timely serve a Government Claims Act notice as

---

[1] For purposes of judicial convenience and reference, the State Defendants' Motions in Limine are identified pursuant to the numbering and designation set forth in the Court's Final Pretrial Order (ECF 83), at 4-5.

1

Defendants' Motion in Limine to Exclude Evidence of Claims or Theories Relating to Police Tactics Not Included in Plaintiff's Complaint or a Government Claims Act Notice [STATE MIL #9] (1:20-CV-01793-KJM-SKO)

1    required by California law.

2         This motion is based upon this notice of motion, the attached memorandum of points and

3    authorities, the attached declaration of Supervising Deputy Attorney General Norman D.

4    Morrison IV, all pleadings and records on file in this action, and on such further authority,

5    evidence, or argument as may be presented at or before the time of any hearing on this motion.

6         **Statement of Compliance:**

7         This Motion is made in response to this Court's July 24, 2025, ruling (ECF 83), as well as

8    the discussions on the record about the issue during the final pretrial conference held in this

9    matter.

10

11   Dated:  October 27, 2025                              Respectfully submitted,

12                                                         ROB BONTA
                                                           Attorney General of California

13

14

15                                                         NORMAN D. MORRISON
                                                           Supervising Deputy Attorney General
16                                                         *Attorneys for Defendants Neil Compston,*
                                                           *John Silveira and Edward Sinclair*

17

18

19

20

21

22

23

24

25

26

27

28

2

1

## INTRODUCTION

2    This lawsuit arises out of a shooting that occurred during the early morning hours on June

3    18, 2019, on a road next to State Route 43 near Hanford, California. Prior to this incident,

4    Plaintiff Fredie Quair, Jr. had been under surveillance for multiple months as part of a joint

5    Federal, State and local task force known as "Operation Red Reaper" that was investigating the

6    Nuestra Familia criminal organization and the Norteño street gangs in the Kings and Tulare

7    County region. As one of the targets of Operation Red Reaper, Plaintiff was the subject of a

8    combination of video, audio, and electronic surveillance over a period of months performed by

9    the Defendants. This included wiretaps of phone numbers used by Plaintiff and his criminal

10   associates, including Jose Quintero. The months long surveillance captured evidence of Plaintiff

11   engaging in the trafficking of illegal firearms with other criminals, the sales of narcotics, and the

12   discussion of various criminal activities relating to the Norteño's and Nuestra Familia.

13   During the early morning hours of June 18, 2019, Plaintiff and two accomplices, Jose

14   Quintero and David Hernandez, engaged in an armed home invasion robbery of a residence

15   located in Corcoran, California. During the home invasion robbery, Plaintiff's accomplice, David

16   Hernandez, was shot in the stomach. Plaintiff fled the scene on foot, and Hernandez was

17   transported to the hospital by Quintero; the firearm used during the armed home invasion robbery

18   was also in the vehicle used by Quintero.

19   Plaintiff fled the scene on foot after the shooting, and eventually borrowed a cellular

20   phone from a third-party to call Quintero. During this phone call, which was monitored by the

21   Defendants as part of the court authorized wiretap, they heard Plaintiff and Quintero discussing

22   the armed home invasion robbery, the shooting, the firearm used during the armed home invasion

23   robbery, and Plaintiff's instructions to Quintero to come pick him up from the side of the

24   highway. Plaintiff gave Quintero specific information about his address.

25   Based upon the phone call, and their knowledge of the armed home invasion robbery that

26   Plaintiff had just committed, and due to the existence of an arrest warrant issued for the Plaintiff

27   by a court, the Defendants began surveillance of the Plaintiff using other vehicles as well as a

28

3

1    plane. Plaintiff was subsequently stopped by law enforcement officers in a field alongside the

2    highway. In light of the facts known to them, including Plaintiff's involvement in an armed home

3    invasion robbery where someone had just been shot, as well as Plaintiff's prior history involving

4    firearms, the Defendants performed a "felony traffic stop."

5            After Plaintiff and his accomplice stopped their vehicle, they refused to follow

6    instructions and directions made by Kings County Sheriff's Sergeant Taylor Lopes. Instead,

7    Plaintiff flung open the front passenger side door of his vehicle and immediately assumed an

8    isosceles shooting stance, holding both hands together and extended in front of him consistent

9    with someone holding and intending to use a handgun, pointing towards the Defendants. Plaintiff

10   then suddenly moved his hands upward in a motion consistent with experiencing the physical

11   recoil of a firearm being shot. Knowing Plaintiff had a history of being armed with illegal

12   firearms, having just been involved in an armed home invasion robbery where another individual

13   was shot, seeing Plaintiff assume what was recognized as a shooting stance and displaying a

14   physical reaction consistent with firing a handgun while simultaneously hearing gunfire,

15   Defendants reasonably and logically believed the Plaintiff was shooting at them and discharged

16   their firearms at the Plaintiff and the vehicle he had just exited in self-defense. After being shot,

17   Plaintiff continued to resist arrest by refusing to comply with orders, before he was ultimately

18   taken into custody and treated by emergency medical personnel.

19           Defendants now move for an order in limine precluding Plaintiff and/or his counsel of

20   record from introducing or eliciting at trial any testimony, evidence or opinions from Plaintiff's

21   expert, Curtis Rothschiller, or any other witnesses regarding any claims, legal theories, or

22   arguments relating to police tactics, negligence, and any other state-law based claims based upon

23   Plaintiff's failure to timely serve a Government Claims Act notice as required by California law.

24   ///

25   ///

26   ///

27   ///

28

4

# ARGUMENT

## LEGAL STANDARD

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). "In the case of a jury trial, a court's ruling 'at the outset' gives counsel advance notice of the scope of certain evidence so that admissibility is settled before attempted use of the evidence before the jury." Id. at 1111-12. Although the federal rules do not explicitly authorize motions in limine, the Supreme Court has held that trial judges are authorized to rule on motions in limine under their authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984).

**I.    PLAINTIFF IS BARRED FROM ASSERTING ANY STATE-LAW BASED CLAIMS, INCLUDING FOR NEGLIGENT TACTICS, DUE TO HIS FAILURE TO COMPLY WITH THE CALIFORNIA GOVERNMENT CLAIMS ACT.**

Defendants anticipate that at trial, Plaintiff will attempt to introduce evidence and argument relating to state law negligence based claims and theories in support of his excessive force claim, including arguments that the Defendants were negligent in connection with their tactics and actions leading up to the use of force at issue. Such causes of action and theories are barred due to Plaintiff's failure to comply with the requirements of the California Government Claims Act, including the requirement to file a timely government claim.

**1.    Plaintiff Failed to Comply with the Claims Presentation Requirements of the California Government Claims Act, Barring Any State Law Based Claims or Theories at Trial.**

Pursuant to the California Government Claims Act (Claims Act), no suit for money or damages may be brought against a state entity <u>or its employees</u> until the claims have been presented for review and the State has issued a notice rejecting those claims. Cal. Gov't Code § 900 eq seq.; *Klein v. City of Laguna Beach*, 533 Fed. Appx. 772, 774 (9th Cir. 2013); *Willis v. Reddin*, 418 F.2d 702, 704 (9th Cir. 1969); *Mohsin v. California Department of Water Resources*, 52 F.Supp.3d 1006, 1017-1018 (E.D. Cal. 2014). The claims presentation requirement of the

Claims Act has been recognized as constituting an element of any cause of action arising under the Claims Act. *Mohsin*, 52 F.Supp.3d at 1017-1018. Fulfillment of the Claims Act's requirements are also recognized are constituting a jurisdictional requirement, with compliance being a prerequisite to maintaining suit against the public entity or its employees, and the failure to comply with the Claims Act operates to bar any lawsuit. *Nguyen v. Los Angeles Harbor/UCLA Medical Center*, 8 Cal.App.4th 729, 732 (1992)( "The presentation of a claim to a public entity and its rejection are prerequisites to maintaining suit against the entity."); *State of California v. Superior Court*, 32 Cal. 4th 1234, 1240 (2004)(holding claims filing requirements of Claims Act "more than a procedural requirement, it is a condition precedent to [a] plaintiff's maintaining an action against [a] defendant, in short, an integral part of [a] plaintiff's cause of action."); *Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 627 (9th Cir. 1988); *Neal v. Gatlin*, 35 Cal.App.3d 871, 877-878 (1973)(dismiss state law claims for plaintiff's failure to file claim with governmental entity employing defendant acting within express or implied authority.)

Federal Courts require compliance with the Claims Act, and the failure to do so precludes a plaintiff from bringing claims against a public entity or public employee. *Hacienda La Puente Unified School District of Los Angeles v. Honig*, 976 F.2d 487, 495 (9th Cir. 1992); *Nicholas v. City of West Covina, No.* 2:22-cv-02425-PA-JC, 2024 WL 3463169, at *7 (C.D. Cal. June 12, 2024)(collecting cases.) A plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirements of the Claims Act as part of his complaint. *Robinson v. Alameda County*, 875 F.Supp.2d 1029, 1043 (N.D. Cal. 2012); *Hamilton v. California Department of Corrections and Rehabilitation*, No. 19-CV-1949-AUB, 2021 WL 347691, at *3 (S.D. Cal. Feb. 2, 2021). Thus, a plaintiff must plead compliance with the Claims Act in their complaint, and the failure to do plead compliance with the Claims Act is fatal to any state law claims or theories. *Karim-Panahi*, 839 F.2d at 627; *Lopez v. Burgess*, No. 5:21-CV-00920-JAK-SHK, 2021 WL 6618691, at *10 (C.D. Cal., Oct. 25, 2021), *report and recommendation adopted* (C.D. Cal., Dec. 1, 2021, No. 5:21-CV-00920-JAK-SHK, 2021 WL 5755732. The requirements of the Claims Act, including the presentation of a claim and its rejection thereof, are required

"even in the fact of the public entity's actual knowledge of the circumstances surrounding the claim." *Robinson*, 875 F.Supp.2d at 1043; *City of Stockton v. Superior Court*, 42 Cal.4th 730, 738 (2007).

Plaintiff's Complaint does not allege any compliance with the Claims Act prior to filing suit. Nor does the Complaint allege any attempt to comply with the claims act, or any circumstances that would have prevented or excluded compliance. Plaintiff did not identify any Claims Act notice or rejection in any of its discovery responses or in the initial disclosures filed in this case. (Declaration of Supervising Deputy Attorney General Norman D. Morrison IV (Decl. Morrison) at ¶ 3.) Further, no record of any claim by Plaintiff was located in response to a search performed in connection with this case. (Decl. Morrison, ¶ 4.)

Accordingly, Plaintiff is barred from asserting any state law-based claims or theories in this lawsuit based upon his failure to comply with the Claims Act.

### 2. Plaintiff's Complaint Does Not Contain Any Allegations, Claims, or Facts Relating to Allegedly Negligent Actions or Tactics by Defendants.

Plaintiff's Complaint does not include any allegations of, or facts that would support a theory or inference of, any negligent tactics or actions by the Defendants in connection with the use of force incident. Paragraph 21 of the Complaint is the one of only three paragraphs that relates to the Defendants' actions prior to the use of force incident, and alleges only that:

> On or about June 18, 2019, in the early morning hours, PLAINTIFF was the right front passenger in a vehicle that was traveling on Highway 43 in the County of Kings, California. Numerous unmarked police vehicles conducted a traffic stop on the above-mentioned vehicle. The driver stopped the vehicle in a clearing near a vacant field. The Defendants all pulled their unmarked police vehicles behind the vehicle when it came to a stop.

In paragraph 30 of the Complaint, Plaintiff alleges that:

> On or about June 18, 2019, in County of Kings, California, PLAINTIFF was a passenger in a vehicle when several unmarked law enforcement vehicles initiated a traffic stop on the vehicle PLAINTIFF was riding in. The driver of the vehicle pulled over in a large clearing, and PLAINTIFF exited the vehicle with his hands raised.

Finally, in paragraph 31 of his Complaint, Plaintiff alleges:

7

At the time the traffic stop was initiated, Defendants LOPES, COMPSTON, SILVERIA, SINCLAIR and DOES 1-7 pulled their vehicles in behind PLAINTIFF'S and exited their vehicles.

Thus, nowhere in Plaintiff's Complaint does he identify any allegedly negligent police tactics, actions, or omissions by the Defendants preceding the use of force incident. Accordingly, Plaintiff should be prevented from now attempting to make such arguments or asserting such theories at trial, or introducing them through his expert and other witnesses.

**3.    Plaintiff's Failure to Comply with the Claims Act, and His Failure to Allege Any State Law Claims, Bars Him from Asserting Theories and Claims Premised Upon Negligence, Including Negligent Tactics in the Events Preceding the Use of Force Incident.**

Defendants anticipate that at trial, Plaintiff will attempt to introduce evidence, arguments, and claims relating to various alleged pre-incident negligence, negligent tactics and improper decisions made by the Defendants as causing the incident. Defendants note that in his Rule 26 expert report, as well as his deposition testimony, Plaintiff's use of force expert, Curtis Rothschiller, specifically pointed to such issues as supporting his contentions that Defendants utilized excessive force. While such arguments, theories, opinions and testimony could arguably be relevant to a negligence based claim under state law, such as for negligent tactics, no such cause of action or theory is either alleged or plead by Plaintiff in his complaint. Further, Plaintiff is precluded as a matter of law from pursuing a negligence based claim due to his failure to comply with the Claims Act. Since the requirement is jurisdictional, the Court lacks jurisdiction over any such claims.

In his Rule 26 report, and his deposition testimony, Rothschiller identified multiple decisions and actions by the various Defendants that he identified as "negligent" and causing, or contributing to his opinion that excessive force was used. This includes his contention that the surveillance officers following Plaintiff and Quintero on the highway immediately before the felony stop "blew their cover" by their actions; that the Defendants failed to establish a perimeter and wait for additional backup officers; that the Defendants should have waited for S.W.A.T. or K9 officers before attempting to make the arrest; that the Defendants allegedly failed to identify a

8

1   lead officer to supervise and oversee the felony stop; and that the Defendants positioning of their

2   vehicles and actions in connection with setting up the felony stop were negligent.

3       Because Plaintiff's Complaint fails to allege a *state law* claim, such as negligent tactics or

4   negligence, Rothschiller's conclusions and opinions are irrelevant for purposes of the Fourth

5   Amendment analysis. Unlike California negligence law, the court's Fourth Amendment "totality

6   of circumstances" analysis focuses on whether deadly force used in the moment was reasonable.

7   *Biscotti v. Yuba City*, 636 F. App'x 419, 421–22 (9th Cir. 2016). Conduct that amounts to nothing

8   more than negligence does not constitute a Fourth Amendment violation. *Daniels v. Williams*,

9   474 U.S. 327 (1986); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir, 2002), abrogated on other

10  grounds by *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017); *Brower v. County of lnyo*,

11  489 U.S. 593, 596-97 (1989).

12      The analysis required under the Fourth Amendment for use of force "tends to focus more

13  narrowly on the moment when deadly force is used," whereas state law based claims are much

14  broader and consider "the totality of the circumstances surrounding any use of deadly force."

15  *Monzon v. City of Murrieta*, No. 2:17-CV-01371-RGK-SKX, 2019 WL 1061686, at *9, (C.D.

16  Cal., Jan. 9, 2019), aff'd (9th Cir. 2020) 966 F.3d 946, and aff'd (9th Cir. 2020) 978 F.3d 1150.

17  Rothschiller's opinions regarding the pre-use of force conduct constitute the exact type of

18  "provocation rule" evidence and opinions that the Supreme Court unequivocally rejected in

19  *County of Los Angeles v. Mendez*, 581 U.S. 420, 426-427 (2017). Pursuant to *Mendez*, any

20  alleged improper actions by the officers prior to the use of force forming the basis of the

21  excessive force claim (here, the officer involved shooting on June 18, 2019) cannot support or

22  bootstrap a subsequent Fourth Amendment excessive force claim.

23      Nor can Plaintiff, or Rothschiller, attempt to argue that any alleged pre-incident activities

24  and actions by the Defendants somehow "provoked" or caused Plaintiff's actions before and

25  during the incident. For example, Rothschiller opines that "[Plaintiff] and Mr. Quintero did not

26  pose an immediate threat to anyone that morning, therefore the use of deadly force by the

27  investigators was inappropriate, excessive, and unreasonable, violated generally accepted policing

28

9

Defendants' Motion in Limine to Exclude Evidence of Claims or Theories Relating to Police Tactics Not Included in
Plaintiff's Complaint or a Government Claims Act Notice [STATE MIL #9] (1:20-CV-01793-KJM-SKO)

1   training and standards, and violated KCSD policy. KCSD and DOJ personnel should have

2   remained in a position of safety (cover / concealment), fully observe the totality of the event (time

3   and space) and [Plaintiff's] actions to better determine their options (Rothschiller Rep. ¶ 107);

4   "[h]ad the officers followed P.O.S.T. training and industry standards, under the circumstances as

5   presented, they would never have endangered Mr. Quintero and [Plaintiff's] lives or the lives of

6   other potential occupants of the Nissan or caused them significant bodily injury by firing their

7   weapons. KCSD and DOJ personnel's decisions and actions were dangerous and reckless, and a

8   direct casual factor in the sequence of events leading up to the unreasonable use of excessive

9   lethal force on [Plaintiff]." (*Id.* at ¶ 108); "Sergeant Lopes' actions in this case, with respect to the

10  tactics Leading up to and during the stop, and amount the amount of force used, reflected, at best,

11  a reckless disregard to the life and safety of [Plaintiff], Mr. Quintero, himself, his fellow officers,

12  and the public." (*Id.* at ¶ 121); "[t]he use of force in connection with this incident was also

13  excessive and unreasonable because there were far more reasonable options available. Sergeant

14  Lopes rushed to the front of the surveillance and tried to initiate a high-risk stop without

15  additional resources. There was no reason to draw attention to the surveillance or an urgency to

16  stop the Nissan." (*Id.* at ¶ 125).

17      Any such argument, evidence or theories should also be barred at trial, because they not

18  only relates to state law negligence theories, which are barred here, but also constitutes exactly

19  the type of "provocation" theory and argument that the Supreme Court has unequivocally rejected

20  and held inapplicable in Fourth Amendment use of force cases. *County of Los Angeles v. Mendez*,

21  581 U.S. 420 (2017). As another court noted in 2020, the "Supreme Court has rejected the theory

22  that police conduct that "created a situation which led to the use of force" can form the basis of an

23  excessive force claim when the resulting use of force was reasonable under *Graham*." *Elifritz v.*

24  *Fender*, 460 F.Supp.3d 1088, 1112 (D. Ore. 2020). Further, Plaintiff does not identify, and there

25  are no facts to support, any contention that any exceptions to the rule identified by the *Munoz*

26  Court would be applicable here.

27  ///

28

1

**CONCLUSION**

2

Accordingly, Defendants request that the Court grant the motion in limine barring Plaintiff

3

and/or his counsel from introducing or attempting to elicit any testimony or opinions at trial from

4

Rothschiller, or anyone else, regarding any state law-based claims or legal theories relating to

5

police tactics utilized by the law enforcement officers, due to Plaintiff's failure to comply with

6

the Government Claims Act and failure to identify such claims and theories in his complaint.

7

8

Dated: October 27, 2025                                              Respectfully submitted,

9                                                                    ROB BONTA
                                                                     Attorney General of California
10

11

12                                                                   NORMAN D. MORRISON
                                                                     Supervising Deputy Attorney General
13                                                                   *Attorneys for Defendants Neil Compston,
                                                                     John Silveira and Edward Sinclair*

14       FR2021301267

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Motion in Limine to Exclude Evidence of Claims or Theories Relating to Police Tactics Not Included in
Plaintiff's Complaint or a Government Claims Act Notice [STATE MIL #9] (1:20-CV-01793-KJM-SKO)

**DECLARATION OF SUPERVISING DEPUTY ATTORNEY GENERAL NORMAN D. MORRISON IV IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CLAIMS OR THEORIES RELATING TO POLICE TACTICS NOT INCLUDED IN PLAINTIFF'S COMPLAINT OR A GOVERNMENT CLAIMS ACT NOTICE[STATE MIL NO. 9]**

I, Norman D. Morrison IV, do hereby declare as follow:

1.      I am employed by the State of California Department of Justice, Office of the Attorney General, as a Supervising Deputy Attorney General. I am counsel of record for Defendants Neil Compston, John Silveira and Edward Sinclair in this case. I am aware of the facts identified herein, and if called to testify I could and would testify accurate to them. This Declaration is made in support of the Defendants' Motion in Limine to exclude portions of the opinions and testimony of Plaintiff's designated expert, Curtis Rothschiller.

2.      This lawsuit arises out of a shooting that occurred during the early morning hours on June 18, 2019, on a road next to State Route 43 near Hanford, California. Prior to this incident, Plaintiff Freddie Quair, Jr. had been under surveillance for multiple months as part of a joint Federal, State and local task force known as "Operation Red Reaper" that was investigating the Nuestra Familia criminal organization and the Norteño street gangs in the Kings and Tulare County region. As one of the targets of Operation Red Reaper, Plaintiff was the subject of a combination of video, audio, and electronic surveillance over a period of months performed by the Defendants. This included wiretaps of phone numbers used by Plaintiff and his criminal associates, including Jose Quintero. The months-long surveillance captured evidence of Plaintiff engaging in the trafficking of illegal firearms with other criminals, the sales of narcotics, and the discussion of various criminal activities relating to the Norteños and Nuestra Familia.

3.      All parties served initial disclosures in connection with this case. Plaintiff's initial disclosures do not identify the existence of a Government Claims Notice. I have also reviewed Plaintiff's discovery responses served in this case to the State Defendants, and these discovery responses also do not include any reference to, or representation of, filing a Government Claims Notice and such Claims Notice being rejected prior to the Complaint being filed in this case.

4.      In connection with this case, I had my staff work with the Department of General Services to perform a search of the Government Claims Act database to identify whether any

1

claim had been filed on behalf of Plaintiff relating to the incident forming the basis of his Complaint. No Claims Act notice was located as a result of the search of the Database, indicating that no Claims Act notice was ever received by the State of California as required for compliance with the Government Claims Act.

5.    In 2022, Plaintiff served a copy of their expert designation, identifying Curtis Rothschiller as their police practices expert. A copy of Mr. Rothschillers expert report, served pursuant to Fed. R. Civ. P. 26, is attached hereto as Exhibit "A." Since their service of Mr. Rothschiller's report in 2022, Plaintiff has not served any supplemental expert report or advised that Mr. Rothschiller had any additional or different opinions beyond those expressed in his report and at his deposition, or that he had reviewed any additional documents.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of October, 2025, in Fresno, California.

_____

Norman D. Morrison IV

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit

# A

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
*dalekgalipo@yahoo.com*
Eugenia Bagdassarian, Esq. (SBN 334898)
*ebagassarian@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel:  (818) 347-3333;  Fax: (818) 347-4118

**LAW OFFICE OF DARRELL J. YORK**
Darrell J. York (SBN 145601)
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Telephone: (661) 362-0828; Fax: (877) 221-3306
Email:  djylaw@gmail.com

*Attorneys for Plaintiff Fredie Quair*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDIE QUAIR,<br><br>       Plaintiff,<br><br>    v.<br><br>COUNTY OF KINGS; TAYLOR LOPES; NEIL COMPSTON; JOHN SILVERIA; EDWARD SINCLAIR; and DOES 1 THROUGH 10, inclusive,<br><br>       Defendants. | **CASE No.: 1:20–CV–01793–JLT–SKO**<br><br>**PLAINTIFF'S RULE 26 INITIAL EXPERT DESIGNATION** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure, Plaintiff Fredie Quair hereby designates the following retained expert witness who may be called upon to give expert testimony at trial. Plaintiff reserves the right to supplement and/or amend this disclosure.

/ / /

/ / /

**RETAINED EXPERTS:**

    **1. Curt Rothschiller**

       KJB Consulting, Inc.

       5021 Verdugo Way #187

       Camarillo, CA

       (805) 947-8323

       Mr. Rothschiller is a police practices expert. Mr. Rothschiller's Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto as **Exhibit "A."**

**NON-RETAINED EXPERTS:**

    1. **Dr. Ammon Rasmussen** (surgeon who performed surgery on Mr. Quair)

       Kaweah Delta Health Care District

       400 W. Mineral King Ave.

       Visalia, CA 93291

    2. **Dr. Joseph Ford** (surgeon who performed surgery on Mr. Quair)

       Kaweah Delta Health Care District

       400 W. Mineral King Ave.

       Visalia, CA 93291

    3. **Dr. Matthew Campbell** (surgeon who performed surgery on Mr. Quair)

       Kaweah Delta Health Care District

       400 W. Mineral King Ave.

       Visalia, CA 93291

    4. **Dr. Nichole Atherton** (surgeon who performed surgery on Mr. Quair)

       Kaweah Delta Health Care District

       400 W. Mineral King Ave.

       Visalia, CA 93291

5. **Dr. Lindita Coku** (surgeon who performed surgery on Mr. Quair)

   Kaweah Delta Health Care District

   400 W. Mineral King Ave.

   Visalia, CA 93291

6. **Dr. Naeem Siddiqi** (Mr. Quair's primary care physician)

   Visalia Health Care Center

   2611 N. Dinuba Blvd.

   Visalia, CA 93291

7. **Dr. Robynn Weston** (Mr. Quair's nurse practitioner)

   Wellpath

   329 West 8th Street

   Hanford, CA 93230

DATED: July 25, 2022

LAW OFFICES OF DALE K. GALIPO
LAW OFFICES OF DARRELL J. YORK


Dale K. Galipo
Darrell J. York
Eugenia Bagdassarian
*Attorneys for Plaintiff Fredie Quair*

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 25, 2022, I served the foregoing document described as: **PLAINTIFF'S RULE 26 INITIAL EXPERT DESIGNATION**, on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

### METHOD OF SERVICE

☒    (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐    I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☒    I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒    (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐    (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 25, 2022, at Woodland Hills, California.

Karen Slyapich

4
PLAINTIFF'S RULE 26 INITIAL EXPERT DESIGNATION

1

<u>SERVICE LIST</u>

2

James J. Arendt, Esq.
WEAKLEY & ARENDT

3

5200 N. Palm Avenue, Suite 211
Fresno, CA 93704

4

Tel:   (559) 221-5256
Fax:   (559) 221-5262

5

Email:  james@walaw-fresno.com

6

*Attorney for Defendants County of Kings and Taylor Lopes*

7

Rob Bonta
Attorney General

8

Pamela J. Holmes, State Bar No. 147360
Supervising Deputy Attorney General

9

Norman D. Morrison, State Bar No. 212090
Deputy Attorney General

10

2550 Mariposa Mall, Room 5090
Fresno, CA  93721

11

Telephone:  (559) 705-2304
Fax: (559) 445-5106

12

E-mail:  Norman.Morrison@doj.ca.gov

13

*Attorney for Defendants Neil Compston, John Silveira, and Edward Sinclair*

14

Darrell J. York, Esq. (SBN 145601)
LAW OFFICE OF DARRELL J. YORK

15

1935 East Vine Street, Suite 140
Salt Lake City, Utah 84121

16

Telephone: (661) 478-9640
Email: djylaw@gmail.com

17

*Attorney for Plaintiff, Freddie Quair*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA

## Curt Rothschiller

**805.947.8323**

**PLEASE NOTE THAT PORTIONS OF THIS REPORT ADDRESS CONFIDENTIAL MATERIAL COVERED BY THE PROTECTIVE ORDER AND SHOULD ANY SUCH PORTION REQUIRE SUBSEQUENT FILING WITH THE COURT IN A PUBLIC DOCUMENT, OPPOSING PARTY SHOULD CONTACT PLAINTIFFS' COUNSEL FOR REDACTION.**

July 22, 2022

Darrell J. York, Esq.
The Law Office of Darrell J. York
1935 East Vine Street, Suite 140
Salt Lake City, UT 84121

Dale K. Galipo, Esq.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Re: Quair v. County of Kings, et.al.

Dear Counsel:

You have asked me to analyze material and render opinions regarding the officer involved shooting of Freddie Quair by the Kings County Sheriff's Department (KCSD) and California Department of Justice Special Agents on June 18, 2019, in Kings County, California, as well as the applicable police policies and procedures of the Kings County Sheriff's Department (KCSD) related to Mr. Quair's arrest.

Pursuant to the requirements of Rule 26, I have studied the records, reports, depositions, recordings, including video files and other documented materials (as listed in this report under Materials Reviewed Thus Far) provided to me regarding this case. I also reserve the right to supplement my opinion should additional information be provided by the defendants or throughout the expert deposition process.

As an expert, I do not express opinions regarding who are the more believable witnesses. The resolution of any such conflicts is for a jury to decide. Taking any such differences (such as they are) into account, my opinions to date follow.

1

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA

**Curt Rothschiller**    805.947.8323

**Materials Reviewed Thus Far:**

1.  Photographs of Mr. Quair's injuries
2.  Photographs of the shooting and arrest scene
3.  Photographs of the red Nissan
4.  Arial video surveillance recording of the incident
5.  A copy of the Complaint for Damages in this action
6.  Notice of Deposition of Freddie Quair with request for production of documents
7.  KCSD policy manual
8.  Lexipol / Policy Manual
9.  Training records for Taylor Lopes
10. Audio recording of a telephone conversation between Mr. Quair and Mr. Quintero
11. California POST Basic Learning Domains:
    a.   #1: "Leadership, Professionalism & Ethics."
    b.   #2: "Criminal Justice System."
    c.   #3: "Policing in the Community."
    d.   #5: "Introduction to Criminal Law."
    e.   #15: "Laws of Arrest."
    f.   #16: "Search and Seizure."
    g.   #17: "Courtroom Testimony."
    h.   #18: "Investigative Report Writing."
    i.   #20: "Use of Force."
    j.   #21: "Patrol Techniques."
    k.   #23: "Crimes in Progress."
    l.   #33: "Arrest Methods/Defensive Tactics."
12. Standards for Law Enforcement Agencies, 5th Ed., CALEA (2009)
13. Surrounding Counties policy and police manuals, and Lexipol Manuals re: use of force applications.
14. KCSD's Use of Force and Deadly Force Policies
15. Ventura County Criminal Justice Training Center Field Training manual.
16. Deposition of Freddie Quair
17. Deposition of Edward Sinclair
18. Deposition of John Silveira
19. Deposition of Neil Compston
20. Deposition of Taylor Lopes
21. Certified transcripts of the initial statements of Compston, Lopes, Scomona, Dobbins, Silveira, and Sinclair

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                                    805.947.8323

### General Law Enforcement Overview and Basis for Opinions to Follow:

1. The mission of the California Commission on Peace Officer Standards and Training (P.O.S.T.) is to continually enhance the professionalism of California law enforcement in serving its communities.

2. Recognizing that effective law enforcement is the cornerstone of a free and safe society, P.O.S.T. is committed to a vision of the future that ensures quality, integrity, accountability, and cooperation; encourages new ideas; explores and uses appropriate technologies; and delivers relevant, client-based programs and services.

3. P.O.S.T continuously researches, trains, and certifies law enforcement personnel and updates agencies on current techniques, force options, and officer safety trends and options. It is incumbent upon professional law enforcement agencies and their personnel to seek out available training to maintain knowledge, proficiency in their craft and sharpen their perishable skills. There are established protocols taught at basic police training academies and In-Service training, including the P.O.S.T approved Basic Training Academies, to all certified officers.

4. A great deal of emphasis is placed on tried and proven tactics during the P.O.S.T. Basic Academy and In-Service training with the strong message that incompetent tactics and weakened perishable skills will invariably lead to unnecessary tragedies, including injury and/or death. Officer safety is an underlying emphasis in most training. Officers are drilled not to place themselves in immediate peril.

5. Additionally, officers are taught at the P.O.S.T. Basic Academy that there are fundamental tactics that are required as a professional. They are also taught that when they depart from the required tactics it creates an unacceptable and unnecessary risk to themselves, their fellow officers, the suspects that they encounter, and the public. A primary emphasis is it is essential that all officers maintain officer safety protocol, including cover, throughout an incident.

6. Officers are trained at the certified P.O.S.T. Basic Academy that the use of force must meet an "Objectively Reasonable" standard. Further, P.O.S.T. teaches early in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by P.O.S.T. certified police officers.

7. The P.O.S.T. standard of "Reasonable Fear" is defined as: A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual, perceived circumstances. P.O.S.T. defines "Excessive and unreasonable Fear" as: Generated in the

3

officer's mind with no direct correlation to facts and situations. (Learning Domain # 20, Chapter 5.)

8.   Officers are trained that all force used must be "objectively reasonable", and force used in an arrest or in self-defense must be proportional to the threat, and that force used to control a person must be objectively reasonable under the circumstances. Police officers are also trained that by taking an oath and accepting their badges and guns they must always act in consideration of the extreme reverence our society places on all human life, even when that means facing certain risks themselves.

9.   P.O.S.T. training domains have identified an officer's mentality in decision making to depart from basic tactics as: "Tombstone Courage." That is: "Overly anxious to show one's courage; [and] attempting to handle dangerous situations beyond one's ability." (P.O.S.T. Learning Domain # 21, pages 1-21.) P.O.S.T. has also given a specific name to tactical mistakes that are likely to lead to injury or death as: "*Fatal Error.*"

10.  Additionally, P.O.S.T. specifies that there are key factors that can affect which force option is approved and appropriate under the concept of the "Totality of Circumstances." (Learning Domain # 20 "Use of Force," Chapter 2.)

11.  P.O.S.T. training specifies that the use of force under the "Totality of Circumstances" is only justified on the basis of an "objectively reasonable" standard. In other words, per the P.O.S.T. requirements, officers are not justified in any use of force based on "subjective fear." The requirements are taught in detail through the P.O.S.T. Basic Curriculum (as required by law).

12.  P.O.S.T. trains that an officer's overreaction to the resistance (Subjective Fear) presented by a subject is synonymous with excessive force and an officer's subjective fear does not reach the threshold of 'reasonably objective' justification for the use of force. Officers must also adhere to the 5C's and not place themselves in a position of danger to justify the use of force.

13.  Offices are trained that good police tactics are not only important for the safety of the officers; they are also essential for the safety of the public at large. Far too often innocent persons are injured or killed by incompetent and unnecessary police acts – particularly during apprehensions of criminal suspects.

14.  For decades, law enforcement agencies across the country have recognized the need and trained their officers in multiple ways to apprehend recalcitrant / non-responsive suspects without resorting to unnecessary excessive force. These methods are continuously updated,

4

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                          805.947.8323

well known, and have proven to be effective for the safety and welfare of officers, subjects, and the public. Often referred to as "perishable skills", it is critical for everyone's safety that officers receive regular training and maintain proficiency. A critical emphasis in the training is that each and every use of deadly force must be justified and must be in immediate defense of life.

15.   All law enforcement agencies must provide updated and accurate P.O.S.T. certified training for their personnel. P.O.S.T mandates regular training for the "perishable skills" required of officers to safely provide law enforcement services. Equally as important is that agencies monitor their personnel for compliance and adherence to that training.

16.   Training, including the P.O.S.T. Basic Academy and any other P.O.S.T. certified courses, is only valuable if the course attendees absorb and embrace the presented material. Certified officers must then apply that knowledge and implement the tactics in their daily activities. Failure or refusal to maintain proficiency in critical aspects of their duties often leads to violations of policy and tragic outcomes.

17.   Mandatory P.O.S.T. training, by itself, is often not sufficient for active law enforcement officers to maintain proficiency in their profession. As officers advance through their careers, it is incumbent that they seek additional training, practice, and maintain their perishable skills, and stay current on policy, case law, and tactics.

18.   The criminal justice system gives law enforcement two extraordinary powers:
  a) The power of arrest; and
  b) The power to use force, including deadly force.
  Incumbent upon them with this power is to know what constitutes probable cause.

19.   The authority to do so does not come from the rules of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint. It is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve. (Learning Domain # 2: "Criminal Justice System," pages 1-4.)

20.   Officers are trained that the use of deadly force constitutes a lawful and justifiable act of self-defense only when the officer using deadly force actually and objectively reasonably believes one or more of the following facts exist:
  a)   That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                           805.947.8323

    b)    That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.

    c)    That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime or other obvious factors. In such cases, deadly force is not allowed to prevent the escape of misdemeanants and most felony suspects.

21.    It is incumbent upon all Peace Officers to develop the ability to identify threats intelligently and objectively to their safety and the safety of others. Factors that officers must consider when assessing a potential threat include:
    a) Nature of the threat that must be overcome.
    b) Presence of a firearm and the type of firearm.
    c) Seriousness of the offense.
    d) Person's age, history, and capabilities.
    e) Officer's capability to overcome the resistance.
    f) Availability of assistance from other officers.
    g) Location and surroundings.
    h) Level of danger to bystanders.
    i) Time of day. (P.O.S.T. Learning Domain # 35 "Firearms/Chemicals Agents," (p. 5-32.)

22.    The safe resolution of incidents without the use of force calls for ingrained critical incident knowledge and experience. All officers must receive sufficient certified training which gives them the skills needed to consider their options and to act with reason.

23.    Law enforcement officers must continuously train in updated officer safety tactics, maintain proficiency in perishable skills and other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution. Officers proficient in the officer safety use of cover, concealment, time and space reduce their personal risk as well as the need to use unnecessary excessive force.

24.    Firing a weapon at a human being is unlike all other police uses of force. There are, indeed, other police tactics that may qualify as "deadly force," but none carry the same high probability of death as an officer's weapon. Police officers are trained that they can use firearms in the immediate defense of life or to prevent serious bodily injury to themselves or others. The reasonable need to resort to deadly force is extremely rare, especially if officers follow their training and adhere to the rules of officer safety.

25.    The vast majority of police officers in the United States never use their firearms as deadly

*KJB CONSULTING, INC.*   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                              805.947.8323

force during their entire careers. They continuously train in updated officer safety tactics, maintain proficiency in perishable skills and other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution.

26.  P.O.S.T. certified law enforcement officers are also trained that if a decision is made to use lethal force by firing their weapon, each and every time they pull the trigger is a separate use of lethal force and must be justified and necessary to prevent serious injury or loss of life. Maintaining proficiency in their perishable skills provides officers with the ability to quickly assess whether continued use of lethal force is objectively reasonable, and officers have a duty to reassess to determine whether deadly force is still necessary and appropriate.

27.  Command, Coordination, Communication, Containment and Control are commonly referred to as the 5 Cs of tactics in the law enforcement world and emphasized as key elements during any critical incident. In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from P.O.S.T. certified officers.

   a)  Command:
   There must be an officer-in-charge who takes control of the incident and directs all others toward a safe conclusion. Initially, this is the first officer on-scene. As other officers arrive, a plan should be discussed as to a safe resolution, roles of the officers, and which officer would take the lead. In most circumstances, the lead officer tends to be a senior officer, a Field Training Officer (FTO) or supervisor who takes on the role of overseeing the incident and coordinating resources.

   b)  Coordination
   Assets on-scene and responding units must be properly utilized. The officer-in-charge must communicate to all officers on the scene and give frequent updates as the situation unfolds. Probable cause must be determined before an arrest is initiated. As personnel arrive on-scene, roles should be assigned, i.e., lead officer, lead communicator, arrest team. less lethal, lethal, etc. It is critical the officers approach the incident as a coordinated team and follow the agreed upon plan. Independent action in a team environment often leads to tragedy.

   c)  Containment
   It is imperative that those on scene who are suspects, for their safety as well as the safety of the officers, be monitored, and contained if necessary but this does not always include, and should not always include, physical take down methods. If the circumstances dictate, an inner and outer perimeter must be established to prevent escape, apprehend, and preserve evidence.

7

     d)   Communication
          Tactical communication is often the key element in the successful outcome of an incident. Failure to communicate with the suspect, officers on scene, and / or responding personnel often compromises evidence and officer safety.

     e)   Control
          Control of the scene is mandatory. A plan to efficiently bring an incident to a safe conclusion both for the suspect and the officers must be discussed, understood, and adhered to. Control of a subject by restricting his movements and preventing any opportunity to flee is critical to the safety of all during a detention or arrest. The dynamics are exacerbated when a vehicle is part of the equation and multiplied if the vehicle is still moving.

28.     Across the state, P.O.S.T training teaches law enforcement personnel de-escalation tactics when encountering members of the public, including wanted individuals. The training also stresses that "time and space", and "empathy and compassion" are critical tools in de-escalating crisis situations for the safety of the individual as well as the officer. It also emphasizes the utilization of the 5C's to bring potentially life-threatening incidents to a safe resolution.

29.     P.O.S.T. Basic and approved In-Service training, along with industry standard has the first officer on-scene assume command of an incident. As additional officers arrive, a plan for a safe outcome should be discussed, roles of each officer defined, and which officer would take the lead. In most circumstances, the lead officer tends to be a senior officer, a Field Training Officer (FTO) or supervisor who takes on the role of overseeing the incident and coordinating resources. Formulating a plan prior to contacting a wanted individual, when threat is not imminent and when time allows, grants the officers the ability to work together as a team geared toward safety and de-escalation.

30.     Individuals in stressful contact with law enforcement often fail to recognize their behavior as threatening and often act out without thinking. KCSD personnel should have recognized the possibility of irrational behavior by Mr. Quair and Mr. Quintero due to their circumstances and reverted to P.O.S.T. training of adding "time and space" when contacting them. More "time and space" creates a larger window for the crisis cycle to run its course. This would also have allowed KCSD personnel to implement a plan (had one been formulated) to avoid the unreasonable excessive force.

31.     Any use of unjustified force by deputies constitutes excessive and unreasonable force under the circumstances (as taught by P.O.S.T., and as exists in the KCSD policy manual).

# *KJB CONSULTING, INC.*   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                                      805.947.8323

32.   P.O.S.T. Learning Domain #18 (LD#18) – Investigative Report Writing - trains officers during the basic law enforcement academies about the importance of clearly documenting the facts and activities of an investigation and the documentation's reflection on the officer's own professionalism. LD#18 also emphasizes the consequences of an ineffective / inaccurate report to the officer, the officer's agency, policing profession, and the community.

## Facts not in dispute:

There are several significant facts, which do not seem to be in dispute, including:

33.   The Kings County Sheriff's Department's Use of Force and Deadly Force Policies commencing with Section 300.1 and following dictate that deputies shall use only that force which reasonably appears necessary, given the facts and circumstances perceived by the deputy (300.3). When determining whether to apply force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit (Government Code § 7286(b)). These factors include but are not limited to: (a) The apparent immediacy and severity of the threat to deputies or others (Penal Code§ 835a), (b) The conduct of the individual being confronted, as reasonably perceived by the deputy at the time (Penal Code § 835a), (c) Deputy/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of deputies available vs. subjects), (d) The conduct of the involved deputy leading up to the use of force (Penal Code § 835a), (e) The effects of suspected drugs or alcohol, (f) The individual's apparent mental state or capacity (Penal Code § 835a), (g) The individual's apparent ability to understand and comply with deputy commands (Penal Code § 835a), (h) Proximity of weapons or dangerous improvised devices. (i) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained. (j) The availability of other reasonable and feasible options and their possible effectiveness (Penal Code § 835a), (k) Seriousness of the suspected offense or reason for contact with the individual prior to and at the time force is used, (l) Training and experience of the deputy, (m) Potential for injury to deputies, suspects, bystanders, and others, (n) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the deputy, (o) The risk and reasonably foreseeable consequences of escape, (p) The apparent need for immediate control of the subject or a prompt resolution of the situation, (q) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the deputy or others, (r) Prior contacts with the subject or awareness of any propensity for violence.(s) Any other exigent circumstances.

9

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                                        805.947.8323

34.  300.2.1 of the KCSD Policy manual – Duty to Intercede – Clearly states that any deputy present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable deputy under the circumstances, shall, when in a position to do so, intercede to prevent the use of unreasonable force. When observing force used by a law enforcement officer, each deputy should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject. (Government Code § 7286(b))

35.  On June 18, 2019, in the early morning hours, Kern County Sheriff's Department (KCSD), California Department of Justice investigators, and investigators from numerous Kings Count law enforcement agencies were preparing to terminate, by arrests and search warrants, a months-long wiretap investigation in which they had identified individuals allegedly involved in criminal activity, including Mr. Quair and Mr. Quintero.

36.  Investigators received information that Mr. Quintero was in a red vehicle on his way to pick up Mr. Quair on Highway 43. Investigators in unmarked police vehicles observed a red Nissan stop on the side of Highway 43 and a subject get into the passenger side of the Nissan.

37.  Multiple unmarked police vehicles and Sergeant Lopes attempted to conduct a high risk-traffic stop on the Nissan. The Nissan turned off Highway 43 into a clearing near a vacant field. The unmarked police vehicles and Sergeant Lopes pulled in behind the Nissan. The Nissan's windows had dark tint preventing the investigators from seeing the interior to determine the number of occupants or movement.

38.  Sergeant Lopes began yelling orders to the occupants of the Nissan before the other investigators were prepared or in tactical positions. Sergeant Lopes was focused on the driver and the driver's side of the Nissan.

39.  Mr. Quair exited the right front passenger door of the Nissan and raised his empty hands. (Video 05:35:55) (Quair depo 69/25)

40.  Sergeant Lopes immediately began rapid-firing multiple rounds from his assault rifle at Mr. Quair, striking Mr. Quair numerous times, even though Sergeant Lopes never saw Mr. Quair with a weapon. Mr. Quair fell to the ground immediately after Sergeant Lopes fired his first round. (Video 05:35:55)

41.  Sergeant Lopes continued to rapid-fire multiple rounds from his assault weapon at Mr. Quair and the Nissan while Mr. Quair was immobile and unarmed on the ground, even

10

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                      805.947.8323

though he could not see Mr. Quair or any other threat. (Video 05:35:55 – 05:36:06) (Interview 35/1)

42. Sergeant Lopes fired multiple rounds from his assault rifle through the rear window into the passenger compartment of the Nissan, even though he could not see if anyone was in the car. (Interview 34/12)

43. DOJ investigator Compston fired multiple rounds from his handgun at Mr. Quair while Mr. Quair was unarmed and on the ground. Investigator Compston never saw Mr. Quair with a weapon or anything in his hands. (Interview 11/18)

44. DOJ investigator Silveira fired multiple rounds from his handgun at Mr. Quair, even though Mr. Quair was unarmed and on the ground. Investigator Silveira never saw Mr. Quair with a weapon or anything in his hands. (Interview 10/8)

45. DOJ investigator Sinclair fired multiple rounds from his assault rifle at Mr. Quair while Mr. Quair was unarmed and on the ground. Investigator Sinclair never saw Mr. Quair with a weapon or anything in his hands. (Interview 9/8) He also testified in his deposition that he indiscriminately fired into the Nissan without knowing if there were additional occupants. (23-24)

46. The video clearly shows dirt flying up as rounds strike the ground near Mr. Quair while he is laying on his back on the ground, unarmed and no threat to law enforcement or anyone else.

47. CHP officer Scomona did not perceive Mr. Quair or Mr. Quintero as a threat and therefor, did not fire his weapon. (Interview 14 - 15)

48. No weapons were found on or near Mr. Quair, on or near Mr. Quintero, or in the Nissan.

## Departures from Proper Procedures Resulting in the Unreasonable Use of Excessive Force Against Mr. Quair:

49. Investigators from the KCSD and DOJ attempted to address a dynamic, high-risk event with no tactical plan and no concern for the 5C's, which is contrary to all current P.O.S.T. training and industry standards. Disregard for multiple industry standards and accepted practices led to the unreasonable use of excessive lethal force against Mr. Quair.

50. KCSD and DOJ personnel failed to establish command of the enforcement action by designating an officer-in-charge (OIC). The OIC would have directed the other officers

11

toward a safe conclusion without the need to use unreasonable excessive lethal force against Mr. Quair.

51. Because of the lack of leadership and command, Sergeant Lopes and other investigators violated established industry standard and acceptable tactics that put Mr. Quair and Mr. Quintero on notice of an impending law enforcement action.

52. P.O.S.T. teachings in the Basic Academies and In-Service trainings are very clear when addressing high risk enforcement actions. Coordination of assisting units and communication of the impending plan is critical to the safe resolution, not only of the officers involved, but the individuals subjected to the law enforcement action. This incident was compromised by the lack of a common radio frequency which would have allowed the multiple agencies involved to coordinate their law enforcement actions to a safe resolution.

53. In his initial statement to investigators, Investigator Compston related the following:
    a) He was driving an unmarked Chevrolet Traverse with a hidden siren, and enforcement light, which had to be manually placed in on the dash. (C 3/23)
    b) He admitted he made a U-turn, activated his vehicles hazard lights, and parked on the side of Highway 43, all within view of Mr. Quair. (C 8/19) Investigator Compston further stated he let one un-involved vehicle pass him before he pulled his vehicle out in front of other traffic so he could catch the Nissan that picked up Mr. Quair. (C 9/12) Investigator Compston then passed the un-involved vehicle, leaving no vehicles between him and the Nissan for "cover." (C 9/14)
        1) Both movements are contrary to industry standards and P.O.S.T Surveillance course teaching because they tend to draw attention to the surveilling units and law enforcement presence.
    c) Sergeant Lopes activated his enforcement lights shortly after he maneuvered his vehicle passed Investigator Compston and was directly behind the Nissan. (C 10/20)
    d) The Nissan turned off Highway 43 into a dirt area. (C 10/21)
    e) Investigator Compston parked his vehicle to the right of Sergeant Lopes' vehicle. (C 10/24)
    f) Sergeant Lopes was already out of his vehicle and yelling commands at the occupants of the Nissan before Investigator Compston could get out of his own vehicle. (C 11/4)
    g) The back window of the Nissan was heavily tinted. (C 11)
    h) As soon as Mr. Quair got out of the passenger side of the Nissan Investigator Compston heard gunshots being fired, so he began firing. (C 11/19)

54. In his initial statement to investigators Sergeant Lopes related the following:
    a) He was driving a black Major Crimes Task Force Dodge, "which are well known in

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA

**Curt Rothschiller**    805.947.8323

    the community with our gangsters." (L 7/23)

b) The back windows and rear side widows of the Nissan were heavily tinted preventing him from seeing inside the vehicle. (L 21/10)

c) DOJ investigators pulled alongside Sergeant Lopes in the unmarked vehicles and multiple commands were given to the occupants of the Nissan. (L 21/22)

d) He was focused on the driver of the Nissan. (L 23/4)

e) The passenger door opened and Mr. Quair "jumps out of the vehicle – like, just fucking jumps. Like, I don't know how else to describe it, like jumps, and he runs up, and all you see is him run up." (L 23/19)

f) In a "split second" he began firing at Mr. Quair, center mass.

g) He continued to fire his assault rifle at Mr. Quair after Mr. Quair fell out of his view. (L 24/14)

h) He did not find a weapon on Mr. Quair or in the Nissan. (L 28/8)

55. Sergeant Lopes rushed past the surveillance units (Silveira statement/8), drawing attention to himself and the undercover surveillance units following the red Nissan. His actions led to unnecessarily warning the subjects in the Nissan of an impending traffic stop, which directly led to the unreasonable use of excessive lethal force against Mr. Quair. (L 20)

56. There was no urgency to draw attention to the surveillance or initiate a stop of the Nissan without a coordinated plan once it was under the surveillance of the undercover investigators and the CHP air unit. Rather than coordinate an arrest plan, arrange for additional resources including less lethal options, a K9, SWAT vehicles, etc., that would have increased the odds of a safe, non-use-of-force resolution, Sergeant Lopes initiated a traffic stop before his assisting units were prepared.

57. Once the Nissan turned off Highway 43, Sergeant Lopes failed to coordinate the stop and impending forced apprehension of the individuals in the Nissan.

58. Even in high-risk vehicle stops, the tenants of "time and space" as taught by P.O.S.T are critical to the safety of all involved. "Time and space" allow for the human crisis cycle to begin to run its course toward more rational decision making.

59. Sergeant Lopes was the ranking law enforcement individual on scene and failed to control and coordinate the arrest of the individuals in the Nissan. Instead, Sergeant Lopes jumped out of his vehicle with his assault rifle and started yelling commands to the driver of the Nissan, without waiting for other surveillance units and investigators to be properly equipped and in tactical positions.

60. KCSD and Cal DOJ personnel failed to designate one individual (OIC) to take command

13

and control of the incident, and because of the lack of command and control, multiple investigators shouted commands at the individuals in the Nissan. (Lopes statement 21/22)

61.    Without an OIC, there was no investigator to coordinate the enforcement action and prevent the independent actions of other officers in a critical, team environment. This failure directly led to the unnecessary use of unreasonable use of excessive lethal force against Mr. Quair.

62.    Sergeant Lopes positioned his police unit behind the Nissan but failed to take advantage of the "cover" his engine block would provide if he positioned his vehicle semi-perpendicular to the Nissan. This technique has been taught by P.O.S.T. and has been an officer safety staple for many years.

63.    Sergeant Lopes began randomly, rapid firing his assault rifle at the Nissan and Mr. Quair, even though he had no time to assess the threat of Mr. Quair exiting the Nissan because his focus was on the driver's side of the Nissan and Mr. Quintero.

64.    Sergeant Lopes, Investigator Compston, Investigator Silveira, and Investigator Sinclair all testified they each fired their weapons without seeing a weapon in Mr. Quair's hands, without an armed threat, without acquiring target acquisition, and while Mr. Quair was both going to and on the ground.

65.    Mr. Quair and Mr. Quintero did not pose an immediate threat of death or serious bodily injury prior to the KCSD and DOJ personnel's use of deadly force, and there should have been less lethal options available. Further, there was no warning that deadly force was imminent.

66.    Mr. Quair testified in his deposition that he followed the directions given to him by law enforcement to get out of the Nissan with his hand up. He got out of the Nissan with his hands up and his palms showing. (69-70)

67.    Investigators Compston, Silveira, and Sinclair, in what can only be considered "contagious fire", fired their weapons after hearing shots being fired, even though there was no threat to their safety, and they never saw Mr. Quair or Mr. Quintero with a weapon.

68.    Sergeant Lopes testified in his deposition to the following:
    a) The use of lethal force against Mr. Quair was the fifth use of deadly force incident in which he was a shooter. (12)
        1)    He fired 18-20 rounds from a rifle in his first use of deadly force. (14/12)
        2)    He fired 3-4 rounds from a handgun in his second use of deadly force.

14

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
805.947.8323

(16/17)

3)    He fired 8-9 in his third use of deadly force. (17/22)

4)    He fired one round from a rifle in his fourth use of deadly force. (20/1)

b) He never saw Mr. Quair reach for his waistband or pocket. (48/25)

c) He had received training that you cannot use deadly force if you do not see a weapon. (48/12)

d) He had received training on the appropriateness of shooting an individual taking a stance with no weapon. (47/25)

e) He did not see Mr. Quair in possession of a weapon prior to his use of deadly force. (35/24) (36/15)

f) He did not see Mr. Quair in possession of a weapon while he was using deadly force against Mr. Quair. 36/25)

g) He was able to see weapons from a greater distance in his prior shootings. (34/1)

h) He claimed Mr. Quair advanced toward the rear of the Nissan after getting out of the passenger side of the Nissan.

i) He did not hear shots being fired before he fired at Mr. Quair. (25/19)

j) He did not see muzzle flash coming from the direction of Mr. Quair or the Nissan. (42/22)

k) He did not hear any threats from Mr. Quair or Mr. Quintero. (42/22)

l) He fired 22 rounds at Mr. Quair from an assault rifle. (23/23)

m) In semi-automatic mode, Sergeant Lopes intentionally pulled the trigger on his assault rifle each, and every time he fired a round. (29/5).

n) No weapons were found on or near Mr. Quair, or in the Nissan. (54)

o) He had his rifle in the semi-automatic setting (24/16), but it was also equipped to fire in full-automatic mode. (24/13)

p) He fired the 22 rounds in three-to five seconds. (25/13)

q) He had the impression his first round hit Mr. Quair. (38/19)

r) He used deadly force against Mr. Quair while Mr. Quair was on the ground. (37/6)

s) He continued to use deadly force against Mr. Quair even though he had no target acquisition on Mr. Quair. (39/1)

t) He was aware it was inappropriate to use deadly force against Mr. Quair while Mr. Quair was on the ground. (76/6)

u) He estimated there was 1-2 seconds between the time Mr. Quair began getting out of the Nissan and the time he began using deadly force against Mr. Quair. (30/25)

v) He used deadly force against Mr. Quair, with "less than half" of the rounds he fired when he had no target acquisition on Mr. Quair. (40/13) (70/8)

w) He used deadly force by firing rounds through the rear window of the Nissan, even though he could not see Mr. Quair or into the passenger compartment of the Nissan. (40/23) (71/3)

15

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA

**Curt Rothschiller**                                            805.947.8323

      x) The encounter "scared the hell out of me." (26/17)

      y) He backed away from the protection of the engine block of his vehicle and continued to use deadly force against Mr. Quair even though he could not see Mr. Quair or determine if he was a threat.

69.    P.O.S.T. certified peace officers are trained to maintain cover and/ or concealment and to avoid placing themselves in any position of danger. P.O.S.T. training in this regard is precise. Officers are taught that leaving the safety of cover and standing in the open area is a forbidden tactic. It is defined by P.O.S.T. as a "Fatal Error" and indicates a "Tombstone Mentality" that will likely cause unnecessary injury and/or death to citizens and officers (Learning Domain # 22 – "Vehicle Pullovers").

70.    Contrary to all training, from P.O.S.T Basic Academy through mandatory in-service training, Sergeant Lopes left a position of cover behind his vehicle's engine block, and back-peddled away from his vehicle into an open space while continuing to randomly and indiscriminately rapid fire his assault weapon in the direction of the Nissan and where he believed Mr. Quair was on the ground. A trained law enforcement professional, especially a sergeant with multiple years of experience and professed SWAT training, is expected to utilize their extensive Officer Safety training and knowledge during all critical incidents.

71.    In his deposition, Investigator Compston testified to the following:

      a) He positioned his vehicle behind and slightly to the right of the Nissan giving him a clear view of the passenger side.

      b) He did not give any commands to the occupants of the Nissan (8/7), and he did not hear any of the investigators announce that they had seen a gun (8/8) before he fired at Mr. Quair.

      c) He was unsure as to the number of rounds he fired - "about five (5)" "could have been more"- from his .40 cal. Glock handgun, (6/8) even though he had been trained that he was accountable for every round he fired. (15/19)

      d) He heard one shot (9/5) but never saw Mr. Quair with a weapon (11/15) or saw muzzle flash coming from the area of the Nissan before he began firing at Mr. Quair. (12/25)

      e) One of the reasons he shot was the sound of gunfire. (25/3)

      f) He never had any information that Mr. Quair ever point a gun at anyone, shot at anyone, injured anyone, or threaten to harm officers in the past. (12)

      g) He did not perceive Mr. Quair as a threat while Mr. Quair was on the ground. (16/1)

      h) He believed he could shoot Mr. Quair if Mr. Quair attempted to flee "based on the information we have about them being involved in a home invasion." (23-24)

      i) He would not shoot simply because someone came out in a stance with his hands together but no identifiable gun. (25-26)

16

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**
                                                                    805.947.8323

j) He never saw a gun in Mr. Quair's possession and did not see muzzle flash coming from Mr. Quair. (26/12)

k) Mr. Quair was not firing at him or anyone else while Mr. Quair was going to the ground, and Mr. Quair was not pointing anything at the KCSD and DOJ personnel while he was on the ground. (27)

72.   In his deposition, Investigator Silveira testified to the following:

a) He positioned his unmarked vehicle to the right of Investigator Compston's vehicle giving him a clear view of the passenger side of the Nissan.

b) He did not put up his red and blue handheld light "because there was no time." (5/13)

c) He never saw Mr. Quair or Mr. Quintero in possession of a weapon. (13)

d) He could see Mr. Quair's hands when Mr. Quair got out of the Nissan, but he did not see anything in Mr. Quair's hands. (25/22)

e) He has been trained that deadly force cannot be used if the suspect simply puts his hands together, but a weapon is not seen. (33/24)

f) He has been trained that deadly force cannot be used if there is no immediate threat. (34/1)

g) Based on his training, he knew he could not shoot someone already down. (39/12)

h) He had no information that Mr. Quair was in possession of a weapon. (15) (25/1)

i) He did not see muzzle flash coming from Mr. Quair's position. (26/7)

j) No weapon was found on Mr. Quair or on the ground. ((30)

k) He fired three rounds within two seconds (26/3) from his Glock handgun (6/17) five-to-ten seconds after Mr. Quair got out of the Nissan (14/9), and after hearing shots being fired. (7/1)

73.   Investigator Sinclair testified in his deposition to the following:

a) He positioned his vehicle to the left of Sergeant Lopes' vehicle, to the rear of the Nissan. (7/ 17)

b) He fired three rounds, with an intentional trigger pull for each round, from his AR M-Platform rifle at the Nissan even though he could not see Mr. Quair (12/3) or any other threat.

c) He fired his weapon only after hearing "a lot" of shots being fired (8/25) and never saw Mr. Quair's hands. (17/1)

d) He claimed Mr. Quair was advancing rapidly toward the rear of Nissan after he got out of the Nissan. (21/1)

e) He never saw a weapon in Mr. Quair's possession. (23/19)

f) He did not have information that Mr. Quair pointed a weapon or shot at anyone. (38/17)

g) He fired into the passenger area of the Nissan even though he did not see a threat. (24/5)

h) He fired because other law enforcement officers were firing at the Nissan and Mr.

17

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
805.947.8323

Quair. (25/3)

i) He never heard any law enforcement official tell anyone to drop a gun. (31/1)
j) He has never had training on contagious or sympathetic fire. (39/1)
k) He had no target acquisition before firing at the Nissan. (43/22)

74. Photographs of the Nissan after the unreasonable and excessive use of lethal force against Mr. Quair showed KCSD and DOJ personnel fired numerous rounds into the Nissan even though they testified they could not see a threat to their safety due to the tinted windows.

75. KCSD and DOJ personnel never warned the occupants of the Nissan, including Mr. Quair, that lethal force was imminent

76. P.O.S.T. certified officers are continuously trained and reminded that deadly force is justified only:
    a) as a last resort
    b) under the direst of circumstances
    c) in the immediate defense of life
    d) when no other options are available
    e) when all other options are exhausted
    f) after a deadly force warning has been given, if feasible
    g) if every shot can be justified

## Failure of King's County, DOJ and KCSD Personnel to Provide the Necessary and Required Medical Attention per Training.

77. The American Red Cross First Aid / CPR / and AED course emphasizes several critical points when assisting a severely injured individual, including once you recognize that an emergency has occurred, you must decide how to help and what to do.

78. All certified law enforcement officers are taught that the failure to provide timely medical treatment to an injured person could result in further and significant injury and the unnecessary infliction of additional pain.

79. Policy 424 of the KCSD's policy manual (Emergency Medical Care) establishes policies and procedures for first aid services which will conform with current medical practices. The Kings County Sheriff's Office sworn personnel are responsible for providing emergency medical care for victims that are encountered during law enforcement activities, in the absence of any other emergency medical care.

18

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
**805.947.8323**

80. At approximately 05:35:55, the air surveillance video provided clearly shows Mr. Quair getting out of the front passenger side of the Nissan and immediately falling to the ground after Sergeant Lopes fires his initial round. Numerous rounds can be seen kicking up dirt around Mr. Quair while he lays immobile on his back on the ground.

81. After being shot approximately seventeen (17) times from multiple lethal firearms, Mr. Quair was immobile, bleeding profusely, and in obvious and critical need of emergency medical care and treatment. KCSD and DOJ personnel did not timely summon medical care or permit medical personnel to treat Mr. Quair. The delay of medical care caused Mr. Quair extreme physical and emotional pain and suffering and was a contributing cause to Mr. Quair's injuries.

82. Mr. Quair was left on the ground with no medical aid until 05:51:48 when medical professionals began attending to Mr. Quair, even though there were numerous law enforcement officers present and the scene was safe. The officers did not provide any first aid or lifesaving measures for Mr. Quair in clear violation of KCSD policy. In fact, many can be seen milling around with apparent indifference to Mr. Quair's well-being. There was no effort by any of the officers to apply pressure to Mr. Quair's wounds, attempt stop the bleeding, or even retrieve issued First Aid kits. The officers do take the time to retrieve protective gloves for themselves prior to searching Mr. Quair, but then just stand around him without rendering any aid.

## Failure of the County of Kings, the King's County Sheriff's Department and the State of California to Conduct an Appropriate Criminal Investigation, Administrative Review, or Internal Affairs Investigation.

83. I was not presented with evidence a thorough, impartial, independent Internal Affairs or criminal investigation was completed regarding this use of unreasonable excessive lethal force. The lack of an industry standard impartial investigation by the KCSD and DOJ or other independent entity compounded the issues with this incident. P.O.S.T requires that agencies maintain adequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct. Failure to provide such documentation is indicative of entities not complying with P.O.S.T. requirements.

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                                                 805.947.8323

84.    It is imperative that all incidents and officers' actions are openly and honestly reviewed through Critical Incident Debriefings, After Action Reports, and Internal Affairs investigations. Failure to conduct critical incident reviews leads to agencies and officers continuously making critical errors. Complete and factual information must be provided for the reviews to determine if tactics and training must be adjusted. I have seen no evidence of critical incident reviews being conducted surrounding the use of unreasonable excessive lethal force against Mr. Quair.

85.    The approval and ratification of the KCSD and DOJ personnel's actions in this incident are also concerning and may be indicative that their personnel are not held to the standards and policies of modern law enforcement. I have seen no evidence that any of the investigators or Sergeant Lopes were either disciplined or re-trained in arrest methods, tactical deployments, basic investigative techniques, first aid, or use of force.

86.    302.1 of the KCSD Policy manual specifically establishes a process for the Kings County Sheriff's Office to review the use of force by its employees. It states that this review process shall be in addition to any other review or investigation that may be conducted by any outside or multi-agency entity having authority over the investigation or evaluation of the use of deadly force. 302.2 of the manual states the Kings County Sheriff's Office will objectively evaluate the use of force by its members to ensure that their authority is used lawfully, appropriately and is consistent with training and policy. 302.3 calls for the removal from duty assignment whenever an employee's actions or use of force in an official capacity, or while using department equipment, results in death or very serious injury to another, and that employee will be placed in a temporary administrative assignment pending an administrative review. No evidence or documentation was presented to me that the KCSD complied with 302.1 – 302.3 in this case.

87.    Although 306.1 of the KCSD Policy manual establishes policy and procedures for the investigation of an incident in which a person is injured or dies as the result of an officer-involved shooting or dies as a result of other action of a deputy and specifically outlines steps and responsibilities, including criminal investigations, administrative investigations, and civil investigations to determine liability, there was no evidence presented to me or indication that any of the investigation or policy had been followed.

88.    In my opinion, actions by law enforcement personnel that defy current training and industry standard tend to indicate disregard for that training, or improper training and lack of experience. A systemic issue is apparent when failure to follow policy, procedure, and industry standards are later ratified by other members in the organizations. Misperceptions that the actions were proper set a dangerous precedent, reinforce negative behavior and are

20

# KJB CONSULTING, INC.    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
                                                              805.947.8323

counter to industry standards and training.

89.  The lack of an industry standard, impartial investigation by Internal Affairs or other independent entities compounds the issues with this unreasonable and excessive use of force by KCSD and DOJ personnel and signals to KCSD and DOJ personnel that excessive and unreasonable lethal force is acceptable.

## Failure to Train and Failure to Supervise KCSD and DOJ Personnel by the County of Kings, the King's County Sheriff's Department and the State of California

90.  For decades, law enforcement agencies across the country have recognized the need and trained their officers in multiple ways to apprehend non-compliant suspects without resorting to unreasonable excessive force. These methods are continuously updated, well known, and have proven to be effective for the safety and welfare of officers, subjects, and the public. Often referred to as "perishable skills", it is critical for everyone's safety that officers receive regular training and maintain proficiency. A critical emphasis in the training is that every use of force must be accounted for and justified.

91.  The safe resolution of incidents without the use of force calls for ingrained critical incident knowledge and experience. All officers must receive sufficient certified training which gives them the skills needed to consider their options and to act with reason.

92.  Based on their outdated actions during this incident, the County of Kings, KCSD and DOJ failed to continuously train their personnel in updated officer safety tactics, perishable skills, other methods of de-escalation and force options. Failure to do so hinders their ability to bring critical incidents to a safe resolution. Officers proficient in the officer safety use of cover, concealment, time, and space reduce their personal risk as well as the need to use unreasonable excessive force.

93.  The County of Kings, KCSD and DOJ failed to train their personnel basic, current industry standard arrest, use of force, surveillance and investigation methods resulting in unreasonable and excessive use of lethal force against Mr. Quair causing him significant injuries.

94.  I was presented with no evidence that KCSD and DOJ personnel had documented, or had others accurately document, their actions. The only account of the incident provided was their transcribed interview statements, which went unchallenged by the interviewers. In my experience, training, and how I train report writing, "If it wasn't in your report, it didn't happen."

21

**KJB CONSULTING, INC.**    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**    805.947.8323

95. I was never presented with any evidence an after-action debriefing for KCSD and DOJ personnel occurred to determine what went right and what went terribly wrong and led to the use of excessive lethal force on Mr. Quair. Without debriefing critical incidents and determining corrective action, the personnel are destined to continue to violate the rights of the citizens they serve.

96. It is incumbent on all law enforcement professional that they stay proficient at their perishable skills, whether-or-not their agency trains them.

97. Leading up to the unreasonable and excessive use of lethal force against Mr. Quair, personnel from multiple agencies were tasked with high-risk enforcement action without a plan or supervisor. Investigators were spread throughout the County and left to their own devices and unbridled rogue behavior. Sergeant Lopes eliminated himself from the role of supervisor when he inserted himself as the primary unit on a high-risk arrest where there was no urgency to take immediate enforcement action.

98. As illustrated in this case, the lack of supervision during any critical incident allows for rogue deputies to dispense excessive, unreasonable lethal force. Had industry standards and P.O.S.T. training been followed, a supervisor could have taken command, formulated a professional tactical plan, directed their personnel's actions, coordinated resources, and controlled the incident to a safe conclusion. Sergeant Lopes was so consumed with being in the middle of the action that he abandoned his primary role as a supervisor, and no other law enforcement personnel assumed the role.

99. Sergeant Lopes admitted, without remorse, having been in four (4) use of deadly force shootings of human beings prior to his shooting of Mr. Quair.
   a) In Berbereia v. County of Kings, et al., case number 1:16-cv-00363; the Kings County and Sergeant Lopes settled with the family of Albert Hanson, Jr., a 76-year-old man who was fatally shot by sheriff deputies including Sergeant Lopes. Kings County sheriff's deputies used an excessive and unreasonable amount of force when they fired more than 45 rounds through the rear of Mr. Hanson's vehicle at a time when Mr. Hanson did not pose a threat to the deputies' or any other person's safety. Sergeant Lopes at the time of Berbereia, had previously been involved in two (2) prior shooting incidents, both without adverse consequences.
   b) In Estate of Stephen E. Crawley, et al.v. Kings County, et al., case number 1:13-cv-02042; Kings County settled with the family of Stephen Crawley, after sheriff's deputies used excessive and unreasonable force to break through the door of Mr. Crawley's residence and fired an unknown number of rounds, fatally striking Mr.

22

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                        805.947.8323

Crawley three times.

100.    Sergeant Lopes' use of excessive and unreasonable use of deadly force against Mr. Quair was his fifth (5th) such incident. It is clear the Kings County and the KCSD do not feel the need to hold their employees accountable when they clearly fail to follow industry standards and P.O.S.T training. Kings County and KCSD knew or should have known Sergeant Lopes had the propensities and character traits to repeatedly use unreasonable and excessive lethal force. I was not presented with any evidence Sergeant Lopes, or the DOJ investigators, were disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Mr. Quair's injuries.

101.    King's County and the KCSD failed to supervise and properly address the known issues concerning Sergeant Lopes, i.e., his repeated use of excessive force, including deadly force. As mentioned above, the vast majority of law enforcement offices never resort to the use of deadly force, even in lengthy careers in high-risk assignments.

102.    Without established and enforced oversight of use of force incidents by KCSD and DOJ personnel, unreasonable and excessive use of force incidents will continue to violate the safety of citizens. There was no evidence presented to me that indicated there was a thorough and unbiased investigation into this unreasonable and excessive use of lethal force against Mr. Quair.

103.    Lack of and poor supervision are synonymous with the failure to discipline, reprimand, retrain, or suspend.

**Summary of Opinions:**

104.    This incident is a case of the use of excessive and unreasonable lethal force by Sergeant Lopes and DOJ personnel against Mr. Quair and the failure of KCSD and DOJ personnel to provide the required first aid and life-saving measures for the injuries he incurred as a result.

105.    Every day, law enforcement must weigh their response to the circumstances presented to them objectively reasonable, without prejudice. This incident is clearly a case of over-zealous law enforcement personnel using excessive and objectively unreasonable deadly force against Mr. Quair which led to his extensive injuries and continuing medical issues. The firing of a gun by a police officer at a person constitutes the use of deadly force and can only be justified in immediate defense of life.

106.    Based on my analysis of the evidence and statements of events given by KCSD and DOJ

23

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                              805.947.8323

personnel, their use of deadly force was excessive and unreasonable. Mr. Quair was unarmed, had his hands raised, was not advancing toward the investigators, and not a reasonably objective threat to the officers when the excessive lethal force was used. The investigators had access to positions of safety (cover and concealment), time, and space to tactically and fully evaluate Mr. Quair's actions. The use of deadly force against Mr. Quair was not objectively reasonable under the circumstances as presented.

107.    Mr. Quair and Mr. Quintero did not pose an immediate threat to anyone that morning, therefore the use of deadly force by the investigators was inappropriate, excessive, and unreasonable, violated generally accepted policing training and standards, and violated KCSD policy. KCSD and DOJ personnel should have remained in a position of safety (cover / concealment), fully observe the totality of the event (time and space) and Mr. Quair's actions to better determine their options.

108.    Officers are trained that as they assess the possibility of using lethal force they must consider whether innocent individuals or unintended targets are in peril. Had the officers followed P.O.S.T. training and industry standards, under the circumstances as presented, they would never have endangered Mr. Quintero and Mr. Quair's lives or the lives of other potential occupants of the Nissan or caused them significant bodily injury by firing their weapons. KCSD and DOJ personnel's decisions and actions were dangerous and reckless, and a direct casual factor in the sequence of events leading up to the unreasonable use of excessive lethal force on Mr. Quair.

109.    The use of deadly force in connection with this incident was also unreasonable because there were far more reasonable options available besides shooting at the Nissan and Mr. Quair. There were fundamental errors and a gross lack of situational awareness in this incident.

110.    Law enforcement officers across the country face perilous circumstances every day. They are trained that their duty is to respond to each incident objectively and within reason. They must evaluate the behavior and actions of the individuals they contact with an unbiased, open mind. An individual's prior history and associations may be considered but cannot be used to formulate a decision to use lethal force. "Subjective fear" (the fear associated with non-factual information) must be eliminated from the factors when law enforcement chooses to use deadly force.

111.    KCSD and DOJ personnel, especially Sergeant Lopes, were un-rationally (subjectively) pre-disposed to resistance from the occupants of the Nissan. They failed to independently evaluate the threat or gauge compliance of Mr. Quair and Mr. Quintero, and instead without a threat, unleashed unreasonable and excessive force against them by firing a barrage of

*KJB CONSULTING, INC.*   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                           805.947.8323

lethal rounds at them.

112.    Sergeant Lopes and the DOJ investigators claimed they were in fear of Mr. Quair and Mr. Quintero prior to the tactically botched enforcement stop because of their alleged association with other individuals.

113.    While KCSD and DOJ personnel may have had third hand information (wiretap) Mr. Quair or Mr. Quintero were associated with illegal activity, they had no information either had a violent criminal history, a propensity toward violence, were in possession of a weapon, or a threat to law enforcement or the public.

114.    Other than the statements of KCSD and DOJ personnel, there was no evidence presented to me that Mr. Quair or Mr. Quintero had criminal associates, were a threat to the public, had threatened violence, had threatened law enforcement personnel, or law enforcement knew they were involved in violent criminal activity at the time of the unreasonable use of excessive force.

115.    Sergeant Lopes and DOJ personnel created their own fear by subjectively interpreting the information they received from other officials, the alleged information gathered in the wiretap investigation, and the actions of Mr. Quair and Mr. Quintero the morning of June 18. Sergeant Lopes' statement that the occupants of the Nissan left the windows partially rolled up as some sort of sign the were plotting something "because everyone in traffic stops seem to roll down their windows" and the "angle of car–red flag" (L 22/15) is one small example of his subjective mindset that morning. His subjective fear is also evident by his statement that Mr. Quair "jumps" out of the Nissan and "runs up" prior to the use of unreasonable excessive force when it is clearly contradicted by video evidence.

116.    KCSD and DOJ personnel unleashed an objectively unreasonable and excessive use of lethal force on Mr. Quair and Mr. Quintero without threat to their safety or the safety of the public.

117.    The use of deadly force against Mr. Quair and Mr. Quintero was excessive and objectively unreasonable under the circumstances, especially because Mr. Quair and Mr. Quintero were un-armed, and they did not pose an immediate threat of death or serious bodily injury to anyone.

118.    Each investigator present during the objectively unreasonable excessive use of force that morning had the ethical and moral duty, and as outlined in KCSD Policy 300.2.1, to intervene and de-escalate the continuous, contagious rapid-fire shooting of Mr. Quair. P.O.S.T. Basic and In-Service training stresses that officers maintain self-control, effective

communication, scene assessment and management, and weigh force options in high-risk incidents where use of force is considered. (LD#20) Avoidance of contagious fire is stressed in firearms training throughout an officer's career. They are taught to make their own assessment of the threat prior to firing their weapon. They are also taught to communicate with other officers present if they determine there is no longer a threat.

119.    Investigators Compston and Silveira, who both had a clear view of Mr. Quair while he was on the ground, unarmed, and obviously injured, should have called for Sergeant Lopes and Investigator Sinclair to cease their indiscriminate rapid-fire use of unreasonable excessive lethal force on Mr. Quair. Instead, they magnified the unreasonable excessive use of deadly force by allowing Sergeant Lopes and Investigator Sinclair to continue firing, and by firing their own additional rounds at Mr. Quair while he was on the ground, clearly unarmed.

120.    Certified law enforcement personnel are trained that they are not justified in a use of deadly force when their deliberate decisions and actions are contrary to reasonable and required tactics.

121.    Sergeant Lopes' actions in this case, with respect to the tactics leading up to and during the stop, and amount the amount of force used, reflected, at best, a reckless disregard to the life and safety of Mr. Quair, Mr. Quintero, himself, his fellow officers, and the public.

122.    Sergeant Lopes' actions in this incident appear as deliberate (and not accidental), and as the cause of the cascading series of events that culminated in the use of deadly force against Mr. Quair.

123.    In this regard, the use of deadly force against Mr. Quair demonstrates that Sergeant Lopes and the DOJ personnel were not properly trained on current officer safety techniques and force options or failed to follow that training and the California Peace Officer Standards and Training (P.O.S.T.) guidelines regarding the proper tactics and procedures, and /or chose to ignore that training.

124.    KCSD and DOJ personnel failed to understand that an officer's overreaction to a subject's failure to follow verbal commands, verbal resistance, or passive resistance is synonymous with excessive force and an officers' subjective fear does not reach the threshold of 'reasonably objective' justification for the use of excessive force.

125.    The use of force in connection with this incident was also excessive and unreasonable because there were far more reasonable options available. Sergeant Lopes rushed to the front of the surveillance and tried to initiate a high-risk stop without additional resources. There was no reason to draw attention to the surveillance or an urgency to stop the Nissan.

26

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                    805.947.8323

126.  Additional resources, SWAT vehicles, K9 officers, etc., were available to the surveilling investigators and Sergeant Lopes, which would have minimized or prevented the use of unreasonable force against Mr. Quair.

127.  "Time and space" have proven to be allies when investigators attempt to take enforcement action. Law enforcement must always evaluate the true threat and decide which options are appropriate considering that threat.

128.  A significant number of civilian injuries and deaths caused by police officers result from a series of cascading departures from expected and required tactics. This statistic is consistent with the downward spiral of events resulting in the use of excessive and unreasonable force by the KCSD and DOJ personnel.

129.  KCSD and DOJ personnel failed to understand that they are not justified in a use of force when their deliberate decisions and actions are contrary to reasonable and required tactics. Deputies' actions in this tragic incident, with respect to the tactics and amount of force used, reflected—at best—a reckless disregard to the liberty and safety of Mr. Quair and Mr. Quintero and contradictory to police practices and procedure.

130.  There was no objectively reasonable basis, given my skillset, training and experience, to believe that Mr. Quair was an armed threat to KCSD and DOJ personnel prior to the investigators firing their weapons at him.

131.  Had KCSD and DOJ personnel been sufficiently trained and followed their P.O.S.T certified training and industry standard under the circumstances as presented, they would never have violated Mr. Quair's constitutional right to be free from an excessive and unreasonable use of force. KCSD and DOJ personnel's decisions and actions were excessive and unreasonable, and a direct casual factor in the sequence of events leading up to Mr. Quair's injuries.

132.  The lack of transparency in this case, regarding the production of official reports and documentation is extremely concerning.  Failure to produce official documentation, i.e., Use of Force, investigative, crime scene, and Internal Affairs reports from KCSD and DOJ leads me to believe there was a concerted effort by law enforcement to prevent the facts of this incident to become known.

## Qualifications for Reviewing this Case:

133.  My opinions are based in part on my training, professional experience, and education, as

27

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                      805.947.8323

well as review of policies and procedures from multiple agencies, and the items of evidence provided to me.

134.   I have over thirty-six years of service with the Ventura County Sheriff's Office retiring as a Sheriff's Captain. I was hired on October 1, 1979, and I retired from active service on March 3, 2016. I am a graduate of the P.O.S.T. Basic Academy Class 79-4 and hold P.O.S.T. Basic, Intermediate and Advanced certificates. I completed numerous P.O.S.T. approved Management, Supervision, Officer Safety, and Critical Incident Tactics courses. I obtained a Bachelor's degree in Psychology while employed by the Sheriff's office and I am in the process of completing the thesis portion of a Master's degree in Psychology.

135.   During my service with the department, I had a wide range of duties where I gained the experience on which to base my opinions. As a deputy those duties included custody, uniformed patrol, a Special Enforcement unit, and general assignment investigations. As a senior deputy, I was briefly assigned to custody before working narcotics for approximately nine (9) years where I served as a training officer for over eight years. As a sergeant I supervised patrol, administration, and community services units, and narcotics for approximately seven (7) years. After being promoted to captain, I managed highly skilled and trained units of narcotics, intelligence, and special crimes task forces. I gained extensive operational, investigative, tactical, covert surveillance, and Anti –Terrorist experience while assigned to, supervising, and managing multi-agency personnel, operations and units. I have testified as an expert for the prosecution in State and Federal court and I am a recognized expert and certified instructor of multiple law enforcement disciplines.

136.   Between 2001 and 2016, I was a member and an instructor for the Ventura County Law Enforcement Crisis Intervention Team (CIT), a multi-jurisdictional task force approach based on the Memphis Model of law enforcement treatment of those with a mentally illness. Initially, I secured $800,000 of federal funding and served as the agency wide VCSO CIT Coordinator. From 2009 -2016, I was the county-wide, multi-agency CIT Coordinator and manager. I taught at and hosted over thirty (30) forty-hour (40 hr.) CIT academies which trained hundreds of officers from throughout California. I am also a former Ventura County Behavioral Health Advisory Board appointee and Ventura County National Alliance on Mental Illness Board (NAMI) member.

137.   I have trained new and seasoned officers in P.O.S.T. and agency approved patrol procedures, critical incidents, field investigations, officer safety, apprehension techniques, crisis intervention, high-risk arrests, and emergency procedures.

138.   I have reviewed, and continue to review, critical incidents and offered opinions at the

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                        805.947.8323

request of law enforcement agencies and private attorneys.

139. I commanded multi-agency task forces made up of local, state, and federal investigators and supervisors. While doing so, I reviewed policy and procedures from multiple agencies and created an operational manual addressing tactical deployment of personnel during critical incidents, which was approved by Letter of Agreement from numerous agencies.

140. My units conducted investigations including undercover surveillance, high risk apprehensions, buys, buy busts, and reverse stings. The narcotics cases usually involved multiple kilogram quantities of drugs and up to millions of dollars, which raised the stakes and violence by the offenders. The investigations spanned all corners of the country and includes foreign nations. We also conducted numerous investigations involving Organized Crime and street gang activity. Additionally, we deployed at the request of other investigative units (Robbery, Homicide, Burglary, etc.) due to our experience, tactical expertise, and training. Many of the suspects I was involved in apprehending were armed and considered extremely dangerous. Most were apprehended during their crimes, armed and extremely prone to use firearms to escape apprehension.

141. Over my career, I have been involved with numerous arrests, pursuits, and high-risk operations where deadly force was often a possibility. Even though in many instances it may have been technically "justified", I have never used deadly force. In those instances, I chose other options available to me. Additionally, no officer under my direction or supervision has ever needed to resort to the use of deadly force. The lack of use of deadly force by myself and co-workers speaks for itself and was accomplished through proper tactics, training, and pointed reviews of incidents, and revision of tactics, if necessary.

142. I commanded and supervised personnel with a focus on training in updated and current, safe tactical apprehension methods, officer safety, and adherence to the moral and ethical standards endorsed by California P.O.S.T., the agencies committed to the task forces, and state and federal law. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice. I advocated and demanded critical reviews of all incidents to identify mistakes, adjust training and prevent the same mistakes from occurring in the future.

143. Attached as Exhibit A is a statement, curriculum vitae, listing my law enforcement qualifications and experience.

144. I have testified as a compensated expert in Court. I have also testified as an expert for the prosecution when I was employed by a government agency, for which I did not receive

# *KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                                         805.947.8323

expert compensation.

**145.**    I am currently sole proprietor of KJB Consulting, Inc. which specializes in law enforcement tactical training and trial preparation.

These opinions are based upon my education, training, experience, and skillset and are based upon information known to me at this time. Should new information become available, I reserve the right to consider same.

Submitted this 22nd day of July 2022

Curt Rothschiller

30

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller
**805.947.8323**

## Curriculum Vitae

**Curt Rothschiller**                    curt.kjbconsulting@yahoo.com
Home: (805) 947-8323

## PROFESSIONAL EXPERIENCE:

03/16 – present    **Director of Security and Safety, Golden State Medical Supply, Inc.**

03/16 – present    **KJB Consulting, Inc. Sole Proprietor**
- Law Enforcement Policies and Procedures
- Use of Force
- Tactics Assessment
- Investigation Analysis
- Case Review
- Trial Preparation
- Crisis Intervention (CIT)
- Peer Support
- Security

Over 36 years with the Ventura County Sheriff's Office includes:

04/12 - 03/16    **Captain, Special Services, Special Investigation Unit**
- Manage the Sheriff's Narcotics and Intelligence / Special Crimes Division.
- Managed Regional Ventura County Combined Agency Team (VCAT), a multi-local and federal agency task force assigned to interdict major Drug Trafficking Organizations (DTO) internationally.
- Implemented regional Pharmaceutical Diversion Task Force and Open Source (Social Medial) unit.
- County-wide manager of the Ventura County Law Enforcement Crisis Intervention Team (CIT) program.

04/08 – 04/12    **Sergeant, Community Resource Unit—Central County Patrol**
- Implemented and managed the C.O.P.P.S. philosophy of policing.
- Management of School Resource Officers, the Juvenile Detective, Citizen Patrol, Explorers, and Crime Prevention Officers.
- County-wide coordinator of the Ventura County Law Enforcement Crisis Intervention Team (CIT) program.

03/07—04/08    **Sergeant, Administration—Central County Patrol Services**

*KJB CONSULTING, INC.*    5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                        805.947.8323

|           | • Administrative duties and staff work of all patrol services within the Central County Patrol Services station including: COMPSTAT, scheduling, training, records, and budget. <br> • CIT coordinator |
|-----------|---|
| 03/05—03/07 | **Sergeant, Field Supervisor—Central County Patrol Services** <br> • Supervise patrol field operations within the city of Camarillo and the surrounding county. <br> • Coordinate briefings and conduct training sessions for patrol services. <br> • CIT coordinator. |
| 08/04—03/05 | **Sergeant, Field Supervisor—East County Patrol Services** <br> • Supervise patrol field operations within the city of Thousand Oaks and the surrounding county. <br> • Coordinate briefings and conduct training sessions for patrol services. <br> • CIT coordinator. |
| 09/01—08/04 | **Sergeant, Administration—East County Patrol Services** <br> • Administrative, budget, and staff work duties of all patrol services within the East County Patrol Services Division. <br> • CIT coordinator. |
| 07/94—09/01 | **Sergeant, Narcotics—Special Services Division** <br> • Supervision and management of Narcotics Units conducting undercover operations throughout the western United States. |
| 02/94—07/94 | **Sergeant, Watch Commander - Detention Services** |
| 06/84—02/94 | **Senior Deputy, Narcotics Investigator—Special Services Division** <br> • Managed multi-state narcotics investigations. <br> • California Narcotics Officers Association Investigator of the Year 1993 and 1994 |
| 01/84—06/84 | **Senior Deputy, Pre-Trial Detention Facility—Detention Services** |
| 10/79—01/84 | **Deputy—Detention Services / East County Patrol Services** |

**SPECIAL QUALIFICATIONS / ACHIEVEMENTS:**

- Extensive investigative, covert surveillance, and Anti –Terrorist experience

- Extensive operational and tactical supervision of multi-agency covert operations

- Developed and managed Intelligence Led Policing Special Crimes / Intelligence unit

- Master Interview and Interrogation Expert

# KJB CONSULTING, INC.   5021 Verdugo Way #187, Camarillo, CA
## Curt Rothschiller                                      805.947.8323

- Development Team for the statewide Drug Abuse Recognition program

- Drug Recognition and Influence Expert

- State and Federally Recognized Expert and certified Instructor (multi-discipline)

- Research and development of policies and operational procedures

- Labor Relations Liaison and Human Resource experience

- Leadership, Management, and Supervision Courses

- Quality staff reports and responses to city councils and managers

- Grant Writing and Administration

- Public Information Officer (PIO) with extensive media relations

- Development Team and manager for the countywide Crisis Intervention Team (CIT) program

- Advanced California Peace Officer Standards and Training Certificate

**AFFILIATIONS:**

- Law Enforcement representative for the Ventura County Behavioral Health Advisory Board

- California Narcotics Officers Association – Lifetime Member

- National High School Football Coaches Association – 1989-present

**EDUCATION:**

- California Coast University, B.S., Psychology
- California Coast University, M.S., Psychology (Thesis IP)

33

**KJB CONSULTING, INC.**   5021 Verdugo Way #187, Camarillo, CA
**Curt Rothschiller**                                                805.947.8323

## CASES TESTIFIED BY TRIAL / DEPOSITION

- Bordegaray v. County of Santa Barbara Case No. 2:14-cv-08610-CAS (JPRx) October 2016
- Bedetti v. City of Long Beach, et. al    Case No. 2:14-cv-09102-DMG March 2017
- Hornshaw v. City of Long Beach, et al Case No. 2:18-cv-06555-MVF (PLAx)
- Williams v. County of San Bernardino, et al Case No. 5:19-cv-00470-SVW-SHK
- Briceno v. County of Los Angeles, et al. Case No. 2:21-CV-01388-SB (Ex)

Curt Rothschiller
KJB Consulting Inc.
5021 Verdugo Way 187, Camarillo, CA 93012

Fee Schedule

Detailed below is my current fee schedule.

1. 1. A retainer fee of $2,000.00 is required prior to the commencement of professional services on any case and will be credited against the first invoice. Billing for services performed or expenses incurred will be charged against the retainer until it is exhausted. Any unused portion of the retainer fee will be refunded to the client. Fees are billed to the client in fifteen-minute increments with a minimum charge of fifteen minutes.

2. Consulting time, including but not limited to, case reviews, report reviews, deposition reviews, analysis of criminal investigations, research, interviews, consultation time, meetings, site inspections, deposition preparation, deposition support, interpretation of police documents, interpretation of investigative files, report preparation, preparation for negotiation or any miscellaneous tasks as assigned by the client attorney or opposing attorney (client approved) shall be billed at $300.00 per hour. Billing will be in fifteen-minute increments plus expenses.

3. Consulting time for professional services is $400.00 per hour. This includes deposition testimony, trial testimony and any other legal testimony.

4. Travel and actual expenses reasonably and necessarily include (meals, lodging, ground transportation, rental car, etc.) will be billed to the client at cost and copies of expenses will be provided when available.


Schedule of Fees (2022):

Retainer: $2,000.00 at commencement of retention, to be applied toward case review.

Hourly fee for case file review, investigation, research, analysis
and preparation:                          $300.00 per hour

Deposition/Trial testimony:               $400.00 per hour

All travel time outside of Ventura County will be billed at $125.00 per hour and travel costs are due and payable when invoiced.

FRESNO OFFICE
DEPARTMENT OF JUSTICE

2022 JUL 28 AM 10: 53

ATTORNEY GENERAL
RECEIVED

RECEIVED
ATTORNEY GENERAL

2022 JUL 28  AM 10: 53

DEPARTMENT OF JUSTICE
FRESNO OFFICE

# CERTIFICATE OF SERVICE

Case Name:  **Quair v. County of Kings, et al.**     No.   **1:20-CV-01793-KJM-SKO**

I hereby certify that on <u>October 27, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CLAIMS OR THEORIES RELATING TO POLICE TACTICS NOT INCLUDED IN PLAINTIFF'S COMPLAINT OR A GOVERNMENT CLAIMS ACT NOTICE [STATE MIL NO. 9]**

2. **[PROPOSED] ORDER REGARDING DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CLAIMS OR THEORIES RELATING TO POLICE TACTICS NOT INCLUDED IN PLAINTIFF'S COMPLAINT OR A GOVERNMENT CLAIMS ACT NOTICE [STATE MIL NO. 9]**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 27, 2025</u>, at Los Angeles, California.

|  |  |
|---|---|
| J. Sissov | */s/ J. Sissov* |
| Declarant | Signature |

FR2021301267